60 U.S. 393 (____)
19 How. 393
DRED SCOTT, PLAINTIFF IN ERROR,
v.
JOHN F.A. SANDFORD.
Supreme Court of United States.

*399 It was now argued by Mr. Blair and Mr. G.F. Curtis for the plaintiff in error, and by Mr. Geyer and Mr. Johnson for the defendant in error.
Mr. Chief Justice TANEY delivered the opinion of the court.
This case has been twice argued. After the argument at the last term, differences of opinion were found to exist among the members of the court; and as the questions in controversy are of the highest importance, and the court was at that time much pressed by the ordinary business of the term, it was deemed advisable to continue the case, and direct a re-argument on some of the points, in order that we might have an opportunity of giving to the whole subject a more deliberate *400 consideration. It has accordingly been again argued by counsel, and considered by the court; and I now proceed to deliver its opinion.
There are two leading questions presented by the record:
1. Had the Circuit Court of the United States jurisdiction to hear and determine the case between these parties? And
2. If it had jurisdiction, is the judgment it has given erroneous or not?
The plaintiff in error, who was also the plaintiff in the court below, was, with his wife and children, held as slaves by the defendant, in the State of Missouri; and he brought this action in the Circuit Court of the United States for that district, to assert the title of himself and his family to freedom.
The declaration is in the form usually adopted in that State to try questions of this description, and contains the averment necessary to give the court jurisdiction; that he and the defendant are citizens of different States; that is, that he is a citizen of Missouri, and the defendant a citizen of New York.
The defendant pleaded in abatement to the jurisdiction of the court, that the plaintiff was not a citizen of the State of Missouri, as alleged in his declaration, being a negro of African descent, whose ancestors were of pure African blood, and who were brought into this country and sold as slaves.
To this plea the plaintiff demurred, and the defendant joined in demurrer. The court overruled the plea, and gave judgment that the defendant should answer over. And he thereupon put in sundry pleas in bar, upon which issues were joined; and at the trial the verdict and judgment were in his favor. Whereupon the plaintiff brought this writ of error.
Before we speak of the pleas in bar, it will be proper to dispose of the questions which have arisen on the plea in abatement.
That plea denies the right of the plaintiff to sue in a court of the United States, for the reasons therein stated.
If the question raised by it is legally before us, and the court should be of opinion that the facts stated in it disqualify the plaintiff from becoming a citizen, in the sense in which that word is used in the Constitution of the United States, then the judgment of the Circuit Court is erroneous, and must be reversed.
It is suggested, however, that this plea is not before us; and that as the judgment in the court below on this plea was in favor of the plaintiff, he does not seek to reverse it, or bring it before the court for revision by his writ of error; and also that the defendant waived this defence by pleading over, and thereby admitted the jurisdiction of the court.
*401 But, in making this objection, we think the peculiar and limited jurisdiction of courts of the United States has not been adverted to. This peculiar and limited jurisdiction has made it necessary, in these courts, to adopt different rules and principles of pleading, so far as jurisdiction is concerned, from those which regulate courts of common law in England, and in the different States of the Union which have adopted the common-law rules.
In these last-mentioned courts, where their character and rank are analogous to that of a Circuit Court of the United States; in other words, where they are what the law terms courts of general jurisdiction; they are presumed to have jurisdiction, unless the contrary appears. No averment in the pleadings of the plaintiff is necessary, in order to give jurisdiction. If the defendant objects to it, he must plead it specially, and unless the fact on which he relies is found to be true by a jury, or admitted to be true by the plaintiff, the jurisdiction cannot be disputed in an appellate court.
Now, it is not necessary to inquire whether in courts of that description a party who pleads over in bar, when a plea to the jurisdiction has been ruled against him, does or does not waive his plea; nor whether upon a judgment in his favor on the pleas in bar, and a writ of error brought by the plaintiff, the question upon the plea in abatement would be open for revision in the appellate court. Cases that may have been decided in such courts, or rules that may have been laid down by common-law pleaders, can have no influence in the decision in this court. Because, under the Constitution and laws of the United States, the rules which govern the pleadings in its courts, in questions of jurisdiction, stand on different principles and are regulated by different laws.
This difference arises, as we have said, from the peculiar character of the Government of the United States. For although it is sovereign and supreme in its appropriate sphere of action, yet it does not possess all the powers which usually belong to the sovereignty of a nation. Certain specified powers, enumerated in the Constitution, have been conferred upon it; and neither the legislative, executive, nor judicial departments of the Government can lawfully exercise any authority beyond the limits marked out by the Constitution. And in regulating the judicial department, the cases in which the courts of the United States shall have jurisdiction are particularly and specifically enumerated and defined; and they are not authorized to take cognizance of any case which does not come within the description therein specified. Hence, when a plaintiff sues in a court of the United States, it is necessary that he should *402 show, in his pleading, that the suit he brings is within the jurisdiction of the court, and that he is entitled to sue there. And if he omits to do this, and should, by any oversight of the Circuit Court, obtain a judgment in his favor, the judgment would be reversed in the appellate court for want of jurisdiction in the court below. The jurisdiction would not be presumed, as in the case of a common-law English or State court, unless the contrary appeared. But the record, when it comes before the appellate court, must show, affirmatively, that the inferior court had authority, under the Constitution, to hear and determine the case. And if the plaintiff claims a right to sue in a Circuit Court of the United States, under that provision of the Constitution which gives jurisdiction in controversies between citizens of different States, he must distinctly aver in his pleading that they are citizens of different States; and he cannot maintain his suit without showing that fact in the pleadings.
This point was decided in the case of Bingham v. Cabot, (in 3 Dall., 382,) and ever since adhered to by the court. And in Jackson v. Ashton, (8 Pet., 148,) it was held that the objection to which it was open could not be waived by the opposite party, because consent of parties could not give jurisdiction.
It is needless to accumulate cases on this subject. Those already referred to, and the cases of Capron v. Van Noorden, (in 2 Cr., 126,) and Montalet v. Murray, (4 Cr., 46,) are sufficient to show the rule of which we have spoken. The case of Capron v. Van Noorden strikingly illustrates the difference between a common-law court and a court of the United States.
If, however, the fact of citizenship is averred in the declaration, and the defendant does not deny it, and put it in issue by plea in abatement, he cannot offer evidence at the trial to disprove it, and consequently cannot avail himself of the objection in the appellate court, unless the defect should be apparent in some other part of the record. For if there is no plea in abatement, and the want of jurisdiction does not appear in any other part of the transcript brought up by the writ of error, the undisputed averment of citizenship in the declaration must be taken in this court to be true. In this case, the citizenship is averred, but it is denied by the defendant in the manner required by the rules of pleading, and the fact upon which the denial is based is admitted by the demurrer. And, if the plea and demurrer, and judgment of the court below upon it, are before us upon this record, the question to be decided is, whether the facts stated in the plea are sufficient to show that the plaintiff is not entitled to sue as a citizen in a court of the United States.
*403 We think they are before us. The plea in abatement and the judgment of the court upon it, are a part of the judicial proceedings in the Circuit Court, and are there recorded as such; and a writ of error always brings up to the superior court the whole record of the proceedings in the court below. And in the case of the United States v. Smith, (11 Wheat., 172,) this court said, that the case being brought up by writ of error, the whole record was under the consideration of this court. And this being the case in the present instance, the plea in abatement is necessarily under consideration; and it becomes, therefore, our duty to decide whether the facts stated in the plea are or are not sufficient to show that the plaintiff is not entitled to sue as a citizen in a court of the United States.
This is certainly a very serious question, and one that now for the first time has been brought for decision before this court. But it is brought here by those who have a right to bring it, and it is our duty to meet it and decide it.
The question is simply this: Can a negro, whose ancestors were imported into this country, and sold as slaves, become a member of the political community formed and brought into existence by the Constitution of the United States, and as such become entitled to all the rights, and privileges, and immunities, guarantied by that instrument to the citizen? One of which rights is the privilege of suing in a court of the United States in the cases specified in the Constitution.
It will be observed, that the plea applies to that class of persons only whose ancestors were negroes of the African race, and imported into this country, and sold and held as slaves. The only matter in issue before the court, therefore, is, whether the descendants of such slaves, when they shall be emancipated, or who are born of parents who had become free before their birth, are citizens of a State, in the sense in which the word citizen is used in the Constitution of the United States. And this being the only matter in dispute on the pleadings, the court must be understood as speaking in this opinion of that class only, that is, of those persons who are the descendants of Africans who were imported into this country, and sold as slaves.
The situation of this population was altogether unlike that of the Indian race. The latter, it is true, formed no part of the colonial communities, and never amalgamated with them in social connections or in government. But although they were uncivilized, they were yet a free and independent people, associated together in nations or tribes, and governed by their own laws. Many of these political communities were situated in territories to which the white race claimed the ultimate *404 right of dominion. But that claim was acknowledged to be subject to the right of the Indians to occupy it as long as they thought proper, and neither the English nor colonial Governments claimed or exercised any dominion over the tribe or nation by whom it was occupied, nor claimed the right to the possession of the territory, until the tribe or nation consented to cede it. These Indian Governments were regarded and treated as foreign Governments, as much so as if an ocean had separated the red man from the white; and their freedom has constantly been acknowledged, from the time of the first emigration to the English colonies to the present day, by the different Governments which succeeded each other. Treaties have been negotiated with them, and their alliance sought for in war; and the people who compose these Indian political communities have always been treated as foreigners not living under our Government. It is true that the course of events has brought the Indian tribes within the limits of the United States under subjection to the white race; and it has been found necessary, for their sake as well as our own, to regard them as in a state of pupilage, and to legislate to a certain extent over them and the territory they occupy. But they may, without doubt, like the subjects of any other foreign Government, be naturalized by the authority of Congress, and become citizens of a State, and of the United States; and if an individual should leave his nation or tribe, and take up his abode among the white population, he would be entitled to all the rights and privileges which would belong to an emigrant from any other foreign people.
We proceed to examine the case as presented by the pleadings.
The words "people of the United States" and "citizens" are synonymous terms, and mean the same thing. They both describe the political body who, according to our republican institutions, form the sovereignty, and who hold the power and conduct the Government through their representatives. They are what we familiarly call the "sovereign people," and every citizen is one of this people, and a constituent member of this sovereignty. The question before us is, whether the class of persons described in the plea in abatement compose a portion of this people, and are constituent members of this sovereignty? We think they are not, and that they are not included, and were not intended to be included, under the word "citizens" in the Constitution, and can therefore claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States. On the contrary, they were at that time considered as a subordinate *405 and inferior class of beings, who had been subjugated by the dominant race, and, whether emancipated or not, yet remained subject to their authority, and had no rights or privileges but such as those who held the power and the Government might choose to grant them.
It is not the province of the court to decide upon the justice or injustice, the policy or impolicy, of these laws. The decision of that question belonged to the political or law-making power; to those who formed the sovereignty and framed the Constitution. The duty of the court is, to interpret the instrument they have framed, with the best lights we can obtain on the subject, and to administer it as we find it, according to its true intent and meaning when it was adopted.
In discussing this question, we must not confound the rights of citizenship which a State may confer within its own limits, and the rights of citizenship as a member of the Union. It does not by any means follow, because he has all the rights and privileges of a citizen of a State, that he must be a citizen of the United States. He may have all of the rights and privileges of the citizen of a State, and yet not be entitled to the rights and privileges of a citizen in any other State. For, previous to the adoption of the Constitution of the United States, every State had the undoubted right to confer on whomsoever it pleased the character of citizen, and to endow him with all its rights. But this character of course was confined to the boundaries of the State, and gave him no rights or privileges in other States beyond those secured to him by the laws of nations and the comity of States. Nor have the several States surrendered the power of conferring these rights and privileges by adopting the Constitution of the Untied States. Each State may still confer them upon an alien, or any one it thinks proper, or upon any class or description of persons; yet he would not be a citizen in the sense in which that word is used in the Constitution of the United States, nor entitled to sue as such in one of its courts, nor to the privileges and immunities of a citizen in the other States. The rights which he would acquire would be restricted to the State which gave them. The Constitution has conferred on Congress the right to establish an uniform rule of naturalization, and this right is evidently exclusive, and has always been held by this court to be so. Consequently, no State, since the adoption of the Constitution, can by naturalizing an alien invest him with the rights and privileges secured to a citizen of a State under the Federal Government, although, so far as the State alone was concerned, he would undoubtedly be entitled to the rights of a citizen, and clothed with all the *406 rights and immunities which the Constitution and laws of the State attached to that character.
It is very clear, therefore, that no State can, by any act or law of its own, passed since the adoption of the Constitution, introduce a new member into the political community created by the Constitution of the United States. It cannot make him a member of this community by making him a member of its own. And for the same reason it cannot introduce any person, or description of persons, who were not intended to be embraced in this new political family, which the Constitution brought into existence, but were intended to be excluded from it.
The question then arises, whether the provisions of the Constitution, in relation to the personal rights and privileges to which the citizen of a State should be entitled, embraced the negro African race, at that time in this country, or who might afterwards be imported, who had then or should afterwards be made free in any State; and to put it in the power of a single State to make him a citizen of the United States, and endue him with the full rights of citizenship in every other State without their consent? Does the Constitution of the United States act upon him whenever he shall be made free under the laws of a State, and raised there to the rank of a citizen, and immediately clothe him with all the privileges of a citizen in every other State, and in its own courts?
The court think the affirmative of these propositions cannot be maintained. And if it cannot, the plaintiff in error could not be a citizen of the State of Missouri, within the meaning of the Constitution of the United States, and, consequently, was not entitled to sue in its courts.
It is true, every person, and every class and description of persons, who were at the time of the adoption of the Constitution recognised as citizens in the several States, became also citizens of this new political body; but none other; it was formed by them, and for them and their posterity, but for no one else. And the personal rights and privileges guarantied to citizens of this new sovereignty were intended to embrace those only who were then members of the several State communities, or who should afterwards by birthright or otherwise become members, according to the provisions of the Constitution and the principles on which it was founded. It was the union of those who were at that time members of distinct and separate political communities into one political family, whose power, for certain specified purposes, was to extend over the whole territory of the Untied States. And it gave to each citizen rights and privileges outside of his State *407 which he did not before possess, and placed him in every other State upon a perfect equality with its own citizens as to rights of person and rights of property; it made him a citizen of the United States.
It becomes necessary, therefore, to determine who were citizens of the several States when the Constitution was adopted. And in order to do this, we must recur to the Governments and institutions of the thirteen colonies, when they separated from Great Britain and formed new sovereignties, and took their places in the family of independent nations. We must inquire who, at that time, were recognised as the people or citizens of a State, whose rights and liberties had been outraged by the English Government; and who declared their independence, and assumed the powers of Government to defend their rights by force of arms.
In the opinion of the court, the legislation and histories of the times, and the language used in the Declaration of Independence, show, that neither the class of persons who had been imported as slaves, nor their descendants, whether they had become free or not, were then acknowledged as a part of the people, nor intended to be included in the general words used in that memorable instrument.
It is difficult at this day to realize the state of public opinion in relation to that unfortunate race, which prevailed in the civilized and enlightened portions of the world at the time of the Declaration of Independence, and when the Constitution of the United States was framed and adopted. But the public history of every European nation displays it in a manner too plain to be mistaken.
They had for more than a century before been regarded as beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect; and that the negro might justly and lawfully be reduced to slavery for his benefit. He was bought and sold, and treated as an ordinary article of merchandise and traffic, whenever a profit could be made by it. This opinion was at that time fixed and universal in the civilized portion of the white race. It was regarded as an axiom in morals as well as in politics, which no one thought of disputing, or supposed to be open to dispute; and men in every grade and position in society daily and habitually acted upon it in their private pursuits, as well as in matters of public concern, without doubting for a moment the correctness of this opinion.
And in no nation was this opinion more firmly fixed or more *408 uniformly acted upon than by the English Government and English people. They not only seized them on the coast of Africa, and sold them or held them in slavery for their own use; but they took them as ordinary articles of merchandise to every country where they could make a profit on them, and were far more extensively engaged in this commerce than any other nation in the world.
The opinion thus entertained and acted upon in England was naturally impressed upon the colonies they founded on this side of the Atlantic. And, accordingly, a negro of the African race was regarded by them as an article of property, and held, and bought and sold as such, in every one of the thirteen colonies which united in the Declaration of Independence, and afterwards formed the Constitution of the United States. The slaves were more or less numerous in the different colonies, as slave labor was found more or less profitable. But no one seems to have doubted the correctness of the prevailing opinion of the time.
The legislation of the different colonies furnishes positive and indisputable proof of this fact.
It would be tedious, in this opinion, to enumerate the various laws they passed upon this subject. It will be sufficient, as a sample of the legislation which then generally prevailed throughout the British colonies, to give the laws of two of them; one being still a large slaveholding State, and the other the first State in which slavery ceased to exist.
The province of Maryland, in 1717, (ch. 13, s. 5,) passed a law declaring "that if any free negro or mulatto intermarry with any white woman, or if any white man shall intermarry with any negro or mulatto woman, such negro or mulatto shall become a slave during life, excepting mulattoes born of white women, who, for such intermarriage, shall only become servants for seven years, to be disposed of as the justices of the county court, where such marriage so happens, shall think fit; to be applied by them towards the support of a public school within the said county. And any white man or white woman who shall intermarry as aforesaid, with any negro or mulatto, such white man or white woman shall become servants during the term of seven years, and shall be disposed of by the justices as aforesaid, and be applied to the uses aforesaid."
The other colonial law to which we refer was passed by Massachusetts in 1705, (chap. 6.) It is entitled "An act for the better preventing of a spurious and mixed issue," &c.; and it provides, that "if any negro or mulatto shall presume to smite or strike any person of the English or other Christian nation, such negro or mulatto shall be severely whipped, at *409 the discretion of the justices before whom the offender shall be convicted."
And "that none of her Majesty's English or Scottish subjects, nor of any other Christian nation, within this province, shall contract matrimony with any negro or mulatto; nor shall any person, duly authorized to solemnize marriage, presume to join any such in marriage, on pain of forfeiting the sum of fifty pounds; one moiety thereof to her Majesty, for and towards the support of the Government within this province, and the other moiety to him or them that shall inform and sue for the same, in any of her Majesty's courts of record within the province, by bill, plaint, or information."
We give both of these laws in the words used by the respective legislative bodies, because the language in which they are framed, as well as the provisions contained in them, show, too plainly to be misunderstood, the degraded condition of this unhappy race. They were still in force when the Revolution began, and are a faithful index to the state of feeling towards the class of persons of whom they speak, and of the position they occupied throughout the thirteen colonies, in the eyes and thoughts of the men who framed the Declaration of Independence and established the State Constitutions and Governments. They show that a perpetual and impassable barrier was intended to be erected between the white race and the one which they had reduced to slavery, and governed as subjects with absolute and despotic power, and which they then looked upon as so far below them in the scale of created beings, that intermarriages between white persons and negroes or mulattoes were regarded as unnatural and immoral, and punished as crimes, not only in the parties, but in the person who joined them in marriage. And no distinction in this respect was made between the free negro or mulatto and the slave, but this stigma, of the deepest degradation, was fixed upon the whole race.
We refer to these historical facts for the purpose of showing the fixed opinions concerning that race, upon which the statesmen of that day spoke and acted. It is necessary to do this, in order to determine whether the general terms used in the Constitution of the United States, as to the rights of man and the rights of the people, was intended to include them, or to give to them or their posterity the benefit of any of its provisions.
The language of the Declaration of Independence is equally conclusive:
It begins by declaring that, "when in the course of human events it becomes necessary for one people to dissolve the political bands which have connected them with another, and to *410 assume among the powers of the earth the separate and equal station to which the laws of nature and nature's God entitle them, a decent respect for the opinions of mankind requires that they should declare the causes which impel them to the separation."
It then proceeds to say: "We hold these truths to be self-evident: that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among them is life, liberty, and the pursuit of happiness; that to secure these rights, Governments are instituted, deriving their just powers from the consent of the governed."
The general words above quoted would seem to embrace the whole human family, and if they were used in a similar instrument at this day would be so understood. But it is too clear for dispute, that the enslaved African race were not intended to be included, and formed no part of the people who framed and adopted this declaration; for if the language, as understood in that day, would embrace them, the conduct of the distinguished men who framed the Declaration of Independence would have been utterly and flagrantly inconsistent with the principles they asserted; and instead of the sympathy of mankind, to which they so confidently appealed, they would have deserved and received universal rebuke and reprobation.
Yet the men who framed this declaration were great men  high in literary acquirements  high in their sense of honor, and incapable of asserting principles inconsistent with those on which they were acting. They perfectly understood the meaning of the language they used, and how it would be understood by others; and they knew that it would not in any part of the civilized world be supposed to embrace the negro race, which, by common consent, had been excluded from civilized Governments and the family of nations, and doomed to slavery. They spoke and acted according to the then established doctrines and principles, and in the ordinary language of the day, and no one misunderstood them. The unhappy black race were separated from the white by indelible marks, and laws long before established, and were never thought of or spoken of except as property, and when the claims of the owner or the profit of the trader were supposed to need protection.
This state of public opinion had undergone no change when the Constitution was adopted, as is equally evident from its provisions and language.
The brief preamble sets forth by whom it was formed, for what purposes, and for whose benefit and protection. It declares *411 that it is formed by the people of the United States; that is to say, by those who were members of the different political communities in the several States; and its great object is declared to be to secure the blessings of liberty to themselves and their posterity. It speaks in general terms of the people of the United States, and of citizens of the several States, when it is providing for the exercise of the powers granted or the privileges secured to the citizen. It does not define what description of persons are intended to be included under these terms, or who shall be regarded as a citizen and one of the people. It uses them as terms so well understood, that no further description or definition was necessary.
But there are two clauses in the Constitution which point directly and specifically to the negro race as a separate class of persons, and show clearly that they were not regarded as a portion of the people or citizens of the Government then formed.
One of these clauses reserves to each of the thirteen States the right to import slaves until the year 1808, if it thinks proper. And the importation which it thus sanctions was unquestionably of persons of the race of which we are speaking, as the traffic in slaves in the United States had always been confined to them. And by the other provision the States pledge themselves to each other to maintain the right of property of the master, by delivering up to him any slave who may have escaped from his service, and be found within their respective territories. By the first above-mentioned clause, therefore, the right to purchase and hold this property is directly sanctioned and authorized for twenty years by the people who framed the Constitution. And by the second, they pledge themselves to maintain and uphold the right of the master in the manner specified, as long as the Government they then formed should endure. And these two provisions show, conclusively, that neither the description of persons therein referred to, nor their descendants, were embraced in any of the other provisions of the Constitution; for certainly these two clauses were not intended to confer on them or their posterity the blessings of liberty, or any of the personal rights so carefully provided for the citizen.
No one of that race had ever migrated to the United States voluntarily; all of them had been brought here as articles of merchandise. The number that had been emancipated at that time were but few in comparison with those held in slavery; and they were identified in the public mind with the race to which they belonged, and regarded as a part of the slave population rather than the free. It is obvious that they were not *412 even in the minds of the framers of the Constitution when they were conferring special rights and privileges upon the citizens of a State in every other part of the Union.
Indeed, when we look to the condition of this race in the several States at the time, it is impossible to believe that these rights and privileges were intended to be extended to them.
It is very true, that in that portion of the Union where the labor of the negro race was found to be unsuited to the climate and unprofitable to the master, but few slaves were held at the time of the Declaration of Independence; and when the Constitution was adopted, it had entirely worn out in one of them, and measures had been taken for its gradual abolition in several others. But this change had not been produced by any change of opinion in relation to this race; but because it was discovered, from experience, that slave labor was unsuited to the climate and productions of these States: for some of the States, where it had ceased or nearly ceased to exist, were actively engaged in the slave trade, procuring cargoes on the coast of Africa, and transporting them for sale to those parts of the Union where their labor was found to be profitable, and suited to the climate and productions. And this traffic was openly carried on, and fortunes accumulated by it, without reproach from the people of the States where they resided. And it can hardly be supposed that, in the States where it was then countenanced in its worst form  that is, in the seizure and transportation  the people could have regarded those who were emancipated as entitled to equal rights with themselves.
And we may here again refer, in support of this proposition, to the plain and unequivocal language of the laws of the several States, some passed after the Declaration of Independence and before the Constitution was adopted, and some since the Government went into operation.
We need not refer, on this point, particularly to the laws of the present slaveholding States. Their statute books are full of provisions in relation to this class, in the same spirit with the Maryland law which we have before quoted. They have continued to treat them as an inferior class, and to subject them to strict police regulations, drawing a broad line of distinction between the citizen and the slave races, and legislating in relation to them upon the same principle which prevailed at the time of the Declaration of Independence. As relates to these States, it is too plain for argument, that they have never been regarded as a part of the people or citizens of the State, nor supposed to possess any political rights which the dominant race might not withhold or grant at their pleasure. *413 And as long ago as 1822, the Court of Appeals of Kentucky decided that free negroes and mulattoes were not citizens within the meaning of the Constitution of the United States; and the correctness of this decision is recognised, and the same doctrine affirmed, in 1 Meigs's Tenn. Reports, 331.
And if we turn to the legislation of the States where slavery had worn out, or measures taken for its speedy abolition, we shall find the same opinions and principles equally fixed and equally acted upon.
Thus, Massachusetts, in 1786, passed a law similar to the colonial one of which we have spoken. The law of 1786, like the law of 1705, forbids the marriage of any white person with any negro, Indian, or mulatto, and inflicts a penalty of fifty pounds upon any one who shall join them in marriage; and declares all such marriages absolutely null and void, and degrades thus the unhappy issue of the marriage by fixing upon it the stain of bastardy. And this mark of degradation was renewed, and again impressed upon the race, in the careful and deliberate preparation of their revised code published in 1836. This code forbids any person from joining in marriage any white person with any Indian, negro, or mulatto, and subjects the party who shall offend in this respect, to imprisonment, not exceeding six months, in the common jail, or to hard labor, and to a fine of not less than fifty nor more than two hundred dollars; and, like the law of 1786, it declares the marriage to be absolutely null and void. It will be seen that the punishment is increased by the code upon the person who shall marry them, by adding imprisonment to a pecuniary penalty.
So, too, in Connecticut. We refer more particularly to the legislation of this State, because it was not only among the first to put an end to slavery within its own territory, but was the first to fix a mark of reprobation upon the African slave trade. The law last mentioned was passed in October, 1788, about nine months after the State had ratified and adopted the present Constitution of the United States; and by that law it prohibited its own citizens, under severe penalties, from engaging in the trade, and declared all policies of insurance on the vessel or cargo made in the State to be null and void. But, up to the time of the adoption of the Constitution, there is nothing in the legislation of the State indicating any change of opinion as to the relative rights and position of the white and black races in this country, or indicating that it meant to place the latter, when free, upon a level with its citizens. And certainly nothing which would have led the slaveholding States to suppose, that Connecticut designed to claim for them, under *414 the new Constitution, the equal rights and privileges and rank of citizens in every other State.
The first step taken by Connecticut upon this subject was as early as 1774, when it passed an act forbidding the further importation of slaves into the State. But the section containing the prohibition is introduced by the following preamble:
"And whereas the increase of slaves in this State is injurious to the poor, and inconvenient."
This recital would appear to have been carefully introduced, in order to prevent any misunderstanding of the motive which induced the Legislature to pass the law, and places it distinctly upon the interest and convenience of the white population  excluding the inference that it might have been intended in any degree for the benefit of the other.
And in the act of 1784, by which the issue of slaves, born after the time therein mentioned, were to be free at a certain age, the section is again introduced by a preamble assigning a similar motive for the act. It is in these words:
"Whereas sound policy requires that the abolition of slavery should be effected as soon as may be consistent with the rights of individuals, and the public safety and welfare"  showing that the right of property in the master was to be protected, and that the measure was one of policy, and to prevent the injury and inconvenience, to the whites, of a slave population in the State.
And still further pursuing its legislation, we find that in the same statute passed in 1774, which prohibited the further importation of slaves into the State, there is also a provision by which any negro, Indian, or mulatto servant, who was found wandering out of the town or place to which he belonged, without a written pass such as is therein described, was made liable to be seized by any one, and taken before the next authority to be examined and delivered up to his master  who was required to pay the charge which had accrued thereby. And a subsequent section of the same law provides, that if any free negro shall travel without such pass, and shall be stopped, seized, or taken up, he shall pay all charges arising thereby. And this law was in full operation when the Constitution of the United States was adopted, and was not repealed till 1797. So that up to that time free negroes and mulattoes were associated with servants and slaves in the police regulations established by the laws of the State.
And again, in 1833, Connecticut passed another law, which made it penal to set up or establish any school in that State for the instruction of persons of the African race not inhabitants of the State, or to instruct or teach in any such school or *415 institution, or board or harbor for that purpose, any such person, without the previous consent in writing of the civil authority of the town in which such school or institution might be.
And it appears by the case of Crandall v. The State, reported in 10 Conn. Rep., 340, that upon an information filed against Prudence Crandall for a violation of this law, one of the points raised in the defence was, that the law was a violation of the Constitution of the United States; and that the persons instructed, although of the African race, were citizens of other States, and therefore entitled to the rights and privileges of citizens in the State of Connecticut. But Chief Justice Dagget, before whom the case was tried, held, that persons of that description were not citizens of a State, within the meaning of the word citizen in the Constitution of the United States, and were not therefore entitled to the privileges and immunities of citizens in other States.
The case was carried up to the Supreme Court of Errors of the State, and the question fully argued there. But the case went off upon another point, and no opinion was expressed on this question.
We have made this particular examination into the legislative and judicial action of Connecticut, because, from the early hostility it displayed to the slave trade on the coast of Africa, we may expect to find the laws of that State as lenient and favorable to the subject race as those of any other State in the Union; and if we find that at the time the Constitution was adopted, they were not even there raised to the rank of citizens, but were still held and treated as property, and the laws relating to them passed with reference altogether to the interest and convenience of the white race, we shall hardly find them elevated to a higher rank anywhere else.
A brief notice of the laws of two other States, and we shall pass on to other considerations.
By the laws of New Hampshire, collected and finally passed in 1815, no one was permitted to be enrolled in the militia of the State, but free white citizens; and the same provision is found in a subsequent collection of the laws, made in 1855. Nothing could more strongly mark the entire repudiation of the African race. The alien is excluded, because, being born in a foreign country, he cannot be a member of the community until he is naturalized. But why are the African race, born in the State, not permitted to share in one of the highest duties of the citizen? The answer is obvious; he is not, by the institutions and laws of the State, numbered among its people. He forms no part of the sovereignty of the State, and is not therefore called on to uphold and defend it.
*416 Again, in 1822, Rhode Island, in its revised code, passed a law forbidding persons who were authorized to join persons in marriage, from joining in marriage any white person with any negro, Indian, or mulatto, under the penalty of two hundred dollars, and declaring all such marriages absolutely null and void; and the same law was again re-enacted in its revised code of 1844. So that, down to the last-mentioned period, the strongest mark of inferiority and degradation was fastened upon the African race in that State.
It would be impossible to enumerate and compress in the space usually allotted to an opinion of a court, the various laws, marking the condition of this race, which were passed from time to time after the Revolution, and before and since the adoption of the Constitution of the United States. In addition to those already referred to, it is sufficient to say, that Chancellor Kent, whose accuracy and research no one will question, states in the sixth edition of his Commentaries, (published in 1848, 2 vol., 258, note b,) that in no part of the country except Maine, did the African race, in point of fact, participate equally with the whites in the exercise of civil and political rights.
The legislation of the States therefore shows, in a manner not to be mistaken, the inferior and subject condition of that race at the time the Constitution was adopted, and long afterwards, throughout the thirteen States by which that instrument was framed; and it is hardly consistent with the respect due to these States, to suppose that they regarded at that time, as fellow-citizens and members of the sovereignty, a class of beings whom they had thus stigmatized; whom, as we are bound, out of respect to the State sovereignties, to assume they had deemed it just and necessary thus to stigmatize, and upon whom they had impressed such deep and enduring marks of inferiority and degradation; or, that when they met in convention to form the Constitution, they looked upon them as a portion of their constituents, or designed to include them in the provisions so carefully inserted for the security and protection of the liberties and rights of their citizens. It cannot be supposed that they intended to secure to them rights, and privileges, and rank, in the new political body throughout the Union, which every one of them denied within the limits of its own dominion. More especially, it cannot be believed that the large slaveholding States regarded them as included in the word citizens, or would have consented to a Constitution which might compel them to receive them in that character from another State. For if they were so received, and entitled to the privileges and immunities of citizens, it would exempt them from the operation of the special laws and from the police *417 regulations which they considered to be necessary for their own safety. It would give to persons of the negro race, who were recognised as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, to sojourn there as long as they pleased, to go where they pleased at every hour of the day or night without molestation, unless they committed some violation of law for which a white man would be punished; and it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, and to keep and carry arms wherever they went. And all of this would be done in the face of the subject race of the same color, both free and slaves, and inevitably producing discontent and insubordination among them, and endangering the peace and safety of the State.
It is impossible, it would seem to believe that the great men of the slaveholding States, who took so large a share in framing the Constitution of the United States, and exercised so much influence in procuring its adoption, could have been so forgetful or regardless of their own safety and the safety of those who trusted and confided in them.
Besides, this want of foresight and care would have been utterly inconsistent with the caution displayed in providing for the admission of new members into this political family. For, when they gave to the citizens of each State the privileges and immunities of citizens in the several States, they at the same time took from the several States the power of naturalization, and confined that power exclusively to the Federal Government. No State was willing to permit another State to determine who should or should not be admitted as one of its citizens, and entitled to demand equal rights and privileges with their own people, within their own territories. The right of naturalization was therefore, with one accord, surrendered by the States, and confided to the Federal Government. And this power granted to Congress to establish an uniform rule of naturalization is, by the well-understood meaning of the word, confined to persons born in a foreign country, under a foreign Government. It is not a power to raise to the rank of a citizen any one born in the United States, who, from birth or parentage, by the laws of the country, belongs to an inferior and subordinate class. And when we find the States guarding themselves from the indiscreet or improper admission by other States of emigrants from other countries, by giving the power exclusively to Congress, we cannot fail to see that they could never have left with the States a much *418 more important power  that is, the power of transforming into citizens a numerous class of persons, who in that character would be much more dangerous to the peace and safety of a large portion of the Union, than the few foreigners one of the States might improperly naturalize. The Constitution upon its adoption obviously took from the States all power by any subsequent legislation to introduce as a citizen into the political family of the United States any one, no matter where he was born, or what might be his character or condition; and it gave to Congress the power to confer this character upon those only who were born outside of the dominions of the United States. And no law of a State, therefore, passed since the Constitution was adopted, can give any right of citizenship outside of its own territory.
A clause similar to the one in the Constitution, in relation to the rights and immunities of citizens of one State in the other States, was contained in the Articles of Confederation. But there is a difference of language, which is worthy of note. The provision in the Articles of Confederation was, "that the free inhabitants of each of the States, paupers, vagabonds, and fugitives from justice, excepted, should be entitled to all the privileges and immunities of free citizens in the several States."
It will be observed, that under this Confederation, each State had the right to decide for itself, and in its own tribunals, whom it would acknowledge as a free inhabitant of another State. The term free inhabitant, in the generality of its terms, would certainly include one of the African race who had been manumitted. But no example, we think, can be found of his admission to all the privileges of citizenship in any State of the Union after these Articles were formed, and while they continued in force. And, notwithstanding the generality of the words "free inhabitants," it is very clear that, according to their accepted meaning in that day, they did not include the African race, whether free or not: for the fifth section of the ninth article provides that Congress should have the power "to agree upon the number of land forces to be raised, and to make requisitions from each State for its quota in proportion to the number of white inhabitants in such State, which requisition should be binding."
Words could hardly have been used which more strongly mark the line of distinction between the citizen and the subject; the free and the subjugated races. The latter were not even counted when the inhabitants of a State were to be embodied in proportion to its numbers for the general defence. And it cannot for a moment be supposed, that a class of *419 persons thus separated and rejected from those who formed the sovereignty of the States, were yet intended to be included under the words "free inhabitants," in the preceding article, to whom privileges and immunities were so carefully secured in every State.
But although this clause of the Articles of Confederation is the same in principle with that inserted in the Constitution, yet the comprehensive word inhabitant, which might be construed to include an emancipated slave, is omitted; and the privilege is confined to citizens of the State. And this alteration in words would hardly have been made, unless a different meaning was intended to be conveyed, or a possible doubt removed. The just and fair inference is, that as this privilege was about to be placed under the protection of the General Government, and the words expounded by its tribunals, and all power in relation to it taken from the State and its courts, it was deemed prudent to describe with precision and caution the persons to whom this high privilege was given  and the word citizen was on that account substituted for the words free inhabitant. The word citizen excluded, and no doubt intended to exclude, foreigners who had not become citizens of some one of the States when the Constitution was adopted; and also every description of persons who were not fully recognised as citizens in the several States. This, upon any fair construction of the instruments to which we have referred, was evidently the object and purpose of this change of words.
To all this mass of proof we have still to add, that Congress has repeatedly legislated upon the same construction of the Constitution that we have given. Three laws, two of which were passed almost immediately after the Government went into operation, will be abundantly sufficient to show this. The two first are particularly worthy of notice, because many of the men who assisted in framing the Constitution, and took an active part in procuring its adoption, were then in the halls of legislation, and certainly understood what they meant when they used the words "people of the United States" and "citizen" in that well-considered instrument.
The first of these acts is the naturalization law, which was passed at the second session of the first Congress, March 26, 1790, and confines the right of becoming citizens "to aliens being free white persons."
Now, the Constitution does not limit the power of Congress in this respect to white persons. And they may, if they think proper, authorize the naturalization of any one, of any color, who was born under allegiance to another Government. But the language of the law above quoted, shows that citizenship *420 at that time was perfectly understood to be confined to the white race; and that they alone constituted the sovereignty in the Government.
Congress might, as we before said, have authorized the naturalization of Indians, because they were aliens and foreigners. But, in their then untutored and savage state, no one would have thought of admitting them as citizens in a civilized community. And, moreover, the atrocities they had but recently committed, when they were the allies of Great Britain in the Revolutionary war, were yet fresh in the recollection of the people of the United States, and they were even then guarding themselves against the threatened renewal of Indian hostilities. No one supposed then that any Indian would ask for, or was capable of enjoying, the privileges of an American citizen, and the word white was not used with any particular reference to them.
Neither was it used with any reference to the African race imported into or born in this country; because Congress had no power to naturalize them, and therefore there was no necessity for using particular words to exclude them.
It would seem to have been used merely because it followed out the line of division which the Constitution has drawn between the citizen race, who formed and held the Government, and the African race, which they held in subjection and slavery, and governed at their own pleasure.
Another of the early laws of which we have spoken, is the first militia law, which was passed in 1792, at the first session of the second Congress. The language of this law is equally plain and significant with the one just mentioned. It directs that every "free able-bodied white male citizen" shall be enrolled in the militia. The word white is evidently used to exclude the African race, and the word "citizen" to exclude unnaturalized foreigners; the latter forming no part of the sovereignty, owing it no allegiance, and therefore under no obligation to defend it. The African race, however, born in the country, did owe allegiance to the Government, whether they were slave or free; but it is repudiated, and rejected from the duties and obligations of citizenship in marked language.
The third act to which we have alluded is even still more decisive; it was passed as late as 1813, (2 Stat., 809,) and it provides: "That from and after the termination of the war in which the United States are now engaged with Great Britain, it shall not be lawful to employ, on board of any public or private vessels of the United States, any person or persons except citizens of the United States, or persons of color, natives of the United States.
*421 Here the line of distinction is drawn in express words. Persons of color, in the judgment of Congress, were not included in the word citizens, and they are described as another and different class of persons, and authorized to be employed, if born in the United States.
And even as late as 1820, (chap. 104, sec. 8,) in the charter to the city of Washington, the corporation is authorized "to restrain and prohibit the nightly and other disorderly meetings of slaves, free negroes, and mulattoes," thus associating them together in its legislation; and after prescribing the punishment that may be inflicted on the slaves, proceeds in the following words: "And to punish such free negroes and mulattoes by penalties not exceeding twenty dollars for any one offence; and in case of the inability of any such free negro or mulatto to pay any such penalty and cost thereon, to cause him or her to be confined to labor for any time not exceeding six calendar months." And in a subsequent part of the same section, the act authorizes the corporation "to prescribe the terms and conditions upon which free negroes and mulattoes may reside in the city."
This law, like the laws of the States, shows that this class of persons were governed by special legislation directed expressly to them, and always connected with provisions for the government of slaves, and not with those for the government of free white citizens. And after such an uniform course of legislation as we have stated, by the colonies, by the States, and by Congress, running through a period of more than a century, it would seem that to call persons thus marked and stigmatized, "citizens" of the United States, "fellow-citizens," a constituent part of the sovereignty, would be an abuse of terms, and not calculated to exalt the character of an American citizen in the eyes of other nations.
The conduct of the Executive Department of the Government has been in perfect harmony upon this subject with this course of legislation. The question was brought officially before the late William Wirt, when he was the Attorney General of the United States, in 1821, and he decided that the words "citizens of the United States" were used in the acts of Congress in the same sense as in the Constitution; and that free persons of color were not citizens, within the meaning of the Constitution and laws; and this opinion has been confirmed by that of the late Attorney General, Caleb Cushing, in a recent case, and acted upon by the Secretary of State, who refused to grant passports to them as "citizens of the United States."
But it is said that a person may be a citizen, and entitled to *422 that character, although he does not possess all the rights which may belong to other citizens; as, for example, the right to vote, or to hold particular offices; and that yet, when he goes into another State, he is entitled to be recognised there as a citizen, although the State may measure his rights by the rights which it allows to persons of a like character or class resident in the State, and refuse to him the full rights of citizenship.
This argument overlooks the language of the provision in the Constitution of which we are speaking.
Undoubtedly, a person may be a citizen, that is, a member of the community who form the sovereignty, although he exercises no share of the political power, and is incapacitated from holding particular offices. Women and minors, who form a part of the political family, cannot vote; and when a property qualification is required to vote or hold a particular office, those who have not the necessary qualification cannot vote or hold the office, yet they are citizens.
So, too, a person may be entitled to vote by the law of the State, who is not a citizen even of the State itself. And in some of the States of the Union foreigners not naturalized are allowed to vote. And the State may give the right to free negroes and mulattoes, but that does not make them citizens of the State, and still less of the United States. And the provision in the Constitution giving privileges and immunities in other States, does not apply to them.
Neither does it apply to a person who, being the citizen of a State, migrates to another State. For then he becomes subject to the laws of the State in which he lives, and he is no longer a citizen of the State from which he removed. And the State in which he resides may then, unquestionably, determine his status or condition, and place him among the class of persons who are not recognised as citizens, but belong to an inferior and subject race; and may deny him the privileges and immunities enjoyed by its citizens.
But so far as mere rights of person are concerned, the provision in question is confined to citizens of a State who are temporarily in another State without taking up their residence there. It gives them no political rights in the State, as to voting or holding office, or in any other respect. For a citizen of one State has no right to participate in the government of another. But if he ranks as a citizen in the State to which he belongs, within the meaning of the Constitution of the United States, then, whenever he goes into another State, the Constitution clothes him, as to the rights of person, with all the privileges and immunities which belong to citizens of the *423 State. And if persons of the African race are citizens of a State, and of the United States, they would be entitled to all of these privileges and immunities in every State, and the State could not restrict them; for they would hold these privileges and immunities under the paramount authority of the Federal Government, and its courts would be bound to maintain and enforce them, the Constitution and laws of the State to the contrary notwithstanding. And if the States could limit or restrict them, or place the party in an inferior grade, this clause of the Constitution would be unmeaning, and could have no operation; and would give no rights to the citizen when in another State. He would have none but what the State itself chose to allow him. This is evidently not the construction or meaning of the clause in question. It guaranties rights to the citizen, and the State cannot withhold them. And these rights are of a character and would lead to consequences which make it absolutely certain that the African race were not included under the name of citizens of a State, and were not in the contemplation of the framers of the Constitution when these privileges and immunities were provided for the protection of the citizen in other States.
The case of Legrand v. Darnall (2 Peters, 664) has been referred to for the purpose of showing that this court has decided that the descendant of a slave may sue as a citizen in a court of the United States; but the case itself shows that the question did not arise and could not have arisen in the case.
It appears from the report, that Darnall was born in Maryland, and was the son of a white man by one of his slaves, and his father executed certain instruments to manumit him, and devised to him some landed property in the State. This property Darnall afterwards sold to Legrand, the appellant, who gave his notes for the purchase-money. But becoming afterwards apprehensive that the appellee had not been emancipated according to the laws of Maryland, he refused to pay the notes until he could be better satisfied as to Darnall's right to convey. Darnall, in the mean time, had taken up his residence in Pennsylvania, and brought suit on the notes, and recovered judgment in the Circuit Court for the district of Maryland.
The whole proceeding, as appears by the report, was an amicable one; Legrand being perfectly willing to pay the money, if he could obtain a title, and Darnall not wishing him to pay unless he could make him a good one. In point of fact, the whole proceeding was under the direction of the counsel who argued the case for the appellee, who was the mutual friend of the parties, and confided in by both of them, and whose only *424 object was to have the rights of both parties established by judicial decision in the most speedy and least expensive manner.
Legrand, therefore, raised no objection to the jurisdiction of the court in the suit at law, because he was himself anxious to obtain the judgment of the court upon his title. Consequently, there was nothing in the record before the court to show that Darnall was of African descent, and the usual judgment and award of execution was entered. And Legrand thereupon filed his bill on the equity side of the Circuit Court, stating that Darnall was born a slave, and had not been legally emancipated, and could not therefore take the land devised to him, nor make Legrand a good title; and praying an injunction to restrain Darnall from proceeding to execution on the judgment, which was granted. Darnall answered, averring in his answer that he was a free man, and capable of conveying a good title. Testimony was taken on this point, and at the hearing the Circuit Court was of opinion that Darnall was a free man and his title good, and dissolved the injunction and dismissed the bill; and that decree was affirmed here, upon the appeal of Legrand.
Now, it is difficult to imagine how any question about the citizenship of Darnall, or his right to sue in that character, can be supposed to have arisen or been decided in that case. The fact that he was of African descent was first brought before the court upon the bill in equity. The suit at law had then passed into judgment and award of execution, and the Circuit Court, as a court of law, had no longer any authority over it. It was a valid and legal judgment, which the court that rendered it had not the power to reverse or set aside. And unless it had jurisdiction as a court of equity to restrain him from using its process as a court of law, Darnall, if he thought proper, would have been at liberty to proceed on his judgment, and compel the payment of the money, although the allegations in the bill were true, and he was incapable of making a title. No other court could have enjoined him, for certainly no State equity court could interfere in that way with the judgment of a Circuit Court of the United States.
But the Circuit Court as a court of equity certainly had equity jurisdiction over its own judgment as a court of law, without regard to the character of the parties; and had not only the right, but it was its duty  no matter who were the parties in the judgment  to prevent them from proceeding to enforce it by execution, if the court was satisfied that the money was not justly and equitably due. The ability of Darnall to convey did not depend upon his citizenship, but upon his title to freedom. And if he was free, he could hold and *425 convey property, by the laws of Maryland, although he was not a citizen. But if he was by law still a slave, he could not. It was therefore the duty of the court, sitting as a court of equity in the latter case, to prevent him from using its process, as a court of common law, to compel the payment of the purchase-money, when it was evident that the purchaser must lose the land. But if he was free, and could make a title, it was equally the duty of the court not to suffer Legrand to keep the land, and refuse the payment of the money, upon the ground that Darnall was incapable of suing or being sued as a citizen in a court of the United States. The character or citizenship of the parties had no connection with the question of jurisdiction, and the matter in dispute had no relation to the citizenship of Darnall. Nor is such a question alluded to in the opinion of the court.
Besides, we are by no means prepared to say that there are not many cases, civil as well as criminal, in which a Circuit Court of the United States may exercise jurisdiction, although one of the African race is a party; that broad question is not before the court. The question with which we are now dealing is, whether a person of the African race can be a citizen of the United States, and become thereby entitled to a special privilege, by virtue of his title to that character, and which, under the Constitution, no one but a citizen can claim. It is manifest that the case of Legrand and Darnall has no bearing on that question, and can have no application to the case now before the court.
This case, however, strikingly illustrates the consequences that would follow the construction of the Constitution which would give the power contended for to a State. It would in effect give it also to an individual. For if the father of young Darnall had manumitted him in his lifetime, and sent him to reside in a State which recognised him as a citizen, he might have visited and sojourned in Maryland when he pleased, and as long as he pleased, as a citizen of the United States; and the State officers and tribunals would be compelled, by the paramount authority of the Constitution, to receive him and treat him as one of its citizens, exempt from the laws and police of the State in relation to a person of that description, and allow him to enjoy all the rights and privileges of citizenship, without respect to the laws of Maryland, although such laws were deemed by it absolutely essential to its own safety.
The only two provisions which point to them and include them, treat them as property, and make it the duty of the Government to protect it; no other power, in relation to this race, is to be found in the Constitution; and as it is a Government *426 of special, delegated, powers, no authority beyond these two provisions can be constitutionally exercised. The Government of the United States had no right to interfere for any other purpose but that of protecting the rights of the owner, leaving it altogether with the several States to deal with this race, whether emancipated or not, as each State may think justice, humanity, and the interests and safety of society, require. The States evidently intended to reserve this power exclusively to themselves.
No one, we presume, supposes that any change in public opinion or feeling, in relation to this unfortunate race, in the civilized nations of Europe or in this country, should induce the court to give to the words of the Constitution a more liberal construction in their favor than they were intended to bear when the instrument was framed and adopted. Such an argument would be altogether inadmissible in any tribunal called on to interpret it. If any of its provisions are deemed unjust, there is a mode prescribed in the instrument itself by which it may be amended; but while it remains unaltered, it must be construed now as it was understood at the time of its adoption. It is not only the same in words, but the same in meaning, and delegates the same powers to the Government, and reserves and secures the same rights and privileges to the citizen; and as long as it continues to exist in its present form, it speaks not only in the same words, but with the same meaning and intent with which it spoke when it came from the hands of its framers, and was voted on and adopted by the people of the United States. Any other rule of construction would abrogate the judicial character of this court, and make it the mere reflex of the popular opinion or passion of the day. This court was not created by the Constitution for such purposes. Higher and graver trusts have been confided to it, and it must not falter in the path of duty.
What the construction was at that time, we think can hardly admit of doubt. We have the language of the Declaration of Independence and of the Articles of Confederation, in addition to the plain words of the Constitution itself; we have the legislation of the different States, before, about the time, and since, the Constitution was adopted; we have the legislation of Congress, from the time of its adoption to a recent period; and we have the constant and uniform action of the Executive Department, all concurring together, and leading to the same result. And if anything in relation to the construction of the Constitution can be regarded as settled, it is that which we now give to the word "citizen" and the word "people."
And upon a full and careful consideration of the subject, *427 the court is of opinion, that, upon the facts stated in the plea in abatement, Dred Scott was not a citizen of Missouri within the meaning of the Constitution of the United States, and not entitled as such to sue in its courts; and, consequently, that the Circuit Court had no jurisdiction of the case, and that the judgment on the plea in abatement is erroneous.
We are aware that doubts are entertained by some of the members of the court, whether the plea in abatement is legally before the court upon this writ of error; but if that plea is regarded as waived, or out of the case upon any other ground, yet the question as to the jurisdiction of the Circuit Court is presented on the face of the bill of exception itself, taken by the plaintiff at the trial; for he admits that he and his wife were born slaves, but endeavors to make out his title to freedom and citizenship by showing that they were taken by their owner to certain places, hereinafter mentioned, where slavery could not by law exist, and that they thereby became free, and upon their return to Missouri became citizens of that State.
Now, if the removal of which he speaks did not give them their freedom, then by his own admission he is still a slave; and whatever opinions may be entertained in favor of the citizenship of a free person of the African race, no one supposes that a slave is a citizen of the State or of the United States. If, therefore, the acts done by his owner did not make them free persons, he is still a slave, and certainly incapable of suing in the character of a citizen.
The principle of law is too well settled to be disputed, that a court can give no judgment for either party, where it has no jurisdiction; and if, upon the showing of Scott himself, it appeared that he was still a slave, the case ought to have been dismissed, and the judgment against him and in favor of the defendant for costs, is, like that on the plea in abatement, erroneous, and the suit ought to have been dismissed by the Circuit Court for want of jurisdiction in that court.
But, before we proceed to examine this part of the case, it may be proper to notice an objection taken to the judicial authority of this court to decide it; and it has been said, that as this court has decided against the jurisdiction of the Circuit Court on the plea in abatement, it has no right to examine any question presented by the exception; and that anything it may say upon that part of the case will be extra-judicial, and mere obiter dicta.
This is a manifest mistake; there can be no doubt as to the jurisdiction of this court to revise the judgment of a Circuit Court, and to reverse it for any error apparent on the record, *428 whether it be the error of giving judgment in a case over which it had no jurisdiction, or any other material error; and this, too, whether there is a plea in abatement or not.
The objection appears to have arisen from confounding writs of error to a State court, with writs of error to a Circuit Court of the United States. Undoubtedly, upon a writ of error to a State court, unless the record shows a case that gives jurisdiction, the case must be dismissed for want of jurisdiction in this court. And if it is dismissed on that ground, we have no right to examine and decide upon any question presented by the bill of exceptions, or any other part of the record. But writs of error to a State court, and to a Circuit Court of the United States, are regulated by different laws, and stand upon entirely different principles. And in a writ of error to a Circuit Court of the United States, the whole record is before this court for examination and decision; and if the sum in controversy is large enough to give jurisdiction, it is not only the right, but it is the judicial duty of the court, to examine the whole case as presented by the record; and if it appears upon its face that any material error or errors have been committed by the court below, it is the duty of this court to reverse the judgment, and remand the case. And certainly an error in passing a judgment upon the merits in favor of either party, in a case which it was not authorized to try, and over which it had no jurisdiction, is as grave an error as a court can commit.
The plea in abatement is not a plea to the jurisdiction of this court, but to the jurisdiction of the Circuit Court. And it appears by the record before us, that the Circuit Court committed an error, in deciding that it had jurisdiction, upon the facts in the case, admitted by the pleadings. It is the duty of the appellate tribunal to correct this error; but that could not be done by dismissing the case for want of jurisdiction here  for that would leave the erroneous judgment in full force, and the injured party without remedy. And the appellate court therefore exercises the power for which alone appellate courts are constituted, by reversing the judgment of the court below for this error. It exercises its proper and appropriate jurisdiction over the judgment and proceedings of the Circuit Court, as they appear upon the record brought up by the writ of error.
The correction of one error in the court below does not deprive the appellate court of the power of examining further into the record, and correcting any other material errors which may have been committed by the inferior court. There is certainly no rule of law  nor any practice  nor any decision of a *429 court  which even questions this power in the appellate tribunal. On the contrary, it is the daily practice of this court, and of all appellate courts where they reverse the judgment of an inferior court for error, to correct by its opinions whatever errors may appear on the record material to the case; and they have always held it to be their duty to do so where the silence of the court might lead to misconstruction or future controversy, and the point has been relied on by either side, and argued before the court.
In the case before us, we have already decided that the Circuit Court erred in deciding that it had jurisdiction upon the facts admitted by the pleadings. And it appears that, in the further progress of the case, it acted upon the erroneous principle it had decided on the pleadings, and gave judgment for the defendant, where, upon the facts admitted in the exception, it had no jurisdiction.
We are at a loss to understand upon what principle of law, applicable to appellate jurisdiction, it can be supposed that this court has not judicial authority to correct the last-mentioned error, because they had before corrected the former; or by what process of reasoning it can be made out, that the error of an inferior court in actually pronouncing judgment for one of the parties, in a case in which it had no jurisdiction, cannot be looked into or corrected by this court, because we have decided a similar question presented in the pleadings. The last point is distinctly presented by the facts contained in the plaintiff's own bill of exceptions, which he himself brings here by this writ of error. It was the point which chiefly occupied the attention of the counsel on both sides in the argument  and the judgment which this court must render upon both errors is precisely the same. It must, in each of them, exercise jurisdiction over the judgment, and reverse it for the errors committed by the court below; and issue a mandate to the Circuit Court to conform its judgment to the opinion pronounced by this court, by dismissing the case for want of jurisdiction in the Circuit Court. This is the constant and invariable practice of this court, where it reverses a judgment for want of jurisdiction in the Circuit Court.
It can scarcely be necessary to pursue such a question further. The want of jurisdiction in the court below may appear on the record without any plea in abatement. This is familiarly the case where a court of chancery has exercised jurisdiction in a case where the plaintiff had a plain and adequate remedy at law, and it so appears by the transcript when brought here by appeal. So also where it appears that a court of admiralty has exercised jurisdiction in a case belonging exclusively *430 to a court of common law. In these cases there is no plea in abatement. And for the same reason, and upon the same principles, where the defect of jurisdiction is patent on the record, this court is bound to reverse the judgment, although the defendant has not pleaded in abatement to the jurisdiction of the inferior court.
The cases of Jackson v. Ashton and of Capron v. Van Noorden, to which we have referred in a previous part of this opinion, are directly in point. In the last-mentioned case, Capron brought an action against Van Noorden in a Circuit Court of the United States, without showing, by the usual averments of citizenship, that the court had jurisdiction. There was no plea in abatement put in, and the parties went to trial upon the merits. The court gave judgment in favor of the defendant with costs. The plaintiff thereupon brought his writ of error, and this court reversed the judgment given in favor of the defendant, and remanded the case with directions to dismiss it, because it did not appear by the transcript that the Circuit Court had jurisdiction.
The case before us still more strongly imposes upon this court the duty of examining whether the court below has not committed an error, in taking jurisdiction and giving a judgment for costs in favor of the defendant; for in Capron v. Van Noorden the judgment was reversed, because it did not appear that the parties were citizens of different States. They might or might not be. But in this case it does appear that the plaintiff was born a slave; and if the facts upon which he relies have not made him free, then it appears affirmatively on the record that he is not a citizen, and consequently his suit against Sandford was not a suit between citizens of different States, and the court had no authority to pass any judgment between the parties. The suit ought, in this view of it, to have been dismissed by the Circuit Court, and its judgment in favor of Sandford is erroneous, and must be reversed.
It is true that the result either way, by dismissal or by a judgment for the defendant, makes very little, if any, difference in a pecuniary or personal point of view to either party. But the fact that the result would be very nearly the same to the parties in either form of judgment, would not justify this court in sanctioning an error in the judgment which is patent on the record, and which, if sanctioned, might be drawn into precedent, and lead to serious mischief and injustice in some future suit.
We proceed, therefore, to inquire whether the facts relied on by the plaintiff entitled him to his freedom.
*431 The case, as he himself states it, on the record brought here by his writ of error, is this:
The plaintiff was a negro slave, belonging to Dr. Emerson, who was a surgeon in the army of the United States. In the year 1834, he took the plaintiff from the State of Missouri to the military post at Rock Island, in the State of Illinois, and held him there as a slave until the month of April or May, 1836. At the time last mentioned, said Dr. Emerson removed the plaintiff from said military post at Rock Island to the military post at Fort Snelling, situate on the west bank of the Mississippi river, in the Territory known as Upper Louisiana, acquired by the United States of France, and situate north of the latitude of thirty-six degrees thirty minutes north, and north of the State of Missouri. Said Dr. Emerson held the plaintiff in slavery at said Fort Snelling, from said last-mentioned date until the year 1838.
In the year 1835, Harriet, who is named in the second count of the plaintiff's declaration, was the negro slave of Major Taliaferro, who belonged to the army of the United States. In that year, 1835, said Major Taliaferro took said Harriet to said Fort Snelling, a military post, situated as hereinbefore stated, and kept her there as a slave until the year 1836, and then sold and delivered her as a slave, at said Fort Snelling, unto the said Dr. Emerson hereinbefore named. Said Dr. Emerson held said Harriet in slavery at said Fort Snelling until the year 1838.
In the year 1836, the plaintiff and Harriet intermarried, at Fort Snelling, with the consent of Dr. Emerson, who then claimed to be their master and owner. Eliza and Lizzie, named in the third count of the plaintiff's declaration, are the fruit of that marriage. Eliza is about fourteen years old, and was born on board the steamboat Gipsey, north of the north line of the State of Missouri, and upon the river Mississippi. Lizzie is about seven years old, and was born in the State of Missouri, at the military post called Jefferson Barracks.
In the year 1838, said Dr. Emerson removed the plaintiff and said Harriet, and their said daughter Eliza, from said Fort Snelling to the State of Missouri, where they have ever since resided.
Before the commencement of this suit, said Dr. Emerson sold and conveyed the plaintiff, and Harriet, Eliza, and Lizzie, to the defendant, as slaves, and the defendant has ever since claimed to hold them, and each of them, as slaves.
In considering this part of the controversy, two questions arise: 1. Was he, together with his family, free in Missouri by reason of the stay in the territory of the United States hereinbefore *432 mentioned? And 2. If they were not, is Scott himself free by reason of his removal to Rock Island, in the State of Illinois, as stated in the above admissions?
We proceed to examine the first question.
The act of Congress, upon which the plaintiff relies, declares that slavery and involuntary servitude, except as a punishment for crime, shall be forever prohibited in all that part of the territory ceded by France, under the name of Louisiana, which lies north of thirty-six degrees thirty minutes north latitude, and not included within the limits of Missouri. And the difficulty which meets us at the threshold of this part of the inquiry is, whether Congress was authorized to pass this law under any of the powers granted to it by the Constitution; for if the authority is not given by that instrument, it is the duty of this court to declare it void and inoperative, and incapable of conferring freedom upon any one who is held as a slave under the laws of any one of the States.
The counsel for the plaintiff has laid much stress upon that article in the Constitution which confers on Congress the power "to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States;" but, in the judgment of the court, that provision has no bearing on the present controversy, and the power there given, whatever it may be, is confined, and was intended to be confined, to the territory which at that time belonged to, or was claimed by, the United States, and was within their boundaries as settled by the treaty with Great Britain, and can have no influence upon a territory afterwards acquired from a foreign Government. It was a special provision for a known and particular territory, and to meet a present emergency, and nothing more.
A brief summary of the history of the times, as well as the careful and measured terms in which the article is framed, will show the correctness of this proposition.
It will be remembered that, from the commencement of the Revolutionary war, serious difficulties existed between the States, in relation to the disposition of large and unsettled territories which were included in the chartered limits of some of the States. And some of the other States, and more especially Maryland, which had no unsettled lands, insisted that as the unoccupied lands, if wrested from Great Britain, would owe their preservation to the common purse and the common sword, the money arising from them ought to be applied in just proportion among the several States to pay the expenses of the war, and ought not to be appropriated to the use of the State in whose chartered limits they might happen *433 to lie, to the exclusion of the other States, by whose combined efforts and common expense the territory was defended and preserved against the claim of the British Government.
These difficulties caused much uneasiness during the war, while the issue was in some degree doubtful, and the future boundaries of the United States yet to be defined by treaty, if we achieved our independence.
The majority of the Congress of the Confederation obviously concurred in opinion with the State of Maryland, and desired to obtain from the States which claimed it a cession of this territory, in order that Congress might raise money on this security to carry on the war. This appears by the resolution passed on the 6th of September, 1780, strongly urging the States to cede these lands to the United States, both for the sake of peace and union among themselves, and to maintain the public credit; and this was followed by the resolution of October 10th, 1780, by which Congress pledged itself, that if the lands were ceded, as recommended by the resolution above mentioned, they should be disposed of for the common benefit of the United States, and be settled and formed into distinct republican States, which should become members of the Federal Union, and have the same rights of sovereignty, and freedom, and independence, as other States.
But these difficulties became much more serious after peace took place, and the boundaries of the United States were established. Every State, at that time, felt severely the pressure of its war debt; but in Virginia, and some other States, there were large territories of unsettled lands, the sale of which would enable them to discharge their obligations without much inconvenience; while other States, which had no such resource, saw before them many years of heavy and burdensome taxation; and the latter insisted, for the reasons before stated, that these unsettled lands should be treated as the common property of the States, and the proceeds applied to their common benefit.
The letters from the statesmen of that day will show how much this controversy occupied their thoughts, and the dangers that were apprehended from it. It was the disturbing element of the time, and fears were entertained that it might dissolve the Confederation by which the States were then united.
These fears and dangers were, however, at once removed, when the State of Virginia, in 1784, voluntarily ceded to the United States the immense tract of country lying northwest of the river Ohio, and which was within the acknowledged limits of the State. The only object of the State, in making *434 this cession, was to put an end to the threatening and exciting controversy, and to enable the Congress of that time to dispose of the lands, and appropriate the proceeds as a common fund for the common benefit of the States. It was not ceded, because it was inconvenient to the State to hold and govern it, nor from any expectation that it could be better or more conveniently governed by the United States.
The example of Virginia was soon afterwards followed by other States, and, at the time of the adoption of the Constitution, all of the States, similarly situated, had ceded their unappropriated lands, except North Carolina and Georgia. The main object for which these cessions were desired and made, was on account of their money value, and to put an end to a dangerous controversy, as to who was justly entitled to the proceeds when the lands should be sold. It is necessary to bring this part of the history of these cessions thus distinctly into view, because it will enable us the better to comprehend the phraseology of the article in the Constitution, so often referred to in the argument.
Undoubtedly the powers of sovereignty and the eminent domain were ceded with the land. This was essential, in order to make it effectual, and to accomplish its objects. But it must be remembered that, at that time, there was no Government of the United States in existence with enumerated and limited powers; what was then called the United States, were thirteen separate, sovereign, independent States, which had entered into a league or confederation for their mutual protection and advantage, and the Congress of the United States was composed of the representatives of these separate sovereignties, meeting together, as equals, to discuss and decide on certain measures which the States, by the Articles of Confederation, had agreed to submit to their decision. But this Confederation had none of the attributes of sovereignty in legislative, executive, or judicial power. It was little more than a congress of ambassadors, authorized to represent separate nations, in matters in which they had a common concern.
It was this Congress that accepted the cession from Virginia. They had no power to accept it under the Articles of Confederation. But they had an undoubted right, as independent sovereignties, to accept any cession of territory for their common benefit, which all of them assented to; and it is equally clear, that as their common property, and having no superior to control them, they had the right to exercise absolute dominion over it, subject only to the restrictions which Virginia had imposed in her act of cession. There was, as we have said, no Government of the United States then in existence *435 with special enumerated and limited powers. The territory belonged to sovereignties, who, subject to the limitations above mentioned, had a right to establish any form of government they pleased, by compact or treaty among themselves, and to regulate rights of person and rights of property in the territory, as they might deem proper. It was by a Congress, representing the authority of these several and separate sovereignties, and acting under their authority and command, (but not from any authority derived from the Articles of Confederation,) that the instrument usually called the ordinance of 1787 was adopted; regulating in much detail the principles and the laws by which this territory should be governed; and among other provisions, slavery is prohibited in it. We do not question the power of the States, by agreement among themselves, to pass this ordinance, nor its obligatory force in the territory, while the confederation or league of the States in their separate sovereign character continued to exist.
This was the state of things when the Constitution of the United States was formed. The territory ceded by Virginia belonged to the several confederated States as common property, and they had united in establishing in it a system of government and jurisprudence, in order to prepare it for admission as States, according to the terms of the cession. They were about to dissolve this federative Union, and to surrender a portion of their independent sovereignty to a new Government, which, for certain purposes, would make the people of the several States one people, and which was to be supreme and controlling within its sphere of action throughout the United States; but this Government was to be carefully limited in its powers, and to exercise no authority beyond those expressly granted by the Constitution, or necessarily to be implied from the language of the instrument, and the objects it was intended to accomplish; and as this league of States would, upon the adoption of the new Government, cease to have any power over the territory, and the ordinance they had agreed upon be incapable of execution, and a mere nullity, it was obvious that some provision was necessary to give the new Government sufficient power to enable it to carry into effect the objects for which it was ceded, and the compacts and agreements which the States had made with each other in the exercise of their powers of sovereignty. It was necessary that the lands should be sold to pay the war debt; that a Government and system of jurisprudence should be maintained in it, to protect the citizens of the United States who should migrate to the territory, in their rights of person and of property. It was also necessary that the new Government, about to be *436 adopted, should be authorized to maintain the claim of the United States to the unappropriated lands in North Carolina and Georgia, which had not then been ceded, but the cession of which was confidently anticipated upon some terms that would be arranged between the General Government and these two States. And, moreover, there were many articles of value besides this property in land, such as arms, military stores, munitions, and ships of war, which were the common property of the States, when acting in their independent characters as confederates, which neither the new Government nor any one else would have a right to take possession of, or control, without authority from them; and it was to place these things under the guardianship and protection of the new Government, and to clothe it with the necessary powers, that the clause was inserted in the Constitution which gives Congress the power "to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." It was intended for a specific purpose, to provide for the things we have mentioned. It was to transfer to the new Government the property then held in common by the States, and to give to that Government power to apply it to the objects for which it had been destined by mutual agreement among the States before their league was dissolved. It applied only to the property which the States held in common at that time, and has no reference whatever to any territory or other property which the new sovereignty might afterwards itself acquire.
The language used in the clause, the arrangement and combination of the powers, and the somewhat unusual phraseology it uses, when it speaks of the political power to be exercised in the government of the territory, all indicate the design and meaning of the clause to be such as we have mentioned. It does not speak of any territory, nor of Territories, but uses language which, according to its legitimate meaning, points to a particular thing. The power is given in relation only to the territory of the United States  that is, to a territory then in existence, and then known or claimed as the territory of the United States. It begins its enumeration of powers by that of disposing, in other words, making sale of the lands, or raising money from them, which, as we have already said, was the main object of the cession, and which is accordingly the first thing provided for in the article. It then gives the power which was necessarily associated with the disposition and sale of the lands  that is, the power of making needful rules and regulations respecting the territory. And whatever construction may now be given to these words, every one, we think, *437 must admit that they are not the words usually employed by statesmen in giving supreme power of legislation. They are certainly very unlike the words used in the power granted to legislate over territory which the new Government might afterwards itself obtain by cession from a State, either for its seat of Government, or for forts, magazines, arsenals, dock yards, and other needful buildings.
And the same power of making needful rules respecting the territory is, in precisely the same language, applied to the other property belonging to the United States  associating the power over the territory in this respect with the power over movable or personal property  that is, the ships, arms, and munitions of war, which then belonged in common to the State sovereignties. And it will hardly be said, that this power, in relation to the last-mentioned objects, was deemed necessary to be thus specially given to the new Government, in order to authorize it to make needful rules and regulations respecting the ships it might itself build, or arms and munitions of war it might itself manufacture or provide for the public service.
No one, it is believed, would think a moment of deriving the power of Congress to make needful rules and regulations in relation to property of this kind from this clause of the Constitution. Nor can it, upon any fair construction, be applied to any property but that which the new Government was about to receive from the confederated States. And if this be true as to this property, it must be equally true and limited as to the territory, which is so carefully and precisely coupled with it  and like it referred to as property in the power granted. The concluding words of the clause appear to render this construction irresistible; for, after the provisions we have mentioned, it proceeds to say, "that nothing in the Constitution shall be so construed as to prejudice any claims of the United States, or of any particular State."
Now, as we have before said, all of the States, except North Carolina and Georgia, had made the cession before the Constitution was adopted, according to the resolution of Congress of October 10, 1780. The claims of other States, that the unappropriated lands in these two States should be applied to the common benefit, in like manner, was still insisted on, but refused by the States. And this member of the clause in question evidently applies to them, and can apply to nothing else. It was to exclude the conclusion that either party, by adopting the Constitution, would surrender what they deemed their rights. And when the latter provision relates so obviously to the unappropriated lands not yet ceded by the States, and the first clause makes provision for those then actually ceded, it is *438 impossible, by any just rule of construction, to make the first provision general, and extend to all territories, which the Federal Government might in any way afterwards acquire, when the latter is plainly and unequivocally confined to a particular territory; which was a part of the same controversy, and involved in the same dispute, and depended upon the same principles. The union of the two provisions in the same clause shows that they were kindred subjects; and that the whole clause is local, and relates only to lands, within the limits of the United States, which had been or then were claimed by a State; and that no other territory was in the mind of the framers of the Constitution, or intended to be embraced in it. Upon any other construction it would be impossible to account for the insertion of the last provision in the place where it is found, or to comprehend why, or for what object, it was associated with the previous provision.
This view of the subject is confirmed by the manner in which the present Government of the United States dealt with the subject as soon as it came into existence. It must be borne in mind that the same States that formed the Confederation also formed and adopted the new Government, to which so large a portion of their former sovereign powers were surrendered. It must also be borne in mind that all of these same States which had then ratified the new Constitution were represented in the Congress which passed the first law for the government of this territory; and many of the members of that legislative body had been deputies from the States under the Confederation  had united in adopting the ordinance of 1787, and assisted in forming the new Government under which they were then acting, and whose powers they were then exercising. And it is obvious from the law they passed to carry into effect the principles and provisions of the ordinance, that they regarded it as the act of the States done in the exercise of their legitimate powers at the time. The new Government took the territory as it found it, and in the condition in which it was transferred, and did not attempt to undo anything that had been done. And, among the earliest laws passed under the new Government, is one reviving the ordinance of 1787, which had become inoperative and a nullity upon the adoption of the Constitution. This law introduces no new form or principles for its government, but recites, in the preamble, that it is passed in order that this ordinance may continue to have full effect, and proceeds to make only those rules and regulations which were needful to adapt it to the new Government, into whose hands the power had fallen. It appears, therefore, that this Congress regarded the purposes *439 to which the land in this Territory was to be applied, and the form of government and principles of jurisprudence which were to prevail there, while it remained in the Territorial state, as already determined on by the States when they had full power and right to make the decision; and that the new Government, having received it in this condition, ought to carry substantially into effect the plans and principles which had been previously adopted by the States, and which no doubt the States anticipated when they surrendered their power to the new Government. And if we regard this clause of the Constitution as pointing to this Territory, with a Territorial Government already established in it, which had been ceded to the States for the purposes hereinbefore mentioned  every word in it is perfectly appropriate and easily understood, and the provisions it contains are in perfect harmony with the objects for which it was ceded, and with the condition of its government as a Territory at the time. We can, then, easily account for the manner in which the first Congress legislated on the subject  and can also understand why this power over the territory was associated in the same clause with the other property of the United States, and subjected to the like power of making needful rules and regulations. But if the clause is construed in the expanded sense contended for, so as to embrace any territory acquired from a foreign nation by the present Government, and to give it in such territory a despotic and unlimited power over persons and property, such as the confederated States might exercise in their common property, it would be difficult to account for the phraseology used, when compared with other grants of power  and also for its association with the other provisions in the same clause.
The Constitution has always been remarkable for the felicity of its arrangement of different subjects, and the perspicuity and appropriateness of the language it uses. But if this clause is construed to extend to territory acquired by the present Government from a foreign nation, outside of the limits of any charter from the British Government to a colony, it would be difficult to say, why it was deemed necessary to give the Government the power to sell any vacant lands belonging to the sovereignty which might be found within it; and if this was necessary, why the grant of this power should precede the power to legislate over it and establish a Government there; and still more difficult to say, why it was deemed necessary so specially and particularly to grant the power to make needful rules and regulations in relation to any personal or movable property it might acquire there. For the words, other property necessarily, by every known rule of interpretation, must mean *440 property of a different description from territory or land. And the difficulty would perhaps be insurmountable in endeavoring to account for the last member of the sentence, which provides that "nothing in this Constitution shall be so construed as to prejudice any claims of the United States or any particular State," or to say how any particular State could have claims in or to a territory ceded by a foreign Government, or to account for associating this provision with the preceding provisions of the clause, with which it would appear to have no connection.
The words "needful rules and regulations" would seem, also, to have been cautiously used for some definite object. They are not the words usually employed by statesmen, when they mean to give the powers of sovereignty, or to establish a Government, or to authorize its establishment. Thus, in the law to renew and keep alive the ordinance of 1787, and to re-establish the Government, the title of the law is: "An act to provide for the government of the territory northwest of the river Ohio." And in the Constitution, when granting the power to legislate over the territory that may be selected for the seat of Government independently of a State, it does not say Congress shall have power "to make all needful rules and regulations respecting the territory;" but it declares that "Congress shall have power to exercise exclusive legislation in all cases whatsoever over such District (not exceeding ten miles square) as may, by cession of particular States and the acceptance of Congress, become the seat of the Government of the United States.
The words "rules and regulations" are usually employed in the Constitution in speaking of some particular specified power which it means to confer on the Government, and not, as we have seen, when granting general powers of legislation. As, for example, in the particular power to Congress "to make rules for the government and regulation of the land and naval forces, or the particular and specific power to regulate commerce;" "to establish an uniform rule of naturalization;" "to coin money and regulate the value thereof." And to construe the words of which we are speaking as a general and unlimited grant of sovereignty over territories which the Government might afterwards acquire, is to use them in a sense and for a purpose for which they were not used in any other part of the instrument. But if confined to a particular Territory, in which a Government and laws had already been established, but which would require some alterations to adapt it to the new Government, the words are peculiarly applicable and appropriate for that purpose.
*441 The necessity of this special provision in relation to property and the rights or property held in common by the confederated States, is illustrated by the first clause of the sixth article. This clause provides that "all debts, contracts, and engagements entered into before the adoption of this Constitution, shall be as valid against the United States under this Government as under the Confederation." This provision, like the one under consideration, was indispensable if the new Constitution was adopted. The new Government was not a mere change in a dynasty, or in a form of government, leaving the nation or sovereignty the same, and clothed with all the rights, and bound by all the obligations of the preceding one. But, when the present United States came into existence under the new Government, it was a new political body, a new nation, then for the first time taking its place in the family of nations. It took nothing by succession from the Confederation. It had no right, as its successor, to any property or rights of property which it had acquired, and was not liable for any of its obligations. It was evidently viewed in this light by the framers of the Constitution. And as the several States would cease to exist in their former confederated character upon the adoption of the Constitution, and could not, in that character, again assemble together, special provisions were indispensable to transfer to the new Government the property and rights which at that time they held in common; and at the same time to authorize it to lay taxes and appropriate money to pay the common debt which they had contracted; and this power could only be given to it by special provisions in the Constitution. The clause in relation to the territory and other property of the United States provided for the first, and the clause last quoted provided for the other. They have no connection with the general powers and rights of sovereignty delegated to the new Government, and can neither enlarge nor diminish them. They were inserted to meet a present emergency, and not to regulate its powers as a Government.
Indeed, a similar provision was deemed necessary, in relation to treaties made by the Confederation; and when in the clause next succeeding the one of which we have last spoken, it is declared that treaties shall be the supreme law of the land, care is taken to include, by express words, the treaties made by the confederated States. The language is: "and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land."
Whether, therefore, we take the particular clause in question, by itself, or in connection with the other provisions of the Constitution, we think it clear, that it applies only to the particular *442 territory of which we have spoken, and cannot, by any just rule of interpretation, be extended to territory which the new Government might afterwards obtain from a foreign nation. Consequently, the power which Congress may have lawfully exercised in this Territory, while it remained under a Territorial Government, and which may have been sanctioned by judicial decision, can furnish no justification and no argument to support a similar exercise of power over territory afterwards acquired by the Federal Government. We put aside, therefore, any argument, drawn from precedents, showing the extent of the power which the General Government exercised over slavery in this Territory, as altogether inapplicable to the case before us.
But the case of the American and Ocean Insurance Companies v. Canter (1 Pet., 511) has been quoted as establishing a different construction of this clause of the Constitution. There is, however, not the slightest conflict between the opinion now given and the one referred to; and it is only by taking a single sentence out of the latter and separating it from the context, that even an appearance of conflict can be shown. We need not comment on such a mode of expounding an opinion of the court. Indeed it most commonly misrepresents instead of expounding it. And this is fully exemplified in the case referred to, where, if one sentence is taken by itself, the opinion would appear to be in direct conflict with that now given; but the words which immediately follow that sentence show that the court did not mean to decide the point, but merely affirmed the power of Congress to establish a Government in the Territory, leaving it an open question, whether that power was derived from this clause in the Constitution, or was to be necessarily inferred from a power to acquire territory by cession from a foreign Government. The opinion on this part of the case is short, and we give the whole of it to show how well the selection of a single sentence is calculated to mislead.
The passage referred to is in page 542, in which the court, in speaking of the power of Congress to establish a Territorial Government in Florida until it should become a State, uses the following language:
"In the mean time Florida continues to be a Territory of the United States, governed by that clause of the Constitution which empowers Congress to make all needful rules and regulations respecting the territory or other property of the United States. Perhaps the power of governing a Territory belonging to the United States, which has not, by becoming a State, acquired the means of self-government, may result, necessarily, from the facts that it is not within the jurisdiction of any particular *443 State, and is within the power and jurisdiction of the United States. The right to govern may be the inevitable consequence of the right to acquire territory. Whichever may be the source from which the power is derived, the possession of it is unquestionable."
It is thus clear, from the whole opinion on this point, that the court did not mean to decide whether the power was derived from the clause in the Constitution, or was the necessary consequence of the right to acquire. They do decide that the power in Congress is unquestionable, and in this we entirely concur, and nothing will be found in this opinion to the contrary. The power stands firmly on the latter alternative put by the court  that is, as "the inevitable consequence of the right to acquire territory."
And what still more clearly demonstrates that the court did not mean to decide the question, but leave it open for future consideration, is the fact that the case was decided in the Circuit Court by Mr. Justice Johnson, and his decision was affirmed by the Supreme Court. His opinion at the circuit is given in full in a note to the case, and in that opinion he states, in explicit terms, that the clause of the Constitution applies only to the territory then within the limits of the United States, and not to Florida, which had been acquired by cession from Spain. This part of his opinion will be found in the note in page 517 of the report. But he does not dissent from the opinion of the Supreme Court; thereby showing that, in his judgment, as well as that of the court, the case before them did not call for a decision on that particular point, and the court abstained from deciding it. And in a part of its opinion subsequent to the passage we have quoted, where the court speak of the legislative power of Congress in Florida, they still speak with the same reserve. And in page 546, speaking of the power of Congress to authorize the Territorial Legislature to establish courts there, the court say: "They are legislative courts, created in virtue of the general right of sovereignty which exists in the Government, or in virtue of that clause which enables Congress to make all needful rules and regulations respecting the territory belonging to the United States."
It has been said that the construction given to this clause is new, and now for the first time brought forward. The case of which we are speaking, and which has been so much discussed, shows that the fact is otherwise. It shows that precisely the same question came before Mr. Justice Johnson, at his circuit, thirty years ago  was fully considered by him, and the same construction given to the clause in the Constitution which is now given by this court. And that upon an appeal *444 from his decision the same question was brought before this court, but was not decided because a decision upon it was not required by the case before the court.
There is another sentence in the opinion which has been commented on, which even in a still more striking manner shows how one may mislead or be misled by taking out a single sentence from the opinion of a court, and leaving out of view what precedes and follows. It is in page 546, near the close of the opinion, in which the court say: "In legislating for them," (the territories of the United States,) "Congress exercises the combined powers of the General and of a State Government." And it is said, that as a State may unquestionably prohibit slavery within its territory, this sentence decides in effect that Congress may do the same in a Territory of the United States, exercising there the powers of a State, as well as the power of the General Government.
The examination of this passage in the case referred to, would be more appropriate when we come to consider in another part of this opinion what power Congress can constitutionally exercise in a Territory, over the rights of person or rights of property of a citizen. But, as it is in the same case with the passage we have before commented on, we dispose of it now, as it will save the court from the necessity of referring again to the case. And it will be seen upon reading the page in which this sentence is found, that it has no reference whatever to the power of Congress over rights of person or rights of property  but relates altogether to the power of establishing judicial tribunals to administer the laws constitutionally passed, and defining the jurisdiction they may exercise.
The law of Congress establishing a Territorial Government in Florida, provided that the Legislature of the Territory should have legislative powers over "all rightful objects of legislation; but no law should be valid which was inconsistent with the laws and Constitution of the United States."
Under the power thus conferred, the Legislature of Florida passed an act, erecting a tribunal at Key West to decide cases of salvage. And in the case of which we are speaking, the question arose whether the Territorial Legislature could be authorized by Congress to establish such a tribunal, with such powers; and one of the parties, among other objections, insisted that Congress could not under the Constitution authorize the Legislature of the Territory to establish such a tribunal with such powers, but that it must be established by Congress itself; and that a sale of cargo made under its order, to pay salvors, was void, as made without legal authority, and passed no property to the purchaser.
*445 It is in disposing of this objection that the sentence relied on occurs, and the court begin that part of the opinion by stating with great precision the point which they are about to decide.
They say: "It has been contended that by the Constitution of the United States, the judicial power of the United States extends to all cases of admiralty and maritime jurisdiction; and that the whole of the judicial power must be vested `in one Supreme Court, and in such inferior courts as Congress shall from time to time ordain and establish.' Hence it has been argued that Congress cannot vest admiralty jurisdiction in courts created by the Territorial Legislature."
And after thus clearly stating the point before them, and which they were about to decide, they proceed to show that these Territorial tribunals were not constitutional courts, but merely legislative, and that Congress might, therefore, delegate the power to the Territorial Government to establish the court in question; and they conclude that part of the opinion in the following words: "Although admiralty jurisdiction can be exercised in the States in those courts only which are established in pursuance of the third article of the Constitution, the same limitation does not extend to the Territories. In legislating for them, Congress exercises the combined powers of the General and State Governments."
Thus it will be seen by these quotations from the opinion, that the court, after stating the question it was about to decide in a manner too plain to be misunderstood, proceeded to decide it, and announced, as the opinion of the tribunal, that in organizing the judicial department of the Government in a Territory of the United States, Congress does not act under, and is not restricted by, the third article in the Constitution, and is not bound, in a Territory, to ordain and establish courts in which the judges hold their offices during good behaviour, but may exercise the discretionary power which a State exercises in establishing its judicial department, and regulating the jurisdiction of its courts, and may authorize the Territorial Government to establish, or may itself establish, courts in which the judges hold their offices for a term of years only; and may vest in them judicial power upon subjects confided to the judiciary of the United States. And in doing this, Congress undoubtedly exercises the combined power of the General and a State Government. It exercises the discretionary power of a State Government in authorizing the establishment of a court in which the judges hold their appointments for a term of years only, and not during good behaviour; and it exercises the power of the General Government in investing that *446 court with admiralty jurisdiction, over which the General Government had exclusive jurisdiction in the Territory.
No one, we presume, will question the correctness of that opinion; nor is there anything in conflict with it in the opinion now given. The point decided in the case cited has no relation to the question now before the court. That depended on the construction of the third article of the Constitution, in relation to the judiciary of the United States, and the power which Congress might exercise in a Territory in organizing the judicial department of the Government. The case before us depends upon other and different provisions of the Constitution, altogether separate and apart from the one above mentioned. The question as to what courts Congress may ordain or establish in a Territory to administer laws which the Constitution authorizes it to pass, and what laws it is or is not authorized by the Constitution to pass, are widely different  are regulated by different and separate articles of the Constitution, and stand upon different principles. And we are satisfied that no one who reads attentively the page in Peters's Reports to which we have referred, can suppose that the attention of the court was drawn for a moment to the question now before this court, or that it meant in that case to say that Congress had a right to prohibit a citizen of the United States from taking any property which he lawfully held into a Territory of the United States.
This brings us to examine by what provision of the Constitution the present Federal Government, under its delegated and restricted powers, is authorized to acquire territory outside of the original limits of the United States, and what powers it may exercise therein over the person or property of a citizen of the United States, while it remains a Territory, and until it shall be admitted as one of the States of the Union.
There is certainly no power given by the Constitution to the Federal Government to establish or maintain colonies bordering on the United States or at a distance, to be ruled and governed at its own pleasure; nor to enlarge its territorial limits in any way, except by the admission of new States. That power is plainly given; and if a new State is admitted, it needs no further legislation by Congress, because the Constitution itself defines the relative rights and powers, and duties of the State, and the citizens of the State, and the Federal Government. But no power is given to acquire a Territory to be held and governed permanently in that character.
And indeed the power exercised by Congress to acquire territory and establish a Government there, according to its own unlimited discretion, was viewed with great jealousy by the *447 leading statesmen of the day. And in the Federalist, (No. 38,) written by Mr. Madison, he speaks of the acquisition of the Northwestern Territory by the confederated States, by the cession from Virginia, and the establishment of a Government there, as an exercise of power not warranted by the Articles of Confederation, and dangerous to the liberties of the people. And he urges the adoption of the Constitution as a security and safeguard against such an exercise of power.
We do not mean, however, to question the power of Congress in this respect. The power to expand the territory of the United States by the admission of new States is plainly given; and in the construction of this power by all the departments of the Government, it has been held to authorize the acquisition of territory, not fit for admission at the time, but to be admitted as soon as its population and situation would entitle it to admission. It is acquired to become a State, and not to be held as a colony and governed by Congress with absolute authority; and as the propriety of admitting a new State is committed to the sound discretion of Congress, the power to acquire territory for that purpose, to be held by the United States until it is in a suitable condition to become a State upon an equal footing with the other States, must rest upon the same discretion. It is a question for the political department of the Government, and not the judicial; and whatever the political department of the Government shall recognise as within the limits of the United States, the judicial department is also bound to recognise, and to administer in it the laws of the United States, so far as they apply, and to maintain in the Territory the authority and rights of the Government and also the personal rights and rights of property of individual citizens, as secured by the Constitution. All we mean to say on this point is, that, as there is no express regulation in the Constitution defining the power which the General Government may exercise over the person or property of a citizen in a Territory thus acquired, the court must necessarily look to the provisions and principles of the Constitution, and its distribution of powers, for the rules and principles by which its decision must be governed.
Taking this rule to guide us, it may be safely assumed that citizens of the United States who migrate to a Territory belonging to the people of the United States, cannot be ruled as mere colonists, dependent upon the will of the General Government, and to be governed by any laws it may think proper to impose. The principle upon which our Governments rest, and upon which alone they continue to exist, is the union of States, sovereign and independent within their own limits in *448 their internal and domestic concerns, and bound together as one people by a General Government, possessing certain enumerated and restricted powers, delegated to it by the people of the several States, and exercising supreme authority within the scope of the powers granted to it, throughout the dominion of the United States. A power, therefore, in the General Government to obtain and hold colonies and dependent territories, over which they might legislate without restriction, would be inconsistent with its own existence in its present form. Whatever it acquires, it acquires for the benefit of the people of the several States who created it. It is their trustee acting for them, and charged with the duty of promoting the interests of the whole people of the Union in the exercise of the powers specifically granted.
At the time when the Territory in question was obtained by cession from France, it contained no population fit to be associated together and admitted as a State; and it therefore was absolutely necessary to hold possession of it, as a Territory belonging to the United States, until it was settled and inhabited by a civilized community capable of self-government, and in a condition to be admitted on equal terms with the other States as a member of the Union. But, as we have before said, it was acquired by the General Government, as the representative and trustee of the people of the United States, and it must therefore be held in that character for their common and equal benefit; for it was the people of the several States, acting through their agent and representative, the Federal Government, who in fact acquired the Territory in question, and the Government holds it for their common use until it shall be associated with the other States as a member of the Union.
But until that time arrives, it is undoubtedly necessary that some Government should be established, in order to organize society, and to protect the inhabitants in their persons and property; and as the people of the United States could act in this matter only through the Government which represented them, and through which they spoke and acted when the Territory was obtained, it was not only within the scope of its powers, but it was its duty to pass such laws and establish such a Government as would enable those by whose authority they acted to reap the advantages anticipated from its acquisition, and to gather there a population which would enable it to assume the position to which it was destined among the States of the Union. The power to acquire necessarily carries with it the power to preserve and apply to the purposes for which it was acquired. The form of government to be established *449 necessarily rested in the discretion of Congress. It was their duty to establish the one that would be best suited for the protection and security of the citizens of the United States, and other inhabitants who might be authorized to take up their abode there, and that must always depend upon the existing condition of the Territory, as to the number and character of its inhabitants, and their situation in the Territory. In some cases a Government, consisting of persons appointed by the Federal Government, would best subserve the interests of the Territory, when the inhabitants were few and scattered, and new to one another. In other instances, it would be more advisable to commit the powers of self-government to the people who had settled in the Territory, as being the most competent to determine what was best for their own interests. But some form of civil authority would be absolutely necessary to organize and preserve civilized society, and prepare it to become a State; and what is the best form must always depend on the condition of the Territory at the time, and the choice of the mode must depend upon the exercise of a discretionary power by Congress, acting within the scope of its constitutional authority, and not infringing upon the rights of person or rights of property of the citizen who might go there to reside, or for any other lawful purpose. It was acquired by the exercise of this discretion, and it must be held and governed in like manner, until it is fitted to be a State.
But the power of Congress over the person or property of a citizen can never be a mere discretionary power under our Constitution and form of Government. The powers of the Government and the rights and privileges of the citizen are regulated and plainly defined by the Constitution itself. And when the Territory becomes a part of the United States, the Federal Government enters into possession in the character impressed upon it by those who created it. It enters upon it with its powers over the citizen strictly defined, and limited by the Constitution, from which it derives its own existence, and by virtue of which alone it continues to exist and act as a Government and sovereignty. It has no power of any kind beyond it; and it cannot, when it enters a Territory of the United States, put off its character, and assume discretionary or despotic powers which the Constitution has denied to it. It cannot create for itself a new character separated from the citizens of the United States, and the duties it owes them under the provisions of the Constitution. The Territory being a part of the United States, the Government and the citizen both enter it under the authority of the Constitution, with their respective rights defined and marked out; and the Federal Government *450 can exercise no power over his person or property, beyond what that instrument confers, nor lawfully deny any right which it has reserved.
A reference to a few of the provisions of the Constitution will illustrate this proposition.
For example, no one, we presume, will contend that Congress can make any law in a Territory respecting the establishment of religion, or the free exercise thereof, or abridging the freedom of speech or of the press, or the right of the people of the Territory peaceably to assemble, and to petition the Government for the redress of grievances.
Nor can Congress deny to the people the right to keep and bear arms, nor the right to trial by jury, nor compel any one to be a witness against himself in a criminal proceeding.
These powers, and others, in relation to rights of person, which it is not necessary here to enumerate, are, in express and positive terms, denied to the General Government; and the rights of private property have been guarded with equal care. Thus the rights of property are united with the rights of person, and placed on the same ground by the fifth amendment to the Constitution, which provides that no person shall be deprived of life, liberty, and property, without due process of law. And an act of Congress which deprives a citizen of the United States of his liberty or property, merely because he came himself or brought his property into a particular Territory of the United States, and who had committed no offence against the laws, could hardly be dignified with the name of due process of law.
So, too, it will hardly be contended that Congress could by law quarter a soldier in a house in a Territory without the consent of the owner, in time of peace; nor in time of war, but in a manner prescribed by law. Nor could they by law forfeit the property of a citizen in a Territory who was convicted of treason, for a longer period than the life of the person convicted; nor take private property for public use without just compensation.
The powers over person and property of which we speak are not only not granted to Congress, but are in express terms denied, and they are forbidden to exercise them. And this prohibition is not confined to the States, but the words are general, and extend to the whole territory over which the Constitution gives it power to legislate, including those portions of it remaining under Territorial Government, as well as that covered by States. It is a total absence of power everywhere within the dominion of the United States, and places the citizens of a Territory, so far as these rights are *451 concerned, on the same footing with citizens of the States, and guards them as firmly and plainly against any inroads which the General Government might attempt, under the plea of implied or incidental powers. And if Congress itself cannot do this  if it is beyond the powers conferred on the Federal Government  it will be admitted, we presume, that it could not authorize a Territorial Government to exercise them. It could confer no power on any local Government, established by its authority, to violate the provisions of the Constitution.
It seems, however, to be supposed, that there is a difference between property in a slave and other property, and that different rules may be applied to it in expounding the Constitution of the United States. And the laws and usages of nations, and the writings of eminent jurists upon the relation of master and slave and their mutual rights and duties, and the powers which Governments may exercise over it, have been dwelt upon in the argument.
But in considering the question before us, it must be borne in mind that there is no law of nations standing between the people of the United States and their Government, and interfering with their relation to each other. The powers of the Government, and the rights of the citizen under it, are positive and practical regulations plainly written down. The people of the United States have delegated to it certain enumerated powers, and forbidden it to exercise others. It has no power over the person or property of a citizen but what the citizens of the United States have granted. And no laws or usages of other nations, or reasoning of statesmen or jurists upon the relations of master and slave, can enlarge the powers of the Government, or take from the citizens the rights they have reserved. And if the Constitution recognises the right of property of the master in a slave, and makes no distinction between that description of property and other property owned by a citizen, no tribunal, acting under the authority of the United States, whether it be legislative, executive, or judicial, has a right to draw such a distinction, or deny to it the benefit of the provisions and guarantees which have been provided for the protection of private property against the encroachments of the Government.
Now, as we have already said in an earlier part of this opinion, upon a different point, the right of property in a slave is distinctly and expressly affirmed in the Constitution. The right to traffic in it, like an ordinary article of merchandise and property, was guarantied to the citizens of the United States, in every State that might desire it, for twenty years. And the Government in express terms is pledged to protect *452 it in all future time, if the slave escapes from his owner. This is done in plain words  too plain to be misunderstood. And no word can be found in the Constitution which gives Congress a greater power over slave property, or which entitles property of that kind to less protection than property of any other description. The only power conferred is the power coupled with the duty of guarding and protecting the owner in his rights.
Upon these considerations, it is the opinion of the court that the act of Congress which prohibited a citizen from holding and owning property of this kind in the territory of the United States north of the line therein mentioned, is not warranted by the Constitution, and is therefore void; and that neither Dred Scott himself, nor any of his family, were made free by being carried into this territory; even if they had been carried there by the owner, with the intention of becoming a permanent resident.
We have so far examined the case, as it stands under the Constitution of the United States, and the powers thereby delegated to the Federal Government.
But there is another point in the case which depends on State power and State law. And it is contended, on the part of the plaintiff, that he is made free by being taken to Rock Island, in the State of Illinois, independently of his residence in the territory of the United States; and being so made free, he was not again reduced to a state of slavery by being brought back to Missouri.
Our notice of this part of the case will be very brief; for the principle on which it depends was decided in this court, upon much consideration, in the case of Strader et al. v. Graham, reported in 10th Howard, 82. In that case, the slaves had been taken from Kentucky to Ohio, with the consent of the owner, and afterwards brought back to Kentucky. And this court held that their status or condition, as free or slave, depended upon the laws of Kentucky, when they were brought back into that State, and not of Ohio; and that this court had no jurisdiction to revise the judgment of a State court upon its own laws. This was the point directly before the court, and the decision that this court had not jurisdiction turned upon it, as will be seen by the report of the case.
So in this case. As Scott was a slave when taken into the State of Illinois by his owner, and was there held as such, and brought back in that character, his status, as free or slave, depended on the laws of Missouri, and not of Illinois.
It has, however, been urged in the argument, that by the laws of Missouri he was free on his return, and that this case, *453 therefore, cannot be governed by the case of Strader et al. v. Graham, where it appeared, by the laws of Kentucky, that the plaintiffs continued to be slaves on their return from Ohio. But whatever doubts or opinions may, at one time, have been entertained upon this subject, we are satisfied, upon a careful examination of all the cases decided in the State courts of Missouri referred to, that it is now firmly settled by the decisions of the highest court in the State, that Scott and his family upon their return were not free, but were, by the laws of Missouri, the property of the defendant; and that the Circuit Court of the United States had no jurisdiction, when, by the laws of the State, the plaintiff was a slave, and not a citizen.
Moreover, the plaintiff, it appears, brought a similar action against the defendant in the State court of Missouri, claiming the freedom of himself and his family upon the same grounds and the same evidence upon which he relies in the case before the court. The case was carried before the Supreme Court of the State; was fully argued there; and that court decided that neither the plaintiff nor his family were entitled to freedom, and were still the slaves of the defendant; and reversed the judgment of the inferior State court, which had given a different decision. If the plaintiff supposed that this judgment of the Supreme Court of the State was erroneous, and that this court had jurisdiction to revise and reverse it, the only mode by which he could legally bring it before this court was by writ of error directed to the Supreme Court of the State, requiring it to transmit the record to this court. If this had been done, it is too plain for argument that the writ must have been dismissed for want of jurisdiction in this court. The case of Strader and others v. Graham is directly in point; and, indeed, independent of any decision, the language of the 25th section of the act of 1789 is too clear and precise to admit of controversy.
But the plaintiff did not pursue the mode prescribed by law for bringing the judgment of a State court before this court for revision, but suffered the case to be remanded to the inferior State court, where it is still continued, and is, by agreement of parties, to await the judgment of this court on the point. All of this appears on the record before us, and by the printed report of the case.
And while the case is yet open and pending in the inferior State court, the plaintiff goes into the Circuit Court of the United States, upon the same case and the same evidence, and against the same party, and proceeds to judgment, and then brings here the same case from the Circuit Court, which the law would not have permitted him to bring directly from the *454 State court. And if this court takes jurisdiction in this form, the result, so far as the rights of the respective parties are concerned, is in every respect substantially the same as if it had in open violation of law entertained jurisdiction over the judgment of the State court upon a writ of error, and revised and reversed its judgment upon the ground that its opinion upon the question of law was erroneous. It would ill become this court to sanction such an attempt to evade the law, or to exercise an appellate power in this circuitous way, which it is forbidden to exercise in the direct and regular and invariable forms of judicial proceedings.
Upon the whole, therefore, it is the judgment of this court, that it appears by the record before us that the plaintiff in error is not a citizen of Missouri, in the sense in which that word is used in the Constitution; and that the Circuit Court of the United States, for that reason, had no jurisdiction in the case, and could give no judgment in it. Its judgment for the defendant must, consequently, be reversed, and a mandate issued, directing the suit to be dismissed for want of jurisdiction.
Mr. Justice WAYNE.
Concurring as I do entirely in the opinion of the court, as it has been written and read by the Chief Justice  without any qualification of its reasoning or its conclusions  I shall neither read nor file an opinion of my own in this case, which I prepared when I supposed it might be necessary and proper for me to do so.
The opinion of the court meets fully and decides every point which was made in the argument of the case by the counsel on either side of it. Nothing belonging to the case has been left undecided, nor has any point been discussed and decided which was not called for by the record, or which was not necessary for the judicial disposition of it, in the way that it has been done, by more than a majority of the court.
In doing this, the court neither sought nor made the case. It was brought to us in the course of that administration of the laws which Congress has enacted, for the review of cases from the Circuit Courts by the Supreme Court.
In our action upon it, we have only discharged our duty as a distinct and efficient department of the Government, as the framers of the Constitution meant the judiciary to be, and as the States of the Union and the people of those States intended it should be, when they ratified the Constitution of the United States.
The case involves private rights of value, and constitutional principles of the highest importance, about which there had *455 become such a difference of opinion, that the peace and harmony of the country required the settlement of them by judicial decision.
It would certainly be a subject of regret, that the conclusions of the court have not been assented to by all of its members, if I did not know from its history and my own experience how rarely it has happened that the judges have been unanimous upon constitutional questions of moment, and if our decision in this case had not been made by as large a majority of them as has been usually had on constitutional questions of importance.
Two of the judges, Mr. Justices McLean and Curtis, dissent from the opinion of the court. A third, Mr. Justice Nelson, gives a separate opinion upon a single point in the case, with which I concur, assuming that the Circuit Court had jurisdiction; but he abstains altogether from expressing any opinion upon the eighth section of the act of 1820, known commonly as the Missouri Compromise law, and six of us declare that it was unconstitutional.
But it has been assumed, that this court has acted extra-judicially in giving an opinion upon the eighth section of the act of 1820, because, as it has decided that the Circuit Court had no jurisdiction of the case, this court had no jurisdiction to examine the case upon its merits.
But the error of such an assertion has arisen in part from a misapprehension of what has been heretofore decided by the Supreme Court, in cases of a like kind with that before us; in part, from a misapplication to the Circuit Courts of the United States, of the rules of pleading concerning pleas to the jurisdiction which prevail in common-law courts; and from its having been forgotten that this case was not brought to this court by appeal or writ of error from a State court, but by a writ of error to the Circuit Court of the United States.
The cases cited by the Chief Justice to show that this court has now only done what it has repeatedly done before in other cases, without any question of its correctness, speak for themselves. The differences between the rules concerning pleas to the jurisdiction in the courts of the United States and common-law courts have been stated and sustained by reasoning and adjudged cases; and it has been shown that writs of error to a State court and to the Circuit Courts of the United States are to be determined by different laws and principles. In the first, it is our duty to ascertain if this court has jurisdiction, under the twenty-fifth section of the judiciary act, to review the case from the State court; and if it shall be found that it has not, the case is at end, so far as this court is concerned; for our power *456 to review the case upon its merits has been made, by the twenty-fifth section, to depend upon its having jurisdiction; when it has not, this court cannot criticise, controvert, or give any opinion upon the merits of a case from a State court.
But in a case brought to this court, by appeal or by writ of error from a Circuit Court of the United States, we begin a review of it, not by inquiring if this court has jurisdiction, but if that court has it. If the case has been decided by that court upon its merits, but the record shows it to be deficient in those averments which by the law of the United States must be made by the plaintiff in the action, to give the court jurisdiction of his case, we send it back to the court from which it was brought, with directions to be dismissed, though it has been decided there upon its merits.
So, in a case containing the averments by the plaintiff which are necessary to give the Circuit Court jurisdiction, if the defendant shall file his plea in abatement denying the truth of them, and the plaintiff shall demur to it, and the court should erroneously sustain the plaintiff's demurrer, or declare the plea to be insufficient, and by doing so require the defendant to answer over by a plea to the merits, and shall decide the case upon such pleading, this court has the same authority to inquire into the jurisdiction of that court to do so, and to correct its error in that regard, that it had in the other case to correct its error, in trying a case in which the plaintiff had not made those averments which were necessary to give the court jurisdiction. In both cases the record is resorted to, to determine the point of jurisdiction; but, as the power of review of cases from a Federal court, by this court, is not limited by the law to a part of the case, this court may correct an error upon the merits; and there is the same reason for correcting an erroneous judgment of the Circuit Court, where the want of jurisdiction appears from any part of the record, that there is for declaring a want of jurisdiction for a want of necessary averments. Any attempt to control the court from doing so by the technical common-law rules of pleading in cases of jurisdiction, when a defendant has been denied his plea to it, would tend to enlarge the jurisdiction of the Circuit Court, by limiting this court's review of its judgments in that particular. But I will not argue a point already so fully discussed. I have every confidence in the opinion of the court upon the point of jurisdiction, and do not allow myself to doubt that the error of a contrary conclusion will be fully understood by all who shall read the argument of the Chief Justice.
I have already said that the opinion of the court has my unqualified assent.
*457 Mr. Justice NELSON.
I shall proceed to state the grounds upon which I have arrived at the conclusion, that the judgment of the court below should be affirmed. The suit was brought in the court below by the plaintiff, for the purpose of asserting his freedom, and that of Harriet, his wife, and two children.
The defendant plead, in abatement to the suit, that the cause of action, if any, accrued to the plaintiff out of the jurisdiction of the court, and exclusively within the jurisdiction of the courts of the State of Missouri; for, that the said plaintiff is not a citizen of the State of Missouri, as alleged in the declaration, because he is a negro of African descent; his ancestors were of pure African blood, and were brought into this country and sold as negro slaves.
To this plea the plaintiff demurred, and the defendant joined in demurrer. The court below sustained the demurrer, holding that the plea was insufficient in law to abate the suit.
The defendant then plead over in bar of the action:
1. The general issue. 2. That the plaintiff was a negro slave, the lawful property of the defendant. And 3. That Harriet, the wife of said plaintiff, and the two children, were the lawful slaves of the said defendant. Issue was taken upon these pleas, and the cause went down to trial before the court and jury, and an agreed state of facts was presented, upon which the trial proceeded, and resulted in a verdict for the defendant, under the instructions of the court. 
The facts agreed upon were substantially as follows:
That in the year 1834, the plaintiff, Scott, was a negro slave of Dr. Emerson, who was a surgeon in the army of the United States; and in that year he took the plaintiff from the State of Missouri to the military post at Rock Island, in the State of Illinois, and held him there as a slave until the month of April or May, 1836. At this date, Dr. Emerson removed, with the plaintiff, from the Rock Island post to the military post at Fort Snelling, situate on the west bank of the Mississippi river, in the Territory of Upper Louisiana, and north of the latitude thirty-six degrees thirty minutes, and north of the State of Missouri. That he held the plaintiff in slavery, at Fort Snelling, from the last-mentioned date until the year 1838.
That in the year 1835, Harriet, mentioned in the declaration, was a negro slave of Major Taliaferro, who belonged to the army of the United States; and in that year he took her to Fort Snelling, already mentioned, and kept her there as a slave until the year 1836, and then sold and delivered her to Dr. Emerson, who held her in slavery, at Fort Snelling, until the year 1838. That in the year 1836, the plaintiff and Harriet *458 were married, at Fort Snelling, with the consent of their master. The two children, Eliza and Lizzie, are the fruit of this marriage. The first is about fourteen years of age, and was born on board the steamboat Gipsey, north of the State of Missouri, and upon the Mississippi river; the other, about seven years of age, was born in the State of Missouri, at the military post called Jefferson Barracks.
In 1838, Dr. Emerson removed the plaintiff, Harriet, and their daughter Eliza, from Fort Snelling to the State of Missouri, where they have ever since resided. And that, before the commencement of this suit, they were sold by the Doctor to Sandford, the defendant, who has claimed and hell them as slaves ever since.
The agreed case also states that the plaintiff brought a suit for his freedom, in the Circuit Court of the State of Missouri on which a judgment was rendered in his favor; but that, on a writ of error from the Supreme Court of the State, the judgment of the court below was reversed, and the cause remanded to the circuit for a new trial.
On closing the testimony in the court below, the counsel for the plaintiff prayed the court to instruct the jury, upon the agreed state of facts, that they ought to find for the plaintiff; when the court refused, and instructed them that, upon the facts, the law was with the defendant.
With respect to the plea in abatement, which went to the citizenship of the plaintiff, and his competency to bring a suit in the Federal courts, the common-law rule of pleading is, that upon a judgment against the plea on demurrer, and that the defendant answer over, and the defendant submits to the judgment, and pleads over to the merits, the plea in abatement is deemed to be waived, and is not afterwards to be regarded as a part of the record in deciding upon the rights of the parties. There is some question, however, whether this rule of pleading applies to the peculiar system and jurisdiction of the Federal courts. As, in these courts, if the facts appearing on the record show that the Circuit Court had no jurisdiction, its judgment will be reversed in the appellate court for that cause, and the case remanded with directions to be dismissed.
In the view we have taken of the case, it will not be necessary to pass upon this question, and we shall therefore proceed at once to an examination of the case upon its merits. The question upon the merits, in general terms, is, whether or not the removal of the plaintiff, who was a slave, with his master, from the State of Missouri to the State of Illinois, with a view to a temporary residence, and after such residence and *459 return to the slave State, such residence in the free State works an emancipation.
As appears from an agreed statement of facts, this question has been before the highest court of the State of Missouri, and a judgment rendered that this residence in the free State has no such effect; but, on the contrary, that his original condition continued unchanged.
The court below, the Circuit Court of the United States for Missouri, in which this suit was afterwards brought, followed the decision of the State court, and rendered a like judgment against the plaintiff.
The argument against these decisions is, that the laws of Illinois, forbidding slavery within her territory, had the effect to set the slave free while residing in that State, and to impress upon him the condition and status of a freeman; and that, by force of these laws, this status and condition accompanied him on his return to the slave State, and of consequence he could not be there held as a slave.
This question has been examined in the courts of several of the slaveholding States, and different opinions expressed and conclusions arrived at. We shall hereafter refer to some of them, and to the principles upon which they are founded. Our opinion is, that the question is one which belongs to each State to decide for itself, either by its Legislature or courts of justice; and hence, in respect to the case before us, to the State of Missouri  a question exclusively of Missouri law, and which, when determined by that State, it is the duty of the Federal courts to follow it. In other words, except in cases where the power is restrained by the Constitution of the United States, the law of the State is supreme over the subject of slavery within its jurisdiction.
As a practical illustration of the principle, we may refer to the legislation of the free States in abolishing slavery, and prohibiting its introduction into their territories. Confessedly, except as restrained by the Federal Constitution, they exercised, and rightfully, complete and absolute power over the subject. Upon what principle, then, can it be denied to the State of Missouri? The power flows from the sovereign character of the States of this Union; sovereign, not merely as respects the Federal Government  except as they have consented to its limitation  but sovereign as respects each other. Whether, therefore, the State of Missouri will recognise or give effect to the laws of Illinois within her territories on the subject of slavery, is a question for her to determine. Nor is there any constitutional power in this Government that can rightfully control her.
*460 Every State or nation possesses an exclusive sovereignty and jurisdiction within her own territory; and, her laws affect and bind all property and persons residing within it. It may regulate the manner and circumstances under which property is held, and the condition, capacity, and state, of all persons therein; and, also, the remedy and modes of administering justice. And it is equally true, that no State or nation can affect or bind property out of its territory, or persons not residing within it. No State, therefore, can enact laws to operate beyond its own dominions, and, if it attempts to do so, it may be lawfully refused obedience. Such laws can have no inherent authority extra-territorially. This is the necessary result of the independence of distinct and separate sovereignties.
Now, it follows from these principles, that whatever force or effect the laws of one State or nation may have in the territories of another, must depend solely upon the laws and municipal regulations of the latter, upon its own jurisprudence and polity, and upon its own express or tacit consent.
Judge Story observes, in his Conflict of Laws, (p. 24,) "that a State may prohibit the operation of all foreign laws, and the rights growing out of them, within its territories." "And that when its code speaks positively on the subject, it must be obeyed by all persons who are within reach of its sovereignty; when its customary unwritten or common law speaks directly on the subject, it is equally to be obeyed."
Nations, from convenience and comity, and from mutual interest, and a sort of moral necessity to do justice, recognise and administer the laws of other countries. But, of the nature, extent, and utility, of them, respecting property, or the state and condition of persons within her territories, each nation judges for itself; and is never bound, even upon the ground of comity, to recognise them, if prejudicial to her own interests. The recognition is purely from comity, and not from any absolute or paramount obligation.
Judge Story again observes, (398,) "that the true foundation and extent of the obligation of the laws of one nation within another is the voluntary consent of the latter, and is inadmissible when they are contrary to its known interests." And he adds, "in the silence of any positive rule affirming or denying or restraining the operation of the foreign laws, courts of justice presume the tacit adoption of them by their own Government, unless they are repugnant to its policy or prejudicial to its interests." (See also 2 Kent Com., p. 457; 13 Peters, 519, 589.)
These principles fully establish, that it belongs to the sovereign *461 State of Missouri to determine by her laws the question of slavery within her jurisdiction, subject only to such limitations as may be found in the Federal Constitution; and, further, that the laws of other States of the Confederacy, whether enacted by their Legislatures or expounded by their courts, can have no operation within her territory, or affect rights growing out of her own laws on the subject. This is the necessary result of the independent and sovereign character of the State. The principle is not peculiar to the State of Missouri, but is equally applicable to each State belonging to the Confederacy. The laws of each have no extra-territorial operation within the jurisdiction of another, except such as may be voluntarily conceded by her laws or courts of justice. To the extent of such concession upon the rule of comity of nations, the foreign law may operate, as it then becomes a part of the municipal law of the State. When determined that the foreign law shall have effect, the municipal law of the State retires, and gives place to the foreign law.
In view of these principles, let us examine a little more closely the doctrine of those who maintain that the law of Missouri is not to govern the status and condition of the plaintiff. They insist that the removal and temporary residence with his master in Illinois, where slavery is inhibited, had the effect to set him free, and that the same effect is to be given to the law of Illinois, within the State of Missouri, after his return. Why was he set free in Illinois? Because the law of Missouri, under which he was held as a slave, had no operation by its own force extra-territorially; and the State of Illinois refused to recognize its effect within her limits, upon principles of comity, as a state of slavery was inconsistent with her laws, and contrary to her policy. But, how is the case different on the return of the plaintiff to the State of Missouri? Is she bound to recognize and enforce the law of Illinois? For, unless she is, the status and condition of the slave upon his return remains the same as originally existed. Has the law of Illinois any greater force within the jurisdiction of Missouri, than the laws of the latter within that of the former? Certainly not. They stand upon an equal footing. Neither has any force extra-territorially, except what may be voluntarily conceded to them.
It has been supposed, by the counsel for the plaintiff, that a rule laid down by Huberus had some bearing upon this question. Huberus observes that "personal qualities, impressed by the laws of any place, surround and accompany the person wherever he goes, with this effect: that in every place he enjoys and is subject to the same law which other persons of his *462 class elsewhere enjoy or are subject to." (De Confl. Leg., lib. 1, tit. 3, sec. 12; 4 Dallas, 375 n.; 1 Story Con. Laws, pp. 59, 60.)
The application sought to be given to the rule was this: that as Dred Scott was free while residing in the State of Illinois, by the laws of that State, on his return to the State of Missouri he carried with him the personal qualities of freedom, and that the same effect must be given to his status there as in the former State. But the difficulty in the case is in the total misapplication of the rule.
These personal qualities, to which Huberus refers, are those impressed upon the individual by the law of the domicil; it is this that the author claims should be permitted to accompany the person into whatever country he might go, and should supersede the law of the place where he had taken up a temporary residence.
Now, as the domicil of Scott was in the State of Missouri, where he was a slave, and from whence he was taken by his master into Illinois for a temporary residence, according to the doctrine of Huberus, the law of his domicil would have accompanied him, and during his residence there he would remain in the same condition as in the State of Missouri. In order to have given effect to the rule, as claimed in the argument, it should have been first shown that a domicil had been acquired in the free State, which cannot be pretended upon the agreed facts in the case. But the true answer to the doctrine of Huberus is, that the rule, in any aspect in which it may be viewed, has no bearing upon either side of the question before us, even if conceded to the extent laid down by the author; for he admits that foreign Governments give effect to these laws of the domicil no further than they are consistent with their own laws, and not prejudicial to their own subjects; in other words, their force and effect depend upon the law of comity of the foreign Government. We should add, also, that this general rule of Huberus, referred to, has not been admitted in the practice of nations, nor is it sanctioned by the most approved jurists of international law. (Story Con., sec. 91, 96, 103, 104; 2 Kent. Com., p. 457, 458; 1 Burge Con. Laws, pp. 12, 127.)
We come now to the decision of this court in the case of Strader et al. v. Graham, (10 How., p. 2.) The case came up from the Court of Appeals, in the State of Kentucky. The question in the case was, whether certain slaves of Graham, a resident of Kentucky, who had been employed temporarily at several places in the State of Ohio, with their master's consent, and had returned to Kentucky into his service, had thereby *463 become entitled to their freedom. The Court of Appeals held that they had not. The case was brought to this court under the twenty-fifth section of the judiciary act. This court held that it had no jurisdiction, for the reason, the question was one that belonged exclusively to the State of Kentucky. The Chief Justice, in delivering the opinion of the court, observed that "every State has an undoubted right to determine the status or domestic and social condition of the persons domiciled within its territory, except in so far as the powers of the States in this respect are restrained, or duties and obligations imposed upon them, by the Constitution of the United States. There is nothing in the Constitution of the United States, he observes, that can in any degree control the law of Kentucky upon this subject. And the condition of the negroes, therefore, as to freedom or slavery, after their return, depended altogether upon the laws of that State, and could not be influenced by the laws of Ohio. It was exclusively in the power of Kentucky to determine, for herself, whether their employment in another State should or should not make them free on their return."
It has been supposed, in the argument on the part of the plaintiff, that the eighth section of the act of Congress passed March 6, 1820, (3 St. at Large, p. 544,) which prohibited slavery north of thirty-six degrees thirty minutes, within which the plaintiff and his wife temporarily resided at Fort Snelling, possessed some superior virtue and effect, extra-territorially, and within the State of Missouri, beyond that of the laws of Illinois, or those of Ohio in the case of Strader et al. v. Graham. A similar ground was taken and urged upon the court in the case just mentioned, under the ordinance of 1787, which was enacted during the time of the Confederation, and re-enacted by Congress after the adoption of the Constitution, with some amendments adapting it to the new Government. (1 St. at Large, p. 50.)
In answer to this ground, the Chief Justice, in delivering the opinion of the court, observed: "The argument assumes that the six articles which that ordinance declares to be perpetual, are still in force in the States since formed within the territory, and admitted into the Union. If this proposition could be maintained, it would not alter the question; for the regulations of Congress, under the old Confederation or the present Constitution, for the government of a particular Territory, could have no force beyond its limits. It certainly could not restrict the power of the States, within their respective territories, nor in any manner interfere with their laws and institutions, nor give this court control over them.
*464 "The ordinance in question, he observes, if still in force, could have no more operation than the laws of Ohio in the State of Kentucky, and could not influence the decision upon the rights of the master or the slaves in that State."
This view, thus authoritatively declared, furnishes a conclusive answer to the distinction attempted to be set up between the extra-territorial effect of a State law and the act of Congress in question.
It must be admitted that Congress possesses no power to regulate or abolish slavery within the States; and that, if this act had attempted any such legislation, it would have been a nullity. And yet the argument here, if there be any force in it, leads to the result, that effect may be given to such legislation; for it is only by giving the act of Congress operation within the State of Missouri, that it can have any effect upon the question between the parties. Having no such effect directly, it will be difficult to maintain, upon any consistent reasoning, that it can be made to operate indirectly upon the subject.
The argument, we think, in any aspect in which it may be viewed, is utterly destitute of support upon any principles of constitutional law, as, according to that, Congress has no power whatever over the subject of slavery within the State; and is also subversive of the established doctrine of international jurisprudence, as, according to that, it is an axiom that the laws of one Government have no force within the limits of another, or extra-territorially, except from the consent of the latter.
It is perhaps not unfit to notice, in this connection, that many of the most eminent statesmen and jurists of the country entertain the opinion that this provision of the act of Congress, even within the territory to which it relates, was not authorized by any power under the Constitution. The doctrine here contended for, not only upholds its validity in the territory, but claims for it effect beyond and within the limits of a sovereign State  an effect, as insisted, that displaces the laws of the State, and substitutes its own provisions in their place.
The consequences of any such construction are apparent. If Congress possesses the power, under the Constitution, to abolish slavery in a Territory, it must necessarily possess the like power to establish it. It cannot be a one-sided power, as may suit the convenience or particular views of the advocates. It is a power, if it exists at all, over the whole subject; and then, upon the process of reasoning which seeks to extend its influence beyond the Territory, and within the limits of a State, if Congress should establish, instead of abolish, slavery, we do *465 not see but that, if a slave should be removed from the Territory into a free State, his status would accompany him, and continue, notwithstanding its laws against slavery. The laws of the free State, according to the argument, would be displaced, and the act of Congress, in its effect, be substituted in their place. We do not see how this conclusion could be avoided, if the construction against which we are contending should prevail. We are satisfied, however, it is unsound, and that the true answer to it is, that even conceding, for the purposes of the argument, that this provision of the act of Congress is valid within the Territory for which it was enacted, it can have no operation or effect beyond its limits, or within the jurisdiction of a State. It can neither displace its laws, nor change the status or condition of its inhabitants.
Our conclusion, therefore, is, upon this branch of the case, that the question involved is one depending solely upon the law of Missouri, and that the Federal court sitting in the State, and trying the case before us, was bound to follow it.
The remaining question for consideration is, What is the law of the State of Missouri on this subject? And it would be a sufficient answer to refer to the judgment of the highest court of the State in the very case, were it not due to that tribunal to state somewhat at large the course of decision and the principles involved, on account of some diversity of opinion in the cases. As we have already stated, this case was originally brought in the Circuit Court of the State, which resulted in a judgment for the plaintiff. The case was carried up to the Supreme Court for revision. That court reversed the judgment below, and remanded the cause to the circuit, for a new trial. In that state of the proceeding, a new suit was brought by the plaintiff in the Circuit Court of the United States, and tried upon the issues and agreed case before us, and a verdict and judgment for the defendant, that court following the decision of the Supreme Court of the State. The judgment of the Supreme Court is reported in the 15 Misso. R., p. 576. The court placed the decision upon the temporary residence of the master with the slaves in the State and Territory to which they removed, and their return to the slave State; and upon the principles of international law, that foreign laws have no extra-territorial force, except such as the State within which they are sought to be enforced may see fit to extend to them, upon the doctrine of comity of nations.
This is the substance of the grounds of the decision.
The same question has been twice before that court since, and the same judgment given, (15 Misso. R., 595; 17 Ib., 434.) It must be admitted, therefore, as the settled law of the State, *466 and, according to the decision in the case of Strader et al. v. Graham, is conclusive of the case in this court.
It is said, however, that the previous cases and course of decision in the State of Missouri on this subject were different, and that the courts had held the slave to be free on his return from a temporary residence in the free State. We do not see, were this to be admitted, that the circumstance would show that the settled course of decision, at the time this case was tried in the court below, was not to be considered the law of the State. Certainly, it must be, unless the first decision of a principle of law by a State court is to be permanent and irrevocable. The idea seems to be, that the courts of a State. are not to change their opinions, or, if they do, the first decision is to be regarded by this court as the law of the State. It is certain, if this be so, in the case before us, it is an exception to the rule governing this court in all other cases. But what court has not changed its opinions? What judge has not changed his?
Waiving, however, this view, and turning to the decisions of the courts of Missouri, it will be found that there is no discrepancy between the earlier and the present cases upon this subject. There are some eight of them reported previous to the decision in the case before us, which was decided in 1852. The last of the earlier cases was decided in 1836. In each one of these, with two exceptions, the master or mistress removed into the free State with the slave, with a view to a permanent residence  in other words, to make that his or her domicil. And in several of the cases, this removal and permanent residence were relied on, as the ground of the decision in favor of the plaintiff. All these cases, therefore, are not necessarily in conflict with the decision in the case before us, but consistent with it. In one of the two excepted cases, the master had hired the slave in the State of Illinois from 1817 to 1825. In the other, the master was an officer in the army, and removed with his slave to the military post of Fort Snelling, and at Prairie du Chien, in Michigan, temporarily, while acting under the orders of his Government. It is conceded the decision in this case was departed from in the case before us, and in those that have followed it. But it is to be observed that these subsequent cases are in conformity with those in all the slave States bordering on the free  in Kentucky, (2 Marsh., 476; 5 B. Munroe, 176; 9 Ib., 565)  in Virginia, (1 Rand., 15; 1 Leigh, 172; 10 Grattan, 495)  in Maryland, (4 Harris and McHenry, 295, 322, 325.) In conformity, also, with the law of England on this subject, Ex parte Grace, (2 Hagg. Adm., R., 94,) and with the opinions of the *467 most eminent jurists of the country. (Story's Confl., 396 a; 2 Kent Com., 258 n.; 18 Pick., 193, Chief Justice Shaw. See Corresp. between Lord Stowell and Judge Story, 1 vol. Life of Story, p. 552, 558.)
Lord Stowell, in communicating his opinion in the case of the slave Grace to Judge Story, states, in his letter, what the question was before him, namely: "Whether the emancipation of a slave brought to England insured a complete emancipation to him on his return to his own country, or whether it only operated as a suspension of slavery in England, and his original character devolved on him again upon his return." He observed, "the question had never been examined since an end was put to slavery fifty years ago," having reference to the decision of Lord Mansfield in the case of Somersett; but the practice, he observed, "has regularly been, that on his return to his own country, the slave resumed his original character of slave." And so Lord Stowell held in the case.
Judge Story, in his letter in reply, observes: "I have read with great attention your judgment in the slave case, &c. Upon the fullest consideration which I have been able to give the subject, I entirely concur in your views. If I had been called upon to pronounce a judgment in a like case, I should have certainly arrived at the same result." Again he observes: "In my native State, (Massachusetts,) the state of slavery is not recognized as legal; and yet, if a slave should come hither, and afterwards return to his own home, we should certainly think that the local law attached upon him, and that his servile character would be redintegrated."
We may remark, in this connection, that the case before the Maryland court, already referred to, and which was decided in 1799, presented the same question as that before Lord Stowell, and received a similar decision. This was nearly thirty years before the decision in that case, which was in 1828. The Court of Appeals observed, in deciding the Maryland case, that "however the laws of Great Britain in such instances, operating upon such persons there, might interfere so as to prevent the exercise of certain acts by the masters, not permitted, as in the case of Somersett, yet, upon the bringing Ann Joice into this State, (then the province of Maryland,) the relation of master and slave continued in its extent, as authorized by the laws of this State." And Luther Martin, one of the counsel in that case, stated, on the argument, that the question had been previously decided the same way in the case of slaves returning from a residence in Pennsylvania, where they had become free under her laws.
The State of Louisiana, whose courts had gone further in *468 holding the slave free on his return from a residence in a free State than the courts of her sister States, has settled the law, by an act of her Legislature, in conformity with the law of the court of Missouri in the case before us. (Sess. Law, 1846.)
The case before Lord Stowell presented much stronger features for giving effect to the law of England in the case of the slave Grace than exists in the cases that have arisen in this country, for in that case the slave returned to a colony of England over which the Imperial Government exercised supreme authority. Yet, on the return of the slave to the colony, from a temporary residence in England, he held that the original condition of the slave attached. The question presented in cases arising here is as to the effect and operation to be given to the laws of a foreign State, on the return of the slave within an independent sovereignty.
Upon the whole, it must be admitted that the current of authority, both in England and in this country, is in accordance with the law as declared by the courts of Missouri in the case before us, and we think the court below was not only right, but bound to follow it.
Some question has been made as to the character of the residence in this case in the free State. But we regard the facts as set forth in the agreed case as decisive. The removal of Dr. Emerson from Missouri to the military posts was in the discharge of his duties as surgeon in the army, and under the orders of his Government. He was liable at any moment to be recalled, as he was in 1838, and ordered to another post. The same is also true as it respects Major Taliaferro. In such a case, the officer goes to his post for a temporary purpose, to remain there for an uncertain time, and not for the purpose of fixing his permanent abode. The question we think too plain to require argument. The case of the Attorney General v. Napier, (6 Welsh, Hurtst. and Gordon Exch. Rep., 217,) illustrates and applies the principle in the case of an officer of the English army.
A question has been alluded to, on the argument, namely: the right of the master with his slave of transit into or through a free State, on business or commercial pursuits, or in the exercise of a Federal right, or the discharge of a Federal duty, being a citizen of the United States, which is not before us. This question depends upon different considerations and principles from the one in hand, and turns upon the rights and privileges secured to a common citizen of the republic under the Constitution of the United States. When that question arises, we shall be prepared to decide it.
*469 Our conclusion is, that the judgment of the court below should be affirmed.
Mr. Justice GRIER.
I concur in the opinion delivered by Mr. Justice Nelson on the questions discussed by him.
I also concur with the opinion of the court as delivered by the Chief Justice, that the act of Congress of 6th March, 1820, is unconstitutional and void; and that, assuming the facts as stated in the opinion, the plaintiff cannot sue as a citizen of Missouri in the courts of the United States. But, that the record shows a prima facie case of jurisdiction, requiring the court to decide all the questions properly arising in it; and as the decision of the pleas in bar shows that the plaintiff is a slave, and therefore not entitled to sue in a court of the United States, the form of the judgment is of little importance; for, whether the judgment be affirmed or dismissed for want of jurisdiction, it is justified by the decision of the court, and is the same in effect between the parties to the suit.
Mr. Justice DANIEL.
It may with truth be affirmed, that since the establishment of the several communities now constituting the States of this Confederacy, there never has been submitted to any tribunal within its limits questions surpassing in importance those now claiming the consideration of this court. Indeed it is difficult to imagine, in connection with the systems of polity peculiar to the United States, a conjuncture of graver import than that must be, within which it is aimed to comprise, and to control, not only the faculties and practical operation appropriate to the American Confederacy as such, but also the rights and powers of its separate and independent members, with reference alike to their internal and domestic authority and interests, and the relations they sustain to their confederates.
To my mind it is evident, that nothing less than the ambitious and far-reaching pretension to compass these objects of vital concern, is either directly essayed or necessarily implied in the positions attempted in the argument for the plaintiff in error.
How far these positions have any foundation in the nature of the rights and relations of separate, equal, and independent Governments, or in the provisions of our own Federal compact, or the laws enacted under and in pursuance of the authority of that compact, will be presently investigated.
In order correctly to comprehend the tendency and force of those positions, it is proper here succinctly to advert to the *470 facts upon which the questions of law propounded in the argument have arisen.
This was an action of trespass vi et armis, instituted in the Circuit Court of the United States for the district of Missouri, in the name of the plaintiff in error, a negro held as a slave, for the recovery of freedom for himself, his wife, and two children, also negroes.
To the declaration in this case the defendant below, who is also the defendant in error, pleaded in abatement that the court could not take cognizance of the cause, because the plaintiff was not a citizen of the State of Missouri, as averred in the declaration, but was a negro of African descent, and that his ancestors were of pure African blood, and were brought into this country and sold as negro slaves; and hence it followed, from the second section of the third article of the Constitution, which creates the judicial power of the United States, with respect to controversies between citizens of different States, that the Circuit Court could not take cognizance of the action:
To this plea in abatement, a demurrer having been interposed on behalf of the plaintiff, it was sustained by the court. After the decision sustaining the demurrer, the defendant, in pursuance of a previous agreement between counsel, and with the leave of the court, pleaded in bar of the action: 1st, not guilty; 2dly, that the plaintiff was a negro slave, the lawful property of the defendant, and as such the defendant gently laid his hands upon him, and thereby had only restrained him, as the defendant had a right to do; 3dly, that with respect to the wife and daughters of the plaintiff, in the second and third counts of the declaration mentioned, the defendant had, as to them, only acted in the same manner, and in virtue of the same legal right.
Issues having been joined upon the above pleas in bar, the following statement, comprising all the evidence in the cause, was agreed upon and signed by the counsel of the respective parties, viz:
"In the year 1834, the plaintiff was a negro slave belonging to Doctor Emerson, who was a surgeon in the army of the United States. In that year, 1834, said Dr. Emerson took the plaintiff from the State of Missouri to the military post at Rock Island, in the State of Illinois, and held him there as a slave until the month of April or May, 1836. At the time last mentioned, said Dr. Emerson removed the plaintiff from said military post at Rock Island to the military post at Fort Snelling, situate on the west bank of the Mississippi river, in the Territory known as Upper Louisiana, acquired by the United States of France, and situate north of the latitude of thirty-six *471 degrees thirty minutes north, and north of the State of Missouri. Said Dr. Emerson held the plaintiff in slavery at said Fort Snelling, from said last-mentioned date until the year 1838.
"In the year 1835, Harriet, who is named in the second count of the plaintiff's declaration, was the negro slave of Major Taliaferro, who belonged to the army of the United States. In that year, 1835, said Major Taliaferro took said Harriet to said Fort Snelling, a military post situated as hereinbefore stated, and kept her there as a slave until the year 1836, and then sold and delivered her as a slave at said Fort Snelling unto the said Dr. Emerson, hereinbefore named. Said Dr. Emerson held said Harriet in slavery at said Fort Snelling until the year 1838.
"In the year 1836, the plaintiff and said Harriet, at said Fort Snelling, with the consent of said Dr. Emerson, who then claimed to be their master and owner, intermarried, and took each other for husband and wife. Eliza and Lizzie, named in the third count of the plaintiff's declaration, are the fruit of that marriage. Eliza is about fourteen years old, and was born on board the steamboat Gipsey, north of the north line of the State of Missouri, and upon the river Mississippi. Lizzie is about seven years old, and was born in the State of Missouri, at a military post called Jefferson barracks.
"In the year 1838, said Dr. Emerson removed the plaintiff and said Harriet, and their said daughter Eliza, from said Fort Snelling to the State of Missouri, where they have ever since resided.
"Before the commencement of this suit, said Dr. Emerson sold and conveyed the plaintiff, said Harriet, Eliza, and Lizzie, to the defendant, as slaves, and the defendant has ever since claimed to hold them and each of them as slaves.
"At the times mentioned in the plaintiff's declaration, the defendant, claiming to be owner as aforesaid, laid his hands upon said plaintiff, Harriet, Eliza, and Lizzie, and imprisoned them, doing in this respect, however, no more than what he might lawfully do if they were of right his slaves at such times.
"Further proof may be given on the trial for either party.
 "R.M. FIELD, for Plaintiff.
 "H.A. GARLAND, for Defendant.
"It is agreed that Dred Scott brought suit for his freedom in the Circuit Court of St. Louis county; that there was a verdict and judgment in his favor; that on a writ of error to the Supreme Court, the judgment below was reversed, and the *472 cause remanded to the Circuit Court, where it has been continued to await the decision of this case.
 "FIELD, for Plaintiff.
 "GARLAND, for Defendant."
Upon the aforegoing agreed facts, the plaintiff prayed the court to instruct the jury that they ought to find for the plaintiff, and upon the refusal of the instruction thus prayed for, the plaintiff excepted to the court's opinion. The court then, upon the prayer of the defendant, instructed the jury, that upon the facts of this case agreed as above, the law was with the defendant. To this opinion, also, the plaintiff's counsel excepted, as he did to the opinion of the court denying to the plaintiff a new trial after the verdict of the jury in favor of the defendant.
The question first in order presented by the record in this cause, is that which arises upon the plea in abatement, and the demurrer to that plea; and upon this question it is my opinion that the demurrer should have been overruled, and the plea sustained.
On behalf of the plaintiff it has been urged, that by the pleas interposed in bar of a recovery in the court below, (which pleas both in fact and in law are essentially the same with the objections averred in abatement,) the defence in abatement has been displaced or waived; that it could therefore no longer be relied on in the Circuit Court, and cannot claim the consideration of this court in reviewing this cause. This position is regarded as wholly untenable. On the contrary, it would seem to follow conclusively from the peculiar character of the courts of the United States, as organized under the Constitution and the statutes, and as defined by numerous and unvarying adjudications from this bench, that there is not one of those courts whose jurisdiction and powers can be deduced from mere custom or tradition; not one, whose jurisdiction and powers must not be traced palpably to, and invested exclusively by, the Constitution and statutes of the United States; not one that is not bound, therefore, at all times, and at all stages of its proceedings, to look to and to regard the special and declared extent and bounds of its commission and authority. There is no such tribunal of the United States as a court of general jurisdiction, in the sense in which that phrase is applied to the superior courts under the common law; and even with respect to the courts existing under that system, it is a well-settled principle, that consent can never give jurisdiction.
The principles above stated, and the consequences regularly deducible from them, have, as already remarked, been repeatedly *473 and unvaryingly propounded from this bench. Beginning with the earliest decisions of this court, we have the cases of Bingham v. Cabot et al., (3 Dallas, 382;) Turner v. Eurille, (4 Dallas, 7;) Abercrombie v. Dupuis et al., (1 Cranch, 343;) Wood v. Wagnon, (2 Cranch, 9;) The United States v. The brig Union et al., (4 Cranch, 216;) Sullivan v. The Fulton Steamboat Company, (6 Wheaton, 450;) Mollan et al. v. Torrence, (9 Wheaton, 537;) Brown v. Keene, (8 Peters, 112,) and Jackson v. Ashton, (8 Peters, 148;) ruling, in uniform and unbroken current, the doctrine that it is essential to the jurisdiction of the courts of the United States, that the facts upon which it is founded should appear upon the record. Nay, to such an extent and so inflexibly has this requisite to the jurisdiction been enforced, that in the case of Capron v. Van Noorden, (2 Cranch, 126,) it is declared, that the plaintiff in this court may assign for error his own omission in the pleadings in the court below, where they go to the jurisdiction. This doctrine has been, if possible, more strikingly illustrated in a later decision, the case of The State of Rhode Island v. The State of Massachusetts, in the 12th of Peters.
In this case, on page 718 of the volume, this court, with reference to a motion to dismiss the cause for want of jurisdiction, have said: "However late this objection has been made, or may be made, in any cause in an inferior or appellate court of the United States, it must be considered and decided before any court can move one farther step in the cause, as any movement is necessarily to exercise the jurisdiction. Jurisdiction is the power to hear and determine the subject-matter in controversy between the parties to a suit; to adjudicate or exercise any judicial power over them. The question is, whether on the case before the court their action is judicial or extra-judicial; with or without the authority of law to render a judgment or decree upon the rights of the litigant parties. A motion to dismiss a cause pending in the courts of the United States, is not analogous to a plea to the jurisdiction of a court of common law or equity in England; there, the superior courts have a general jurisdiction over all persons within the realm, and all causes of action between them. It depends on the subject-matter, whether the jurisdiction shall be exercised by a court of law or equity; but that court to which it appropriately belongs can act judicially upon the party and the subject of the suit, unless it shall be made apparent to the court that the judicial determination of the case has been withdrawn from the court of general jurisdiction to an inferior and limited one. It is a necessary presumption that the court of general jurisdiction can act upon the given case, when nothing to the *474 contrary appears; hence has arisen the rule that the party claiming an exemption from its process must set out the reason by a special plea in abatement, and show that some inferior court of law or equity has the exclusive cognizance of the case, otherwise the superior court must proceed in virtue of its general jurisdiction. A motion to dismiss, therefore, cannot be entertained, as it does not disclose a case of exception; and if a plea in abatement is put in, it must not only make out the exception, but point to the particular court to which the case belongs. There are other classes of cases where the objection to the jurisdiction is of a different nature, as on a bill in chancery, that the subject-matter is cognizable only by the King in Council, or that the parties defendant cannot be brought before any municipal court on account of their sovereign character or the nature of the controversy; or to the very common cases which present the question, whether the cause belong to a court of law or equity. To such cases, a plea in abatement would not be applicable, because the plaintiff could not sue in an inferior court. The objection goes to a denial of any jurisdiction of a municipal court in the one class of cases, and to the jurisdiction of any court of equity or of law in the other, on which last the court decides according to its discretion.
"An objection to jurisdiction on the ground of exemption from the process of the court in which the suit is brought, or the manner in which a defendant is brought into it, is waived by appearance and pleading to issue; but when the objection goes to the power of the court over the parties or the subject-matter, the defendant need not, for he cannot, give the plaintiff a better writ. Where an inferior court can have no jurisdiction of a case of law or equity, the ground of objection is not taken by plea in abatement, as an exception of the given case from the otherwise general jurisdiction of the court; appearance does not cure the defect of judicial power, and it may be relied on by plea, answer, demurrer, or at the trial or hearing. As a denial of jurisdiction over the subject-matter of a suit between parties within the realm, over which and whom the court has power to act, cannot be successful in an English court of general jurisdiction, a motion like the present could not be sustained consistently with the principles of its constitution. But as this court is one of limited and special original jurisdiction, its action must be confined to the particular cases, controversies, and parties, over which the Constitution and laws have authorized it to act; any proceeding without the limits prescribed is coram non judice, and its action a nullity. And whether the want or excess of power is objected by a party, or is apparent *475 to the court, it must surcease its action or proceed extra-judicially."
In the constructing of pleadings either in abatement or in bar, every fact or position constituting a portion of the public law, or of known or general history, is necessarily implied. Such fact or position need not be specially averred and set forth; it is what the world at large and every individual are presumed to know  nay, are bound to know and to be governed by.
If, on the other hand, there exist facts or circumstances by which a particular case would be withdrawn or exempted from the influence of public law or necessary historical knowledge, such facts and circumstances form an exception to the general principle, and these must be specially set forth and established by those who would avail themselves of such exception.
Now, the following are truths which a knowledge of the history of the world, and particularly of that of our own country, compels us to know  that the African negro race never have been acknowledged as belonging to the family of nations; that as amongst them there never has been known or recognised by the inhabitants of other countries anything partaking of the character of nationality, or civil or political polity; that this race has been by all the nations of Europe regarded as subjects of capture or purchase; as subjects of commerce or traffic; and that the introduction of that race into every section of this country was not as members of civil or political society, but as slaves, as property in the strictest sense of the term.
In the plea in abatement, the character or capacity of citizen on the part of the plaintiff is denied; and the causes which show the absence of that character or capacity are set forth by averment. The verity of those causes, according to the settled rules of pleading, being admitted by the demurrer, it only remained for the Circuit Court to decide upon their legal sufficiency to abate the plaintiff's action. And it now becomes the province of this court to determine whether the plaintiff below, (and in error here,) admitted to be a negro of African descent, whose ancestors were of pure African blood, and were brought into this country and sold as negro slaves  such being his status, and such the circumstances surrounding his position,  whether he can, by correct legal induction from that status and those circumstances, be clothed with the character and capacities of a citizen of the State of Missouri?
It may be assumed as a postulate, that to a slave, as such, there appertains and can appertain no relation, civil or political, with the State or the Government. He is himself strictly property, to be used in subserviency to the interests, the convenience, *476 or the will, of his owner; and to suppose, with respect to the former, the existence of any privilege or discretion, or of any obligation to others incompatible with the magisterial rights just defined, would be by implication, if not directly, to deny the relation of master and slave, since none can possess and enjoy, as his own, that which another has a paramount right and power to withhold. Hence it follows, necessarily, that a slave, the peculium or property of a master, and possessing within himself no civil nor political rights or capacities, cannot be a CITIZEN. For who, it may be asked, is a citizen? What do the character and status of citizen import? Without fear of contradiction, it does not import the condition of being private property, the subject of individual power and ownership. Upon a principle of etymology alone, the term citizen, as derived from civitas, conveys the ideas of connection or identification with the State or Government, and a participation of its functions. But beyond this, there is not, it is believed, to be found, in the theories of writers on Government, or in any actual experiment heretofore tried, an exposition of the term citizen, which has not been understood as conferring the actual possession and enjoyment, or the perfect right of acquisition and enjoyment, of an entire equality of privileges, civil and political.
Thus Vattel, in the preliminary chapter to his Treatise on the Law of Nations, says: "Nations or States are bodies politic; societies of men united together for the purpose of promoting their mutual safety and advantage, by the joint efforts of their mutual strength. Such a society has her affairs and her interests; she deliberates and takes resolutions in common; thus becoming a moral person, who possesses an understanding and a will peculiar to herself." Again, in the first chapter of the first book of the Treatise just quoted, the same writer, after repeating his definition of a State, proceeds to remark, that, "from the very design that induces a number of men to form a society, which has its common interests and which is to act in concert, it is necessary that there should be established a public authority, to order and direct what is to be done by each, in relation to the end of the association. This political authority is the sovereignty." Again this writer remarks: "The authority of all over each member essentially belongs to the body politic or the State."
By this same writer it is also said: "The citizens are the members of the civil society; bound to this society by certain duties, and subject to its authority; they equally participate in its advantages. The natives, or natural-born citizens, are those born in the country, of parents who are citizens. As society *477 cannot perpetuate itself otherwise than by the children of the citizens, those children naturally follow the condition of their parents, and succeed to all their rights." Again: "I say, to be of the country, it is necessary to be born of a person who is a citizen; for if he be born there of a foreigner, it will be only the place of his birth, and not his country. The inhabitants, as distinguished from citizens, are foreigners who are permitted to settle and stay in the country." (Vattel, Book 1, cap. 19, p. 101.)
From the views here expressed, and they seem to be unexceptionable, it must follow, that with the slave, with one devoid of rights or capacities, civil or political, there could be no pact; that one thus situated could be no party to, or actor in, the association of those possessing free will, power, discretion. He could form no part of the design, no constituent ingredient or portion of a society based upon common, that is, upon equal interests and powers. He could not at the same time be the sovereign and the slave.
But it has been insisted, in argument, that the emancipation of a slave, effected either by the direct act and assent of the master, or by causes operating in contravention of his will, produces a change in the status or capacities of the slave, such as will transform him from a mere subject of property, into a being possessing a social, civil, and political equality with a citizen. In other words, will make him a citizen of the State within which he was, previously to his emancipation, a slave.
It is difficult to conceive by what magic the mere surcease or renunciation of an interest in a subject of property, by an individual possessing that interest, can alter the essential character of that property with respect to persons or communities unconnected with such renunciation. Can it be pretended that an individual in any State, by his single act, though voluntarily or designedly performed, yet without the co-operation or warrant of the Government, perhaps in opposition to its policy or its guaranties, can create a citizen of that State? Much more emphatically may it be asked, how such a result could be accomplished by means wholly extraneous, and entirely foreign to the Government of the State? The argument thus urged must lead to these extraordinary conclusions. It is regarded at once as wholly untenable, and as unsustained by the direct authority or by the analogies of history.
The institution of slavery, as it exists and has existed from the period of its introduction into the United States, though more humane and mitigated in character than was the same institution, either under the republic or the empire of Rome, bears, both in its tenure and in the simplicity incident to the *478 mode of its exercise, a closer resemblance to Roman slavery than it does to the condition of villanage, as it formerly existed in England. Connected with the latter, there were peculiarities, from custom or positive regulation, which varied it materially from the slavery of the Romans, or from slavery at any period within the United States.
But with regard to slavery amongst the Romans, it is by no means true that emancipation, either during the republic or the empire, conferred, by the act itself, or implied, the status or the rights of citizenship.
The proud title of Roman citizen, with the immunities and rights incident thereto, and as contradistinguished alike from the condition of conquered subjects or of the lower grades of native domestic residents, was maintained throughout the duration of the republic, and until a late period of the eastern empire, and at last was in effect destroyed less by an elevation of the inferior classes than by the degradation of the free, and the previous possessors of rights and immunities civil and political, to the indiscriminate abasement incident to absolute and simple despotism.
By the learned and elegant historian of the Decline and Fall of the Roman Empire, we are told that "In the decline of the Roman empire, the proud distinctions of the republic were gradually abolished; and the reason or instinct of Justinian completed the simple form of an absolute monarchy. The emperor could not eradicate the popular reverence which always waits on the possession of hereditary wealth or the memory of famous ancestors. He delighted to honor with titles and emoluments his generals, magistrates, and senators, and his precarious indulgence communicated some rays of their glory to their wives and children. But in the eye of the law all Roman citizens were equal, and all subjects of the empire were citizens of Rome. That inestimable character was degraded to an obsolete and empty name. The voice of a Roman could no longer enact his laws, or create the annual ministers of his powers; his constitutional rights might have checked the arbitrary will of a master; and the bold adventurer from Germany or Arabia was admitted with equal favor to the civil and military command which the citizen alone had been once entitled to assume over the conquests of his fathers. The first Cæsars had scrupulously guarded the distinction of ingenuous and servile birth, which was decided by the condition of the mother. The slaves who were liberated by a generous master immediately entered into the middle class of libertini or freedmen; but they could never be enfranchised from the duties of obedience and gratitude; whatever were the fruits of *479 their industry, their patron and his family inherited the third part, or even the whole of their fortune, if they died without children and without a testament. Justinian respected the rights of patrons, but his indulgence removed the badge of disgrace from the two inferior orders of freedmen; whoever ceased to be a slave, obtained without reserve or delay the station of a citizen; and at length the dignity of an ingenuous birth was created or supposed by the omnipotence of the emperor."[*]
The above account of slavery and its modifications will be found in strictest conformity with the Institutes of Justinian. Thus, book 1st, title 3d, it is said: "The first general division of persons in respect to their rights is into freemen and slaves." The same title, sec. 4th: "Slaves are born such, or become so. They are born such of bondwomen; they become so either by the law of nations, as by capture, or by the civil law. Section 5th: "In the condition of slaves there is no diversity; but among free persons there are many. Thus some are ingenui or freemen, others libertini or freedmen."
Tit. 4th. DE INGENUIS.  "A freeman is one who is born free by being born in matrimony, of parents who both are free, or both freed; or of parents one free and the other freed. But one born of a free mother, although the father be a slave or unknown, is free."
Tit. 5th. DE LIBERTINIS.  "Freedmen are those who have been manumitted from just servitude."
Section third of the same title states that "freedmen were formerly distinguished by a threefold division." But the emperor proceeds to say: "Our piety leading us to reduce all things into a better state, we have amended our laws, and re-established the ancient usage; for anciently liberty was simple and undivided  that is, was conferred upon the slave as his manumittor possessed it, admitting this single difference, that the person manumitted became only a freed man, although his manumittor was a free man." And he further declares: "We have made all freed men in general become citizens of Rome, regarding neither the age of the manumitted, nor the manumittor, nor the ancient forms of manumission. We have also introduced many new methods by which slaves may become Roman citizens."
By the references above given it is shown, from the nature and objects of civil and political associations, and upon the direct authority of history, that citizenship was not conferred *480 by the simple fact of emancipation, but that such a result was deduced therefrom in violation of the fundamental principles of free political association; by the exertion of despotic will to establish, under a false and misapplied denomination, one equal and universal slavery; and to effect this result required the exertions of absolute power  of a power both in theory and practice, being in its most plenary acceptation the SOVEREIGNTY, THE STATE ITSELF  it could not be produced by a less or inferior authority, much less by the will or the act of one who, with reference to civil and political rights, was himself a slave. The master might abdicate or abandon his interest or ownership in his property, but his act would be a mere abandonment. It seems to involve an absurdity to impute to it the investiture of rights which the sovereignty alone had power to impart. There is not perhaps a community in which slavery is recognised, in which the power of emancipation and the modes of its exercise are not regulated by law  that is, by the sovereign authority; and none can fail to comprehend the necessity for such regulation, for the preservation of order, and even of political and social existence.
By the argument for the plaintiff in error, a power equally despotic is vested in every member of the association, and the most obscure or unworthy individual it comprises may arbitrarily invade and derange its most deliberate and solemn ordinances. At assumptions anomalous as these, so fraught with mischief and ruin, the mind at once is revolted, and goes directly to the conclusions, that to change or to abolish a fundamental principle of the society, must be the act of the society itself  of the sovereignty; and that none other can admit to a participation of that high attribute. It may further expose the character of the argument urged for the plaintiff, to point out some of the revolting consequences which it would authorize. If that argument possesses any integrity, it asserts the power in any citizen, or quasi citizen, or a resident foreigner of any one of the States, from a motive either of corruption or caprice, not only to infract the inherent and necessary authority of such State, but also materially to interfere with the organization of the Federal Government, and with the authority of the separate and independent States. He may emancipate his negro slave, by which process he first transforms that slave into a citizen of his own State; he may next, under color of article fourth, section second, of the Constitution of the United States, obtrude him, and on terms of civil and political equality, upon any and every State in this Union, in defiance of all regulations of necessity or policy, ordained by those States for their internal happiness or safety. Nay, more: this manumitted slave *481 may, by a proceeding springing from the will or act of his master alone, be mixed up with the institutions of the Federal Government, to which he is not a party, and in opposition to the laws of that Government which, in authorizing the extension by naturalization of the rights and immunities of citizens of the United States to those not originally parties to the Federal compact, have restricted that boon to free white aliens alone. If the rights and immunities connected with or practiced under the institutions of the United States can by any indirection be claimed or deduced from sources or modes other than the Constitution and laws of the United States, it follows that the power of naturalization vested in Congress is not exclusive  that it has in effect no existence, but is repealed or abrogated.
But it has been strangely contended that the jurisdiction of the Circuit Court might be maintained upon the ground that the plaintiff was a resident of Missouri, and that, for the purpose of vesting the court with jurisdiction over the parties, residence within the State was sufficient.
The first, and to my mind a conclusive reply to this singular argument is presented in the fact, that the language of the Constitution restricts the jurisdiction of the courts to cases in which the parties shall be citizens, and is entirely silent with respect to residence. A second answer to this strange and latitudinous notion is, that it so far stultifies the sages by whom the Constitution was framed, as to impute to them ignorance of the material distinction existing between citizenship and mere residence or domicil, and of the well-known facts, that a person confessedly an alien may be permitted to reside in a country in which he can possess no civil or political rights, or of which he is neither a citizen nor subject; and that for certain purposes a man may have a domicil in different countries, in no one of which he is an actual personal resident.
The correct conclusions upon the question here considered would seem to be these:
That in the establishment of the several communities now the States of this Union, and in the formation of the Federal Government, the African was not deemed politically a person. He was regarded and owned in every State in the Union as property merely, and as such was not and could not be a party or an actor, much less a peer in any compact or form of government established by the State or the United States. That if, since the adoption of the State Governments, he has been or could have been elevated to the possession of political rights or powers, this result could have been effected by no authority less potent than that of the sovereignty  the State  exerted *482 to that end, either in the form of legislation, or in some other mode of operation. It could certainly never have been accomplished by the will of an individual operating independently of the sovereign power, and even contravening and controlling that power. That so far as rights and immunities appertaining to citizens have been defined and secured by the Constitution and laws of the United States, the African race is not and never was recognised either by the language or purposes of the former; and it has been expressly excluded by every act of Congress providing for the creation of citizens by naturalization, these laws, as has already been remarked, being restricted to free white aliens exclusively.
But it is evident that, after the formation of the Federal Government by the adoption of the Constitution, the highest exertion of State power would be incompetent to bestow a character or status created by the Constitution, or conferred in virtue of its authority only. Upon those, therefore, who were not originally parties to the Federal compact, or who are not admitted and adopted as parties thereto, in the mode prescribed by its paramount authority, no State could have power to bestow the character or the rights and privileges exclusively reserved by the States for the action of the Federal Government by that compact.
The States, in the exercise of their political power, might, with reference to their peculiar Government and jurisdiction, guaranty the rights of person and property, and the enjoyment of civil and political privileges, to those whom they should be disposed to make the objects of their bounty; but they could not reclaim or exert the powers which they had vested exclusively in the Government of the United States. They could not add to or change in any respect the class of persons to whom alone the character of citizen of the United States appertained at the time of the adoption of the Federal Constitution. They could not create citizens of the United States by any direct or indirect proceeding.
According to the view taken of the law, as applicable to the demurrer to the plea in abatement in this cause; the questions subsequently raised upon the several pleas in bar might be passed by, as requiring neither a particular examination, nor an adjudication directly upon them. But as these questions are intrinsically of primary interest and magnitude, and have been elaborately discussed in argument, and as with respect to them the opinions of a majority of the court, including my own, are perfectly coincident, to me it seems proper that they should here be fully considered, and, so far as it is practicable for this court to accomplish such an end, finally put to rest.
*483 The questions then to be considered upon the several pleas in bar, and upon the agreed statement of facts between the counsel, are: 1st. Whether the admitted master and owner of the plaintiff, holding him as his slave in the State of Missouri, and in conformity with his rights guarantied to him by the laws of Missouri then and still in force, by carrying with him for his own benefit and accommodation, and as his own slave, the person of the plaintiff into the State of Illinois, within which State slavery had been prohibited by the Constitution thereof, and by retaining the plaintiff during the commorancy of the master within the State of Illinois, had, upon his return with his slave into the State of Missouri, forfeited his rights as master, by reason of any supposed operation of the prohibitory provision in the Constitution of Illinois, beyond the proper territorial jurisdiction of the latter State? 2d. Whether a similar removal of the plaintiff by his master from the State of Missouri, and his retention in service at a point included within no State, but situated north of thirty-six degrees thirty minutes of north latitude, worked a forfeiture of the right of property of the master, and the manumission of the plaintiff?
In considering the first of these questions, the acts or declarations of the master, as expressive of his purpose to emancipate, may be thrown out of view, since none will deny the right of the owner to relinquish his interest in any subject of property, at any time or in any place. The inquiry here bears no relation to acts or declarations of the owner as expressive of his intent or purpose to make such a relinquishment; it is simply a question whether, irrespective of such purpose, and in opposition thereto, that relinquishment can be enforced against the owner of property within his own country, in defiance of every guaranty promised by its laws; and this through the instrumentality of a claim to power entirely foreign and extraneous with reference to himself, to the origin and foundation of his title, and to the independent authority of his country. A conclusive negative answer to such an inquiry is at once supplied, by announcing a few familiar and settled principles and doctrines of public law.
Vattel, in his chapter on the general principles of the laws of nations, section 15th, tells us, that "nations being free and independent of each other in the same manner that men are naturally free and independent, the second general law of their society is, that each nation should be left in the peaceable enjoyment of that liberty which she inherits from nature."
"The natural society of nations," says this writer, "cannot subsist unless the natural rights of each be respected." In *484 section 16th he says, "as a consequence of that liberty and independence, it exclusively belongs to each nation to form her own judgment of what her conscience prescribes for her  of what it is proper or improper for her to do; and of course it rests solely with her to examine and determine whether she can perform any office for another nation without neglecting the duty she owes to herself. In all cases, therefore, in which a nation has the right of judging what her duty requires, no other nation can compel her to act in such or such a particular manner, for any attempt at such compulsion would be an infringement on the liberty of nations." Again, in section 18th, of the same chapter, "nations composed of men, and considered as so many free persons living together in a state of nature, are naturally equal, and inherit from nature the same obligations and rights. Power or weakness does not produce any difference. A small republic is no less a sovereign state than the most powerful kingdom."
So, in section 20: "A nation, then, is mistress of her own actions, so long as they do not affect the proper and perfect rights of any other nation  so long as she is only internally bound, and does not lie under any external and perfect obligation. If she makes an ill use of her liberty, she is guilty of a breach of duty; but other nations are bound to acquiesce in her conduct, since they have no right to dictate to her. Since nations are free, independent, and equal, and since each possesses the right of judging, according to the dictates of her conscience, what conduct she is to pursue, in order to fulfil her duties, the effect of the whole is to produce, at least externally, in the eyes of mankind, a perfect equality of rights between nations, in the administration of their affairs, and in the pursuit of their pretensions, without regard to the intrinsic justice of their conduct, of which others have no right to form a definitive judgment."
Chancellor Kent, in the 1st volume of his Commentaries, lecture 2d, after collating the opinions of Grotius, Heineccius, Vattel, and Rutherford, enunciates the following positions as sanctioned by these and other learned publicists, viz: that "nations are equal in respect to each other, and entitled to claim equal consideration for their rights, whatever may be their relative dimensions or strength, or however greatly they may differ in government, religion, or manners. This perfect equality and entire independence of all distinct States is a fundamental principle of public law. It is a necessary consequence of this equality, that each nation had a right to govern itself as it may think proper, and no one nation is entitled to dictate a form of government or religion, or a course of internal *485 policy, to another." This writer gives some instances of the violation of this great national immunity, and amongst them the constant interference by the ancient Romans, under the pretext of settling disputes between their neighbors, but with the real purpose of reducing those neighbors to bondage; the interference of Russia, Prussia, and Austria, for the dismemberment of Poland; the more recent invasion of Naples by Austria in 1821, and of Spain by the French Government in 1823, under the excuse of suppressing a dangerous spirit of internal revolution and reform.
With reference to this right of self-government in independent sovereign States, an opinion has been expressed, which, whilst it concedes this right as inseparable from and as a necessary attribute of sovereignty and independence, asserts nevertheless some implied and paramount authority of a supposed international law, to which this right of self-government must be regarded and exerted as subordinate; and from which independent and sovereign States can be exempted only by a protest, or by some public and formal rejection of that authority. With all respect for those by whom this opinion has been professed, I am constrained to regard it as utterly untenable, as palpably inconsistent, and as presenting in argument a complete felo de se.
Sovereignty, independence, and a perfect right of self-government, can signify nothing less than a superiority to and an exemption from all claims by any extraneous power, however expressly they may be asserted, and render all attempts to enforce such claims merely attempts at usurpation. Again, could such claims from extraneous sources be regarded as legitimate, the effort to resist or evade them, by protest or denial, would be as irregular and unmeaning as it would be futile. It could in no wise affect the question of superior right. For the position here combatted, no respectable authority has been, and none it is thought can be adduced. It is certainly irreconcilable with the doctrines already cited from the writers upon public law.
Neither the case of Lewis Somersett, (Howell's State Trials, vol. 20,) so often vaunted as the proud evidence of devotion to freedom under a Government which has done as much perhaps to extend the reign of slavery as all the world besides; nor does any decision founded upon the authority of Somersett's case, when correctly expounded, assail or impair the principle of national equality enunciated by each and all of the publicists already referred to. In the case of Somersett, although the applicant for the habeas corpus and the individual claiming property in that applicant were both subjects and residents *486 within the British empire, yet the decision cannot be correctly understood as ruling absolutely and under all circumstances against the right of property in the claimant. That decision goes no farther than to determine, that within the realm of England there was no authority to justify the detention of an individual in private bondage. If the decision in Somersett's case had gone beyond this point, it would have presented the anomaly of a repeal by laws enacted for and limited in their operation to the realm alone, of other laws and institutions established for places and subjects without the limits of the realm of England; laws and institutions at that very time, and long subsequently, sanctioned and maintained under the authority of the British Government, and which the full and combined action of the King and Parliament was required to abrogate.
But could the decision in Somersett's case be correctly interpreted as ruling the doctrine which it has been attempted to deduce from it, still that doctrine must be considered as having been overruled by the lucid and able opinion of Lord Stowell in the more recent case of the slave Grace, reported in the second volume of Haggard, p. 94; in which opinion, whilst it is conceded by the learned judge that there existed no power to coerce the slave whilst in England, that yet, upon her return to the island of Antigua, her status as a slave was revived, or, rather, that the title of the owner to the slave as property had never been extinguished, but had always existed in that island. If the principle of this decision be applicable as between different portions of one and the same empire, with how much more force does it apply as between nations or Governments entirely separate, and absolutely independent of each other? For in this preeise attitude the States of this Union stand with reference to this subject, and with reference to the tenure of every description of property vested under their laws and held within their territorial jurisdiction.
A strong illustration of the principle ruled by Lord Stowell, and of the effect of that principle even in a case of express contract, is seen in the case of Lewis v. Fullerton, decided by the Supreme Court of Virginia, and reported in the first volume of Randolph, p. 15. The case was this: A female slave, the property of a citizen of Virginia, whilst with her master in the State of Ohio, was taken from his possession under a writ of habeas corpus, and set at liberty. Soon, or immediately after, by agreement between this slave and her master, a deed was executed in Ohio by the latter, containing a stipulation that this slave should return to Virginia, and, after a service of two years in that State, should there be free. The law of Virginia *487 regulating emancipation required that deeds of emancipation should, within a given time from their date, be recorded in the court of the county in which the grantor resided, and declared that deeds with regard to which this requisite was not complied with should be void. Lewis, an infant son of this female, under the rules prescribed in such cases, brought an action, in forma pauperis, in one of the courts of Virginia, for the recovery of his freedom, claimed in virtue of the transactions above mentioned. Upon an appeal to the Supreme Court from a judgment against the plaintiff, Roane, Justice, in delivering the opinion of the court, after disposing of other questions discussed in that case, remarks:
"As to the deed of emancipation contained in the record, that deed, taken in connection with the evidence offered in support of it, shows that it had a reference to the State of Virginia; and the testimony shows that it formed a part of this contract, whereby the slave Milly was to be brought back (as she was brought back) into the State of Virginia. Her object was therefore to secure her freedom by the deed within the State of Virginia, after the time should have expired for which she had indented herself, and when she should be found abiding within the State of Virginia.
"If, then, this contract had an eye to the State of Virginia for its operation and effect, the lex loci ceases to operate. In that case it must, to have its effect, conform to the laws of Virginia. It is insufficient under those laws to effectuate an emancipation, for want of a due recording in the county court, as was decided in the case of Givens v. Mann, in this court. It is also ineffectual within the Commonwealth of Virginia for another reason. The lex loci is also to be taken subject to the exception, that it is not to be enforced in another country, when it violates some moral duty or the policy of that country, or is not consistent with a positive right secured to a third person or party by the laws of that country in which it is sought to be enforced. In such a case we are told, `magis jus nostrum, quam jus alienum servemus.'" (Huberus, tom. 2, lib. 1, tit. 3; 2 Fontblanque, p. 444.) "That third party in this instance is the Commonwealth of Virginia, and her policy and interests are also to be attended to. These turn the scale against the lex loci in the present instance."
The second or last-mentioned position assumed for the plaintiff under the pleas in bar, as it rests mainly if not solely upon the provision of the act of Congress of March 6, 1820, prohibiting slavery in Upper Louisiana north of thirty-six degrees thirty minutes north latitude, popularly called the Missouri Compromise, that assumption renews the question, formerly so *488 zealously debated, as to the validity of the provision in the act of Congress, and upon the constitutional competency of Congress to establish it.
Before proceeding, however, to examine the validity of the prohibitory provision of the law, it may, so far as the rights involved in this cause are concerned, be remarked, that conceding to that provision the validity of a legitimate exercise of power, still this concession could by no rational interpretation imply the slightest authority for its operation beyond the territorial limits comprised within its terms; much less could there be inferred from it a power to destroy or in any degree to control rights, either of person or property, entirely within the bounds of a distinct and independent sovereignty  rights invested and fortified by the guaranty of that sovereignty. These surely would remain in all their integrity, whatever effect might be ascribed to the prohibition within the limits defined by its language.
But, beyond and in defiance of this conclusion, inevitable and undeniable as it appears, upon every principle of justice or sound induction, it has been attempted to convert this prohibitory provision of the act of 1820 not only into a weapon with which to assail the inherent  the necessarily inherent  powers of independent sovereign Governments, but into a mean of forfeiting that equality of rights and immunities which are the birthright or the donative from the Constitution of every citizen of the United States within the length and breadth of the nation. In this attempt, there is asserted a power in Congress, whether from incentives of interest, ignorance, faction, partiality, or prejudice, to bestow upon a portion of the citizens of this nation that which is the common property and privilege of all  the power, in fine, of confiscation, in retribution for no offence, or, if for an offence, for that of accidental locality only.
It may be that, with respect to future cases, like the one now before the court, there is felt an assurance of the impotence of such a pretension; still, the fullest conviction of that result can impart to it no claim to forbearance, nor dispense with the duty of antipathy and disgust at its sinister aspect, whenever it may be seen to scowl upon the justice, the order, the tranquillity, and fraternal feeling, which are the surest, nay, the only means, of promoting or preserving the happiness and prosperity of the nation, and which were the great and efficient incentives to the formation of this Government.
The power of Congress to impose the prohibition in the eighth section of the act of 1820 has been advocated upon an attempted construction of the second clause of the third section *489 of the fourth article of the Constitution, which declares that "Congress shall have power to dispose of and to make all needful rules and regulations respecting the territory and other property belonging to the United States."
In the discussions in both houses of Congress, at the time of adopting this eighth section of the act of 1820, great weight was given to the peculiar language of this clause, viz: territory and other property belonging to the United States, as going to show that the power of disposing of and regulating, thereby vested in Congress, was restricted to a proprietary interest in the territory or land comprised therein, and did not extend to the personal or political rights of citizens or settlers, inasmuch as this phrase in the Constitution, "territory or other property," identified territory with property, and inasmuch as citizens or persons could not be property, and especially were not property belonging to the United States. And upon every principle of reason or necessity, this power to dispose of and to regulate the territory of the nation could be designed to extend no farther than to its preservation and appropriation to the uses of those to whom it belonged, viz: the nation. Scarcely anything more illogical or extravagant can be imagined than the attempt to deduce from this provision in the Constitution a power to destroy or in any wise to impair the civil and political rights of the citizens of the United States, and much more so the power to establish inequalities amongst those citizens by creating privileges in one class of those citizens, and by the disfranchisement of other portions or classes, by degrading them from the position they previously occupied.
There can exist no rational or natural connection or affinity between a pretension like this and the power vested by the Constitution in Congress with regard to the Territories; on the contrary, there is an absolute incongruity between them.
But whatever the power vested in Congress, and whatever the precise subject to which that power extended, it is clear that the power related to a subject appertaining to the United States, and one to be disposed of and regulated for the benefit and under the authority of the United States. Congress was made simply the agent or trustee for the United States, and could not, without a breach of trust and a fraud, appropriate the subject of the trust to any other beneficiary or cestui que trust than the United States, or to the people of the United States, upon equal grounds, legal or equitable. Congress could not appropriate that subject to any one class or portion of the people, to the exclusion of others, politically and constitutionally equals; but every citizen would, if any one *490 could claim it, have the like rights of purchase, settlement, occupation, or any other right, in the national territory.
Nothing can be more conclusive to show the equality of this with every other right in all the citizens of the United States, and the iniquity and absurdity of the pretension to exclude or to disfranchise a portion of them because they are the owners of slaves, than the fact that the same instrument, which imparts to Congress its very existence and its every function, guaranties to the slaveholder the title to his property, and gives him the right to its reclamation throughout the entire extent of the nation; and, farther, that the only private property which the Constitution has specifically recognised, and has imposed it as a direct obligation both on the States and the Federal Government to protect and enforce, is the property of the master in his slave; no other right of property is placed by the Constitution upon the same high ground, nor shielded by a similar guaranty.
Can there be imputed to the sages and patriots by whom the Constitution was framed, or can there be detected in the text of that Constitution, or in any rational construction or implication deducible therefrom, a contradiction so palpable as would exist between a pledge to the slaveholder of an equality with his fellow-citizens, and of the formal and solemn assurance for the security and enjoyment of his property, and a warrant given, as it were uno flatu, to another, to rob him of that property, or to subject him to proscription and disfranchisement for possessing or for endeavoring to retain it? The injustice and extravagance necessarily implied in a supposition like this, cannot be rationally imputed to the patriotic or the honest, or to those who were merely sane.
A conclusion in favor of the prohibitory power in Congress, as asserted in the eighth section of the act of 1820, has been attempted, as deducible from the precedent of the ordinance of the convention of 1787, concerning the cession by Virginia of the territory northwest of the Ohio; the provision in which ordinance, relative to slavery, it has been attempted to impose upon other and subsequently-acquired territory.
The first circumstance which, in the consideration of this provision, impresses itself upon my mind, is its utter futility and want of authority. This court has, in repeated instances, ruled, that whatever may have been the force accorded to this ordinance of 1787 at the period of its enactment, its authority and effect ceased, and yielded to the paramount authority of the Constitution, from the period of the adoption of the latter. Such is the principle ruled in the cases of Pollard's Lessee v. Hagan, (3 How., 212,) Parmoli v. The First Municipality of *491 New Orleans, (3 How., 589,) Strader v. Graham, (16 How., 82.) But apart from the superior control of the Constitution, and anterior to the adoption of that instrument, it is obvious that the inhibition in question never had and never could have any legitimate and binding force. We may seek in vain for any power in the convention, either to require or to accept a condition or restriction upon the cession like that insisted on; a condition inconsistent with, and destructive, of, the object of the grant. The cession was, as recommended by the old Congress in 1780, made originally and completed in terms to the United States, and for the benefit of the United States, i.e., for the people, all the people, of the United States. The condition subsequently sought to be annexed in 1787, (declared, too, to be perpetual and immutable,) being contradictory to the terms and destructive of the purposes of the cession, and after the cession was consummated, and the powers of the ceding party terminated, and the rights of the grantees, the people of the United States, vested, must necessarily, so far, have been ab initio void. With respect to the power of the convention to impose this inhibition, it seems to be pertinent in this place to recur to the opinion of one contemporary with the establishment of the Government, and whose distinguished services in the formation and adoption of our national charter, point him out as the artifex maximus of our Federal system. James Madison, in the year 1819, speaking with reference to the prohibitory power claimed by Congress, then threatening the very existence of the Union, remarks of the language of the second clause of the third section of article fourth of the Constitution, "that it cannot be well extended beyond a power over the territory as property, and the power to make provisions really needful or necessary for the government of settlers, until ripe for admission into the Union."
Again he says, "with respect to what has taken place in the Northwest territory, it may be observed that the ordinance giving it its distinctive character on the subject of slaveholding proceeded from the old Congress, acting with the best intentions, but under a charter which contains no shadow of the authority exercised; and it remains to be decided how far the States formed within that territory, and admitted into the Union, are on a different footing from its other members as to their legislative sovereignty. As to the power of admitting new States into the Federal compact, the questions offering themselves are, whether Congress can attach conditions, or the new States concur in conditions, which after admission would abridge or enlarge the constitutional rights of legislation common to other States; whether Congress can, by a compact *492 with a new State, take power either to or from itself, or place the new member above or below the equal rank and rights possessed by the others; whether all such stipulations expressed or implied would not be nullities, and be so pronounced when brought to a practical test. It falls within the scope of your inquiry to state the fact, that there was a proposition in the convention to discriminate between the old and the new States by an article in the Constitution. The proposition, happily, was rejected. The effect of such a discrimination is sufficiently evident."[*]
In support of the ordinance of 1787, there may be adduced the semblance at least of obligation deducible from compact, the form of assent or agreement between the grantor and grantee; but this form or similitude, as is justly remarked by Mr. Madison, is rendered null by the absence of power or authority in the contracting parties, and by the more intrinsic and essential defect of incompatibility with the rights and avowed purposes of those parties, and with their relative duties and obligations to others. If, then, with the attendant formalities of assent or compact, the restrictive power claimed was void as to the immediate subject of the ordinance, how much more unfounded must be the pretension to such a power as derived from that source, (viz: the ordinance of 1787,) with respect to territory acquired by purchase or conquest under the supreme authority of the Constitution  territory not the subject of mere donation, but obtained in the name of all, by the combined efforts and resources of all, and with no condition annexed or pretended.
In conclusion, my opinion is, that the decision of the Circuit Court, upon the law arising upon the several pleas in bar, is correct, but that it is erroneous in having sustained the demurrer to the plea in abatement of the jurisdiction; that for this error the decision of the Circuit Court should be reversed, and the cause remanded to that court, with instructions to abate the action, for the reason set forth and pleaded in the plea in abatement.
In the aforegoing examination of this cause, the circumstance that the questions involved therein had been previously adjudged between these parties by the court of the State of Missouri, has not been adverted to; for although it has been ruled by this court, that in instances of concurrent jurisdiction, the court first obtaining possession or cognizance of the controversy should retain and decide it, yet, as in this case there had *493 been no plea, either of a former judgment or of autre action pendent, it was thought that the fact of a prior decision, however conclusive it might have been if regularly pleaded, could not be incidentally taken into view.
Mr. Justice CAMPBELL.
I concur in the judgment pronounced by the Chief Justice, but the importance of the cause, the expectation and interest it has awakened, and the responsibility involved in its determination, induce me to file a separate opinion.
The case shows that the plaintiff, in the year 1834, was a negro slave in Missouri, the property of Dr. Emerson, a surgeon in the army of the United States. In 1834, his master took him to the military station at Rock Island, on the border of Illinois, and in 1836 to Fort Snelling, in the present Minnesota, then Wisconsin, Territory. While at Fort Snelling, the plaintiff married a slave who was there with her master, and two children have been born of this connection; one during the journey of the family in returning to Missouri, and the other after their return to that State.
Since 1838, the plaintiff and the members of his family have been in Missouri in the condition of slaves. The object of this suit is to establish their freedom. The defendant, who claims the plaintiff and his family, under the title of Dr. Emerson, denied the jurisdiction of the Circuit Court, by the plea that the plaintiff was a negro of African blood, the descendant of Africans who had been imported and sold in this country as slaves, and thus he had no capacity as a citizen of Missouri to maintain a suit in the Circuit Court. The court sustained a demurrer to this plea, a trial was then had upon the general issue, and special pleas to the effect that the plaintiff and his family were slaves belonging to the defendant.
My opinion in this case is not affected by the plea to the jurisdiction, and I shall not discuss the questions it suggests. The claim of the plaintiff to freedom depends upon the effect to be given to his absence from Missouri, in company with his master, in Illinois and Minnesota, and this effect is to be ascertained by a reference to the laws of Missouri. For the trespass complained of was committed upon one claiming to be a freeman and a citizen, in that State, and who had been living for years under the dominion of its laws. And the rule is, that whatever is a justification where the thing is done, must be a justification in the forum where the case is tried. (20 How. St. Tri., 234; Cowp. S.C., 161.)
The Constitution of Missouri recognises slavery as a legal condition, extends guaranties to the masters of slaves, and invites *494 immigrants to introduce them, as property, by a promise of protection. The laws of the State charge the master with the custody of the slave, and provide for the maintenance and security of their relation.
The Federal Constitution and the acts of Congress provide for the return of escaping slaves within the limits of the Union. No removal of the slave beyond the limits of the State, against the consent of the master, nor residence there in another condition, would be regarded as an effective manumission by the courts of Missouri, upon his return to the State. "Sicut liberis captis status restituitur sic servus domino." Nor can the master emancipate the slave within the State, except through the agency of a public authority. The inquiry arises, whether the manumission of the slave is effected by his removal, with the consent of the master, to a community where the law of slavery does not exist, in a case where neither the master nor slave discloses a purpose to remain permanently, and where both parties have continued to maintain their existing relations. What is the law of Missouri in such a case? Similar inquiries have arisen in a great number of suits, and the discussions in the State courts have relieved the subject of much of its difficulty. (12 B.M. Ky. R., 545; Foster v. Foster, 10 Gratt. Va. R., 485; 4 Har. and McH. Md. R., 295; Scott v. Emerson, 15 Misso., 576; 4 Rich. S.C.R., 186; 17 Misso., 434; 15 Misso., 596; 5 B.M., 173; 8 B.M., 540, 633; 9 B.M., 565; 5 Leigh, 614; 1 Raud., 15; 18 Pick., 193.)
The result of these discussions is, that in general, the status, or civil and political capacity of a person, is determined, in the first instance, by the law of the domicil where he is born; that the legal effect on persons, arising from the operation of the law of that domicil, is not indelible, but that a new capacity or status may be acquired by a change of domicil. That questions of status are closely connected with considerations arising out of the social and political organization of the State where they originate, and each sovereign power must determine them within its own territories.
A large class of cases has been decided upon the second of the propositions above stated, in the Southern and Western courts  cases in which the law of the actual domicil was adjudged to have altered the native condition and status of the slave, although he had never actually possessed the status of freedom in that domicil. (Rankin v. Lydia, 2 A.K.M.; Herny v. Decker, Walk., 36; 4 Mart., 385; 1 Misso., 472; Hunter v. Fulcher, 1 Leigh.)
I do not impugn the authority of these cases. No evidence is found in the record to establish the existence of a domicil *495 acquired by the master and slave, either in Illinois or Minnesota. The master is described as an officer of the army, who was transferred from one station to another, along the Western frontier, in the line of his duty, and who, after performing the usual tours of service, returned to Missouri; these slaves returned to Missouri with him, and had been there for near fifteen years, in that condition, when this suit was instituted. But absence, in the performance of military duty, without more, is a fact of no importance in determining a question of a change of domicil. Questions of that kind depend upon acts and intentions, and are ascertained from motives, pursuits, the condition of the family, and fortune of the party, and no change will be inferred, unless evidence shows that one domicil was abandoned, and there was an intention to acquire another. (11 L. and Eq., 6; 6 Exch., 217; 6 M. and W., 511; 2 Curt. Ecc. R., 368.)
The cases first cited deny the authority of a foreign law to dissolve relations which have been legally contracted in the State where the parties are, and have their actual domicil  relations which were never questioned during their absence from that State  relations which are consistent with the native capacity and condition of the respective parties, and with the policy of the State where they reside; but which relations were inconsistent with the policy or laws of the State or Territory within which they had been for a time, and from which they had returned, with these relations undisturbed. It is upon the assumption, that the law of Illinois or Minnesota was indelibly impressed upon the slave, and its consequences carried into Missouri, that the claim of the plaintiff depends. The importance of the case entitles the doctrine on which it rests to a careful examination.
It will be conceded, that in countries where no law or regulation prevails, opposed to the existence and consequences of slavery, persons who are born in that condition in a foréign State would not be liberated by the accident of their introgression. The relation of domestic slavery is recognised in the law of nations, and the interference of the authorities of one State with the rights of a master belonging to another, without a valid cause, is a violation of that law. (Wheat. Law of Na., 724; 5 Stats. at Large, 601; Calh. Sp., 378; Reports of the Com. U.S. and G.B., 187, 238, 241.)
The public law of Europe formerly permitted a master to reclaim his bondsman, within a limited period, wherever he could find him, and one of the capitularies of Charlemagne abolishes the rule of prescription. He directs, "that wheresoever, within the bounds of Italy, either the runaway slave of the king, or of *496 the church, or of any other man, shall be found by his master, he shall be restored without any bar or prescription of years; yet upon the provision that the master be a Frank or German, or of any other nation (foreign;) but if he be a Lombard or a Roman, he shall acquire or receive his slaves by that law which has been established from ancient times among them." Without referring for precedents abroad, or to the colonial history, for similar instances, the history of the Confederation and Union affords evidence to attest the existence of this ancient law. In 1783, Congress directed General Washington to continue his remonstrances to the commander of the British forces respecting the permitting negroes belonging to the citizens of these States to leave New York, and to insist upon the discontinuance of that measure. In 1788, the resident minister of the United States at Madrid was instructed to obtain from the Spanish Crown orders to its Governors in Louisiana and Florida, "to permit and facilitate the apprehension of fugitive slaves from the States, promising that the States would observe the like conduct respecting fugitives from Spanish subjects." The committee that made the report of this resolution consisted of Hamilton, Madison, and Sedgwick, (2 Hamilton's Works, 473;) and the clause in the Federal Constitution providing for the restoration of fugitive slaves is a recognition of this ancient right, and of the principle that a change of place does not effect a change of condition. The diminution of the power of a master to reclaim his escaping bondsman in Europe commenced in the enactment of laws of prescription in favor of privileged communes. Bremen, Spire, Worms, Vienna, and Ratisbon, in Germany; Carcassonne, Béziers, Toulouse, and Paris, in France, acquired privileges on this subject at an early period. The ordinance of William the Conqueror, that a residence of any of the servile population of England, for a year and a day, without being claimed, in any city, burgh, walled town, or castle of the King, should entitle them to perpetual liberty, is a specimen of these laws.
The earliest publicist who has discussed this subject is Bodin, a jurist of the sixteenth century, whose work was quoted in the early discussions of the courts in France and England on this subject. He says: "In France, although there be some remembrance of old servitude, yet it is not lawful here to make a slave or to buy any one of others, insomuch as the slaves of strangers, so soon as they set their foot within France, become frank and free, as was determined by an old decree of the court of Paris against an ambassador of Spain, who had brought a slave with him into France." He states another case, which arose in the city of Toulouse, of a Genoese merchant, who had *497 carried a slave into that city on his voyage from Spain; and when the matter was brought before the magistrates, the "procureur of the city, out of the records, showed certain ancient privileges given unto them of Tholouse, wherein it was granted that slaves, so soon as they should come into Tholouse, should be free." These cases were cited with much approbation in the discussion of the claims of the West India slaves of Verdelin for freedom, in 1738, before the judges in admiralty, (15 Causes Celébrés, p. 1; 2 Masse Droit Com., sec. 58,) and were reproduced before Lord Mansfield, in the cause of Somersett, in 1772. Of the cases cited by Bodin, it is to be observed that Charles V of France exempted all the inhabitants of Paris from serfdom, or other feudal incapacities, in 1371, and this was confirmed by several of his successors, (3 Dulaire Hist. de Par., 546; Broud. Cout. de Par., 21,) and the ordinance of Toulouse is preserved as follows: "Civitas Tholosana fuit et erit sine fine libera, adeo ut servi et ancill, sclavi et sclav dominos sive dominas habentes, cum rebus vel sine rebus suis, ad Tholosam vel infrà terminos extra urbem terminatos accedentes acquirant libertatem." (Hist. de Langue, tome 3, p. 69; Ibid. 6, p. 8; Loysel Inst., b. 1, sec. 6.)
The decisions were made upon special ordinances, or charters, which contained positive prohibitions of slavery, and where liberty had been granted as a privilege; and the history of Paris furnishes but little support for the boast that she was a "sacro sancta civitas," where liberty always had an asylum, or for the "self-complacent rhapsodies" of the French advocates in the case of Verdelin, which amused the grave lawyers who argued the case of Somersett. The case of Verdelin was decided upon a special ordinance, which prescribed the conditions on which West India slaves might be introduced into France, and which had been disregarded by the master.
The casé of Somersett was that of a Virginia slave carried to England by his master in 1770, and who remained there two years. For some cause, he was confined on a vessel destined to Jamaica, where he was to be sold. Lord Mansfield, upon a return to a habeas corpus, states the question involved. "Here, the person of the slave himself," he says, "is the immediate subject of inquiry, Can any dominion, authority, or coercion, be exercised in this country, according to the American laws?" He answers: "The difficulty of adopting the relation, without adopting it in all its consequences is indeed extreme, and yet many of those consequences are absolutely contrary to the municipal law of England." Again, he says: "The return states that the slave departed, and refused to serve; whereupon, he was kept to be sold abroad." "So high *498 an act of dominion must be recognised by the law of the country where it is used. The power of the master over his slave has been extremely different in different countries." "The state of slavery is of such a nature, that it is incapable of being introduced on any reasons, moral or political, but only by positive law, which preserves its force long after the reasons, occasion, and time itself, from whence it was created, are erased from the memory. It is so odious, that nothing can be suffered to support it but positive law." That there is a difference in the systems of States, which recognise and which do not recognise the institution of slavery, cannot be disguised. Constitutional law, punitive law, police, domestic economy, industrial pursuits, and amusements, the modes of thinking and of belief of the population of the respective communities, all show the profound influence exerted upon society by this single arrangement. This influence was discovered in the Federal Convention, in the deliberations on the plan of the Constitution. Mr. Madison observed, "that the States were divided into different interests, not by their difference of size, but by other circumstances; the most material of which resulted partly from climate, but principally from the effects of their having or not having slaves. These two causes concur in forming the great division of interests in the United States."
The question to be raised with the opinion of Lord Mansfield, therefore, is not in respect to the incongruity of the two systems, but whether slavery was absolutely contrary to the law of England; for if it was so, clearly, the American laws could not operate there. Historical research ascertains that at the date of the Conquest the rural population of England were generally in a servile condition, and under various names, denoting slight variances in condition, they were sold with the land like cattle, and were a part of its living money. Traces of the existence of African slaves are to be found in the early chronicles. Parliament in the time of Richard II, and also of Henry VIII, refused to adopt a general law of emancipation. Acts of emancipation by the last-named monarch and by Elizabeth are preserved.
The African slave trade had been carried on, under the unbounded protection of the Crown, for near two centuries, when the case of Somersett was heard, and no motion for its suppression had ever been submitted to Parliament; while it was forced upon and maintained in unwilling colonies by the Parliament and Crown of England at that moment. Fifteen thousand negro slaves were then living in that island, where they had been introduced under the counsel of the most illustrious jurists of the realm, and such slaves had been publicly *499 sold for near a century in the markets of London. In the northern part of the kingdom of Great Britain there existed a class of from 30,000 to 40,000 persons, of whom the Parliament said, in 1775, (15 George III, chap. 28,) "many colliers, coal-heavers, and salters, are in a state of slavery or bondage, bound to the collieries and salt works, where they work for life, transferable with the collieries and salt works when their original masters have no use for them; and whereas the emancipating or setting free the colliers, coal-heavers, and salters, in Scotland, who are now in a state of servitude, gradually and upon reasonable conditions, would be the means of increasing the number of colliers, coal-heavers, and salters, to the great benefit of the public, without doing any injury to the present masters, and would remove the reproach of allowing such a state of servitude to exist in a free country," &c.; and again, in 1799, "they declare that many colliers and coal-heavers still continue in a state of bondage." No statute, from the Conquest till the 15 George III, had been passed upon the subject of personal slavery. These facts have led the most eminent civilian of England to question the accuracy of this judgment, and to insinuate that in this judgment the offence of ampliare jurisdictionem by private authority was committed by the eminent magistrate who pronounced it.
This sentence is distinguishable from those cited from the French courts in this: that there positive prohibitions existed against slavery, and the right to freedom was conferred on the immigrant slave by positive law; whereas here the consequences of slavery merely  that is, the public policy  were found to be contrary to the law of slavery. The case of the slave Grace, (2 Hagg.,) with four others, came before Lord Stowell in 1827, by appeals from the West India vice admiralty courts. They were cases of slaves who had returned to those islands, after a residence in Great Britain, and where the claim to freedom was first presented in the colonial forum. The learned judge in that case said: "This suit fails in its foundation. She (Grace) was not a free person; no injury is done her by her continuance in slavery, and she has no pretensions to any other station than that which was enjoyed by every slave of a family. If she depends upon such freedom conveyed by a mere residence in England, she complains of a violation of right which she possessed no longer than whilst she resided in England, but which totally expired when that residence ceased, and she was imported into Antigua."
The decision of Lord Mansfield was, "that so high an act of dominion" as the master exercises over his slave, in sending him abroad for sale, could not be exercised in England *500 under the American laws, and contrary to the spirit of their own.
The decision of Lord Stowell is, that the authority of the English laws terminated when the slave departed from England. That the laws of England were not imported into Antigua, with the slave, upon her return, and that the colonial forum had no warrant for applying a foreign code to dissolve relations which had existed between persons belonging to that island, and which were legal according to its own system. There is no distinguishable difference between the case before us and that determined in the admiralty of Great Britain.
The complaint here, in my opinion, amounts to this: that the judicial tribunals of Missouri have not denounced as odious the Constitution and laws under which they are organized, and have not superseded them on their own private authority, for the purpose of applying the laws of Illinois, or those passed by Congress for Minnesota, in their stead. The eighth section of the act of Congress of the 6th of March, 1820, (3 Statutes at Large, 545,) entitled, "An act to authorize the people of Missouri to form a State Government," &c., &c., is referred to, as affording the authority to this court to pronounce the sentence which the Supreme Court of Missouri felt themselves constrained to refuse. That section of the act prohibits slavery in the district of country west of the Mississippi, north of thirty-six degrees thirty minutes north latitude, which belonged to the ancient province of Louisiana, not included in Missouri.
It is a settled doctrine of this court, that the Federal Government can exercise no power over the subject of slavery within the States, nor control the intermigration of slaves, other than fugitives, among the States. Nor can that Government affect the duration of slavery within the States, other than by a legislation over the foreign slave trade. The power of Congress to adopt the section of the act above cited must therefore depend upon some condition of the Territories which distinguishes them from States, and subjects them to a control more extended. The third section of the fourth article of the Constitution is referred to as the only and all-sufficient grant to support this claim. It is, that "new States may be admitted by the Congress to this Union; but no new State shall be formed or erected within the jurisdiction of any other States, nor any State be formed by the junction of two or more States, or parts of States, without the consent of the Legislatures of the States concerned, as well as of the Congress. The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property *501 belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular State."
It is conceded, in the decisions of this court, that Congress may secure the rights of the United States in the public domain, provide for the sale or lease of any part of it, and establish the validity of the titles of the purchasers, and may organize Territorial Governments, with powers of legislation. (3 How., 212; 12 How., 1; 1 Pet., 511; 13 P., 436; 16 H., 164.)
But the recognition of a plenary power in Congress to dispose of the public domain, or to organize a Government over it, does not imply a corresponding authority to determine the internal polity, or to adjust the domestic relations, or the persons who may lawfully inhabit the territory in which it is situated. A supreme power to make needful rules respecting the public domain, and a similar power of framing laws to operate upon persons and things within the territorial limits where it lies, are distinguished by broad lines of demarcation in American history. This court has assisted us to define them. In Johnson v. McIntosh, (8 Wheat., 595  543,) they say: "According to the theory of the British Constitution, all vacant lands are vested in the Crown; and the exclusive power to grant them is admitted to reside in the Crown, as a branch of the royal prerogative.
"All the lands we hold were originally granted by the Crown, and the establishment of a royal Government has never been considered as impairing its right to grant lands within the chartered limits of such colony."
And the British Parliament did claim a supremacy of legislation coextensive with the absoluteness of the dominion of the sovereign over the Crown lands. The American doctrine, to the contrary, is embodied in two brief resolutions of the people of Pennsylvania, in 1774: 1st. "That the inhabitants of these colonies are entitled to the same rights and liberties, within the colonies, that the subjects born in England are entitled within the realm." 2d. "That the power assumed by Parliament to bind the people of these colonies by statutes, in all cases whatever, is unconstitutional, and therefore the source of these unhappy difficulties." The Congress of 1774, in their statement of rights and grievances, affirm "a free and exclusive power of legislation" in their several Provincial Legislatures, "in all cases of taxation and internal polity, subject only to the negative of their sovereign, in such manner as has been heretofore used and accustomed." (1 Jour. Cong., 32.)
The unanimous consent of the people of the colonies, then, *502 to the power of their sovereign, "to dispose of and make all needful rules and regulations respecting the territory" of the Crown, in 1774, was deemed by them as entirely consistent with opposition, remonstrance, the renunciation of allegiance, and proclamation of civil war, in preference to submission to his claim of supreme power in the territories.
I pass now to the evidence afforded during the Revolution and Confederation. The American Revolution was not a social revolution. It did not alter the domestic condition or capacity of persons within the colonies, nor was it designed to disturb the domestic relations existing among them. It was a political revolution, by which thirteen dependent colonies became thirteen independent States. "The Declaration of Independence was not," says Justice Chase, "a declaration that the United Colonies jointly, in a collective capacity, were independent States, &c., &c., &c., but that each of them was a sovereign and independent State; that is, that each of them had a right to govern itself by its own authority and its own laws, without any control from any other power on earth." (3 Dall., 199; 4 Cr., 212.)
These sovereign and independent States, being united as a Confederation, by various public acts of cession, became jointly interested in territory, and concerned to dispose of and make all needful rules and regulations respecting it. It is a conclusion not open to discussion in this court, "that there was no territory within the (original) United States, that was claimed by them in any other right than that of some of the confederate States." (Harcourt v. Gaillord, 12 Wh., 523.) "The question whether the vacant lands within the United States," says Chief Justice Marshall, "became joint property, or belonged to the separate States, was a momentous question, which threatened to shake the American Confederacy to its foundations. This important and dangerous question has been compromised, and the compromise is not now to be contested." (6 C.R., 87.)
The cessions of the States to the Confederation were made on the condition that the territory ceded should be laid out and formed into distinct republican States, which should be admitted as members to the Federal Union, having the same rights of sovereignty, freedom, and independence, as the other States. The first effort to fulfil this trust was made in 1785, by the offer of a charter or compact to the inhabitants who might come to occupy the land.
Those inhabitants were to form for themselves temporary State Governments, founded on the Constitutions of any of the States, but to be alterable at the will of their Legislature; and *503 permanent Governments were to succeed these, whenever the population became sufficiently numerous to authorize the State to enter the Confederacy; and Congress assumed to obtain powers from the States to facilitate this object. Neither in the deeds of cession of the States, nor in this compact, was a sovereign power for Congress to govern the Territories asserted. Congress retained power, by this act, "to dispose of and to make rules and regulations respecting the public domain," but submitted to the people to organize a Government harmonious with those of the confederate States.
The next stage in the progress of colonial government was the adoption of the ordinance of 1787, by eight States, in which the plan of a Territorial Government, established by act of Congress, is first seen. This was adopted while the Federal Convention to form the Constitution was sitting. The plan placed the Government in the hands of a Governor, Secretary, and Judges, appointed by Congress, and conferred power on them to select suitable laws from the codes of the States, until the population should equal 5,000. A Legislative Council, elected by the people, was then to be admitted to a share of the legislative authority, under the supervision of Congress; and States were to be formed whenever the number of the population should authorize the measure.
This ordinance was addressed to the inhabitants as a fundamental compact, and six of its articles define the conditions to be observed in their Constitution and laws. These conditions were designed to fulfil the trust in the agreements of cession, that the States to be formed of the ceded Territories should be "distinct republican States." This ordinance was submitted to Virginia in 1788, and the 5th article, embodying as it does a summary of the entire act, was specifically ratified and confirmed by that State. This was an incorporation of the ordinance into her act of cession. It was conceded, in the argument, that the authority of Congress was not adequate to the enactment of the ordinance, and that it cannot be supported upon the Articles of Confederation. To a part of the engagements, the assent of nine States was required, and for another portion no provision had been made in those articles. Mr. Madison said, in a writing nearly contemporary, but before the confirmatory act of Virginia, "Congress have proceeded to form new States, to erect temporary Governments, to appoint officers for them, and to prescribe the conditions on which such States shall be admitted into the Confederacy; all this has been done, and done without the least color of constitutional authority." (Federalist, No. 38.) Richard Henry Lee, one of the committee who reported the ordinance to Congress, *504 transmitted it to General Washington, (15th July, 1787,) saying, "It seemed necessary, for the security of property among uninformed and perhaps licentious people, as the greater part of those who go there are, that a strong-toned Government should exist, and the rights of property be clearly defined." The consent of all the States represented in Congress, the consent of the Legislature of Virginia, the consent of the inhabitants of the Territory, all concur to support the authority of this enactment. It is apparent, in the frame of the Constitution, that the Convention recognised its validity, and adjusted parts of their work with reference to it. The authority to admit new States into the Union, the omission to provide distinctly for Territorial Governments, and the clause limiting the foreign slave trade to States then existing, which might not prohibit it, show that they regarded this Territory as provided with a Government, and organized permanently with a restriction on the subject of slavery. Justice Chase, in the opinion already cited, says of the Government before, and it is in some measure true during the Confederation, that "the powers of Congress originated from necessity, and arose out of and were only limited by events, or, in other words, they were revolutionary in their very nature. Their extent depended upon the exigencies and necessities of public affairs;" and there is only one rule of construction, in regard to the acts done, which will fully support them, viz: that the powers actually exercised were rightfully exercised, wherever they were supported by the implied sanction of the State Legislatures, and by the ratifications of the people.
The clauses in the 3d section of the 4th article of the Constitution, relative to the admission of new States, and the disposal and regulation of the territory of the United States, were adopted without debate in the Convention.
There was a warm discussion on the clauses that relate to the subdivision of the States, and the reservation of the claims of the United States and each of the States from any prejudice. The Maryland members revived the controversy in regard to the Crown lands of the Southwest. There was nothing to indicate any reference to a government of Territories not included within the limits of the Union; and the whole discussion demonstrates that the Convention was consciously dealing with a Territory whose condition, as to government, had been arranged by a fundamental and unalterable compact.
An examination of this clause of the Constitution, by the light of the circumstances in which the Convention was placed, will aid us to determine its significance. The first clause is, "that new States may be admitted by the Congress to this *505 Union." The condition of Kentucky, Vermont, Rhode Island, and the new States to be formed in the Northwest, suggested this, as a necessary addition to the powers of Congress. The next clause, providing for the subdivision of States, and the parties to consent to such an alteration, was required, by the plans on foot, for changes in Massachusetts, New York, Pennsylvania, North Carolina, and Georgia. The clause which enables Congress to dispose of and make regulations respecting the public domain, was demanded by the exigencies of an exhausted treasury and a disordered finance, for relief by sales, and the preparation for sales, of the public lands; and the last clause, that nothing in the Constitution should prejudice the claims of the United States or a particular State, was to quiet the jealousy and irritation of those who had claimed for the United States all the unappropriated lands. I look in vain, among the discussions of the time, for the assertion of a supreme sovereignty for Congress over the territory then belonging to the United States, or that they might thereafter acquire. I seek in vain for an annunciation that a consolidated power had been inaugurated, whose subject comprehended an empire, and which had no restriction but the discretion of Congress. This disturbing element of the Union entirely escaped the apprehensive previsions of Samuel Adams, George Clinton, Luther Martin, and Patrick Henry; and, in respect to dangers from power vested in a central Government over distant settlements, colonies, or provinces, their instincts were always alive. Not a word escaped them, to warn their countrymen, that here was a power to threaten the landmarks of this federative Union, and with them the safeguards of popular and constitutional liberty; or that under this article there might be introduced, on our soil, a single Government over a vast extent of country  a Government foreign to the persons over whom it might be exercised, and capable of binding those not represented, by statutes, in all cases whatever. I find nothing to authorize these enormous pretensions, nothing in the expositions of the friends of the Constitution, nothing in the expressions of alarm by its opponents  expressions which have since been developed as prophecies. Every portion of the United States was then provided with a municipal Government, which this Constitution was not designed to supersede, but merely to modify as to its conditions.
The compacts of cession by North Carolina and Georgia are subsequent to the Constitution. They adopt the ordinance of 1787, except the clause respecting slavery. But the precautionary repudiation of that article forms an argument quite as satisfactory to the advocates for Federal power, as its introduction *506 would have done. The refusal of a power to Congress to legislate in one place, seems to justify the seizure of the same power when another place for its exercise is found.
This proceeds from a radical error, which lies at the foundation of much of this discussion. It is, that the Federal Government may lawfully do whatever is not directly prohibited by the Constitution. This would have been a fundamental error, if no amendments to the Constitution had been made. But the final expression of the will of the people of the States, in the 10th amendment, is, that the powers of the Federal Government are limited to the grants of the Constitution.
Before the cession of Georgia was made, Congress asserted rights, in respect to a part of her territory, which require a passing notice. In 1798 and 1800, acts for the settlement of limits with Georgia, and to establish a Government in the Mississippi Territory, were adopted. A Territorial Government was organized, between the Chattahoochee and Mississippi rivers. This was within the limits of Georgia. These acts dismembered Georgia. They established a separate Government upon her soil, while they rather derisively professed, "that the establishment of that Government shall in no respects impair the rights of the State of Georgia, either to the jurisdiction or soil of the Territory." The Constitution provided that the importation of such persons as any of the existing States shall think proper to admit, shall not be prohibited by Congress before 1808. By these enactments, a prohibition was placed upon the importation of slaves into Georgia, although her Legislature had made none.
This court have repeatedly affirmed the paramount claim of Georgia to this Territory. They have denied the existence of any title in the United States. (6 C.R., 87; 12 Wh., 523; 3 How., 212; 13 How., 381.) Yet these acts were cited in the argument as precedents to show the power of Congress in the Territories. These statutes were the occasion of earnest expostulation and bitter remonstrance on the part of the authorities of the State, and the memory of their injustice and wrong remained long after the legal settlement of the controversy by the compact of 1802. A reference to these acts terminates what I have to say upon the Constitutions of the Territory within the original limits of the United States. These Constitutions were framed by the concurrence of the States making the cessions, and Congress, and were tendered to immigrants who might be attracted to the vacant territory. The legislative powers of the officers of this Government were limited to the selection of laws from the States; and provision was made for the introduction of popular institutions, and their emancipation *507 from Federal control, whenever a suitable opportunity occurred. The limited reservation of legislative power to the officers of the Federal Government was excused, on the plea of necessity; and the probability is, that the clauses respecting slavery embody some compromise among the statesmen of that time; beyond these, the distinguishing features of the system which the patriots of the Revolution had claimed as their birthright, from Great Britain, predominated in them.
The acquisition of Louisiana, in 1803, introduced another system into the United States. This vast province was ceded by Napoleon, and its population had always been accustomed to a viceroyal Government, appointed by the Crowns of France or Spain. To establish a Government constituted on similar principles, and with like conditions, was not an unnatural proceeding.
But there was great difficulty in finding constitutional authority for the measure. The third section of the fourth article of the Constitution was introduced into the Constitution, on the motion of Mr. Gouverneur Morris. In 1803, he was appealed to for information in regard to its meaning. He answers: "I am very certain I had it not in contemplation to insert a decree de coercendo imperio in the Constitution of America. * * * I knew then, as well as I do now, that all North America must at length be annexed to us. Happy indeed, if the lust of dominion stop here. It would therefore have been perfectly utopian to oppose a paper restriction to the violence of popular sentiment, in a popular Government." (3 Mor. Writ., 185.) A few days later, he makes another reply to his correspondent. "I perceive," he says, "I mistook the drift of your inquiry, which substantially is, whether Congress can admit, as a new State, territory which did not belong to the United States when the Constitution was made. In my opinion, they cannot. I always thought, when we should acquire Canada and Louisiana, it would be proper to GOVERN THEM AS PROVINCES, AND ALLOW THEM NO VOICE in our councils. In wording the third SECTION OF THE fourth article, I went as far as circumstances would permit, to establish the exclusion. CANDOR OBLIGES ME TO ADD MY BELIEF, THAT HAD IT BEEN MORE POINTEDLY EXPRESSED, A STRONG OPPOSITION WOULD HAVE BEEN MADE." (3 Mor. Writ., 192.) The first Territorial Government of Louisiana was an Imperial one, founded upon a French or Spanish model. For a time, the Governor, Judges, Legislative Council, Marshal, Secretary, and officers of the militia, were appointed by the President.[*]
*508 Besides these anomalous arrangements, the acquisition gave rise to jealous inquiries, as to the influence it would exert in determining the men and States that were to be "the arbiters and rulers" of the destinies of the Union; and unconstitutional opinions, having for their aim to promote sectional divisions, were announced and developed. "Something," said an eminent statesman, "something has suggested to the members of Congress the policy of acquiring geographical majorities. This is a very direct step towards disunion, for it must foster the geographical enmities by which alone it can be effected. This something must be a contemplation of particular advantages to be derived from such majorities; and is it not notorious that they consist of nothing else but usurpations over persons and property, by which they can regulate the internal wealth and prosperity of States and individuals?"
The most dangerous of the efforts to employ a geographical political power, to perpetuate a geographical preponderance in the Union, is to be found in the deliberations upon the act of the 6th of March, 1820, before cited. The attempt consisted of a proposal to exclude Missouri from a place in the Union, unless her people would adopt a Constitution containing a prohibition upon the subject of slavery, according to a prescription of Congress. The sentiment is now general, if not universal, that Congress had no constitutional power to impose the restriction. This was frankly admitted at the bar, in the course of this argument. The principles which this court have pronounced condemn the pretension then made on behalf of the legislative department. In Groves v. Slaughter, (15 Pet.,) the Chief Justice said: "The power over this subject is exclusively with the several States, and each of them has a right to decide for itself whether it will or will not allow persons of this description to be brought within its limits." Justice McLean said: "The Constitution of the United States operates alike in all the States, and one State has the same power over the subject of slavery as every other State." In Pollard's Lessee v. Hagan, (3 How., 212,) the court say: "The United States have no constitutional capacity to exercise municipal *509 jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, except in cases where it is delegated, and the court denies the faculty of the Federal Government to add to its powers by treaty or compact."
This is a necessary consequence, resulting from the nature of the Federal Constitution, which is a federal compact among the States, establishing a limited Government, with powers delegated by the people of distinct and independent communities, who reserved to their State Governments, and to themselves, the powers they did not grant. This claim to impose a restriction upon the people of Missouri involved a denial of the constitutional relations between the people of the States and Congress, and affirmed a concurrent right for the latter, with their people, to constitute the social and political system of the new States. A successful maintenance of this claim would have altered the basis of the Constitution. The new States would have become members of a Union defined in part by the Constitution and in part by Congress. They would not have been admitted to "this Union." Their sovereignty would have been restricted by Congress as well as the Constitution. The demand was unconstitutional and subversive, but was prosecuted with an energy, and aroused such animosities among the people, that patriots, whose confidence had not failed during the Revolution, began to despair for the Constitution.[*] Amid the utmost violence of this extraordinary contest, the expedient contained in the eighth section of this act was proposed, to moderate it, and to avert the catastrophe it menaced. It was not seriously debated, nor were its constitutional aspects severely scrutinized by Congress. For the first time, in the history of the country, has its operation been embodied in a case at law, and been presented to this court for their judgment. The inquiry is, whether there are conditions in the Constitutions of the Territories which subject the capacity and status of persons within their limits to the direct action of Congress. Can Congress determine the condition and status of persons who inhabit the Territories?
The Constitution permits Congress to dispose of and to make all needful rules and regulations respecting the territory or other property belonging to the United States. This power applies as well to territory belonging to the United States within the States, as beyond them. It comprehends all the public domain, wherever it may be. The argument is, that *510 the power to make "ALL needful rules and regulations" "is a power of legislation," "a full legislative power;" "that it includes all subjects of legislation in the territory," and is without any limitations, except the positive prohibitions which affect all the powers of Congress. Congress may then regulate or prohibit slavery upon the public domain within the new States, and such a prohibition would permanently affect the capacity of a slave, whose master might carry him to it. And why not? Because no power has been conferred on Congress. This is a conclusion universally admitted. But the power to "make rules and regulations respecting the territory" is not restrained by State lines, nor are there any constitutional prohibitions upon its exercise in the domain of the United States within the States; and whatever rules and regulations respecting territory Congress may constitutionally make are supreme, and are not dependent on the situs of "the territory."
The author of the Farmer's Letters, so famous in the ante-revolutionary history, thus states the argument made by the American loyalists in favor of the claim of the British Parliament to legislate in all cases whatever over the colonies: "It has been urged with great vehemence against us," he says, "and it seems to be thought their FORT by our adversaries, that a power of regulation is a power of legislation; and a power of legislation, if constitutional, must be universal and supreme, in the utmost sense of the word. It is therefore concluded that the colonies, by acknowledging the power of regulation, acknowledged every other power."
This sophism imposed upon a portion of the patriots of that day. Chief Justice Marshall, in his life of Washington, says "that many of the best-informed men in Massachusetts had perhaps adopted the opinion of the parliamentary right of internal government over the colonies;" "that the English statute book furnishes many instances of its exercise;" "that in no case recollected, was their authority openly controverted;" and "that the General Court of Massachusetts, on a late occasion, openly recognised the principle." (Marsh. Wash., v. 2, p. 75, 76.)
But the more eminent men of Massachusetts rejected it; and another patriot of the time employs the instance to warn us of "the stealth with which oppression approaches," and "the enormities towards which precedents travel." And the people of the United States, as we have seen, appealed to the last argument, rather than acquiesce in their authority. Could it have been the purpose of Washington and his illustrious associates, by the use of ambiguous, equivocal, and expansive *511 words, such as "rules," "regulations," "territory," to re-establish in the Constitution of their country that fort which had been prostrated amid the toils and with the sufferings and sacrifices of seven years of war? Are these words to be understood as the Norths, the Grenvilles, Hillsboroughs, Hutchinsons, and Dunmores  in a word, as George III would have understood them  or are we to look for their interpretation to Patrick Henry or Samuel Adams, to Jefferson, and Jay, and Dickinson; to the sage Franklin, or to Hamilton, who from his early manhood was engaged in combating British constructions of such words? We know that the resolution of Congress of 1780 contemplated that the new States to be formed under their recommendation were to have the same rights of sovereignty, freedom, and independence, as the old. That every resolution, cession, compact, and ordinance, of the States, observed the same liberal principle. That the Union of the Constitution is a union formed of equal States; and that new States, when admitted, were to enter "this Union." Had another union been proposed in "any pointed manner," it would have encountered not only "strong" but successful opposition. The disunion between Great Britain and her colonies originated in the antipathy of the latter to "rules and regulations" made by a remote power respecting their internal policy. In forming the Constitution, this fact was ever present in the minds of its authors. The people were assured by their most trusted statesmen "that the jurisdiction of the Federal Government is limited to certain enumerated objects, which concern all members of the republic," and "that the local or municipal authorities form distinct portions of supremacy, no more subject within their respective spheres to the general authority, than the general authority is subject to them within its own sphere." Still, this did not content them. Under the lead of Hancock and Samuel Adams, of Patrick Henry and George Mason, they demanded an explicit declaration that no more power was to be exercised than they had delegated. And the ninth and tenth amendments to the Constitution were designed to include the reserved rights of the States, and the people, within all the sanctions of that instrument, and to bind the authorities, State and Federal, by the judicial oath it prescribes, to their recognition and observance. Is it probable, therefore, that the supreme and irresponsible power, which is now claimed for Congress over boundless territories, the use of which cannot fail to react upon the political system of the States, to its subversion, was ever within the contemplation of the statesmen who conducted the counsels of the people in the formation of this Constitution? When *512 the questions that came to the surface upon the acquisition of Louisiana were presented to the mind of Jefferson, he wrote: "I had rather ask an enlargement of power from the nation, where it is found necessary, than to assume it by a construction which would make our powers boundless. Our peculiar security is in the possession of a written Constitution. Let us not make it blank paper by construction. I say the same as to the opinion of those who consider the grant of the treaty-making power as boundless. If it is, then we have no Constitution. If it has bounds, they can be no others than the definitions of the powers which that instrument gives. It specifies and delineates the operations permitted to the Federal Government, and gives the powers necessary to carry them into execution." The publication of the journals of the Federal Convention in 1819, of the debates reported by Mr. Madison in 1840, and the mass of private correspondence of the early statesmen before and since, enable us to approach the discussion of the aims of those who made the Constitution, with some insight and confidence.
I have endeavored, with the assistance of these, to find a solution for the grave and difficult question involved in this inquiry. My opinion is, that the claim for Congress of supreme power in the Territories, under the grant to "dispose of and make all needful rules and regulations respecting territory," is not supported by the historical evidence drawn from the Revolution, the Confederation, or the deliberations which preceded the ratification of the Federal Constitution. The ordinance of 1787 depended upon the action of the Congress of the Confederation, the assent of the State of Virginia, and the acquiescence of the people who recognized the validity of that plea of necessity which supported so many of the acts of the Governments of that time; and the Federal Government accepted the ordinance as a recognised and valid engagement of the Confederation.
In referring to the precedents of 1798 and 1800, I find the Constitution was plainly violated by the invasion of the rights of a sovereign State, both of soil and jurisdiction; and in reference to that of 1804, the wisest statesmen protested against it, and the President more than doubted its policy and the power of the Government.
Mr. John Quincy Adams, at a later period, says of the last act, "that the President found Congress mounted to the pitch of passing those acts, without inquiring where they acquired the authority, and he conquered his own scruples as they had done theirs." But this court cannot undertake for themselves the same conquest. They acknowledge that our peculiar security *513 is in the possession of a written Constitution, and they cannot make it blank paper by construction.
They look to its delineation of the operations of the Federal Government, and they must not exceed the limits it marks out, in their administration. The court have said "that Congress cannot exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, beyond what has been delegated." We are then to find the authority for supreme power in the Territories in the Constitution. What are the limits upon the operations of a Government invested with legislative, executive, and judiciary powers, and charged with the power to dispose of and to make all needful rules and regulations respecting a vast public domain? The feudal system would have recognized the claim made on behalf of the Federal Government for supreme power over persons and things in the Territories, as an incident to this title  that is, the title to dispose of and make rules and regulations respecting it.
The Norman lawyers of William the Conqueror would have yielded an implicit assent to the doctrine, that a supreme sovereignty is an inseparable incident to a grant to dispose of and to make all needful rules and regulations respecting the public domain. But an American patriot, in contrasting the European and American systems, may affirm, "that European sovereigns give lands to their colonists, but reserve to themselves a power to control their property, liberty, and privileges; but the American Government sells the lands belonging to the people of the several States (i.e., United States) to their citizens, who are already in the possession of personal and political rights, which the Government did not give, and cannot take away." And the advocates for Government sovereignty in the Territories have been compelled to abate a portion of the pretensions originally made in its behalf, and to admit that the constitutional prohibitions upon Congress operate in the Territories. But a constitutional prohibition is not requisite to ascertain a limitation upon the authority of the several departments of the Federal Government. Nor are the States or people restrained by any enumeration or definition of their rights or liberties.
To impair or diminish either, the department must produce an authority from the people themselves, in their Constitution; and, as we have seen, a power to make rules and regulations respecting the public domain does not confer a municipal sovereignty over persons and things upon it. But as this is "thought their fort" by our adversaries, I propose a more definite examination of it. We have seen, Congress does not *514 dispose of or make rules and regulations respecting domain belonging to themselves, but belonging to the United States.
These conferred on their mandatory, Congress, authority to dispose of the territory which belonged to them in common; and to accomplish that object beneficially and effectually, they gave an authority to make suitable rules and regulations respecting it. When the power of disposition is fulfilled, the authority to make rules and regulations terminates, for it attaches only upon territory "belonging to the United States."
Consequently, the power to make rules and regulations, from the nature of the subject, is restricted to such administrative and conservatory acts as are needful for the preservation of the public domain, and its preparation for sale or disposition. The system of land surveys; the reservations for schools, internal improvements, military sites, and public buildings; the pre-emption claims of settlers; the establishment of land offices, and boards of inquiry, to determine the validity of land titles; the modes of entry, and sale, and of conferring titles; the protection of the lands from trespass and waste; the partition of the public domain into municipal subdivisions, having reference to the erection of Territorial Governments and States; and perhaps the selection, under their authority, of suitable laws for the protection of the settlers, until there may be a sufficient number of them to form a self-sustaining municipal Government  these important rules and regulations will sufficiently illustrate the scope and operation of the 3d section of the 4th article of the Constitution. But this clause in the Constitution does not exhaust the powers of Congress within the territorial subdivisions, or over the persons who inhabit them. Congress may exercise there all the powers of Government which belong to them as the Legislature of the United States, of which these Territories make a part. (Loughborough v. Blake, 5 Wheat., 317.) Thus the laws of taxation, for the regulation of foreign, Federal, and Indian commerce, and so for the abolition of the slave trade, for the protection of copyrights and inventions, for the establishment of postal communication and courts of justice, and for the punishment of crimes, are as operative there as within the States. I admit that to mark the bounds for the jurisdiction of the Government of the United States within the Territory, and of its power in respect to persons and things within the municipal subdivisions it has created, is a work of delicacy and difficulty, and, in a great measure, is beyond the cognizance of the judiciary department of that Government. How much municipal power may be exercised by the people of the Territory, before their admission to the Union, the courts of justice cannot decide. This must depend, for *515 the most part, on political considerations, which cannot enter into the determination of a case of law or equity. I do not feel called upon to define the jurisdiction of Congress. It is sufficient for the decision of this case to ascertain whether the residuary sovereignty of the States or people has been invaded by the 8th section of the act of 6th March, 1820, I have cited, in so far as it concerns the capacity and status of persons in the condition and circumstances of the plaintiff and his family.
These States, at the adoption of the Federal Constitution, were organized communities, having distinct systems of municipal law, which, though derived from a common source, and recognising in the main similar principles, yet in some respects had become unlike, and on a particular subject promised to be antagonistic.
Their systems provided protection for life, liberty, and property, among their citizens, and for the determination of the condition and capacity of the persons domiciled within their limits. These institutions, for the most part, were placed beyond the control of the Federal Government. The Constitution allows Congress to coin money, and regulate its value; to regulate foreign and Federal commerce; to secure, for a limited period, to authors and inventors, a property in their writings and discoveries: and to make rules concerning captures in war; and, within the limits of these powers, it has exercised, rightly, to a greater or less extent, the power to determine what shall and what shall not be property.
But the great powers of war and negotiation, finance, postal communication, and commerce, in general, when employed in respect to the property of a citizen, refer to, and depend upon, the municipal laws of the States, to ascertain and determine what is property, and the rights of the owner, and the tenure by which it is held.
Whatever these Constitutions and laws validly determine to be property, it is the duty of the Federal Government, through the domain of jurisdiction merely Federal, to recognise to be property.
And this principle follows from the structure of the respective Governments, State and Federal, and their reciprocal relations. They are different agents and trustees of the people of the several States, appointed with different powers and with distinct purposes, but whose acts, within the scope of their respective jurisdictions, are mutually obligatory. They are respectively the depositories of such powers of legislation as the people were willing to surrender, and their duty is to co-operate within their several jurisdictions to maintain the rights of the same citizens under both Governments unimpaired. *516 A proscription, therefore, of the Constitution and laws of one or more States, determining property, on the part of the Federal Government, by which the stability of its social system may be endangered, is plainly repugnant to the conditions on which the Federal Constitution was adopted, or which that Government was designed to accomplish. Each of the States surrendered its powers of war and negotiation, to raise armies and to support a navy, and all of these powers are sometimes required to preserve a State from disaster and ruin. The Federal Government was constituted to exercise these powers for the preservation of the States, respectively, and to secure to all their citizens the enjoyment of the rights which were not surrendered to the Federal Government. The provident care of the statesmen who projected the Constitution was signalized by such a distribution of the powers of Government as to exclude many of the motives and opportunities for promoting provocations and spreading discord among the States, and for guarding against those partial combinations, so destructive of the community of interest, sentiment, and feeling, which are so essential to the support of the Union. The distinguishing features of their system consist in the exclusion of the Federal Government from the local and internal concerns of, and in the establishment of an independent internal Government within, the States. And it is a significant fact in the history of the United States, that those controversies which have been productive of the greatest animosity, and have occasioned most peril to the peace of the Union, have had their origin in the well-sustained opinion of a minority among the people, that the Federal Government had overstepped its constitutional limits to grant some exclusive privilege, or to disturb the legitimate distribution of property or power among the States or individuals. Nor can a more signal instance of this be found than is furnished by the act before us. No candid or rational man can hesitate to believe, that if the subject of the eighth section of the act of March, 1820, had never been introduced into Congress and made the basis of legislation, no interest common to the Union would have been seriously affected. And, certainly, the creation, within this Union, of large confederacies of unfriendly and frowning States, which has been the tendency, and, to an alarming extent, the result, produced by the agitation arising from it, does not commend it to the patriot or statesman. This court have determined that the intermigration of slaves was not committed to the jurisdiction or control of Congress. Wherever a master is entitled to go within the United States, his slave may accompany him, without any impediment from, or fear of, Congressional *517 legislation or interference. The question then arises, whether Congress, which can exercise no jurisdiction over the relations of master and slave within the limits of the Union, and is bound to recognise and respect the rights and relations that validly exist under the Constitutions and laws of the States, can deny the exercise of those rights, and prohibit the continuance of those relations, within the Territories.
And the citation of State statutes prohibiting the immigration of slaves, and of the decisions of State courts enforcing the forfeiture of the master's title in accordance with their rule, only darkens the discussion. For the question is, have Congress the municipal sovereignty in the Territories which the State Legislatures have derived from the authority of the people, and exercise in the States?
And this depends upon the construction of the article in the Constitution before referred to.
And, in my opinion, that clause confers no power upon Congress to dissolve the relations of the master and slave on the domain of the United States, either within or without any of the States.
The eighth section of the act of Congress of the 6th of March, 1820, did not, in my opinion, operate to determine the domestic condition and status of the plaintiff and his family during their sojourn in Minnesota Territory, or after their return to Missouri.
The question occurs as to the judgment to be given in this case. It appeared upon the trial that the plaintiff, in 1834, was in a state of slavery in Missouri, and he had been in Missouri for near fifteen years in that condition when this suit was brought. Nor does it appear that he at any time possessed another state or condition, de facto. His claim to freedom depends upon his temporary elocation, from the domicil of his origin, in company with his master, to communities where the law of slavery did not prevail. My examination is confined to the case, as it was submitted upon uncontested evidence, upon appropriate issues to the jury, and upon the instructions given and refused by the court upon that evidence. My opinion is, that the opinion of the Circuit Court was correct upon all the claims involved in those issues, and that the verdict of the jury was justified by the evidence and instructions.
The jury have returned that the plaintiff and his family are slaves.
Upon this record, it is apparent that this is not a controversy between citizens of different States; and that the plaintiff, at no period of the life which has been submitted to the view of the court, has had a capacity to maintain a suit in the courts *518 of the United States. And in so far as the argument of the Chief Justice upon the plea in abatement has a reference to the plaintiff or his family, in any of the conditions or circumstances of their lives, as presented in the evidence, I concur in that portion of his opinion. I concur in the judgment which expresses the conclusion that the Circuit Court should not have rendered a general judgment.
The capacity of the plaintiff to sue is involved in the pleas in bar, and the verdict of the jury discloses an incapacity under the Constitution. Under the Constitution of the United States, his is an incapacity to sue in their courts, while, by the laws of Missouri, the operation of the verdict would be more extensive. I think it a safe conclusion to enforce the lesser disability imposed by the Constitution of the United States, and leave to the plaintiff all his rights in Missouri. I think the judgment should be affirmed, on the ground that the Circuit Court had no jurisdiction, or that the case should be reversed and remanded, that the suit may be dismissed.
Mr. Justice CATRON.
The defendant pleaded to the jurisdiction of the Circuit Court, that the plaintiff was a negro of African blood; the descendant of Africans, who had been imported and sold in this country as slaves, and thus had no capacity as a citizen of Missouri to maintain a suit in the Circuit Court. The court sustained a demurrer to this plea, and a trial was had upon the pleas, of the general issue, and also that the plaintiff and his family were slaves, belonging to the defendant. In this trial, a verdict was given for the defendant.
The judgment of the Circuit Court upon the plea in abatement is not open, in my opinion, to examination in this court upon the plaintiff's writ.
The judgment was given for him conformably to the prayer of his demurrer. He cannot assign an error in such a judgment. (Tidd's Pr., 1163; 2 Williams's Saund., 46 a; 2 Iredell N.C., 87; 2 W. and S., 391.) Nor does the fact that the judgment was given on a plea to the jurisdiction, avoid the application of this rule. (Capron v. Van Noorden, 2 Cir., 126; 6 Wend., 465; 7 Met., 598; 5 Pike, 1005.)
The declaration discloses a case within the jurisdiction of the court  a controversy between citizens of different States. The plea in abatement, impugning these jurisdictional averments, was waived when the defendant answered to the declaration by pleas to the merits. The proceedings on that plea remain a part of the technical record, to show the history of the case, but are not open to the review of this court by a writ *519 of error. The authorities are very conclusive on this point. Shepherd v. Graves, 14 How., 505; Bailey v. Dozier, 6 How., 23; 1 Stewart, (Alabama,) 46; 10 Ben. Monroe, (Kentucky,) 555; 2 Stewart, (Alabama,) 370, 443; 2 Scammon, (Illinois,) 78. Nor can the court assume, as admitted facts, the averments of the plea from the confession of the demurrer. That confession was for a single object, and cannot be used for any other purpose than to test the validity of the plea. Tompkins. v. Ashley, 1 Moody and Mackin, 32; 33 Maine, 96, 100.
There being nothing in controversy here but the merits, I will proceed to discuss them.
The plaintiff claims to have acquired property in himself, and became free, by being kept in Illinois during two years.
The Constitution, laws, and policy, of Illinois, are somewhat peculiar respecting slavery. Unless the master becomes an inhabitant of that State, the slaves he takes there do not acquire their freedom; and if they return with their master to the slave State of his domicil, they cannot assert their freedom after their return. For the reasons and authorities on this point, I refer to the opinion of my brother Nelson, with which I not only concur, but think his opinion is the most conclusive argument on the subject within my knowledge.
It is next insisted for the plaintiff, that his freedom (and that of his wife and eldest child) was obtained by force of the act of Congress of 1820, usually known as the Missouri compromise act, which declares: "That in all that territory ceded by France to the United States, which lies north of thirty-six degrees thirty minutes north latitude, slavery and involuntary servitude shall be, and are hereby, forever prohibited."
From this prohibition, the territory now constituting the State of Missouri was excepted; which exception to the stipulation gave it the designation of a compromise.
The first question presented on this act is, whether Congress had power to make such compromise. For, if power was wanting, then no freedom could be acquired by the defendant under the act.
That Congress has no authority to pass laws and bind men's rights beyond the powers conferred by the Constitution, is not open to controversy. But it is insisted that, by the Constitution, Congress has power to legislate for and govern the Territories of the United States, and that by force of the power to govern, laws could be enacted, prohibiting slavery in any portion of the Louisiana Territory; and, of course, to abolish slavery in all parts of it, whilst it was, or is, governed as a Territory.
My opinion is, that Congress is vested with power to govern *520 the Territories of the United States by force of the third section of the fourth article of the Constitution. And I will state my reasons for this opinion.
Almost every provision in that instrument has a history that must be understood, before the brief and sententious language employed can be comprehended in the relations its authors intended. We must bring before us the state of things presented to the Convention, and in regard to which it acted, when the compound provision was made, declaring: 1st. That "new States may be admitted by the Congress into this Union." 2d. "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. And nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or any particular State."
Having ascertained the historical facts giving rise to these provisions, the difficulty of arriving at the true meaning of the language employed will be greatly lessened.
The history of these facts is substantially as follows:
The King of Great Britain, by his proclamation of 1763, virtually claimed that the country west of the mountains had been conquered from France, and ceded to the Crown of Great Britain by the treaty of Paris of that year, and he says: "We reserve it under our sovereignty, protection, and dominion, for the use of the Indians."
This country was conquered from the Crown of Great Britain, and surrendered to the United States by the treaty of peace of 1783. The colonial charters of Virginia, North Carolina, and Georgia, included it. Other States set up pretensions of claim to some portions of the territory north of the Ohio, but they were of no value, as I suppose. (5 Wheat., 375.)
As this vacant country had been won by the blood and treasure of all the States, those whose charters did not reach it, insisted that the country belonged to the States united, and that the lands should be disposed of for the benefit of the whole; and to which end, the western territory should be ceded to the States united. The contest was stringent and angry, long before the Convention convened, and deeply agitated that body. As a matter of justice, and to quiet the controversy, Virginia consented to cede the country north of the Ohio as early as 1783; and in 1784 the deed of cession was executed, by her delegates in the Congress of the Confederation, conveying to the United States in Congress assembled, for the benefit of said, States, "all right, title, and claim, as well of soil as of jurisdiction, which this Commonwealth hath to the territory or tract of country within the limits of the Virginia *521 charter, situate, lying, and being to the northwest of the river Ohio." In 1787, (July 13,) the ordinance was passed by the old Congress to govern the Territory.
Massachusetts had ceded her pretension of claim to western territory in 1785, Connecticut hers in 1786, and New York had ceded hers. In August, 1787, South Carolina ceded to the Confederation her pretension of claim to territory west of that State. And North Carolina was expected to cede hers, which she did do, in April, 1790. And so Georgia was confidently expected to cede her large domain, now constituting the territory of the States of Alabama and Mississippi.
At the time the Constitution was under consideration, there had been ceded to the United States, or was shortly expected to be ceded, all the western country, from the British Canada line to Florida, and from the head of the Mississippi almost to its mouth, except that portion which now constitutes the State of Kentucky.
Although Virginia had conferred on the Congress of the Confederation power to govern the Territory north of the Ohio, still, it cannot be denied, as I think, that power was wanting to admit a new State under the Articles of Confederation.
With these facts prominently before the Convention, they proposed to accomplish these ends:
1st. To give power to admit new States.
2d. To dispose of the public lands in the Territories, and such as might remain undisposed of in the new States after they were admitted.
And, thirdly, to give power to govern the different Territories as incipient States, not of the Union, and fit them for admission. No one in the Convention seems to have doubted that these powers were necessary. As early as the third day of its session, (May 29th,) Edmund Randolph brought forward a set of resolutions containing nearly all the germs of the Constitution, the tenth of which is as follows:
"Resolved, That provision ought to be made for the admission of States lawfully arising within the limits of the United States, whether from a voluntary junction of government and territory or otherwise, with the consent of a number of voices in the National Legislature less than the whole."
August 18th, Mr. Madison submitted, in order to be referred to the committee of detail, the following powers as proper to be added to those of the General Legislature:
"To dispose of the unappropriated lands of the United States." "To institute temporary Governments for new States arising therein." (3 Madison Papers, 1353.)
*522 These, with the resolution, that a district for the location of the seat of Government should be provided, and some others, were referred, without a dissent, to the committee of detail, to arrange and put them into satisfactory language.
Gouverneur Morris constructed the clauses, and combined the views of a majority on the two provisions, to admit new States; and secondly, to dispose of the public lands, and to govern the Territories, in the mean time, between the cessions of the States and the admission into the Union of new States arising in the ceded territory. (3 Madison Papers, 1456 to 1466.)
It was hardly possible to separate the power "to make all needful rules and regulations" respecting the government of the territory and the disposition of the public lands.
North of the Ohio, Virginia conveyed the lands, and vested the jurisdiction in the thirteen original States, before the Constitution was formed. She had the sole title and sole sovereignty, and the same power to cede, on any terms she saw proper, that the King of England had to grant the Virginia colonial charter of 1609, or to grant the charter of Pennsylvania to William Penn. The thirteen States, through their representatives and deputed ministers in the old Congress, had the same right to govern that Virginia had before the cession. (Baldwin's Constitutional Views, 90.) And the sixth article of the Constitution adopted all engagements entered into by the Congress of the Confederation, as valid against the United States; and that the laws, made in pursuance of the new Constitution, to carry out this engagement, should be the supreme law of the land, and the judges bound thereby. To give the compact, and the ordinance, which was part of it, full effect under the new Government, the act of August 7th, 1789, was passed, which declares, "Whereas, in order that the ordinance of the United States in Congress assembled, for the government of the Territory northwest of the river Ohio, may have full effect, it is requisite that certain provisions should be made, so as to adapt the same to the present Constitution of the United States." It is then provided that the Governor and other officers should be appointed by the President, with the consent of the Senate; and be subject to removal, &c., in like manner that they were by the old Congress, whose functions had ceased.
By the powers to govern, given by the Constitution, those amendments to the ordinance could be made, but Congress guardedly abstained from touching the compact of Virginia, further than to adapt it to the new Constitution.
It is due to myself to say, that it is asking much of a judge, *523 who has for nearly twenty years been exercising jurisdiction, from the western Missouri line to the Rocky Mountains, and, on this understanding of the Constitution, inflicting the extreme penalty of death for crimes committed where the direct legislation of Congress was the only rule, to agree that he had been all the while acting in mistake, and as an usurper.
More than sixty years have passed away since Congress has exercised power to govern the Territories, by its legislation directly, or by Territorial charters, subject to repeal at all times, and it is now too late to call that power into question, if this court could disregard its own decisions; which it cannot do, as I think. It was held in the case of Cross v. Harrison, (16 How., 193-'4,) that the sovereignty of California was in the United States, in virtue of the Constitution, by which power had been given to Congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States, with the power to admit new States into the Union. That decision followed preceding ones, there cited. The question was then presented, how it was possible for the judicial mind to conceive that the United States Government, created solely by the Constitution, could, by a lawful treaty, acquire territory over which the acquiring power had no jurisdiction to hold and govern it, by force of the instrument under whose authority the country was acquired; and the foregoing was the conclusion of this court on the proposition. What was there announced, was most deliberately done, and with a purpose. The only question here is, as I think, how far the power of Congress is limited.
As to the Northwest Territory, Virginia had the right to abolish slavery there; and she did so agree in 1787, with the other States in the Congress of the Confederation, by assenting to and adopting the ordinance of 1787, for the government of the Northwest Territory. She did this also by an act of her Legislature, passed afterwards, which was a treaty in fact.
Before the new Constitution was adopted, she had as much right to treat and agree as any European Government had. And, having excluded slavery, the new Government was bound by that engagement by article six of the new Constitution. This only meant that slavery should not exist whilst the United States exercised the power of government, in the Territorial form; for, when a new State came in, it might do so, with or without slavery.
My opinion is, that Congress had no power, in face of the compact between Virginia and the twelve other States, to force slavery into the Northwest Territory, because there, it was bound to that "engagement," and could not break it.
*524 In 1790, North Carolina ceded her western territory, now the State of Tennessee, and stipulated that the inhabitants thereof should enjoy all the privileges and advantages of the ordinance for governing the territory north of the Ohio river, and that Congress should assume the government, and accept the cession, under the express conditions contained in the ordinance: Provided, "That no regulation made, or to be made, by Congress, shall tend to emancipate slaves."
In 1802, Georgia ceded her western territory to the United States, with the provision that the ordinance of 1787 should in all its parts extend to the territory ceded, "that article only excepted which forbids slavery." Congress had no more power to legislate slavery out from the North Carolina and Georgia cessions, than it had power to legislate slavery in, north of the Ohio. No power existed in Congress to legislate at all, affecting slavery, in either case. The inhabitants, as respected this description of property, stood protected whilst they were governed by Congress, in like manner that they were protected before the cession was made, and when they were, respectively, parts of North Carolina and Georgia.
And how does the power of Congress stand west of the Mississippi river? The country there was acquired from France, by treaty, in 1803. It declares, that the First Consul, in the name of the French Republic, doth hereby cede to the United States, in full sovereignty, the colony or province of Louisiana, with all the rights and appurtenances of the said territory. And, by article third, that "the inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages, and immunities, of citizens of the United States; and, in the mean time, they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion which they profess."
Louisiana was a province where slavery was not only lawful, but where property in slaves was the most valuable of all personal property. The province was ceded as a unit, with an equal right pertaining to all its inhabitants, in every part thereof, to own slaves. It was, to a great extent, a vacant country, having in it few civilized inhabitants. No one portion of the colony, of a proper size for a State of the Union had a sufficient number of inhabitants to claim admission into the Union. To enable the United States to fulfil the treaty, additional population was indispensable, and obviously desired with anxiety by both sides, so that the whole country should, as soon as possible, become States of the Union. And for this *525 contemplated future population, the treaty as expressly provided as it did for the inhabitants residing in the province when the treaty was made. All these were to be protected "in the mean time;" that is to say, at all times, between the date of the treaty and the time when the portion of the Territory where the inhabitants resided was admitted into the Union as a State.
At the date of the treaty, each inhabitant had the right to the free enjoyment of his property, alike with his liberty and his religion, in every part of Louisiana; the province then being one country, he might go everywhere in it, and carry his liberty, property, and religion, with him, and in which he was to be maintained and protected, until he became a citizen of a State of the Union of the United States. This cannot be denied to the original inhabitants and their descendants. And, if it be true that immigrants were equally protected, it must follow that they can also stand on the treaty.
The settled doctrine in the State courts of Louisiana is, that a French subject coming to the Orleans Territory, after the treaty of 1803 was made, and before Louisiana was admitted into the Union, and being an inhabitant at the time of the admission, became a citizen of the United States by that act; that he was one of the inhabitants contemplated by the third article of the treaty, which referred to all the inhabitants embraced within the new State on its admission.
That this is the true construction, I have no doubt.
If power existed to draw a line at thirty-six degrees thirty minutes north, so Congress had equal power to draw the line on the thirtieth degree  that is, due west from the city of New Orleans  and to declare that north of that line slavery should never exist. Suppose this had been done before 1812, when Louisiana came into the Union, and the question of infraction of the treaty had then been presented on the present assumption of power to prohibit slavery, who doubts what the decision of this court would have been on such an act of Congress; yet, the difference between the supposed line, and that on thirty-six degrees thirty minutes north, is only in the degree of grossness presented by the lower line.
The Missouri compromise line of 1820 was very aggressive; it declared that slavery was abolished forever throughout a country reaching from the Mississippi river to the Pacific ocean, stretching over thirty-two degrees of longitude, and twelve and a half degrees of latitude on its eastern side, sweeping over four-fifths, to say no more, of the original province of Louisiana.
That the United States Government stipulated in favor of *526 the inhabitants to the extent here contended for, has not been seriously denied, as far as I know; but the argument is, that Congress had authority to repeal the third article of the treaty of 1803, in so far as it secured the right to hold slave property, in a portion of the ceded territory, leaving the right to exist in other parts. In other words, that Congress could repeal the third article entirely, at its pleasure. This I deny.
The compacts with North Carolina and Georgia were treaties also, and stood on the same footing of the Louisiana treaty; on the assumption of power to repeal the one, it must have extended to all, and Congress could have excluded the slaveholder of North Carolina from the enjoyment of his lands in the Territory now the State of Tennessee, where the citizens of the mother State were the principal proprietors.
And so in the case of Georgia. Her citizens could have been refused the right to emigrate to the Mississippi or Alabama Territory, unless they left their most valuable and cherished property behind them.
The Constitution was framed in reference to facts then existing or likely to arise: the instrument looked to no theories of Government. In the vigorous debates in the Convention, as reported by Mr. Madison and others, surrounding facts, and the condition and necessities of the country, gave rise to almost every provision; and among those facts, it was prominently true, that Congress dare not be intrusted with power to provide that, if North Carolina or Georgia ceded her western territory, the citizens of the State (in either case) could be prohibited, at the pleasure of Congress, from removing to their lands, then granted to a large extent, in the country likely to be ceded, unless they left their slaves behind. That such an attempt, in the face of a population fresh from the war of the Revolution, and then engaged in war with the great confederacy of Indians, extending from the mouth of the Ohio to the Gulf of Mexico, would end in open revolt, all intelligent men knew.
In view of these facts, let us inquire how the question stands by the terms of the Constitution, aside from the treaty? How it stood in public opinion when the Georgia cession was made, in 1802, is apparent from the fact that no guaranty was required by Georgia of the United States, for the protection of slave property. The Federal Constitution was relied on, to secure the rights of Georgia and her citizens during the Territorial condition of the country. She relied on the indisputable truths, that the States were by the Constitution made equals in political rights, and equals in the right to participate in the common property of all the States united, and held in trust for *527 them. The Constitution having provided that "The citizens of each State shall be entitled to all privileges and immunities of citizens of the several States," the right to enjoy the territory as equals was reserved to the States, and to the citizens of the States, respectively. The cited clause is not that citizens of the United States shall have equal privileges in the Territories, but the citizen of each State shall come there in right of his State, and enjoy the common property. He secures his equality through the equality of his State, by virtue of that great fundamental condition of the Union  the equality of the States.
Congress cannot do indirectly what the Constitution prohibits directly. If the slaveholder is prohibited from going to the Territory with his slaves, who are parts of his family in name and in fact, it will follow that men owning lawful property in their own States, carrying with them the equality of their State to enjoy the common property, may be told, you cannot come here with your slaves, and he will be held out at the border. By this subterfuge, owners of slave property, to the amount of thousand of millions, might be almost as effectually excluded from removing into the Territory of Louisiana north of thirty-six degrees thirty minutes, as if the law declared that owners of slaves, as a class, should be excluded, even if their slaves were left behind.
Just as well might Congress have said to those of the North, you shall not introduce into the territory south of said line your cattle or horses, as the country is already overstocked; nor can you introduce your tools of trade, or machines, as the policy of Congress is to encourage the culture of sugar and cotton south of the line, and so to provide that the Northern people shall manufacture for those of the South, and barter for the staple articles slave labor produces. And thus the Northern farmer and mechanic would be held out, as the slaveholder was for thirty years, by the Missouri restriction.
If Congress could prohibit one species of property, lawful throughout Louisiana when it was acquired, and lawful in the State from whence it was brought, so Congress might exclude any or all property.
The case before us will illustrate the construction contended for. Dr. Emerson was a citizen of Missouri; he had an equal right to go to the Territory with every citizen of other States. This is undeniable, as I suppose. Scott was Dr. Emerson's lawful property in Missouri; he carried his Missouri title with him; and the precise question here is, whether Congress had the power to annul that title. It is idle to say, that if Congress could not defeat the title directly, that it might be done *528 indirectly, by drawing a narrow circle around the slave population of Upper Louisiana, and declaring that if the slave went beyond it, he should be free. Such assumption is mere evasion, and entitled to no consideration. And it is equally idle to contend, that because Congress has express power to regulate commerce among the Indian tribes, and to prohibit intercourse with the Indians, that therefore Dr. Emerson's title might be defeated within the country ceded by the Indians to the United States as early as 1805, and which embraces Fort Snelling. (Am. State Papers, vol. 1, p. 734.) We must meet the question, whether Congress had the power to declare that a citizen of a State, carrying with him his equal rights, secured to him through his State, could be stripped of his goods and slaves, and be deprived of any participation in the common property? If this be the true meaning of the Constitution, equality of rights to enjoy a common country (equal to a thousand miles square) may be cut off by a geographical line, and a great portion of our citizens excluded from it.
Ingenious, indirect evasions of the Constitution have been attempted and defeated heretofore. In the passenger cases, (7 How. R.,) the attempt was made to impose a tax on the masters, crews, and passengers of vessels, the Constitution having prohibited a tax on the vessel itself; but this court held the attempt to be a mere evasion, and pronounced the tax illegal.
I admit that Virginia could, and lawfully did, prohibit slavery northwest of the Ohio, by her charter of cession, and that the territory was taken by the United States with this condition imposed. I also admit that France could, by the treaty of 1803, have prohibited slavery in any part of the ceded territory, and imposed it on the United States as a fundamental condition of the cession, in the mean time, till new States were admitted in the Union.
I concur with Judge Baldwin, that Federal power is exercised over all the territory within the United States, pursuant to the Constitution; and, the conditions of the cession, whether it was a part of the original territory of a State of the Union, or of a foreign State, ceded by deed or treaty; the right of the United States in or over it depends on the contract of cession, which operates to incorporate as well the Territory as its inhabitants into the Union. (Baldwin's Constitutional Views, 84.)
My opinion is, that the third article of the treaty of 1803, ceding Louisiana to the United States, stands protected by the Constitution, and cannot be repealed by Congress.
And, secondly, that the act of 1820, known as the Missouri *529 compromise, violates the most leading feature of the Constitution  a feature on which the Union depends, and which secures to the respective States and their citizens an entire EQUALITY of rights, privileges, and immunities.
On these grounds, I hold the compromise act to have been void; and, consequently, that the plaintiff, Scott, can claim no benefit under it.
For the reasons above stated, I concur with my brother judges that the plaintiff, Scott, is a slave, and was so when this suit was brought.
Mr. Justice McLEAN and Mr. Justice CURTIS dissented.
Mr. Justice McLEAN dissenting.
This case is before us on a writ of error from the Circuit Court for the district of Missouri.
An action of trespass was brought, which charges the defendant with an assault and imprisonment of the plaintiff, and also of Harriet Scott, his wife, Eliza and Lizzie, his two children, on the ground that they were his slaves, which was without right on his part, and against law.
The defendant filed a plea in abatement, "that said causes of action, and each and every of them, if any such accrued to the said Dred Scott, accrued out of the jurisdiction of this court, and exclusively within the jurisdiction of the courts of the State of Missouri, for that to wit, said plaintiff, Dred Scott, is not a citizen of the State of Missouri, as alleged in his declaration, because he is a negro of African descent, his ancestors were of pure African blood, and were brought into this country and sold as negro slaves; and this the said Sandford is ready to verify; wherefore he prays judgment whether the court can or will take further cognizance of the action aforesaid."
To this a demurrer was filed, which, on argument, was sustained by the court, the plea in abatement being held insufficient; the defendant was ruled to plead over. Under this rule he pleaded: 1. Not guilty; 2. That Dred Scott was a negro slave, the property of the defendant; and 3. That Harriet, the wife, and Eliza and Lizzie, the daughters of the plaintiff, were the lawful slaves of the defendant.
Issue was joined on the first plea, and replications of de injuria were filed to the other pleas.
The parties agreed to the following facts: In the year 1834, the plaintiff was a negro slave belonging to Dr. Emerson, who was a surgeon in the army of the United States. In that year, Dr. Emerson took the plaintiff from the State of Missouri to *530 the post of Rock Island, in the State of Illinois, and held him there as a slave until the month of April or May, 1836. At the time last mentioned, Dr. Emerson removed the plaintiff from Rock Island to the military post at Fort Snelling, situate on the west bank of the Mississippi river, in the territory known as Upper Louisiana, acquired by the United States of France, and situate north of latitude thirty-six degrees thirty minutes north, and north of the State of Missouri. Dr. Emerson held the plaintiff in slavery, at Fort Snelling, from the last-mentioned date until the year 1838.
In the year 1835, Harriet, who is named in the second count of the plaintiff's declaration, was the negro slave of Major Taliaferro, who belonged to the army of the United States. In that year, Major Taliaferro took Harriet to Fort Snelling, a military post situated as hereinbefore stated, and kept her there as a slave until the year 1836, and then sold and delivered her as a slave, at Fort Snelling, unto Dr. Emerson, who held her in slavery, at that place, until the year 1838.
In the year 1836, the plaintiff and Harriet were married at Fort Snelling, with the consent of Dr. Emerson, who claimed to be their master and owner. Eliza and Lizzie, named in the third count of the plaintiff's declaration, are the fruit of that marriage. Eliza is about fourteen years old, and was born on board the steamboat Gipsey, north of the north line of the State of Missouri, and upon the river Mississippi. Lizzie is about seven years old, and was born in the State of Missouri, at the military post called Jefferson Barracks.
In the year 1838, Dr. Emerson removed the plaintiff and said Harriet and their daughter Eliza from Fort Snelling to the State of Missouri, where they have ever since resided.
Before the commencement of the suit, Dr. Emerson sold and conveyed the plaintiff, Harriet, Eliza, and Lizzie, to the defendant, as slaves, and he has ever since claimed to hold them as slaves.
At the times mentioned in the plaintiff's declaration, the defendant, claiming to be the owner, laid his hands upon said plaintiff, Harriet, Eliza, and Lizzie, and imprisoned them; doing in this respect, however, no more than he might lawfully do, if they were of right his slaves at such times.
In the first place, the plea to the jurisdiction is not before us, on this writ of error. A demurrer to the plea was sustained, which ruled the plea bad, and the defendant, on leave, pleaded over.
The decision on the demurrer was in favor of the plaintiff; and as the plaintiff prosecutes this writ of error, he does not complain of the decision on the demurrer. The defendant *531 might have complained of this decision, as against him, and have prosecuted a writ of error, to reverse it. But as the case, under the instruction of the court to the jury, was decided in his favor, of course he had no ground of complaint.
But it is said, if the court, on looking at the record, shall clearly perceive that the Circuit Court had no jurisdiction, it is a ground for the dismissal of the case. This may be characterized as rather a sharp practice, and one which seldom, if ever, occurs. No case was cited in the argument as authority, and not a single case precisely in point is recollected in our reports. The pleadings do not show a want of jurisdiction. This want of jurisdiction can only be ascertained by a judgment on the demurrer to the special plea. No such case, it is believed, can be cited. But if this rule of practice is to be applied in this case, and the plaintiff in error is required to answer and maintain as well the points ruled in his favor, as to show the error of those ruled against him, he has more than an ordinary duty to perform. Under such circumstances, the want of jurisdiction in the Circuit Court must be so clear as not to admit of doubt. Now, the plea which raises the question of jurisdiction, in my judgment, is radically defective. The gravamen of the plea is this: "That the plaintiff is a negro of African descent, his ancestors being of pure African blood, and, were brought into this country, and sold as negro slaves."
There is no averment in this plea which shows or conduces to show an inability in the plaintiff to sue in the Circuit Court. It does not allege that the plaintiff had his domicil in any other State, nor that he is not a free man in Missouri. He is averred to have had a negro ancestry, but this does not show that he is not a citizen of Missouri, within the meaning of the act of Congress authorizing him to sue in the Circuit Court. It has never been held necessary, to constitute a citizen within the act, that he should have the qualifications of an elector. Females and minors may sue in the Federal courts, and so may any individual who has a permanent domicil in the State under whose laws his rights are protected, and to which he owes allegiance.
Being born under our Constitution and laws, no naturalization is required, as one of foreign birth, to make him a citizen. The most general and appropriate definition of the term citizen is "a freeman." Being a freeman, and having his domicil in a State different from that of the defendant, he is a citizen within the act of Congress, and the courts of the Union are open to him.
It has often been held, that the jurisdiction, as regards parties, can only be exercised between citizens of different States, *532 and that a mere residence is not sufficient; but this has been said to distinguish a temporary from a permanent residence.
To constitute a good plea to the jurisdiction, it must negative those qualities and rights which enable an individual to sue in the Federal courts. This has not been done; and on this ground the plea was defective, and the demurrer was properly sustained. No implication can aid a plea in abatement or in bar; it must be complete in itself; the facts stated, if true, must abate or bar the right of the plaintiff to sue. This is not the character of the above plea. The facts stated, if admitted, are not inconsistent with other facts, which may be presumed, and which bring the plaintiff within the act of Congress.
The pleader has not the boldness to allege that the plaintiff is a slave, as that would assume against him the matter in controversy, and embrace the entire merits of the case in a plea to the jurisdiction. But beyond the facts set out in the plea, the court, to sustain it, must assume the plaintiff to be a slave, which is decisive on the merits. This is a short and an effectual mode of deciding the cause; but I am yet to learn that it is sanctioned by any known rule of pleading.
The defendant's counsel complain, that if the court take jurisdiction on the ground that the plaintiff is free, the assumption is against the right of the master. This argument is easily answered. In the first place, the plea does not show him to be a slave; it does not follow that a man is not free whose ancestors were slaves. The reports of the Supreme Court of Missouri show that this assumption has many exceptions; and there is no averment in the plea that the plaintiff is not within them.
By all the rules of pleading, this is a fatal defect in the plea. If there be doubt, what rule of construction has been established in the slave States? In Jacob v. Sharp, (Meigs's Rep., Tennessee, 114,) the court held, when there was doubt as to the construction of a will which emancipated a slave, "it must be construed to be subordinate to the higher and more important right of freedom."
No injustice can result to the master, from an exercise of jurisdiction in this cause. Such a decision does not in any degree affect the merits of the case; it only enables the plaintiff to assert his claims to freedom before this tribunal. If the jurisdiction be ruled against him, on the ground that he is a slave, it is decisive of his fate.
It has been argued that, if a colored person be made a citizen of a State, he cannot sue in the Federal court. The Constitution declares that Federal jurisdiction "may be exercised between citizens of different States," and the same is provided *533 in the act of 1789. The above argument is properly met by saying that the Constitution was intended to be a practical instrument; and where its language is too plain to be misunderstood, the argument ends."
In Chiræ v. Chiræ (2 Wheat., 261; 4 Curtis, 99,) this court says: "That the power of naturalization is exclusively in Congress does not seem to be, and certainly ought not to be, controverted." No person can legally be made a citizen of a State, and consequently a citizen of the United States, of foreign birth, unless he be naturalized under the acts of Congress. Congress has power "to establish a uniform rule of naturalization."
It is a power which belongs exclusively to Congress, as intimately connected with our Federal relations. A State may authorize foreigners to hold real estate within its jurisdiction, but it has no power to naturalize foreigners, and give them the rights of citizens. Such a right is opposed to the acts of Congress on the subject of naturalization, and subversive of the Federal powers. I regret that any countenance should be given from this bench to a practice like this in some of the States, which has no warrant in the Constitution.
In the argument, it was said that a colored citizen would not be an agreeable member of society. This is more a matter of taste than of law. Several of the States have admitted persons of color to the right of suffrage, and in this view have recognised them as citizens; and this has been done in the slave as well as the free States. On the question of citizenship, it must be admitted that we have not been very fastidious. Under the late treaty with Mexico, we have made citizens of all grades, combinations, and colors. The same was done in the admission of Louisiana and Florida. No one ever doubted, and no court ever held, that the people of these Territories did not become citizens under the treaty. They have exercised all the rights of citizens, without being naturalized under the acts of Congress.
There are several important principles involved in this case, which have been argued, and which may be considered under the following heads:
1. The locality of slavery, as settled by this court and the courts of the States.
2. The relation which the Federal Government bears to slavery in the States.
3. The power of Congress to establish Territorial Governments, and to prohibit the introduction of slavery therein.
4. The effect of taking slaves into a new State or Territory, and so holding them, where slavery is prohibited.
5. Whether the return of a slave under the control of his *534 master, after being entitled to his freedom, reduces him to his former condition.
6. Are the decisions of the Supreme Court of Missouri, on the questions before us, binding on this court, within the rule adopted.
In the course of my judicial duties, I have had occasion to consider and decide several of the above points.
1. As to the locality of slavery. The civil law throughout the Continent of Europe, it is believed, without an exception, is, that slavery can exist only within the territory where it is established; and that, if a slave escapes, or is carried beyond such territory, his master cannot reclaim him, unless by virtue of some express stipulation. (Grotius, lib. 2, chap. 15, 5, 1; lib. 10, chap. 10, 2, 1; Wicqueposts Ambassador, lib. 1, p. 418; 4 Martin, 385; Case of the Creole in the House of Lords, 1842; 1 Phillimore on International Law, 316, 335.)
There is no nation in Europe which considers itself bound to return to his master a fugitive slave, under the civil law or the law of nations. On the contrary, the slave is held to be free where there is no treaty obligation, or compact in some other form, to return him to his master. The Roman law did not allow freedom to be sold. An ambassador or any other public functionary could not take a slave to France, Spain, or any other country of Europe, without emancipating him. A number of slaves escaped from a Florida plantation, and were received on board of ship by Admiral Cochrane; by the King's Bench, they were held to be free. (2 Barn. and Cres., 440.)
In the great and leading case of Prigg v. The State of Pennsylvania, (16 Peters, 594; 14 Curtis, 421,) this court say that, by the general law of nations, no nation is bound to recognise the state of slavery, as found within its territorial dominions, where it is in opposition to its own policy and institutions, in favor of the subjects of other nations where slavery is organized. If it does it, it is as a matter of comity, and not as a matter of international right. The state of slavery is deemed to be a mere municipal regulation, founded upon and limited to the range of the territorial laws. This was fully recognised in Somersett's case, (Lafft's Rep., 1; 20 Howell's State Trials, 79,) which was decided before the American Revolution.
There was some contrariety of opinion among the judges on certain points ruled in Prigg's case, but there was none in regard to the great principle, that slavery is limited to the range of the laws under which it is sanctioned.
No case in England appears to have been more thoroughly examined than that of Somersett. The judgment pronounced *535 by Lord Mansfield was the judgment of the Court of King's Bench. The cause was argued at great length, and with great ability, by Hargrave and others, who stood among the most eminent counsel in England. It was held under advisement from term to term, and a due sense of its importance was felt and expressed by the Bench.
In giving the opinion of the court, Lord Mansfield said:
"The state of slavery is of such a nature that it is incapable of being introduced on any reasons, moral or political, but only by positive law, which preserves its force long after the reasons, occasion, and time itself, from whence it was created, is erased from the memory; it is of a nature that nothing can be suffered to support it but positive law."
He referred to the contrary opinion of Lord Hardwicke, in October, 1749, as Chancellor: "That he and Lord Talbot, when Attorney and Solicitor General, were of opinion that no such claim, as here presented, for freedom, was valid."
The weight of this decision is sought to be impaired, from the terms in which it was described by the exuberant imagination of Curran. The words of Lord Mansfield, in giving the opinion of the court, were such as were fit to be used by a great judge, in a most important case. It is a sufficient answer to all objections to that judgment, that it was pronounced before the Revolution, and that it was considered by this court as the highest authority. For near a century, the decision in Somersett's case has remained the law of England. The case of the slave Grace, decided by Lord Stowell in 1827, does not, as has been supposed, overrule the judgment of Lord Mansfield. Lord Stowell held that, during the residence of the slave in England, "No dominion, authority, or coercion, can be exercised over him." Under another head, I shall have occasion to examine the opinion in the case of Grace.
To the position, that slavery can only exist except under the authority of law, it is objected, that in few if in any instances has it been established by statutory enactment. This is no answer to the doctrine laid down by the court. Almost all the principles of the common law had their foundation in usage. Slavery was introduced into the colonies of this country by Great Britain at an early period of their history, and it was protected and cherished, until it became incorporated into the colonial policy. It is immaterial whether a system of slavery was introduced by express law, or otherwise, if it have the authority of law. There is no slave State where the institution is not recognised and protected by statutory enactments and judicial decisions. Slaves are made property by the laws of the slave States, and as such are liable to the claims of creditors; *536 they descend to heirs, are taxed, and in the South they are a subject of commerce.
In the case of Rankin v. Lydia, (2 A.K. Marshall's Rep.,) Judge Mills, speaking for the Court of Appeals of Kentucky, says: "In deciding the question, (of slavery,) we disclaim the influence of the general principles of liberty, which we all admire, and conceive it ought to be decided by the law as it is, and not as it ought to be. Slavery is sanctioned by the laws of this State, and the right to hold slaves under our municipal regulations is unquestionable. But we view this as a right existing by positive law of a municipal character, without foundation in the law of nature, or the unwritten and common law."
I will now consider the relation which the Federal Government bears to slavery in the States:
Slavery is emphatically a State institution. In the ninth section of the first article of the Constitution, it is provided "that the migration or importation of such persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the year 1808, but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person."
In the Convention, it was proposed by a committee of eleven to limit the importation of slaves to the year 1800, when Mr. Pinckney moved to extend the time to the year 1808. This motion was carried  New Hampshire, Massachusetts, Connecticut, Maryland, North Carolina, South Carolina, and Georgia, voting in the affirmative; and New Jersey, Pennsylvania, and Virginia, in the negative. In opposition to the motion, Mr. Madison said: "Twenty years will produce all the mischief that can be apprehended from the liberty to import slaves; so long a term will be more dishonorable to the American character than to say nothing about it in the Constitution." (Madison Papers.)
The provision in regard to the slave trade shows clearly that Congress considered slavery a State institution, to be continued and regulated by its individual sovereignty; and to conciliate that interest, the slave trade was continued twenty years, not as a general measure, but for the "benefit of such States as shall think proper to encourage it."
In the case of Groves v. Slaughter, (15 Peters, 449; 14 Curtis, 137,) Messrs. Clay and Webster contended that, under the commercial power, Congress had a right to regulate the slave trade among the several States; but the court held that Congress had no power to interfere with slavery as it exists in the States, or to regulate what is called the slave trade among *537 them. If this trade were subject to the commercial power, it would follow that Congress could abolish or establish slavery in every State of the Union.
The only connection which the Federal Government holds with slaves in a State, arises from that provision of the Constitution which declares that "No person held to service or labor in one State, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up, on claim of the party to whom such service or labor may be due."
This being a fundamental law of the Federal Government, it rests mainly for its execution, as has been held, on the judicial power of the Union; and so far as the rendition of fugitives from labor has become a subject of judicial action, the Federal obligation has been faithfully discharged.
In the formation of the Federal Constitution, care was taken to confer no power on the Federal Government to interfere with this institution in the States. In the provision respecting the slave trade, in fixing the ratio of representation, and providing for the reclamation of fugitives from labor, slaves were referred to as persons, and in no other respect are they considered in the Constitution.
We need not refer to the mercenary spirit which introduced the infamous traffic in slaves, to show the degradation of negro slavery in our country. This system was imposed upon our colonial settlements by the mother country, and it is due to truth to say that the commercial colonies and States were chiefly engaged in the traffic. But we know as a historical fact, that James Madison, that great and good man, a leading member in the Federal Convention, was solicitous to guard the language of that instrument so as not to convey the idea that there could be property in man.
I prefer the lights of Madison, Hamilton, and Jay, as a means of construing the Constitution in all its bearings, rather than to look behind that period, into a traffic which is now declared to be piracy, and punished with death by Christian nations. I do not like to draw the sources of our domestic relations from so dark a ground. Our independence was a great epoch in the history of freedom; and while I admit the Government was not made especially for the colored race, yet many of them were citizens of the New England States, and exercised the rights of suffrage when the Constitution was adopted, and it was not doubted by any intelligent person that its tendencies would greatly ameliorate their condition.
Many of the States, on the adoption of the Constitution, or *538 shortly afterward, took measures to abolish slavery within their respective jurisdictions; and it is a well-known fact that a belief was cherished by the leading men, South as well as North, that the institution of slavery would gradually decline, until it would become extinct. The increased value of slave labor, in the culture of cotton and sugar, prevented the realization of this expectation. Like all other communities and States, the South were influenced by what they considered to be their own interests.
But if we are to turn our attention to the dark ages of the world, why confine our view to colored slavery? On the same principles, white men were made slaves. All slavery has its origin in power, and is against right.
The power of Congress to establish Territorial Governments, and to prohibit the introduction of slavery therein, is the next point to be considered.
After the cession of western territory by Virginia and other States, to the United States, the public attention was directed to the best mode of disposing of it for the general benefit. While in attendance on the Federal Convention, Mr. Madison, in a letter to Edmund Randolph, dated the 22d April, 1787, says: "Congress are deliberating on the plan most eligible for disposing of the western territory not yet surveyed. Some alteration will probably be made in the ordinance on that subject." And in the same letter he says: "The inhabitants of the Illinois complain of the land jobbers, &c., who are purchasing titles among them. Those of St. Vincent's complain of the defective criminal and civil justice among them, as well as of military protection." And on the next day he writes to Mr. Jefferson: "The government of the settlements on the Illinois and Wabash is a subject very perplexing in itself, and rendered more so by our ignorance of the many circumstances on which a right judgment depends. The inhabitants at those places claim protection against the savages, and some provision for both civil and criminal justice."
In May, 1787, Mr. Edmund Randolph submitted to the Federal Convention certain propositions, as the basis of a Federal Government, among which was the following:
"Resolved, That provision ought to be made for the admission of States lawfully arising within the limits of the United States, whether from a voluntary junction of government and territory or otherwise, with the consent of a number of voices in the National Legislature less than the whole."
Afterward, Mr. Madison submitted to the Convention, in order to be referred to the committee of detail, the following powers, as proper to be added to those of general legislation:
*539 "To dispose of the unappropriated lands of the United States. To institute temporary Governments for new States arising therein. To regulate affairs with the Indians, as well within as without the limits of the United States."
Other propositions were made in reference to the same subjects, which it would be tedious to enumerate. Mr. Gouverneur Morris proposed the following:
"The Legislature shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution contained shall be so construed as to prejudice any claims either of the United States or of any particular State."
This was adopted as a part of the Constitution, with two verbal alterations  Congress was substituted for Legislature, and the word either was stricken out.
In the organization of the new Government, but little revenue for a series of years was expected from commerce. The public lands were considered as the principal resource of the country for the payment of the Revolutionary debt. Direct taxation was the means relied on to pay the current expenses of the Government. The short period that occurred between the cession of western lands to the Federal Government by Virginia and other States, and the adoption of the Constitution, was sufficient to show the necessity of a proper land system and a temporary Government. This was clearly seen by propositions and remarks in the Federal Convention, some of which are above cited, by the passage of the Ordinance of 1787, and the adoption of that instrument by Congress, under the Constitution, which gave to it validity.
It will be recollected that the deed of cession of western territory was made to the United States by Virginia in 1784, and that it required the territory ceded to be laid out into States, that the land should be disposed of for the common benefit of the States, and that all right, title, and claim, as well of soil as of jurisdiction, were ceded; and this was the form of cession from other States.
On the 13th of July, the Ordinance of 1787 was passed, "for the government of the United States territory northwest of the river Ohio," with but one dissenting vote. This instrument provided there should be organized in the territory not less than three nor more than five States, designating their boundaries. It was passed while the Federal Convention was in session, about two months before the Constitution was adopted by the Convention. The members of the Convention must therefore have been well acquainted with the provisions of the *540 Ordinance. It provided for a temporary Government, as initiatory to the formation of State Governments. Slavery was prohibited in the territory.
Can any one suppose that the eminent men of the Federal Convention could have overlooked or neglected a matter so vitally important to the country, in the organization of temporary Governments for the vast territory northwest of the river Ohio? In the 3d section of the 4th article of the Constitution, they did make provision for the admission of new States, the sale of the public lands, and the temporary Government of the territory. Without a temporary Government, new States could not have been formed, nor could the public lands have been sold.
If the third section were before us now for consideration for the first time, under the facts stated, I could not hesitate to say there was adequate legislative power given in it. The power to make all needful rules and regulations is a power to legislate. This no one will controvert, as Congress cannot make "rules and regulations," except by legislation. But it is argued that the word territory is used as synonymous with the word land; and that the rules and regulations of Congress are limited to the disposition of lands and other property belonging to the United States. That this is not the true construction of the section appears from the fact that in the first line of the section "the power to dispose of the public lands" is given expressly, and, in addition, to make all needful rules and regulations. The power to dispose of is complete in itself, and requires nothing more. It authorizes Congress to use the proper means within its discretion, and any further provision for this purpose would be a useless verbiage. As a composition, the Constitution is remarkably free from such a charge.
In the discussion of the power of Congress to govern a Territory, in the case of the Atlantic Insurance Company v. Canter, (1 Peters, 511; 7 Curtis, 685,) Chief Justice Marshall, speaking for the court, said, in regard to the people of Florida, "they do not, however, participate in political power; they do not share in the Government till Florida shall become a State; in the mean time, Florida continues to be a Territory of the United States, governed by virtue of that clause in the Constitution which empowers Congress `to make all needful rules and regulations respecting the territory or other property belonging to the United States.'"
And he adds, "perhaps the power of governing a Territory belonging to the United States, which has not, by becoming a State, acquired the means of self-government, may result *541 necessarily from the fact that it is not within the jurisdiction of any particular State, and is within the power and jurisdiction of the United States. The right to govern may be the inevitable consequence of the right to acquire territory; whichever may be the source whence the power is derived, the possession of it is unquestioned." And in the close of the opinion, the court say, "in legislating for them [the Territories,] Congress exercises the combined powers of the General and State Governments."
Some consider the opinion to be loose and inconclusive; others, that it is obiter dicta; and the last sentence is objected to as recognising absolute power in Congress over Territories. The learned and eloquent Wirt, who, in the argument of a cause before the court, had occasion to cite a few sentences from an opinion of the Chief Justice, observed, "no one can mistake the style, the words so completely match the thought."
I can see no want of precision in the language of the Chief Justice; his meaning cannot be mistaken. He states, first, the third section as giving power to Congress to govern the Territories, and two other grounds from which the power may also be implied. The objection seems to be, that the Chief Justice did not say which of the grounds stated he considered the source of the power. He did not specifically state this, but he did say, "whichever may be the source whence the power is derived, the possession of it is unquestioned." No opinion of the court could have been expressed with a stronger emphasis; the power in Congress is unquestioned. But those who have undertaken to criticise the opinion, consider it without authority, because the Chief Justice did not designate specially the power. This is a singular objection. If the power be unquestioned, it can be a matter of no importance on which ground it is exercised.
The opinion clearly was not obiter dicta. The turning point in the case was, whether Congress had power to authorize the Territorial Legislature of Florida to pass the law under which the Territorial court was established, whose decree was brought before this court for revision. The power of Congress, therefore, was the point in issue.
The word "territory," according to Worcester, "means land, country, a district of country under a temporary Government." The words "territory or other property," as used, do imply, from the use of the pronoun other, that territory was used as descriptive of land; but does it follow that it was not used also as descriptive of a district of country? In both of these senses it belonged to the United States  as land, for the purpose of sale; as territory, for the purpose of government.
*542 But, if it be admitted that the word territory as used means land, and nothing but land, the power of Congress to organize a temporary Government is clear. It has power to make all needful regulations respecting the public lands, and the extent of those "needful regulations" depends upon the direction of Congress, where the means are appropriate to the end, and do not conflict with any of the prohibitions of the Constitution. If a temporary Government be deemed needful, necessary, requisite, or is wanted, Congress has power to establish it. This court says, in McCulloch v. The State of Maryland, (4 Wheat., 316,) "If a certain means to carry into effect any of the powers expressly given by the Constitution to the Government of the Union be an appropriate measure, not prohibited by the Constitution, the degree of its necessity is a question of legislative discretion, not of judicial cognizance."
The power to establish post offices and post roads gives power to Congress to make contracts for the transportation of the mail, and to punish all who commit depredations upon it in its transit, or at its places of distribution. Congress has power to regulate commerce, and, in the exercise of its discretion, to lay an embargo, which suspends commerce; so, under the same power, harbors, lighthouses, breakwaters, &c., are constructed.
Did Chief Justice Marshall, in saying that Congress governed a Territory, by exercising the combined powers of the Federal and State Governments, refer to unlimited discretion? A Government which can make white men slaves? Surely, such a remark in the argument must have been inadvertently uttered. On the contrary, there is no power in the Constitution by which Congress can make either white or black men slaves. In organizing the Government of a Territory, Congress is limited to meams appropriate to the attainment of the constitutional object. No powers can be exercised which are prohibited by the Constitution, or which are contrary to its spirit; so that, whether the object may be the protection of the persons and property of purchasers of the public lands, or of communities who have been annexed to the Union by conquest or purchase, they are initiatory to the establishment of State Governments, and no more power can be claimed or exercised than is necessary to the attainment of the and. This is the limitation of all the Federal powers.
But Congress has no power to regulate the internal concerns of a State, as of a Territory; consequently, in providing for the Government of a Territory, to some extent, the combined powers of the Federal and State Governments are necessarily exercised.
*543 If Congress should deem slaves or free colored persons injurious to the population of a free Territory, as conducing to lessen the value of the public lands, or on any other ground connected with the public interest, they have the power to prohibit them from becoming settlers in it. This can be sustained on the ground of a sound national policy, which is so clearly shown in our history by practical results, that it would seem no considerate individual can question it. And, as regards any unfairness of such a policy to our Southern brethren, as urged in the argument, it is only necessary to say that, with one-fourth of the Federal population of the Union, they have in the slave States a larger extent of fertile territory than is included in the free States; and it is submitted, if masters of slaves be restricted from bringing them into free territory, that the restriction on the free citizens of non-slaveholding States, by bringing slaves into free territory, is four times greater than that complained of by the South. But, not only so; some three or four hundred thousand holders of slaves, by bringing them into free territory, impose a restriction on twenty millions of the free States. The repugnancy to slavery would probably prevent fifty or a hundred freemen from settling in a slave Territory, where one slaveholder would be prevented from settling in a free Territory.
This remark is made in answer to the argument urged, that a prohibition of slavery in the free Territories is inconsistent with the continuance of the Union. Where a Territorial Government is established in a slave Territory, it has uniformly remained in that condition until the people form a State Constitution; the same course where the Territory is free, both parties acting in good faith, would be attended with satisfactory results.
The sovereignty of the Federal Government extends to the entire limits of our territory. Should any foreign power invade our jurisdiction, it would be repelled. There is a law of Congress to punish our citizens for crimes committed in districts of country where there is no organized Government. Criminals are brought to certain Territories or States, designated in the law, for punishment. Death has been inflicted in Arkansas and in Missouri, on individuals, for murders committed beyond the limit of any organized Territory or State; and no one doubts that such a jurisdiction was rightfully exercised. If there be a right to acquire territory, there necessarily must be an implied power to govern it. When the military force of the Union shall conquer a country, may not Congress provide for the government of such country? This would be an implied power essential to the acquisition of new territory. *544 This power has been exercised, without doubt of its constitutionality, over territory acquired by conquest and purchase.
And when there is a large district of country within the United States, and not within any State Government, if it be necessary to establish a temporary Government to carry out a power expressly vested in Congress  as the disposition of the public lands  may not such Government be instituted by Congress? How do we read the Constitution? Is it not a practical instrument?
In such cases, no implication of a power can arise which is inhibited by the Constitution, or which may be against the theory of its construction. As my opinion rests on the third section, these remarks are made as an intimation that the power to establish a temporary Government may arise, also, on the other two grounds stated in the opinion of the court in the insurance case, without weakening the third section.
I would here simply remark, that the Constitution was formed for our whole country. An expansion or contraction of our territory required no change in the fundamental law. When we consider the men who laid the foundation of our Government and carried it into operation, the men who occupied the bench, who filled the halls of legislation and the Chief Magistracy, it would seem, if any question could be settled clear of all doubt, it was the power of Congress to establish Territorial Governments. Slavery was prohibited in the entire Northwestern Territory, with the approbation of leading men, South and North; but this prohibition was not retained when this ordinance was adopted for the government of Southern Territories, where slavery existed. In a late replication of a letter of Mr. Madison, dated November 27, 1819, speaking of this power of Congress to prohibit slavery in a Territory, he infers there is no such power, from the fact that it has not been exercised. This is not a very satisfactory argument against any power, as there are but few, if any, subjects on which the constitutional powers of Congress are exhausted. It is true, as Mr. Madison states, that Congress, in the act to establish a Government in the Mississippi Territory, prohibited the importation of slaves into it from foreign parts; but it is equally true, that in the act erecting Louisiana into two Territories, Congress declared, "it shall not be lawful for any person to bring into Orleans Territory, from any port or place within the limits of the United States, any slave which shall have been imported since 1798, or which may hereafter be imported, except by a citizen of the United States who settles in the Territory, under the penalty of the freedom of such slave." The inference of Mr. Madison, therefore, against the power of *545 Congress, is of no force, as it was founded on a fact supposed, which did not exist.
It is refreshing to turn to the early incidents of our history, and learn wisdom from the acts of the great men who have gone to their account. I refer to a report in the House of Representatives, by John Randolph, of Roanoke, as chairman of a committee, in March, 1803  fifty-four years ago. From the Convention held at Vincennes, in Indiana, by their President, and from the people of the Territory, a petition was presented to Congress, praying the suspension of the provision which prohibited slavery in that Territory. The report stated "that the rapid population of the State of Ohio sufficiently evinces, in the opinion of your committee, that the labor of slaves is not necessary to promote the growth and settlement of colonies in that region. That this labor, demonstrably the dearest of any, can only be employed to advantage in the cultivation of products more valuable than any known to that quarter of the United States; that the committee deem it highly dangerous and inexpedient to impair a provision wisely calculated to promote the happiness and prosperity of the Northwestern country, and to give strength and security to that extensive frontier. In the salutary operation of this sagacious and benevolent restraint, it is believed that the inhabitants will, at no very distant day, find ample remuneration for a temporary privation of labor and of emigration." (1 vol. State Papers, Public Lands, 160.)
The judicial mind of this country, State and Federal, has agreed on no subject, within its legitimate action, with equal unanimity, as on the power of Congress to establish Territorial Governments. No court, State or Federal, no judge or statesman, is known to have had any doubts on this question for nearly sixty years after the power was exercised. Such Governments have been established from the sources of the Ohio to the Gulf of Mexico, extending to the Lakes on the north and the Pacific Ocean on the west, and from the lines of Georgia to Texas.
Great interests have grown up under the Territorial laws over a country more than five times greater in extent than the original thirteen States; and these interests, corporate or otherwise, have been cherished and consolidated by a benign policy, without any one supposing the law-making power had united with the Judiciary, under the universal sanction of the whole country, to usurp a jurisdiction which did not belong to them. Such a discovery at this late date is more extraordinary than anything which has occurred in the judicial history of this or any other country. Texas, under a previous organization, *546 was admitted as a State; but no State can be admitted into the Union which has not been organized under some form of government. Without temporary Governments, our public lands could not have been sold, nor our wildernesses reduced to cultivation, and the population protected; nor could our flourishing States, West and South, have been formed.
What do the lessons of wisdom and experience teach, under such circumstances, if the new light, which has so suddenly and unexpectedly burst upon us, be true? Acquiescence; acquiescence under a settled construction of the Constitution for sixty years, though it may be erroneous; which has secured to the country an advancement and prosperity beyond the power of computation.
An act of James Madison, when President, forcibly illustrates this policy. He had made up his opinion that Congress had no power under the Constitution to establish a National Bank. In 1815, Congress passed a bill to establish a bank. He vetoed the bill, on objections other than constitutional. In his message, he speaks as a wise statesman and Chief Magistrate, as follows:
"Waiving the question of the constitutional authority of the Legislature to establish an incorporated bank, as being precluded, in my judgment, by the repeated recognitions under varied circumstances of the validity of such an institution, in acts of the Legislative, Executive, and Judicial branches of the Government, accompanied by indications, in different modes, of a concurrence of the general will of the nation."
Has this impressive lesson of practical wisdom become lost to the present generation?
If the great and fundamental principles of our Government are never to be settled, there can be no lasting prosperity. The Constitution will become a floating waif on the billows of popular excitement.
The prohibition of slavery north of thirty-six degrees thirty minutes, and of the State of Missouri, contained in the act admitting that State into the Union, was passed by a vote of 134, in the House of Representatives, to 42. Before Mr. Monroe signed the act, it was submitted by him to his Cabinet, and they held the restriction of slavery in a Territory to be within the constitutional powers of Congress. It would be singular, if in 1804 Congress had power to prohibit the introduction of slaves in Orleans Territory from any other part of the Union, under the penalty of freedom to the slave, if the same power, embodied in the Missouri compromise, could not be exercised in 1820.
But this law of Congress, which prohibits slavery north of *547 Missouri and of thirty-six degrees thirty minutes, is declared to have been null and void by my brethren. And this opinion is founded mainly, as I understand, on the distinction drawn between the ordinance of 1787 and the Missouri compromise line. In what does the distinction consist? The ordinance, it is said, was a compact entered into by the confederated States before the adoption of the Constitution; and that in the cession of territory authority was given to establish a Territorial Government.
It is clear that the ordinance did not go into operation by virtue of the authority of the Confederation, but by reason of its modification and adoption by Congress under the Constitution. It seems to be supposed, in the opinion of the court, that the articles of cession placed it on a different footing from territories subsequently acquired. I am unable to perceive the force of this distinction. That the ordinance was intended for the government of the Northwestern Territory, and was limited to such Territory, is admitted. It was extended to Southern Territories, with modifications, by acts of Congress, and to some Northern Territories. But the ordinance was made valid by the act of Congress, and without such act could have been of no force. It rested for its validity on the act of Congress, the same, in my opinion, as the Missouri compromise line.
If Congress may establish a Territorial Government in the exercise of its discretion, it is a clear principle that a court cannot control that discretion. This being the case, I do not see on what ground the act is held to be void. It did not purport to forfeit property, or take it for public purposes. It only prohibited slavery; in doing which, it followed the ordinance of 1787.
I will now consider the fourth head, which is: "The effect of taking slaves into a State or Territory, and so holding them, where slavery is prohibited."
If the principle laid down in the case of Prigg v. The State of Pennsylvania is to be maintained, and it is certainly to be maintained until overruled, as the law of this court, there can be no difficulty on this point. In that case, the court says: "The state of slavery is deemed to be a mere municipal regulation, founded upon and limited to the range of the territorial laws." If this be so, slavery can exist nowhere except under the authority of law, founded on usage having the force of law, or by statutory recognition. And the court further says: "It is manifest, from this consideration, that if the Constitution had not contained the clause requiring the rendition of fugitives from labor, every non-slaveholding State in the Union would have been at liberty to have declared free all runaway slaves *548 coming within its limits, and to have given them entire immunity and protection against the claims of their masters."
Now, if a slave abscond, he may be reclaimed; but if he accompany his master into a State or Territory where slavery is prohibited, such slave cannot be said to have left the service of his master where his services were legalized. And if slavery be limited to the range of the territorial laws, how can the slave be coerced to serve in a State or Territory, not only without the authority of law, but against its express provisions? What gives the master the right to control the will of his slave? The local law, which exists in some form. But where there is no such law, can the master control the will of the slave by force? Where no slavery exists, the presumption, without regard to color, is in favor of freedom. Under such a jurisdiction, may the colored man be levied on as the property of his master by a creditor? On the decease of the master, does the slave descend to his heirs as property? Can the master sell him? Any one or all of these acts may be done to the slave, where he is legally held to service. But where the law does not confer this power, it cannot be exercised.
Lord Mansfield held that a slave brought into England was free. Lord Stowell agreed with Lord Mansfield in this respect, and that the slave could not be coerced in England; but on her voluntary return to Antigua, the place of her slave domicil, her former status attached. The law of England did not prohibit slavery, but did not authorize it. The jurisdiction which prohibits slavery is much stronger in behalf of the slave within it, than where it only does not authorize it.
By virtue of what law is it, that a master may take his slave into free territory, and exact from him the duties of a slave? The law of the Territory does not sanction it. No authority can be claimed under the Constitution of the United States, or any law of Congress. Will it be said that the slave is taken as property, the same as other property which the master may own? To this I answer, that colored persons are made property by the law of the State, and no such power has been given to Congress. Does the master carry with him the law of the State from which he removes into the Territory? and does that enable him to coerce his slave in the Territory? Let us test this theory. If this may be done by a master from one slave State, it may be done by a master from every other slave State. This right is supposed to be connected with the person of the master, by virtue of the local law. Is it transferable? May it be negotiated, as a promissory note or bill of exchange? If it be assigned to a man from a free State, may he coerce the slave by virtue of it? What shall this thing be *549 denominated? Is it personal or real property? Or is it an indefinable fragment of sovereignty, which every person carries with him from his late domicil? One thing is certain, that its origin has been very recent, and it is unknown to the laws of any civilized country.
A slave is brought to England from one of its islands, where slavery was introduced and maintained by the mother country. Although there is no law prohibiting slavery in England, yet there is no law authorizing it; and, for near a century, its courts have declared that the slave there is free from the coercion of the master. Lords Mansfield and Stowell agree upon this point, and there is no dissenting authority.
There is no other description of property which was not protected in England, brought from one of its slave islands. Does not this show that property in a human being does not arise from nature or from the common law, but, in the language of this court, "it is a mere municipal regulation, founded upon and limited to the range of the territorial laws?" This decision is not a mere argument, but it is the end of the law, in regard to the extent of slavery. Until it shall be overturned, it is not a point for argument; it is obligatory on myself and my brethren, and on all judicial tribunals over which this court exercises an appellate power.
It is said the Territories are common property of the States, and that every man has a right to go there with his property. This is not controverted. But the court say a slave is not property beyond the operation of the local law which makes him such. Never was a truth more authoritatively and justly uttered by man. Suppose a master of a slave in a British island owned a million of property in England; would that authorize him to take his slaves with him to England? The Constitution, in express terms, recognizes the status of slavery as founded on the municipal law: "No person held to service or labor in one State, under the laws thereof, escaping into another, shall," &c. Now, unless the fugitive escape from a place where, by the municipal law, he is held to labor, this provision affords no remedy to the master. What can be more conclusive than this? Suppose a slave escape from a Territory where slavery is not authorized by law, can he be reclaimed?
In this case, a majority of the court have said that a slave may be taken by his master into a Territory of the United States, the same as a horse, or any other kind of property. It is true, this was said by the court, as also many other things, which are of no authority. Nothing that has been said by them, which has not a direct bearing on the jurisdiction of the court, against which they decided, can be considered as *550 authority. I shall certainly not regard it as such. The question of jurisdiction, being before the court, was decided by them authoritatively, but nothing beyond that question. A slave is not a mere chattel. He bears the impress of his Maker, and is amenable to the laws of God and man; and he is destined to an endless existence.
Under this head I shall chiefly rely on the decisions of the Supreme Courts of the Southern States, and especially of the State of Missouri.
In the first and second sections of the sixth article of the Constitution of Illinois, it is declared that neither slavery nor involuntary servitude shall hereafter be introduced into this State, otherwise than for the punishment of crimes whereof the party shall have been duly convicted; and in the second section it is declared that any violation of this article shall effect the emancipation of such person from his obligation to service. In Illinois, a right of transit through the State is given the master with his slaves. This is a matter which, as I suppose, belongs exclusively to the State.
The Supreme Court of Illinois, in the case of Jarrot v. Jarrot, (2 Gilmer, 7,) said:
"After the conquest of this Territory by Virginia, she ceded it to the United States, and stipulated that the titles and possessions, rights and liberties, of the French settlers, should be guarantied to them. This, it has been contended, secured them in the possession of those negroes as slaves which they held before that time, and that neither Congress nor the Convention had power to deprive them of it; or, in other words, that the ordinance and Constitution should not be so interpreted and understood as applying to such slaves, when it is therein declared that there shall be neither slavery nor involuntary servitude in the Northwest Territory, nor in the State of Illinois, otherwise than in the punishment of crimes. But it was held that those rights could not be thus protected, but must yield to the ordinance and Constitution."
The first slave case decided by the Supreme Court of Missouri, contained in the reports, was Winny v. Whitesides, (1 Missouri Rep., 473,) at October term, 1824. It appeared that, more than twenty-five years before, the defendant, with her husband, had removed from Carolina to Illinois, and brought with them the plaintiff; that they continued to reside in Illinois three or four years, retaining the plaintiff as a slave; after which, they removed to Missouri, taking her with them.
The court held, that if a slave be detained in Illinois until he be entitled to freedom, the right of the owner does not revive when he finds the negro in a slave State.
*551 That when a slave is taken to Illinois by his owner, who takes up his residence there, the slave is entitled to freedom.
In the case of Lagrange v. Chouteau, (2 Missouri Rep., 20, at May term, 1828,) it was decided that the ordinance of 1787 was intended as a fundamental law for those who may choose to live under it, rather than as a penal statute.
That any sort of residence contrived or permitted by the legal owner of the slave, upon the faith of secret trusts or contracts, in order to defeat or evade the ordinance, and thereby introduce slavery de facto, would entitle such slave to freedom.
In Julia v. McKinney, (3 Missouri Rep., 279,) it was held, where a slave was settled in the State of Illinois, but with an intention on the part of the owner to be removed at some future day, that hiring said slave to a person to labor for one or two days, and receiving the pay for the hire, the slave is entitled to her freedom, under the second section of the sixth article of the Constitution of Illinois.
Rachel v. Walker (4 Missouri Rep., 350, June term, 1836) is a case involving, in every particular, the principles of the case before us. Rachel sued for her freedom; and it appeared that she had been bought as a slave in Missouri, by Stockton, an officer of the army, taken to Fort Snelling, where he was stationed, and she was retained there as a slave a year; and then Stockton removed to Prairie du Chien, taking Rachel with him as a slave, where he continued to hold her three years, and then he took her to the State of Missouri, and sold her as a slave.
"Fort Snelling was admitted to be on the west side of the Mississippi river, and north of the State of Missouri, in the territory of the United States. That Prairie du Chien was in the Michigan Territory, on the east side of the Mississippi river. Walker, the defendant, held Rachel under Stockton."
The court said, in this case:
"The officer lived in Missouri Territory, at the time he bought the slave; he sent to a slaveholding country and procured her; this was his voluntary act, done without any other reason than that of his convenience; and he and those claiming under him must be holden to abide the consequences of introducing slavery both in Missouri Territory and Michigan, contrary to law; and on that ground Rachel was declared to be entitled to freedom."
In answer to the argument that, as an officer of the army, the master had a right to take his slave into free territory, the court said no authority of law or the Government compelled him to keep the plaintiff there as a slave.
"Shall it be said, that because an officer of the army owns *552 slaves in Virginia, that when, as officer and soldier, he is required to take the command of a fort in the non-slaveholding States or Territories, he thereby has a right to take with him as many slaves as will suit his interests or convenience? It surely cannot be law. If this be true, the court say, then it is also true that the convenience or supposed convenience of the officer repeals, as to him and others who have the same character, the ordinance and the act of 1821, admitting Missouri into the Union, and also the prohibition of the several laws and Constitutions of the non-slaveholding States."
In Wilson v. Melvin, (4 Missouri R., 592,) it appeared the defendant left Tennessee with an intention of residing in Illinois, taking his negroes with him. After a month's stay in Illinois, he took his negroes to St. Louis, and hired them, then returned to Illinois. On these facts, the inferior court instructed the jury that the defendant was a sojourner in Illinois. This the Supreme Court held was error, and the judgment was reversed.
The case of Dred Scott v. Emerson (15 Missouri R., 682, March term, 1852) will now be stated. This case involved the identical question before us, Emerson having, since the hearing, sold the plaintiff to Sandford, the defendant.
Two of the judges ruled the case, the Chief Justice dissenting. It cannot be improper to state the grounds of the opinion of the court, and of the dissent.
The court say: "Cases of this kind are not strangers in our court. Persons have been frequently here adjudged to be entitled to their freedom, on the ground that their masters held them in slavery in Territories or States in which that institution is prohibited. From the first case decided in our court, it might be inferred that this result was brought about by a presumed assent of the master, from the fact of having voluntarily taken his slave to a place where the relation of master and slave did not exist. But subsequent cases base the right to `exact the forfeiture of emancipation,' as they term it, on the ground, it would seem, that it was the duty of the courts of this State to carry into effect the Constitution and laws of other States and Territories, regardless of the rights, the policy, or the institutions, of the people of this State."
And the court say that the States of the Union, in their municipal concerns, are regarded as foreign to each other; that the courts of one State do not take notice of the laws of other States, unless proved as facts, and that every State has the right to determine how far its comity to other States shall extend; and it is laid down, that when there is no act of manumission decreed to the free State, the courts of the slave States *553 cannot be called to give effect to the law of the free State. Comity, it alleges, between States, depends upon the discretion of both, which may be varied by circumstances. And it is declared by the court, "that times are not as they were when the former decisions on this subject were made." Since then, not only individuals but States have been possessed with a dark and fell spirit in relation to slavery, whose gratification is sought in the pursuit of measures whose inevitable consequence must be the overthrow and destruction of our Government. Under such circumstances, it does not behoove the State of Missouri to show the least countenance to any measure which might gratify this spirit. She is willing to assume her full responsibility for the existence of slavery within her limits, nor does she seek to share or divide it with others.
Chief Justice Gamble dissented from the other two judges. He says:
"In every slaveholding State in the Union, the subject of emancipation is regulated by statute; and the forms are prescribed in which it shall be effected. Whenever the forms required by the laws of the State in which the master and slave are resident are complied with, the emancipation is complete, and the slave is free. If the right of the person thus emancipated is subsequently drawn in question in another State, it will be ascertained and determined by the law of the State in which the slave and his former master resided; and when it appears that such law has been complied with, the right to freedom will be fully sustained in the courts of all the slaveholding States, although the act of emancipation may not be in the form required by law in which the court sits.
"In all such cases, courts continually administer the law of the country where the right was acquired; and when that law becomes known to the court, it is just as much a matter of course to decide the rights of the parties according to its requirements, as it is to settle the title of real estate situated in our State by its own laws."
This appears to me a most satisfactory answer to the argument of the court. Chief Justice continues:
"The perfect equality of the different States lies at the foundation of the Union. As the institution of slavery in the States is one over which the Constitution of the United States gives no power to the General Government, it is left to be adopted or rejected by the several States, as they think best; nor can any one State, or number of States, claim the right to interfere with any other State upon the question of admitting or excluding this institution.
"A citizen of Missouri, who removes with his slave to Illinois, *554 has no right to complain that the fundamental law of that State to which he removes, and in which he makes his residence, dissolves the relation between him and his slave. It is as much his own voluntary act, as if he had executed a deed of emancipation. No one can pretend ignorance of this constitutional provision, and," he says, "the decisions which have heretofore been made in this State, and in many other slaveholding States, give effect to this and other similar provisions, on the ground that the master, by making the free State the residence of his slave, has submitted his right to the operation of the law of such State; and this," he says, "is the same in law as a regular deed of emancipation."
He adds:
"I regard the question as conclusively settled by repeated adjudications of this court, and, if I doubted or denied the propriety of those decisions, I would not feel myself any more at liberty to overturn them, than I would any other series of decisions by which the law of any other question was settled. There is with me," he says, "nothing in the law relating to slavery which distinguishes it from the law on any other subject, or allows any more accommodation to the temporary public excitements which are gathered around it."
"In this State," he says, "it has been recognised from the beginning of the Government as a correct position in law, that a master who takes his slave to reside in a State or Territory where slavery is prohibited, thereby emancipates his slave." These decisions, which come down to the year 1837, seemed to have so fully settled the question, that since that time there has been no case bringing it before the court for any reconsideration, until the present. In the case of Winny v. Whitesides, the question was made in the argument, "whether one nation would execute the penal laws of another," and the court replied in this language, (Huberus, quoted in 4 Dallas,) which says, "personal rights or disabilities obtained or communicated by the laws of any particular place are of a nature which accompany the person wherever he goes;" and the Chief Justice observed, in the case of Rachel v. Walker, the act of Congress called the Missouri compromise was held as operative as the ordinance of 1787.
When Dred Scott, his wife and children, were removed from Fort Snelling to Missouri, in 1838, they were free, as the law was then settled, and continued for fourteen years afterwards, up to 1852, when the above decision was made. Prior to this, for nearly thirty years, as Chief Justice Gamble declares, the residence of a master with his slave in the State of Illinois, or in the Territory north of Missouri, where slavery was prohibited *555 by the act called the Missouri compromise, would manumit the slave as effectually as if he had executed a deed of emancipation; and that an officer of the army who takes his slave into that State or Territory, and holds him there as a slave, liberates him the same as any other citizen  and down to the above time it was settled by numerous and uniform decisions; and that on the return of the slave to Missouri, his former condition of slavery did not attach. Such was the settled law of Missouri until the decision of Scott and Emerson.
In the case of Sylvia v. Kirby, (17 Misso. Rep., 434,) the court followed the above decision, observing it was similar in all respects to the case of Scott and Emerson.
This court follows the established construction of the statutes of a State by its Supreme Court. Such a construction is considered as a part of the statute, and we follow it to avoid two rules of property in the same State. But we do not follow the decisions of the Supreme Court of a State beyond a statutory construction as a rule of decision for this court. State decisions are always viewed with respect and treated as authority; but we follow the settled construction of the statutes, not because it is of binding authority, but in pursuance of a rule of judicial policy.
But there is no pretence that the case of Dred Scott v. Emerson turned upon the construction of a Missouri statute; nor was there any established rule of property which could have rightfully influenced the decision. On the contrary, the decision overruled the settled law for near thirty years.
This is said by my brethren to be a Missouri question; but there is nothing which gives it this character, except that it involves the right to persons claimed as slaves who reside in Missouri, and the decision was made by the Supreme Court of that State. It involves a right claimed under an act of Congress and the Constitution of Illinois, and which cannot be decided without the consideration and construction of those laws. But the Supreme Court of Missouri held, in this case, that it will not regard either of those laws, without which there was no case before it; and Dred Scott, having been a slave, remains a slave. In this respect it is admitted this is a Missouri question  a case which has but one side, if the act of Congress and the Constitution of Illinois are not recognised.
And does such a case constitute a rule of decision for this court  a case to be followed by this court? The course of decision so long and so uniformly maintained established a comity or law between Missouri and the free States and Territories where slavery was prohibited, which must be somewhat regarded in this case. Rights sanctioned for twenty-eight years *556 ought not and cannot be repudiated, with any semblance of justice, by one or two decisions, influenced, as declared, by a determination to counteract the excitement against slavery in the free States.
The courts of Louisiana having held, for a series of years, that where a master took his slave to France, or any free State, he was entitled to freedom, and that on bringing him back the status of slavery did not attach, the Legislature of Louisiana declared by an act that the slave should not be made free under such circumstances. This regulated the rights of the master from the time the act took effect. But the decision of the Missouri court, reversing a former decision, affects all previous decisions, technically, made on the same principles, unless such decisions are protected by the lapse of time or the statute of limitations. Dred Scott and his family, beyond all controversy, were free under the decisions made for twenty-eight years, before the case of Scott v. Emerson. This was the undoubted law of Missouri for fourteen years after Scott and his family were brought back to that State. And the grave question arises, whether this law may be so disregarded as to enslave free persons. I am strongly inclined to think that a rule of decision so well settled as not to be questioned, cannot be annulled by a single decision of the court. Such rights may be inoperative under the decision in future; but I cannot well perceive how it can have the same effect in prior cases.
It is admitted, that when a former decision is reversed, the technical effect of the judgment is to make all previous adjudications on the same question erroneous. But the case before us was not that the law had been erroneously construed, but that, under the circumstances which then existed, that law would not be recognised; and the reason for this is declared to be the excitement against the institution of slavery in the free States. While I lament this excitement as much as any one, I cannot assent that it shall be made a basis of judicial action.
In 1816, the common law, by statute, was made a part of the law of Missouri; and that includes the great principles of international law. These principles cannot be abrogated by judicial decisions. It will require the same exercise of power to abolish the common law, as to introduce it. International law is founded in the opinions generally received and acted on by civilized nations, and enforced by moral sanctions. It becomes a more authoritative system when it results from special compacts, founded on modified rules, adapted to the exigencies of human society; it is in fact an international morality, adapted to the best interests of nations. And in regard to the States *557 of this Union, on the subject of slavery, it is eminently fitted for a rule of action, subject to the Federal Constitution. "The laws of nations are but the natural rights of man applied to nations." (Vattel.)
If the common law have the force of a statutory enactment in Missouri, it is clear, as it seems to me, that a slave who, by a residence in Illinois in the service of his master, becomes entitled to his freedom, cannot again be reduced to slavery by returning to his former domicil in a slave State. It is unnecessary to say what legislative power might do by a general act in such a case, but it would be singular if a freeman could be made a slave by the exercise of a judicial discretion. And it would be still more extraordinary if this could be done, not only in the absence of special legislation, but in a State where the common law is in force.
It is supposed by some, that the third article in the treaty of cession of Louisiana to this country, by France, in 1803, may have some bearing on this question. The article referred to provides, "that the inhabitants of the ceded territory shall be incorporated into the Union, and enjoy all the advantages of citizens of the United States, and in the mean time they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion they profess."
As slavery existed in Louisiana at the time of the cession, it is supposed this is a guaranty that there should be no change in its condition.
The answer to this is, in the first place, that such a subject does not belong to the treaty-making power; and any such arrangement would have been nugatory. And, in the second place, by no admissible construction can the guaranty be carried further than the protection of property in slaves at that time in the ceded territory. And this has been complied with. The organization of the slave States of Louisiana, Missouri, and Arkansas, embraced every slave in Louisiana at the time of the cession. This removes every ground of objection under the treaty. There is therefore no pretence, growing out of the treaty, that any part of the territory of Louisiana, as ceded, beyond the organized States, is slave territory.
Under the fifth head, we were to consider whether the status of slavery attached to the plaintiff and wife, on their return to Missouri.
This doctrine is not asserted in the late opinion of the Supreme Court of Missouri, and up to 1852 the contrary doctrine was uniformly maintained by that court.
In its late decision, the court say that it will not give effect in Missouri to the laws of Illinois, or the law of Congress *558 called the Missouri compromise. This was the effect of the decision, though its terms were, that the court would not take notice, judicially, of those laws.
In 1851, the Court of Appeals of South Carolina recognised the principle, that a slave, being taken to a free State, became free. (Commonwealth v. Pleasants, 10 Leigh Rep., 697.) In Betty v. Horton, the Court of Appeals held that the freedom of the slave was acquired by the action of the laws of Massachusetts, by the said slave being taken there. (5 Leigh Rep., 615.)
The slave States have generally adopted the rule, that where the master, by a residence with his slave in a State or Territory where slavery is prohibited, the slave was entitled to his freedom everywhere. This was the settled doctrine of the Supreme Court of Missouri. It has been so held in Mississippi, in Virginia, in Louisiana, formerly in Kentucky, Maryland, and in other States.
The law, where a contract is made and is to be executed, governs it. This does not depend upon comity, but upon the law of the contract. And if, in the language of the Supreme Court of Missouri, the master, by taking his slave to Illinois, and employing him there as a slave, emancipates him as effectually as by a deed of emancipation, is it possible that such an act is not matter for adjudication in any slave State where the master may take him? Does not the master assent to the law, when he places himself under it in a free State?
The States of Missouri and Illinois are bounded by a common line. The one prohibits slavery, the other admits it. This has been done by the exercise of that sovereign power which appertains to each. We are bound to respect the institutions of each, as emanating from the voluntary action of the people. Have the people of either any right to disturb the relations of the other? Each State rests upon the basis of its own sovereignty, protected by the Constitution. Our Union has been the foundation of our prosperity and national glory. Shall we not cherish and maintain it? This can only be done by respecting the legal rights of each State.
If a citizen of a free State shall entice or enable a slave to escape from the service of his master, the law holds him responsible, not only for the loss of the slave, but he is liable to be indicted and fined for the misdemeanor. And I am bound here to say, that I have never found a jury in the four States which constitute my circuit, which have not sustained this law, where the evidence required them to sustain it. And it is proper that I should also say, that more cases have arisen in my circuit, by reason of its extent and locality, than in all *559 other parts of the Union. This has been done to vindicate the sovereign rights of the Southern States, and protect the legal interests of our brethren of the South.
Let these facts be contrasted with the case now before the court. Illinois has declared in the most solemn and impressive form that there shall be neither slavery nor involuntary servitude in that State, and that any slave brought into it, with a view of becoming a resident, shall be emancipated. And effect has been given to this provision of the Constitution by the decision of the Supreme Court of that State. With a full knowledge of these facts, a slave is brought from Missouri to Rock Island, in the State of Illinois, and is retained there as a slave for two years, and then taken to Fort Snelling, where slavery is prohibited by the Missouri compromise act, and there he is detained two years longer in a state of slavery. Harriet, his wife, was also kept at the same place four years as a slave, having been purchased in Missouri. They were then removed to the State of Missouri, and sold as slaves, and in the action before us they are not only claimed as slaves, but a majority of my brethren have held that on their being returned to Missouri the status of slavery attached to them.
I am not able to reconcile this result with the respect due to the State of Illinois. Having the same rights of sovereignty as the State of Missouri in adopting a Constitution, I can perceive no reason why the institutions of Illinois should not receive the same consideration as those of Missouri. Allowing to my brethren the same right of judgment that I exercise myself, I must be permitted to say that it seems to me the principle laid down will enable the people of a slave State to introduce slavery into a free State, for a longer or shorter time, as may suit their convenience; and by returning the slave to the State whence he was brought, by force or otherwise, the status of slavery attaches, and protects the rights of the master, and defies the sovereignty of the free State. There is no evidence before us that Dred Scott and his family returned to Missouri voluntarily. The contrary is inferable from the agreed case: "In the year 1838, Dr. Emerson removed the plaintiff and said Harriet, and their daughter Eliza, from Fort Snelling to the State of Missouri, where they have ever since resided." This is the agreed case; and can it be inferred from this that Scott and family returned to Missouri voluntarily? He was removed; which shows that he was passive, as a slave, having exercised to volition on the subject. He did not resist the master by absconding or force. But that was not sufficient to bring him within Lord Stowell's decision; he must have acted voluntarily. It would be a *560 mockery of law and an outrage on his rights to coerce his return, and then claim that it was voluntary, and on that ground that his former status of slavery attached.
If the decision be placed on this ground, it is a fact for a jury to decide, whether the return was voluntary, or else the fact should be distinctly admitted. A presumption against the plaintiff in this respect, I say with confidence, is not authorized from the facts admitted.
In coming to the conclusion that a voluntary return by Grace to her former domicil, slavery attached, Lord Stowell took great pains to show that England forced slavery upon her colonies, and that it was maintained by numerous acts of Parliament and public policy, and, in short, that the system of slavery was not only established by Great Britain in her West Indian colonies, but that it was popular and profitable to many of the wealthy and influential people of England, who were engaged in trade, or owned and cultivated plantations in the colonies. No one can read his elaborate views, and not be struck with the great difference between England and her colonies, and the free and slave States of this Union. While slavery in the colonies of England is subject to the power of the mother country, our States, especially in regard to slavery, are independent, resting upon their own sovereignties, and subject only to international laws, which apply to independent States.
In the case of Williams, who was a slave in Granada, having run away, came to England, Lord Stowell said: "The four judges all concur in this  that he was a slave in Granada, though a free man in England, and he would have continued a free man in all other parts of the world except Granada."
Strader v. Graham (10 Howard, 82, and 18 Curtis, 305) has been cited as having a direct bearing in the case before us. In that case the court say: "It was exclusively in the power of Kentucky to determine, for itself, whether the employment of slaves in another State should or should not make them free on their return." No question was before the court in that case, except that of jurisdiction. And any opinion given on any other point is obiter dictum, and of no authority. In the conclusion of his opinion, the Chief Justice said: "In every view of the subject, therefore, this court has no jurisdiction of the case, and the writ of error must on that gronnd be dismissed."
In the case of Spencer v. Negro Dennis, (8 Gill's Rep., 321,) the court say: "Once free, and always free, is the maxim of Maryland law upon the subject. Freedom having once vested, by no compact between the master and the the liberated slave, *561 nor by any condition subsequent, attached by the master to the gift of freedom, can a state of slavery be reproduced."
In Hunter v. Bulcher, (1 Leigh, 172:)
"By a statute of Maryland of 1796, all slaves brought into that State to reside are declared free; a Virginian-born slave is carried by his master to Maryland; the master settled there, and keeps the slave there in bondage for twelve years, the statute in force all the time; then he brings him as a slave to Virginia, and sells him there. Adjudged, in an action brought by the man against the purchaser, that he is free."
Judge Kerr, in the case, says:
"Agreeing, as I do, with the general view taken in this case by my brother Green, I would not add a word, but to mark the exact extent to which I mean to go. The law of Maryland having enacted that slaves carried into that State for sale or to reside shall be free, and the owner of the slave here having carried him to Maryland, and voluntarily submitting himself and the slave to that law, it governs the case."
In every decision of a slave case prior to that of Dred Scott v. Emerson, the Supreme Court of Missouri considered it as turning upon the Constitution of Illinois, the ordinance of 1787, or the Missouri compromise act of 1820. The court treated these acts as in force, and held itself bound to execute them, by declaring the slave to be free who had acquired a domicil under them with the consent of his master.
The late decision reversed this whole line of adjudication, and held that neither the Constitution and laws of the States, nor acts of Congress in relation to Territories, could be judicially noticed by the Supreme Court of Missouri. This is believed to be in conflict with the decisions of all the courts in the Southern States, with some exceptions of recent cases.
In Marie Louise v. Morat et al., (9 Louisiana Rep., 475,) it was held, where a slave having been taken to the kingdom of France or other country by the owner, where slavery is not tolerated, operates on the condition of the slave, and produces immediate emancipation; and that, where a slave thus becomes free, the master cannot reduce him again to slavery.
Josephine v. Poultney, (Louisiana Annual Rep., 329,) "where the owner removes with a slave into a State in which slavery is prohibited, with the intention of residing there, the slave will be thereby emancipated, and their subsequent return to the State of Louisiana cannot restore the relation of master and slave." To the same import are the cases of Smith v. Smith, (13 Louisiana Rep., 441; Thomas v. Generis, Louisiana Rep., 483; Harry et al. v. Decker and Hopkins, Walker's Mississippi Rep., 36.) It was held that, "slaves within the jurisdiction *562 of the Northwestern Territory became freemen by virtue of the ordinance of 1787, and can assert their claim to freedom in the courts of Mississippi." (Griffith v. Fanny, 1 Virginia Rep., 143.) It was decided that a negro held in servitude in Ohio, under a deed executed in Virginia, is entitled to freedom by the Constitution of Ohio.
The case of Rhodes v. Bell (2 Howard, 307; 15 Curtis, 152) involved the main principle in the case before us. A person residing in Washington city purchased a slave in Alexandria, and brought him to Washington. Washington continued under the law of Maryland, Alexandria under the law of Virginia. The act of Maryland of November, 1796, (2 Maxcy's Laws, 351,) declared any one who shall bring any negro, mulatto, or other slave, into Maryland, such slave should be free. The above slave, by reason of his being brought into Washington city, was declared by this court to be free. This, it appears to me, is a much stronger case against the slave than the facts in the case of Scott.
In Bush v. White, (3 Monroe, 104,) the court say:
"That the ordinance was paramount to the Territorial laws, and restrained the legislative power there as effectually as a Constitution in an organized State. It was a public act of the Legislature of the Union, and a part of the supreme law of the land; and, as such, this court is as much bound to take notice of it as it can be of any other law."
In the case of Rankin v. Lydia, before cited, Judge Mills, speaking for the Court of Appeals of Kentucky, says:
"If, by the positive provision in our code, we can and must hold our slaves in the one case, and statutory provisions equally positive decide against that right in the other, and liberate the slave, he must, by an authority equally imperious, be declared free. Every argument which supports the right of the master on one side, based upon the force of written law, must be equally conclusive in favor of the slave, when he can point out in the statute the clause which secures his freedom."
And he further said:
"Free people of color in all the States are, it is believed, quasi citizens, or, at least, denizens. Although none of the States may allow them the privilege of office and suffrage, yet all other civil and conventional rights are secured to them; at least, such rights were evidently secured to them by the ordinance in question for the government of Indiana. If these rights are vested in that or any other portion of the United States, can it be compatible with the spirit of our confederated Government to deny their existence in any other part? Is there less comity existing between State and State, or State *563 and Territory, than exists between the despotic Governments of Europe?"
These are the words of a learned and great judge, born and educated in a slave State.
I now come to inquire, under the sixth and last head, "whether the decisions of the Supreme Court of Missouri, on the question before us, are binding on this court."
While we respect the learning and high intelligence of the State courts, and consider their decisions, with others, as authority, we follow them only where they give a construction to the State statutes. On this head, I consider myself fortunate in being able to turn to the decision of this court, given by Mr. Justice Grier, in Pease v. Peck, a case from the State of Michigan, (18 Howard, 589,) decided in December term, 1855. Speaking for the court, Judge Grier said:
"We entertain the highest respect for that learned court, (the Supreme Court of Michigan,) and in any question affecting the construction of their own laws, where we entertain any doubt, would be glad to be relieved from doubt and responsibility by reposing on their decision. There are, it is true, many dicta to be found in our decisions, averring that the courts of the United States are bound to follow the decisions of the State courts on the construction of their own laws. But although this may be correct, yet a rather strong expression of a general rule, it cannot be received as the annunciation of a maxim of universal application. Accordingly, our reports furnish many cases of exceptions to it. In all cases where there is a settled construction of the laws of a State, by its highest judicature established by admitted precedent, it is the practice of the courts of the United States to receive and adopt it, without criticism or further inquiry. When the decisions of the State court are not consistent, we do not feel bound to follow the last, if it is contrary to our own convictions; and much more is this the case where, after a long course of consistent decisions, some new light suddenly springs up, or an excited public opinion has elicited new doctrines subversive of former safe precedent."
These words, it appears to me, have a stronger application to the case before us than they had to the cause in which they were spoken as the opinion of this court; and I regret that they do not seem to be as fresh in the recollection of some of my brethren as in my own. For twenty-eight years, the decisions of the Supreme Court of Missouri were consistent on all the points made in this case. But this consistent course was suddenly terminated, whether by some new light suddenly springing up, or an excited public opinion, or both, it is not *564 necessary to say. In the case of Scott v. Emerson, in 1852, they were overturned and repudiated.
This, then, is the very case in which seven of my brethren declared they would not follow the last decision. On this authority I may well repose. I can desire no other or better basis.
But there is another ground which I deem conclusive, and which I will re-state.
The Supreme Court of Missouri refused to notice the act of Congress or the Constitution of Illinois, under which Dred Scott, his wife and children, claimed that they are entitled to freedom.
This being rejected by the Missouri court, there was no case before it, or least it was a case with only one side. And this is the case which, in the opinion of this court, we are bound to follow. The Missouri court disregards the express provisions of an act of Congress and the Constitution of a sovereign State, both of which laws for twenty-eight years it had not only regarded, but carried into effect.
If a State court may do this, on a question involving the liberty of a human being, what protection do the laws afford? So far from this being a Missouri question, it is a question, as it would seem, within the twenty-fifth section of the judiciary act, where a right to freedom being set up under the act of Congress, and the decision being against such right, it may be brought for revision before this court, from the Supreme Court of Missouri.
I think the judgment of the court below should be reversed.
Mr. Justice CURTIS dissenting.
I dissent from the opinion pronounced by the Chief Justice, and from the judgment which the majority of the court think it proper to render in this case. The plaintiff alleged, in his declaration, that he was a citizen of the State of Missouri, and that the defendant was a citizen of the State of New York. It is not doubted that it was necessary to make each of these allegations, to sustain the jurisdiction of the Circuit Court. The defendant denied, by a plea to the jurisdiction, either sufficient or insufficient, that the plaintiff was a citizen of the State of Missouri. The plaintiff demurred to that plea. The Circuit Court adjudged the plea insufficient, and the first question for our consideration is, whether the sufficiency of that plea is before this court for judgment, upon this writ of error. The part of the judicial power of the United States, conferred by Congress on the Circuit Courts, being limited to certain described cases and controversies, the question whether a particular *565 case is within the cognizance of a Circuit Court, may be raised by a plea to the jurisdiction of such court. When that question has been raised, the Circuit Court must, in the first instance, pass upon and determine it. Whether its determination be final, or subject to review by this appellate court, must depend upon the will of Congress; upon which body the Constitution has conferred the power, with certain restrictions, to establish inferior courts, to determine their jurisdiction, and to regulate the appellate power of this court. The twenty-second section of the judiciary act of 1789, which allows a writ of error from final judgments of Circuit Courts, provides that there shall be no reversal in this court, on such writ of error, for error in ruling any plea in abatement, other than a plea to the jurisdiction of the court. Accordingly it has been held, from the origin of the court to the present day, that Circuit Courts have not been made by Congress the final judges of their own jurisdiction in civil cases. And that when a record comes here upon a writ of error or appeal, and, on its inspection, it appears to this court that the Circuit Court had not jurisdiction, its judgment must be reversed, and the cause remanded, to be dismissed for want of jurisdiction.
It is alleged by the defendant in error, in this case, that the plea to the jurisdiction was a sufficient plea; that it shows, on inspection of its allegations, confessed by the demurrer, that the plaintiff was not a citizen of the State of Missouri; that upon this record, it must appear to this court that the case was not within the judicial power of the United States, as defined and granted by the Constitution, because it was not a suit by a citizen of one State against a citizen of another State.
To this it is answered, first, that the defendant, by pleading over, after the plea to the jurisdiction was adjudged insufficient, finally waived all benefit of that plea.
When that plea was adjudged insufficient, the defendant was obliged to answer over. He held no alternative. He could not stop the further progress of the case in the Circuit Court by a writ of error, on which the sufficiency of his plea to the jurisdiction could be tried in this court, because the judgment on that plea was not final, and no writ of error would lie. He was forced to plead to the merits. It cannot be true, then, that he waived the benefit of his plea to the jurisdiction by answering over. Waiver includes consent. Here, there was no consent. And if the benefit of the plea was finally lost, it must be, not by any waiver, but because the laws of the United States have not provided any mode of reviewing the decision of the Circuit Court on such a plea, when that decision is against the defendant. This is not the *566 law. Whether the decision of the Circuit Court on a plea to the jurisdiction be against the plaintiff, or against the defendant, the losing party may have any alleged error in law, in ruling such a plea, examined in this court on a writ of error, when the matter in controversy exceeds the sum or value of two thousand dollars. If the decision be against the plaintiff, and his suit dismissed for want of jurisdiction, the judgment is technically final, and he may at once sue out his writ of error. (Mollan v. Torrance, 9 Wheat., 537.) If the decision be against the defendant, though he must answer over, and wait for a final judgment in the cause, he may then have his writ of error, and upon it obtain the judgment of this court on any question of law apparent on the record, touching the jurisdiction. The fact that he pleaded over to the merits, under compulsion, can have no effect on his right to object to the jurisdiction. If this were not so, the condition of the two parties would be grossly unequal. For if a plea to the jurisdiction were ruled against the plaintiff, he could at once take his writ of error, and have the ruling reviewed here; while, if the same plea were ruled against the defendant, he must not only wait for a final judgment, but could in no event have the ruling of the Circuit Court upon the plea reviewed by this court. I know of no ground for saying that the laws of the United States have thus discriminated between the parties to a suit in its courts.
It is further objected, that as the judgment of the Circuit Court was in favor of the defendant, and the writ of error in this cause was sued out by the plaintiff, the defendant is not in a condition to assign any error in the record, and therefore this court is precluded from considering the question whether the Circuit Court had jurisdiction.
The practice of this court does not require a technical assignment of errors. (See the rule.) Upon a writ of error, the whole record is open for inspection; and if any error be found in it, the judgment is reversed. (Bank of U.S. v. Smith, 11 Wheat., 171.)
It is true, as a general rule, that the court will not allow a party to rely on anything as cause for reversing a judgment, which was for his advantage. In this, we follow an ancient rule of the common law. But so careful was that law of the preservation of the course of its courts, that it made an exception out of that general rule, and allowed a party to assign for error that which was for his advantage, if it were a departure by the court itself from its settled course of procedure. The cases on this subject are collected in Bac. Ab., Error H. 4. And this court followed this practice in Capron v. Van Noorden, *567 (2 Cranch, 126,) where the plaintiff below procured the reversal of a judgment for the defendant, on the ground that the plaintiff's allegations of citizenship had not shown jurisdiction.
But it is not necessary to determine whether the defendant can be allowed to assign want of jurisdiction as an error in a judgment in his own favor. The true question is, not what either of the parties may be allowed to do, but whether this court will affirm or reverse a judgment of the Circuit Court on the merits, when it appears on the record, by a plea to the jurisdiction, that it is a case to which the judicial power of the United States does not extend. The course of the court is, where no motion is made by either party, on its own motion, to reverse such a judgment for want of jurisdiction, not only in cases where it is shown, negatively, by a plea to the jurisdiction, that jurisdiction does not exist, but even where it does not appear, affirmatively, that it does exist. (Pequignot v. The Pennsylvania R.R. Co., 16 How., 104.) It acts upon the principle that the judicial power of the United States must not be exerted in a case to which it does not extend, even if both parties desire to have it exerted. (Cutler v. Rae, 7 How., 729.) I consider, therefore, that when there was a plea to the jurisdiction of the Circuit Court in a case brought here by a writ of error, the first duty of this court is, sua sponte, if not moved to it by either party, to examine the sufficiency of that plea; and thus to take care that neither the Circuit Court nor this court shall use the judicial power of the United States in a case to which the Constitution and laws of the United States have not extended that power.
I proceed, therefore, to examine the plea to the jurisdiction.
I do not perceive any sound reason why it is not to be judged by the rules of the common law applicable to such pleas. It is true, where the jurisdiction of the Circuit Court depends on the citizenship of the parties, it is incumbent on the plaintiff to allege on the record the necessary citizenship; but when he has done so, the defendant must interpose a plea in abatement, the allegations whereof show that the court has not jurisdiction; and it is incumbent on him to prove the truth of his plea.
In Sheppard v. Graves, (14 How., 27,) the rules on this subject are thus stated in the opinion of the court: "That although, in the courts of the United States, it is necessary to set forth the grounds of their cognizance as courts of limited jurisdiction, yet wherever jurisdiction shall be averred in the pleadings, in conformity with the laws creating those courts, it must be taken, prima-facie, as existing; and it is incumbent *568 on him who would impeach that jurisdiction for causes dehors the pleading, to allege and prove such causes; that the necessity for the allegation, and the burden of sustaining it by proof, both rest upon the party taking the exception." These positions are sustained by the authorities there cited, as well as by Wickliffe v. Owings, (17 How., 47.)
When, therefore, as in this case, the necessary averments as to citizenship are made on the record, and jurisdiction is assumed to exist, and the defendant comes by a plea to the jurisdiction to displace that presumption, he occupies, in my judgment, precisely the position described in Bacon Ab., Abatement: "Abatement, in the general acceptation of the word, signifies a plea, put in by the defendant, in which he shows cause to the court why he should not be impleaded; or, if at all, not in the manner and form he now is."
This being, then, a plea in abatement, to the jurisdiction of the court, I must judge of its sufficiency by those rules of the common law applicable to such pleas.
The plea was as follows: "And the said John F.A. Sandford, in his own proper person, comes and says that this court ought not to have or take further cognizance of the action aforesaid, because he says that said cause of action, and each and every of them, (if any such have accrued to the said Dred Scott,) accrued to the said Dred Scott out of the jurisdiction of this court, and exclusively within the jurisdiction of the courts of the State of Missouri; for that, to wit, the said plaintiff, Dred Scott, is not a citizen of the State of Missouri, as alleged in his declaration, because he is a negro of African descent; his ancestors were of pure African blood, and were brought into this country and sold as negro slaves, and this the said Sandford is ready to verify. Wherefore, he prays judgment whether this court can or will take further cognizanee of the action aforesaid."
The plaintiff demurred, and the judgment of the Circuit Court was, that the plea was insufficient.
I cannot treat this plea as a general traverse of the citizenship alleged by the plaintiff. Indeed, if it were so treated, the plea was clearly bad, for it concludes with a verification, and not to the country, as a general traverse should. And though this defect in a plea in bar must be pointed out by a special demurrer, it is never necessary to demur specially to a plea in abatement; all matters, though of form only, may be taken advantage of upon a general demurrer to such a plea. (Chitty on Pl., 465.)
The truth is, that though not drawn with the utmost technical accuracy, it is a special traverse of the plaintiff's allegation *569 of citizenship, and was a suitable and proper mode of traverse under the circumstances. By reference to Mr. Stephen's description of the uses of such a traverse, contained in his excellent analysis of pleadings, (Steph. on Pl., 176,) it will be seen how precisely this plea meets one of his descriptions. No doubt the defendant might have traversed, by a common or general traverse, the plaintiff's allegation that he was a citizen of the State of Missouri, concluding to the country. The issue thus presented being joined, would have involved matter of law, on which the jury must have passed, under the direction of the court. But by traversing the plaintiffs citizenship specially  that is, averring those facts on which the defendant relied to show that in point of law the plaintiff was not a citizen, and basing the traverse on those facts as a deduction therefrom  opportunity was given to do, what was done; that is, to present directly to the court, by a demurrer, the sufficiency of those facts to negative, in point of law, the plaintiff's allegation of citizenship. This, then, being a special, and not a general or common traverse, the rule is settled, that the facts thus set out in the plea, as the reason or ground of the traverse, must of themselves constitute, in point of law, a negative of the allegation thus traversed. (Stephen on Pl., 183; Ch. on Pl., 620.) And upon a demurrer to this plea, the question which arises is, whether the facts, that the plaintiff is a negro, of African descent, whose ancestors were of pure African blood, and were brought into this country and sold as negro slaves, may all be true, and yet the plaintiff be a citizen of the State of Missouri, within the meaning of the Constitution and laws of the United States, which confer on citizens of one State the right to sue citizens of another State in the Circuit Courts. Undoubtedly, if these facts, taken together, amount to an allegation that, at the time of action brought, the plaintiff was himself a slave, the plea is sufficient. It has been suggested that the plea, in legal effect, does so aver, because, if his ancestors were sold as slaves, the presumption is they continued slaves; and if so, the presumption is, the plaintiff was born a slave; and if so, the presumption is, he continued to be a slave to the time of action brought.
I cannot think such presumptions can be resorted to, to help out defective averments in pleading; especially, in pleading in abatement, where the utmost certainty and precision are required. (Chitty on Pl., 457.) That the plaintiff himself was a slave at the time of action brought, is a substantive fact, having no necessary connection with the fact that his parents were sold as slaves. For they might have been sold after he was born; or the plaintiff himself, if once a slave, might have *570 became a freeman before action brought. To aver that his ancestors were sold as slaves, is not equivalent, in point of law, to an averment that he was a slave. If it were, he could not even confess and avoid the averment of the slavery of his ancestors, which would be monstrous; and if it be not equivalent in point of law, it cannot be treated as amounting thereto when demurred to; for a demurrer confesses only those substantive facts which are well pleaded, and not other distinct substantive facts which might be inferred therefrom by a jury. To treat an averment that the plaintiff's ancestors were Africans, brought to this country and sold as slaves, as amounting to an averment on the record that he was a slave, because it may lay some foundation for presuming so, is to hold that the facts actually alleged may be treated as intended as evidence of another distinct fact not alleged. But it is a cardinal rule of pleading, laid down in Dowman's case, (9 Rep., 9 b,) and in even earlier authorities therein referred to, "that evidence shall never be pleaded, for it only tends to prove matter of fact; and therefore the matter of fact shall be pleaded." Or, as the rule is sometimes stated, pleadings must not be argumentative. (Stephen on Pleading, 384, and authorities cited by him.) In Com. Dig., Pleader E. 3, and Bac. Abridgement, Pleas I, 5, and Stephen on Pl., many decisions under this rule are collected. In trover, for an indenture whereby A granted a manor, it is no plea that A did not grant the manor, for it does not answer the declaration except by argument. (Yelv., 223.)
So in trespass for taking and carrying away the plaintiff's goods, the defendant pleaded that the plaintiff never had any goods. The court said, "this is an infallible argument that the defendant is not guilty, but it is no plea." (Dyer, a 43.)
In ejectment, the defendant pleaded a surrender of a copyhold by the hand of Fosset, the steward. The plaintiff replied, that Fosset was not steward. The court held this no issue, for it traversed the surrender only argumentatively. (Cro. Elis., 260.)
In these cases, and many others reported in the books, the inferences from the facts stated were irresistible. But the court held they did not, when demurred to, amount to such inferable facts. In the case at bar, the inference that the defendant was a slave at the time of action brought, even if it can be made at all, from the fact that his parents were slaves, is certainly not a necessary inference. This case, therefore, is like that of Digby v. Alexander, (8 Bing., 116.) In that case, the defendant pleaded many facts strongly tending to show that he was once Earl of Stirling; but as there was no positive allegation *571 that he was so at the time of action brought, and as every fact averred might be true, and yet the defendant not have been Earl of Stirling at the time of action brought, the plea was held to be insufficient.
A lawful seizin of land is presumed to continue. But if, in an action of trespass quare clausum, the defendant were to plead that he was lawfully seized of the locus in quo, one month before the time of the alleged trespass, I should have no doubt it would be a bad plea. (See Mollan v. Torrance, 9 Wheat., 537.) So if a plea to the jurisdiction, instead of alleging that the plaintiff was a citizen of the same State as the defendant, were to allege that the plaintiff's ancestors were citizens of that State, I think the plea could not be supported. My judgment would be, as it is in this case, that if the defendant meant to aver a particular substantive fact, as existing at the time of action brought, he must do it directly and explicitly, and not by way of inference from certain other averments, which are quite consistent with the contrary hypothesis. I cannot, therefore, treat this plea as containing an averment that the plaintiff himself was a slave at the time of action brought; and the inquiry recurs, whether the facts, that he is of African descent, and that his parents were once slaves, are necessarily inconsistent with his own citizenship in the State of Missouri, within the meaning of the Constitution and laws of the United States.
In Gassies v. Ballon, (6 Pet., 761,) the defendant was described on the record as a naturalized citizen of the United States, residing in Louisiana. The court held this equivalent to an averment that the defendant was a citizen of Louisiana; because a citizen of the United States, residing in any State of the Union, is, for purposes of jurisdiction, a citizen of that State. Now, the plea to the jurisdiction in this case does not controvert the fact that the plaintiff resided in Missouri at the date of the writ. If he did then reside there, and was also a citizen of the United States, no provisions contained in the Constitution or laws of Missouri can deprive the plaintiff of his right to sue citizens of States other than Missouri, in the courts of the United States.
So that, under the allegations contained in this plea, and admitted by the demurrer, the question is, whether any person of African descent, whose ancestors were sold as slaves in the United States, can be a citizen of the United States. If any such person can be a citizen, this plaintiff has the right to the judgment of the court that he is so; for no cause is shown by the plea why he is not so, except his descent and the slavery of his ancestors.
The first section of the second article of the Constitution *572 uses the language, "a citizen of the United States at the time of the adoption of the Constitution." One mode of approaching this question is, to inquire who were citizens of the United States at the time of the adoption of the Constitution.
Citizens of the United States at the time of the adoption of the Constitution can have been no other than citizens of the United States under the Confederation. By the Articles of Confederation, a Government was organized, the style whereof of was, "The United States of America." This Government was in existence when the Constitution was framed and proposed for adoption, and was to be superseded by the new Government of the United States of America, organized under the Constitution. When, therefore, the Constitution speaks of citizenship of the United States, existing at the time of the adoption of the Constitution, it must necessarily refer to citizenship under the Government which existed prior to and at the time of such adoption.
Without going into any question concerning the powers of the Confederation to govern the territory of the United States out of the limits of the States, and consequently to sustain the relation of Government and citizen in respect to the inhabitants of such territory, it may safely be said that the citizens of the several States were citizens of the United States under the Confederation.
That Government was simply a confederacy of the several States, possessing a few defined powers over subjects of general concern, each State retaining every power, jurisdiction, and right, not expressly delegated to the United States in Congress assembled. And no power was thus delegated to the Government of the Confederation, to act on any question of citizenship, or to make any rules in respect thereto. The whole matter was left to stand upon the action of the several States, and to the natural consequence of such action, that the citizens of each State should be citizens of that Confederacy into which that State had entered, the style whereof was, "The United States of America."
To determine whether any free persons, descended from Africans held in slavery, were citizens of the United States under the Confederation, and consequently at the time of the adoption of the Constitution of the United States, it is only necessary to know whether any such persons were citizens of either of the States under the Confederation, at the time of the adoption of the Constitution.
Of this there can be no doubt. At the time of the ratification of the Articles of Confederation, all free native-born inhabitants of the States of New Hampshire, Massachusetts, New *573 York, New Jersey, and North Carolina, though descended from African slaves, were not only citizens of those States, but such of them as had the other necessary qualifications possessed the franchise of electors, on equal terms with other citizens.
The Supreme Court of North Carolina, in the case of the State v. Manuel, (4 Dev. and Bat., 20,) has declared the law of that State on this subject, in terms which I believe to be as sound law in the other States I have enumerated, as it was in North Carolina.
"According to the laws of this State," says Judge Gaston, in delivering the opinion of the court, "all human beings within it, who are not slaves, fall within one of two classes. Whatever distinctions may have existed in the Roman laws between citizens and free inhabitants, they are unknown to our institutions. Before our Revolution, all free persons born within the dominions of the King of Great Britain, whatever their color or complexion, were native-born British subjects  those born out of his allegiance were aliens. Slavery did not exist in England, but it did in the British colonies. Slaves were not in legal parlance persons, but property. The moment the incapacity, the disqualification of slavery, was removed, they became persons, and were then either British subjects, or not British subjects, according as they were or were not born within the allegiance of the British King. Upon the Revolution, no other change took place in the laws of North Carolina than was consequent on the transition from a colony dependent on a European King, to a free and sovereign State. Slaves remained slaves. British subjects in North Carolina became North Carolina freemen. Foreigners, until made members of the State, remained aliens. Slaves, manumitted here, became freemen, and therefore, if born within North Carolina, are citizens of North Carolina, and all free persons born within the State are born citizens of the State. The Constitution extended the elective franchise to every freeman who had arrived at the age of twenty-one, and paid a public tax; and it is a matter of universal notoriety, that, under it, free persons, without regard to color, claimed and exercised the franchise, until it was taken from free men of color a few years since by our amended Constitution."
In the State v. Newcomb, (5 Iredell's R., 253,) decided in 1844, the same court referred to this case of the State v. Manuel, and said: "That case underwent a very laborious investigation, both by the bar and the bench. The case was brought here by appeal, and was felt to be one of great importance in principle. It was considered with an anxiety and care worthy of the principle involved, and which give it a controlling *574 influence and authority on all questions of a similar character."
An argument from speculative premises, however well chosen, that the then state of opinion in the Commonwealth of Massachusetts was not consistent with the natural rights of people of color who were born on that soil, and that they were not, by the Constitution of 1780 of that State, admitted to the condition of citizens, would be received with surprise by the people of that State, who know their own political history. It is true, beyond all controversy, that persons of color, descended from African slaves, were by that Constitution made citizens of the State; and such of them as have had the necessary qualifications, have held and exercised the elective franchise, as citizens, from that time to the present. (See Com. v. Aves, 18 Pick. R., 210.)
The Constitution of New Hampshire conferred the elective franchise upon "every inhabitant of the State having the necessary qualifications," of which color or descent was not one.
The Constitution of New York gave the right to vote to "every male inhabitant, who shall have resided," &c.; making no discrimination between free colored persons and others. (See Con. of N.Y., Art. 2, Rev. Stats. of N.Y., vol. 1, p. 126.)
That of New Jersey, to "all inhabitants of this colony, of full age, who are worth £50 proclamation money, clear estate."
New York, by its Constitution of 1820, required colored persons to have some qualifications as prerequisites for voting, which white persons need not possess. And New Jersey, by its present Constitution, restricts the right to vote to white male citizens. But these changes can have no other effect upon the present inquiry, except to show, that before they were made, no such restrictions existed; and colored in common with white persons, were not only citizens of those States, but entitled to the elective franchise on the same qualifications as white persons, as they now are in New Hampshire and Massachusetts. I shall not enter into an examination of the existing opinions of that period respecting the African race, nor into any discussion concerning the meaning of those who asserted, in the Declaration of Independence, that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness. My own opinion is, that a calm comparison of these assertions of universal abstract truths, and of their own individual opinions and acts, would not leave *575 these men under any reproach of inconsistency; that the great truths they asserted on that solemn occasion, they were ready and anxious to make effectual, wherever a necessary regard to circumstances, which no statesman can disregard without producing more evil than good, would allow; and that it would not be just to them, nor true in itself, to allege that they intended to say that the Creator of all men had endowed the white race, exclusively, with the great natural rights which the Declaration of Independence asserts. But this is not the place to vindicate their memory. As I conceive, we should deal here, not with such disputes if there can be a dispute concerning this subject, but with those substantial facts evinced by the written Constitutions of States, and by the notorious practice under them. And they show, in a manner which no argument can obscure, that in some of the original thirteen States, free colored persons, before and at the time of the formation of the Constitution, were citizens of those States.
The fourth of the fundamental articles of the Confederation was as follows: "The free inhabitants of each of these States, paupers, vagabonds, and fugitives from justice, excepted, shall be entitled to all the privileges and immunities of free citizens in the several States."
The fact that free persons of color were citizens of some of the several States, and the consequence, that this fourth article of the Confederation would have the effect to confer on such persons the privileges and immunities of general citizenship, were not only known to those who framed and adopted those articles, but the evidence is decisive, that the fourth article was intended to have that effect, and that more restricted language, which would have excluded such persons, was deliberately and purposely rejected.
On the 25th of June, 1778, the Articles of Confederation being under consideration by the Congress, the delegates from South Carolina moved to amend this fourth article, by inserting after the word "free," and before the word "inhabitants," the word "white," so that the privileges and immunities of general citizenship would be secured only to white persons. Two States voted for the amendment, eight States against it, and the vote of one State was divided. The language of the article stood unchanged, and both by its terms of inclusion, "free inhabitants," and the strong implication from its terms of exclusion, "paupers, vagabonds, and fugitives from justice," who alone were excepted, it is clear, that under the Confederation, and at the time of the adoption of the Constitution, free colored persons of African descent might be, and, by reason of their citizenship in certain States, were entitled to the *576 privileges and immunities of general citizenship of the United States.
Did the Constitution of the United States deprive them or their descendants of citizenship?
That Constitution was ordained and established by the people of the United States, through the action, in each State, of those persons who were qualified by its laws to act thereon, in behalf of themselves and all other citizens of that State. In some of the States, as we have seen, colored persons were among those qualified by law to act on this subject. These colored persons were not only included in the body of "the people of the United States," by whom the Constitution was ordained and established, but in at least five of the States they had the power to act, and doubtless did act, by their suffrages, upon the question of its adoption. It would be strange, if we were to find in that instrument anything which deprived of their citizenship any part of the people of the United States who were among those by whom it was established.
I can find nothing in the Constitution which, proprio vigore, deprives of their citizenship any class of persons who were citizens of the United States at the time of its adoption, or who should be native-born citizens of any State after its adoption; nor any power enabling Congress to disfranchise persons born on the soil of any State, and entitled to citizenship of such State by its Constitution and laws. And my opinion is, that, under the Constitution of the United States, every free person born on the soil of a State, who is a citizen of that State by force of its Constitution or laws, is also a citizen of the United States.
I will proceed to state the grounds of that opinion.
The first section of the second article of the Constitution uses the language, "a natural-born citizen." It thus assumes that citizenship may be acquired by birth. Undoubtedly, this language of the Constitution was used in reference to that principle of public law, well understood in this country at the time of the adoption of the Constitution, which referred citizenship to the place of birth. At the Declaration of Independence, and ever since, the received general doctrine has been, in conformity with the common law, that free persons born within either of the colonies were subjects of the King; that by the Declaration of Independence, and the consequent acquisition of sovereignty by the several States, all such persons ceased to be subjects, and became citizens of the several States, except so far as some of them were disfranchised by the legislative power of the States, or availed themselves, seasonably, of the right to adhere to the British Crown in the civil contest, *577 and thus to continue British subjects. (McIlvain v. Coxe's Lessee, 4 Cranch, 209; Inglis v. Sailors' Snug Harbor, 3 Peters, p. 99; Shanks v. Dupont, Ibid, p. 242.)
The Constitution having recognised the rule that persons born within the several States are citizens of the United States, one of four things must be true:
First. That the Constitution itself has described what native-born persons shall or shall not be citizens of the United States; or,
Second. That it has empowered Congress to do so; or,
Third. That all free persons, born within the several States, are citizens of the United States; or,
Fourth. That it is left to each State to determine what free persons, born within its limits, shall be citizens of such State, and thereby be citizens of the United States.
If there be such a thing as citizenship of the United States acquired by birth within the States, which the Constitution expressly recognises, and no one denies, then these four alternatives embrace the entire subject, and it only remains to select that one which is true.
That the Constitution itself has defined citizenship of the United States by declaring what persons, born within the several States, shall or shall not be citizens of the United States, will not be pretended. It contains no such declaration. We may dismiss the first alternative, as without doubt unfounded.
Has it empowered Congress to enact what free persons, born within the several States, shall or shall not be citizens of the United States?
Before examining the various provisions of the Constitution which may relate to this question, it is important to consider for a moment the substantial nature of this inquiry. It is, in effect, whether the Constitution has empowered Congress to create privileged classes within the States, who alone can be entitled to the franchises and powers of citizenship of the United States. If it be admitted that the Constitution has enabled Congress to declare what free persons, born within the several States, shall be citizens of the United States, it must at the same time be admitted that it is an unlimited power. If this subject is within the control of Congress, it must depend wholly on its discretion. For, certainly, no limits of that discretion can be found in the Constitution, which is wholly silent concerning it; and the necessary consequence is, that the Federal Government may select classes of persons within the several States who alone can be entitled to the political privileges of citizenship of the United States. If this power exists, what persons born within the States may be President or Vice President *578 of the United States, or members of either House of Congress, or hold any office or enjoy any privilege whereof citizenship of the United States is a necessary qualification, must depend solely on the will of Congress. By virtue of it, though Congress can grant no title of nobility, they may create an oligarchy, in whose hands would be concentrated the entire power of the Federal Government.
It is a substantive power, distinct in its nature from all others; capable of affecting not only the relations of the States to the General Government, but of controlling the political condition of the people of the United States. Certainly we ought to find this power granted by the Constitution, at least by some necessary inference, before we can say it does not remain to the States or the people. I proceed therefore to examine all the provisions of the Constitution which may have some bearing on this subject.
Among the powers expressly granted to Congress is "the power to establish a uniform rule of naturalization." It is not doubted that this is a power to prescribe a rule for the removal of the disabilities consequent on foreign birth. To hold that it extends further than this, would do violence to the meaning of the term naturalization, fixed in the common law, (Co. Lit., 8 a, 129 a; 2 Ves., sen., 286; 2 Bl. Com., 293,) and in the minds of those who concurred in framing and adopting the Constitution. It was in this sense of conferring on an alien and his issue the rights and powers of a native-born citizen, that it was employed in the Declaration of Independence. It was in this sense it was expounded in the Federalist, (No. 42,) has been understood by Congress, by the Judiciary, (2 Wheat., 259, 269; 3 Wash. R., 313, 322; 12 Wheat., 277,) and by commentators on the Constitution. (3 Story's Com. on Con., 1  3; 1 Rawle on Con., 84  88; 1 Tucker's Bl. Com. App., 255  259.)
It appears, then, that the only power expressly granted to Congress to legislate concerning citizenship, is confined to the removal of the disabilities of foreign birth.
Whether there be anything in the Constitution from which a broader power may be implied, will best be seen when we come to examine the two other alternatives, which are, whether all free persons, born on the soil of the several States, or only such of them as may be citizens of each State, respectively, are thereby citizens of the United States. The last of these alternatives, in my judgment, contains the truth.
Undoubtedly, as has already been said, it is a principle of public law, recognised by the Constitution itself, that birth on the soil of a country both creates the duties and confers the rights of citizenship. But it must be remembered, that though *579 the Constitution was to form a Government, and under it the United States of America were to be one united sovereign nation, to which loyalty and obedience on the one side, and from which protection and privileges on the other, would be due, yet the several sovereign States, whose people were then citizens, were not only to continue in existence, but with powers unimpaired, except so far as they were granted by the people to the National Government.
Among the powers unquestionably possessed by the several States, was that of determining what persons should and what persons should not be citizens. It was practicable to confer on the Government of the Union this entire power. It embraced what may, well enough for the purpose now in view, be divided into three parts. First: The power to remove the disabilities of alienage, either by special acts in reference to each individual case, or by establishing a rule of naturalization to be administered and applied by the courts. Second: Determining what persons should enjoy the privileges of citizenship, in respect to the internal affairs of the several States. Third: What native-born persons should be citizens of the United States.
The first-named power, that of establishing a uniform rule of naturalization, was granted; and here the grant, according to its terms, stopped. Construing a Constitution containing only limited and defined powers of government, the argument derived from this definite and restricted power to establish a rule of naturalization, must be admitted to be exceedingly strong. I do not say it is necessarily decisive. It might be controlled by other parts of the Constitution. But when this particular subject of citizenship was under consideration, and, in the clause specially intended to define the extent of power concerning it, we find a particular part of this entire power separated from the residue, and conferred on the General Government, there arises a strong presumption that this is all which is granted, and that the residue is left to the States and to the people. And this presumption is, in my opinion, converted into a certainty, by an examination of all such other clauses of the Constitution as touch this subject.
I will examine each which can have any possible bearing on this question.
The first clause of the second section of the third article of the Constitution is, "The judicial power shall extend to controversies between a State and citizens of another State; between citizens of different States; between citizens of the same State, claiming lands under grants of different States; and between States, or the citizens thereof, and foreign States, *580 citizens, or subjects." I do not think this clause has any considerable bearing upon the particular inquiry now under consideration. Its purpose was, to extend the judicial power to those controversies into which local feelings or interests might so enter as to disturb the course of justice, or give rise to suspicions that they had done so, and thus possibly give occasion to jealousy or ill will between different States, or a particular State and a foreign nation. At the same time, I would remark, in passing, that it has never been held, I do not know that it has ever been supposed, that any citizen of a State could bring himself under this clause and the eleventh and twelfth sections of the judiciary act of 1789, passed in pursuance of it, who was not a citizen of the United States. But I have referred to the clause, only because it is one of the places where citizenship is mentioned by the Constitution. Whether it is entitled to any weight in this inquiry or not, it refers only to citizenship of the several States; it recognises that; but it does not recognise citizenship of the United States as something distinct therefrom.
As has been said, the purpose of this clause did not necessarily connect it with citizenship of the United States, even if that were something distinct from citizenship of the several States, in the contemplation of the Constitution. This cannot be said of other clauses of the Constitution, which I now proceed to refer to.
"The citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States." Nowhere else in the Constitution is there anything concerning a general citizenship; but here, privileges and immunities to be enjoyed throughout the United States, under and by force of the national compact, are granted and secured. In selecting those who are to enjoy these national rights of citizenship, how are they described? As citizens of each State. It is to them these national rights are secured. The qualification for them is not to be looked for in any provision of the Constitution or laws of the United States. They are to be citizens of the several States, and, as such, the privileges and immunities of general citizenship, derived from and guarantied by the Constitution, are to be enjoyed by them. It would seem that if it had been intended to constitute a class of native-born persons within the States, who should derive their citizenship of the United States from the action of the Federal Government, this was an occasion for referring to them. It cannot be supposed that it was the purpose of this article to confer the privileges and immunities of citizens in all the States upon persons not citizens of the United States.
*581 And if it was intended to secure these rights only to citizens of the United States, how has the Constitution here described such persons? Simply as citizens of each State.
But, further: though, as I shall presently more fully state, I do not think the enjoyment of the elective franchise essential to citizenship, there can be no doubt it is one of the chiefest attributes of citizenship under the American Constitutions; and the just and constitutional possession of this right is decisive evidence of citizenship. The provisions made by a Constitution on this subject must therefore be looked to as bearing directly on the question what persons are citizens under that Constitution; and as being decisive, to this extent, that all such persons as are allowed by the Constitution to exercise the elective franchise, and thus to participate in the Government of the United States, must be deemed citizens of the United States.
Here, again, the consideration presses itself upon us, that if there was designed to be a particular class of native-born persons within the States, deriving their citizenship from the Constitution and laws of the United States, they should at least have been referred to as those by whom the President and House of Representatives were to be elected, and to whom they should be responsible.
Instead of that, we again find this subject referred to the laws of the several States. The electors of President are to be appointed in such manner as the Legislature of each State may direct, and the qualifications of electors of members of the House of Representatives shall be the same as for electors of the most numerous branch of the State Legislature.
Laying aside, then, the case of aliens, concerning which the Constitution of the United States has provided, and confining our view to free persons born within the several States, we find that the Constitution has recognised the general principle of public law, that allegiance and citizenship depend on the place of birth; that it has not attempted practically to apply this principle by designating the particular classes of persons who should or should not come under it; that when we turn to the Constitution for an answer to the question, what free persons, born within the several States, are citizens of the United States, the only answer we can receive from any of its express provisions is, the citizens of the several States are to enjoy the privileges and immunities of citizens in every State, and their franchise as electors under the Constitution depends on their citizenship in the several States. Add to this, that the Constitution was ordained by the citizens of the several States; that they were "the people of the United States," for whom *582 and whose posterity the Government was declared in the preamble of the Constitution to be made; that each of them was "a citizen of the United States at the time of the adoption of the Constitution," within the meaning of those words in that instrument; that by them the Government was to be and was in fact organized; and that no power is conferred on the Government of the Union to discriminate between them, or to disfranchise any of them  the necessary conclusion is, that those persons born within the several States, who, by force of their respective Constitutions and laws, are citizens of the State, are thereby citizens of the United States.
It may be proper here to notice some supposed objections to this view of the subject.
It has been often asserted that the Constitution was made exclusively by and for the white race. It has already been shown that in five of the thirteen original States, colored persons then possessed the elective franchise, and were among those by whom the Constitution was ordained and established. If so, it is not true, in point of fact, that the Constitution was made exclusively by the white race. And that it was made exclusively for the white race is, in my opinion, not only an assumption not warranted by anything in the Constitution, but contradicted by its opening declaration, that it was ordained and established by the people of the United States, for themselves and their posterity. And as free colored persons were then citizens of at least five States, and so in every sense part of the people of the United States, they were among those for whom and whose posterity the Constitution was ordained and established.
Again, it has been objected, that if the Constitution has left to the several States the rightful power to determine who of their inhabitants shall be citizens of the United States, the States may make aliens citizens.
The answer is obvious. The Constitution has left to the States the determination what persons, born within their respective limits, shall acquire by birth citizenship of the United States; it has not left to them any power to prescribe any rule for the removal of the disabilities of alienage. This power is exclusively in Congress.
It has been further objected, that if free colored persons, born within a particular State, and made citizens of that State by its Constitution and laws, are thereby made citizens of the United States, then, under the second section of the fourth article of the Constitution, such persons would be entitled to all the privileges and immunities of citizens in the several States; and if so, then colored persons could vote, and be *583 eligible to not only Federal offices, but offices even in those States whose Constitutions and laws disqualify colored persons from voting or being elected to office.
But this position rests upon an assumption which I deem untenable. Its basis is, that no one can be deemed a citizen of the United States who is not entitled to enjoy all the privileges and franchises which are conferred on any citizen. (See 1 Lit. Kentucky R., 326.) That this is not true, under the Constitution of the United States, seems to me clear.
A naturalized citizen cannot be President of the United States, nor a Senator till after the lapse of nine years, nor a Representative till after the lapse of seven years, from his naturalization. Yet, as soon as naturalized, he is certainly a citizen of the United States. Nor is any inhabitant of the District of Columbia, or of either of the Territories, eligible to the office of Senator or Representative in Congress, though they may be citizens of the United States. So, in all the States, numerous persons, though citizens, cannot vote, or cannot hold office, either on account of their age, or sex, or the want of the necessary legal qualifications. The truth is, that citizenship, under the Constitution of the United States, is not dependent on the possession of any particular political or even of all civil rights; and any attempt so to define it must lead to error. To what citizens the elective franchise shall be confided, is a question to be determined by each State, in accordance with its own views of the necessities or expediencies of its condition. What civil rights shall be enjoyed by its citizens, and whether all shall enjoy the same, or how they may be gained or lost, are to be determined in the same way.
One may confine the right of suffrage to white male citizens; another may extend it to colored persons and females; one may allow all persons above a prescribed age to convey property and transact business; another may exclude married women. But whether native-born women, or persons under age, or under guardianship because insane or spendthrifts, be excluded from voting or holding office, or allowed to do so, I apprehend no one will deny that they are citizens of the United States. Besides, this clause of the Constitution does not confer on the citizens of one State, in all other States, specific and enumerated privileges and immunities. They are entitled to such as belong to citizenship, but not to such as belong to particular citizens attended by other qualifications. Privileges and immunities which belong to certain citizens of a State, by reason of the operation of causes other than mere citizenship, are not conferred. Thus, if the laws of a State require, in addition to *584 citizenship of the State, some qualification for office, or the exercise of the elective franchise, citizens of all other States, coming thither to reside, and not possessing those qualifications, cannot enjoy those privileges, not because they are not to be deemed entitled to the privileges of citizens of the State in which they reside, but because they, in common with the native-born citizens of that State, must have the qualifications prescribed by law for the enjoyment of such privileges, under its Constitution and laws. It rests with the States themselves so to frame their Constitutions and laws as not to attach a particular privilege or immunity to mere naked citizenship. If one of the States will not deny to any of its own citizens a particular privilege or immunity, if it confer it on all of them by reason of mere naked citizenship, then it may be claimed by every citizen of each State by force of the Constitution; and it must be borne in mind, that the difficulties which attend the allowance of the claims of colored persons to be citizens of the United States are not avoided by saying that, though each State may make them its citizens, they are not thereby made citizens of the United States, because the privileges of general citizenship are secured to the citizens of each State. The language of the Constitution is, "The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." If each State may make such persons its citizens, they become, as such, entitled to the benefits of this article, if there be a native-born citizenship of the United States distinct from a native-born citizenship of the several States.
There is one view of this article entitled to consideration in this connection. It is manifestly copied from the fourth of the Articles of Confederation, with only slight changes of phraseology, which render its meaning more precise, and dropping the clause which excluded paupers, vagabonds, and fugitives from justice, probably because these cases could be dealt with under the police powers of the States, and a special provision therefor was not necessary. It has been suggested, that in adopting it into the Constitution, the words "free inhabitants" were changed for the word "citizens." An examination of the forms of expression commonly used in the State papers of that day, and an attention to the substance of this article of the Confederation, will show that the words "free inhabitants," as then used, were synonymous with citizens. When the Articles of Confederation were adopted, we were in the midst of the war of the Revolution, and there were very few persons then embraced in the words "free inhabitants," who were not born on our soil. It was not a time when many, save the *585 children of the soil, were willing to embark their fortunes in our cause; and though there might be an inaccuracy in the uses of words to call free inhabitants citizens, it was then a technical rather than a substantial difference. If we look into the Constitutions and State papers of that period, we find the inhabitants or people of these colonies, or the inhabitants of this State, or Commonwealth, employed to designate those whom we should now denominate citizens. The substance and purpose of the article prove it was in this sense it used these words: it secures to the free inhabitants of each State the privileges and immunities of free citizens in every State. It is not conceivable that the States should have agreed to extend the privileges of citizenship to persons not entitled to enjoy the privileges of citizens in the States where they dwelt; that under this article there was a class of persons in some of the States, not citizens, to whom were secured all the privileges and immunities of citizens when they went into other States; and the just conclusion is, that though the Constitution cured an inaccuracy of language, it left the substance of this article in the National Constitution the same as it was in the Articles of Confederation.
The history of this fourth article, respecting the attempt to exclude free persons of color from its operation, has been already stated. It is reasonable to conclude that this history was known to those who framed and adopted the Constitution. That under this fourth article of the Confederation, free persons of color might be entitled to the privileges of general citizenship, if otherwise entitled thereto, is clear. When this article was, in substance, placed in and made part of the Constitution of the United States, with no change in its language calculated to exclude free colored persons from the benefit of its provisions, the presumption is, to say the least, strong, that the practical effect which it was designed to have, and did have, under the former Government, it was designed to have, and should have, under the new Government.
It may be further objected, that if free colored persons may be citizens of the United States, it depends only on the will of a master whether he will emancipate his slave, and thereby make him a citizen. Not so. The master is subject to the will of the State. Whether he shall be allowed to emancipate his slave at all; if so, on what conditions; and what is to be the political status of the freed man, depend, not on the will of the master, but on the will of the State, upon which the political status of all its native-born inhabitants depends. Under the Constitution of the United States, each State has retained this power of determining the political status of its native-born *586 inhabitants, and no exception thereto can be found in the Constitution. And if a master in a slaveholding State should carry his slave into a free State, and there emancipate him, he would not thereby make him a native-born citizen of that State, and consequently no privileges could be claimed by such emancipated slave as a citizen of the United States. For, whatever powers the States may exercise to confer privileges of citizenship on persons not born on their soil, the Constitution of the United States-does not recognise such citizens. As has already been said, it recognises the great principle of public law, that allegiance and citizenship spring from the place of birth. It leaves to the States the application of that principle to individual eases. It secured to the citizens of each State the privileges and immunities of citizens in every other State. But it does not allow to the States the power to make aliens citizens, or permit one State to take persons born on the soil of another State, and, contrary to the laws and policy of the State where they were born, make them its citizens, and so citizens of the United States. No such deviation from the great rule of public law was contemplated by the Constitution; and when any such attempt shall be actually made, it is to be met by applying to it those rules of law and those principles of good faith which will be sufficient to decide it, and not, in my judgment, by denying that all the free native-born inhabitants of a State, who are its citizens under its Constitution and laws, are also citizens of the United States.
It has sometimes been urged that colored persons are shown not to be citizens of the United States by the fact that the naturalization laws apply only to white persons. But whether a person born in the United States be or be not a citizen, cannot depend on laws which refer only to aliens, and do not affect the status of persons born in the United States. The utmost effect which can be attributed to them is, to show that Congress has not deemed it expedient generally to apply the rule to colored aliens. That they might do so, if thought fit, is clear. The Constitution has not excluded them. And since that has conferred the power on Congress to naturalize colored aliens, it certainly shows color is not a necessary qualification for citizenship under the Constitution of the United States. It may be added, that the power to make colored persons citizens of the United States, under the Constitution, has been actually exercised in repeated and important instances. (See the Treaties with the Choctaws, of September 27, 1830, art. 14; with the Cherokees, of May 23, 1836, art. 12; Treaty of Guadalupe Hidalgo, February 2, 1848, art. 8.)
I do not deem it necessary to review at length the legislation *587 of Congress having more or less bearing on the citizenship of colored persons. It does not seem to me to have any considerable tendency to prove that it has been considered by the legislative department of the Government, that no such persons are citizens of the United States. Undoubtedly they have been debarred from the exercise of particular rights or privileges extended to white persons, but, I believe, always in terms which, by implication, admit they may be citizens. Thus the act of May 17, 1792, for the organization of the militia, directs the enrolment of "every free, able-bodied, white male citizen." An assumption that none but white persons are citizens, would be as inconsistent with the just import of this language, as that all citizens are able-bodied, or males.
So the act of February 28, 1803, (2 Stat. at Large, 205,) to prevent the importation of certain persons into States, when by the laws thereof their admission is prohibited, in its first section forbids all masters of vessels to import or bring "any negro, mulatto, or other person of color, not being a native, a citizen, or registered seaman of the United States," &c.
The acts of March 3, 1813, section 1, (2 Stat. at Large, 809,) and March 1, 1817, section 3, (3 Stat. at Large, 351,) concerning seamen, certainly imply there may be persons of color, natives of the United States, who are not citizens of the United States. This implication is undoubtedly in accordance with the fact. For not only slaves, but free persons of color, born in some of the States, are not citizens. But there is nothing in these laws inconsistent with the citizenship of persons of color in others of the States, nor with their being citizens of the United States.
Whether much or little weight should be attached to the particular phraseology of these and other laws, which were not passed with any direct reference to this subject, I consider their tendency to be, as already indicated, to show that, in the apprehension of their framers, color was not a necessary qualification of citizenship. It would be strange, if laws were found on our statute book to that effect, when, by solemn treaties, large bodies of Mexican and North American Indians as well as free colored inhabitants of Louisiana have been admitted to citizenship of the United States.
In the legislative debates which preceded the admission of the State of Missouri into the Union, this question was agitated. Its result is found in the resolution of Congress, of March 5, 1821, for the admission of that State into the Union. The Constitution of Missouri, under which that State applied for admission into the Union, provided, that it should be the duty *588 of the Legislature "to pass laws to prevent free negroes and mulattoes from coming to and settling in the State, under any pretext whatever." One ground of objection to the admission of the State under this Constitution was, that it would require the Legislature to exclude free persons of color, who would be entitled, under the second section of the fourth article of the Constitution, not only to come within the State, but to enjoy there the privileges and immunities of citizens. The resolution of Congress admitting the State was upon the fundamental condition, "that the Constitution of Missouri shall never be construed to authorize the passage of any law, and that no law shall be passed in conformity thereto, by which any citizen of either of the States of this Union shall be excluded from the enjoyment of any of the privileges and immunities to which such citizen is entitled under the Constitution of the United States." It is true, that neither this legislative declaration, nor anything in the Constitution or laws of Missouri, could confer or take away any privilege or immunity granted by the Constitution. But it is also true, that it expresses the then conviction of the legislative power of the United States, that free negroes, as citizens of some of the States, might be entitled to the privileges and immunities of citizens in all the States.
The conclusions at which I have arrived on this part of the case are:
First. That the free native-born citizens of each State are citizens of the United States.
Second. That as free colored persons born within some of the States are citizens of those States, such persons are also citizens of the United States.
Third. That every such citizen, residing in any State, has the right to sue and is liable to be sued in the Federal courts, as a citizen of that State in which he resides.
Fourth. That as the plea to the jurisdiction in this case shows no facts, except that the plaintiff was of African descent, and his ancestors were sold as slaves, and as these facts are not inconsistent with his citizenship of the United States, and his residence in the State of Missouri, the plea to the jurisdiction was bad, and the judgment of the Circuit Court overruling it was correct.
I dissent, therefore, from that part of the opinion of the majority of the court, in which it is held that a person of African descent cannot be a citizen of the United States; and I regret I must go further, and dissent both from what I deem their assumption of authority to examine the constitutionality of the act of Congress commonly called the Missouri compromise *589 act, and the grounds and conclusions announced in their opinion.
Having first decided that they were bound to consider the sufficiency of the plea to the jurisdiction of the Circuit Court, and having decided that this plea showed that the Circuit Court had not jurisdiction, and consequently that this is a case to which the judicial power of the United States does not extend, they have gone on to examine the merits of the case as they appeared on the trial before the court and jury, on the issues joined on the pleas in bar, and so have reached the question of the power of Congress to pass the act of 1820. On so grave a subject as this, I feel obliged to say that, in my opinion, such an exertion of judicial power transcends the limits of the authority of the court, as described by its repeated decisions, and, as I understand, acknowledged in this opinion of the majority of the court.
In the course of that opinion, it became necessary to comment on the case of Legrand v. Darnall, (reported in 2 Peters's R., 664.) In that case, a bill was filed, by one alleged to be a citizen of Maryland, against one alleged to be a citizen of Pennsylvania. The bill stated that the defendant was the son of a white man by one of his slaves; and that the defendant's father devised to him certain lands, the title to which was put in controversy by the bill. These facts were admitted in the answer, and upon these and other facts the court made its decree, founded on the principle that a devise of land by a master to a slave was by implication also a bequest of his freedom. The facts that the defendant was of African descent, and was born a slave, were not only before the court, but entered into the entire substance of its inquiries. The opinion of the majority of my brethren in this case disposes of the case of Legrand v. Darnall, by saying, among other things, that as the fact that the defendant was born a slave only came before this court on the bill and answer, it was then too late to raise the question of the personal disability of the party, and therefore that decision is altogether inapplicable in this case.
In this I concur. Since the decision of this court in Livingston v. Story, (11 Pet., 351,) the law has been settled, that when the declaration or bill contains the necessary averments of citizenship, this court cannot look at the record, to see whether those averments are true, except so far as they are put in issue by a plea to the jurisdiction. In that case, the defendant denied by his answer that Mr. Livingston was a citizen of New York, as he had alleged in the bill. Both parties went into proofs. The court refused to examine those proofs, with reference to the personal disability of the plaintiff. This is the *590 settled law of the court, affirmed so lately as Shepherd v. Graves, (14 How., 27,) and Wickliff v. Owings, (17 How., 51.) (See also De Wolf v. Rabaud, 1 Pet., 476.) But I do not understand this to be a rule which the court may depart from at its pleasure. If it be a rule, it is as binding on the court as on the suitors. If it removes from the latter the power to take any objection to the personal disability of a party alleged by the record to be competent, which is not shown by a plea to the jurisdiction, it is because the court are forbidden by law to consider and decide on objections so taken. I do not consider it to be within the scope of the judicial power of the majority of the court to pass upon any question respecting the plaintiff's citizenship in Missouri, save that raised by the plea to the jurisdiction; and I do not hold any opinion of this court, or any court, binding, when expressed on a question not legitimately before it. (Carroll v. Carroll, 16 How., 275.) The judgment of this court is, that the case is to be dismissed for want of jurisdiction, because the plaintiff was not a citizen of Missouri, as he alleged in his declaration. Into that judgment, according to the settled course of this court, nothing appearing after a plea to the merits can enter. A great question of constitutional law, deeply affecting the peace and welfare of the country, is not, in my opinion, a fit subject to be thus reached.
But as, in my opinion, the Circuit Court had jurisdiction, I am obliged to consider the question whether its judgment on the merits of the case should stand or be reversed.
The residence of the plaintiff in the State of Illinois, and the residence of himself and his wife in the territory acquired from France lying north of latitude thirty-six degrees thirty minutes, and north of the State of Missouri, are each relied on by the plaintiff in error. As the residence in the terrirory affects the plaintiff's wife and children as well as himself, I must inquire what was its effect.
The general question may be stated to be, whether the plaintiff's status, as a slave, was so changed by his residence within that territory, that he was not a slave in the State of Missouri, at the time this action was brought.
In such cases, two inquiries arise, which may be confounded, but should be kept distinct.
The first is, what was the law of the Territory into which the master and slave went, respecting the relation between them?
The second is, whether the State of Missouri recognises and allows the effect of that law of the Territory, on the status of the slave, on his return within its jurisdiction.
As to the first of these questions, the will of States and nations, *591 by whose municipal law slavery is not recognised, has been manifested in three different ways.
One is, absolutely to dissolve the relation, and terminate the rights of the master existing under the law of the country whence the parties came. This is said by Lord Stowell, in the case of the slave Grace, (2 Hag. Ad. R., 94,) and by the Supreme Court of Louisiana in the case of Maria Louise v. Marot, (9 Louis. R., 473,) to be the law of France; and it has been the law of several States of this Union, in respect to slaves introduced under certain conditions. (Wilson v. Isabel, 5 Call's R., 430; Hunter v. Hulcher, 1 Leigh, 172; Stewart v. Oaks, 5 Har. and John., 107.)
The second is, where the municipal law of a country not recognising slavery, it is the will of the State to refuse the master all aid to exercise any control over his slave; and if he attempt to do so, in a manner justifiable only by that relation, to prevent the exercise of that control. But no law exists, designed to operate directly on the relation of master and slave, and put an end to that relation. This is said by Lord Stowell, in the case above mentioned, to be the law of England, and by Mr. Chief Justice Shaw, in the case of the Commonwealth v. Aves, (18 Pick., 193,) to be the law of Massachusetts.
The third is, to make a distinction between the case of a master and his slave only temporarily in the country, animo non manendi, and those who are there to reside for permanent or indefinite purposes. This is said by Mr. Wheaton to be the law of Prussia, and was formerly the statute law of several States of our Union. It is necessary in this case to keep in view this distinction between those countries whose laws are designed to act directly on the status of a slave, and make him a freeman, and those where his master can obtain no aid from the laws to enforce his rights.
It is to the last case only that the authorities, out of Missouri, relied on by defendant, apply, when the residence in the non-slaveholding Territory was permanent. In the Commonwealth v. Aves, (18 Pick., 218,) Mr. Chief Justice Shaw said: "From the principle above stated, on which a slave brought here becomes free, to wit: that he becomes entitled to the protection of our laws, it would seem to follow, as a necessary conclusion, that if the slave waives the protection of those laws, and returns to the State where he is held as a slave, his condition is not changed." It was upon this ground, as is apparent from his whole reasoning, that Sir William Scott rests his opinion in the case of the slave Grace. To use one of his expressions, the effect of the law of England was to put the liberty of the slave into a parenthesis. If there had been an *592 act of Parliament declaring that a slave coming to England with his master should thereby be deemed no longer to be a slave, it is easy to see that the learned judge could not have arrived at the same conclusion. This distinction is very clearly stated and shown by President Tucker, in his opinion in the case of Betty v. Horton, (5 Leigh's Virginia R., 615.) (See also Hunter v. Fletcher, 1 Leigh's Va. R., 172; Maria Louise v. Marot, 9 Louisiana R.; Smith v. Smith, 13 Ib., 441; Thomas v. Genevieve, 16 Ib., 483; Rankin v. Lydia, 2 A.K. Marshall, 467; Davies v. Tingle, 8 B. Munroe, 539; Griffeth v. Fanny, Gilm. Va. R., 143; Lumford v. Coquillon, 14 Martin's La. R., 405; Josephine v. Poultney, 1 Louis. Ann. R., 329.)
But if the acts of Congress on this subject are valid, the law of the Territory of Wisconsin, within whose limits the residence of the plaintiff and his wife, and their marriage and the birth of one or both of their children, took place, falls under the first category, and is a law operating directly on the status of the slave. By the eighth section of the act of March 6, 1820, (3 Stat. at Large, 548,) it was enacted that, within this Territory, "slavery and involuntary servitude, otherwise than in the punishment of crimes, whereof the parties shall have been duly convicted, shall be, and is hereby, forever prohibited: Provided, always, that any person escaping into the same, from whom labor or service is lawfully claimed in any State or Territory of the United States, such fugitive may be lawfully reclaimed, and conveyed to the person claiming his or her labor or service, as aforesaid."
By the act of April 20, 1836, (4 Stat. at Large, 10,) passed in the same month and year of the removal of the plaintiff to Fort Snelling, this part of the territory ceded by France, where Fort Snelling is, together with so much of the territory of the United States cast of the Mississippi as now constitutes the State of Wisconsin, was brought under a Territorial Government, under the name of the Territory of Wisconsin. By the eighteenth section of this act, it was enacted, "That the inhabitants of this Territory shall be entitled to and enjoy all and singular the rights, privileges, and advantages, granted and secured to the people of the Territory of the United States northwest of the river Ohio, by the articles of compact contained in the ordinance for the government of said Territory, passed on the 13th day of July, 1787; and shall be subject to all the restrictions and prohibitions in said articles of compact imposed upon the people of the said Territory." The sixth article of that compact is, "there shall be neither slavery nor involuntary servitude in the said Territory, otherwise than in *593 the punishment of crimes, whereof the party shall have been duly convicted. Provided, always, that any person escaping into the same, from whom labor or service is lawfully claimed in any one of the original States, such fugitive may be lawfully reclaimed, and conveyed to the person claiming his or her labor or service, as aforesaid." By other provisions of this act establishing the Territory of Wisconsin, the laws of the United States, and the then existing laws of the State of Michigan, are extended over the Territory; the latter being subject to alteration and repeal by the legislative power of the Territory created by the act.
Fort Snelling was within the Territory of Wisconsin, and these laws were extended over it. The Indian title to that site for a military post had been acquired from the Sioux nation as early as September 23, 1805, (Am. State Papers, Indian Affairs, vol. 1, p. 744,) and until the erection of the Territorial Government, the persons at that post were governed by the rules and articles of war, and such laws of the United States, including the eighth section of the act of March 6, 1820, prohibiting slavery, as were applicable to their condition; but after the erection of the Territory, and the extension of the laws of the United States and the laws of Michigan over the whole of the Territory, including this military post, the persons residing there were under the dominion of those laws in all particulars to which the rules and articles of war did not apply.
It thus appears that, by these acts of Congress, not only was a general system of municipal law borrowed from the State of Michigan, which did not tolerate slavery, but it was positively enacted that slavery and involuntary servitude, with only one exception, specifically described, should not exist there. It is not simply that slavery is not recognised and cannot be aided by the municipal law. It is recognised for the purpose of being absolutely prohibited, and declared incapable of existing within the Territory, save in the instance of a fugitive slave.
It would not be easy for the Legislature to employ more explicit language to signify its will that the status of slavery should not exist within the Territory, than the words found in the act of 1820, and in the ordinance of 1787; and if any doubt could exist concerning their application to cases of masters coming into the Territory with their slaves to reside, that doubt must yield to the inference required by the words of exception. That exception is, of cases of fugitive slaves. An exception, from a prohibition marks the extent of the prohibition; for it would be absurd, as well as useless, to except from a prohibition *594 a case not contained within it. (9 Wheat., 200.) I must conclude, therefore, that it was the will of Congress that the state of involuntary servitude of a slave, coming into the Territory with his master, should cease to exist. The Supreme Court of Missouri so held in Rachel v. Walker, (4 Misso. R., 350,) which was the case of a military officer going into the Territory with two slaves.
But it is a distinct question, whether the law of Missouri recognised and allowed effect to the change wrought in the status of the plaintiff, by force of the laws of the Territory of Wisconsin.
I say the law of Missouri, because a judicial tribunal, in one State or nation, can recognise personal rights acquired by force of the law of any other State or nation, only so far as it is the law of the former State that those rights should be recognised. But, in the absence of positive law to the contrary, the will of every civilized State must be presumed to be to allow such effect to foreign laws as is in accordance with the settled rules of international law. And legal tribunals are bound to act on this presumption. It may be assumed that the motive of the State in allowing such operation to foreign laws is what has been termed comity. But, as has justly been said, (per Chief Justice Taney, 13 Pet., 589,) it is the comity of the State, not of the court. The judges have nothing to do with the motive of the State. Their duty is simply to ascertain and give effect to its will. And when it is found by them that its will to depart from a rule of international law has not been manifested by the State, they are bound to assume that its will is to give effect to it. Undoubtedly, every sovereign State may refuse to recognise a change, wrought by the law of a foreign State, on the status of a person, while within such foreign State, even in cases where the rules of international law require that recognition. Its will to refuse such recognition may be manifested by what we term statute law, or by the customary law of the State. It is within the province of its judicial tribunals to inquire and adjudge whether it appears, from the statute or customary law of the State, to be the will of the State to refuse to recognise such changes of status by force of foreign law, as the rules of the law of nations require to be recognised. But, in my opinion, it is not within the province of any judicial tribunal to refuse such recognition from any political considerations, or any view it may take of the exterior political relations between the State and one or more foreign States, or any impressions it may have that a change of foreign opinion and action on the subject of slavery may afford a reason why the State should change its own action. To understand and give *595 just effect to such considerations, and to change the action of the State in consequence of them, are functions of diplomatists and legislators, not of judges.
The inquiry to be made on this part of the case is, therefore, whether the State of Missouri has, by its statute, or its customary law, manifested its will to displace any rule of international law, applicable to a change of the status of a slave, by foreign law.
I have not heard it suggested that there was any statute of the State of Missouri bearing on this question. The customary law of Missouri is the common law, introduced by statute in 1816. (1 Ter. Laws, 436.) And the common law, as Blackstone says, (4 Com., 67,) adopts, in its full extent, the law of nations, and holds it to be a part of the law of the land.
I know of no sufficient warrant for declaring that any rule of international law, concerning the recognition, in that State, of a change of status, wrought by an extra-territorial law, has been displaced or varied by the will of the State of Missouri.
I proceed then to inquire what the rules of international law prescribe concerning the change of status of the plaintiff wrought by the law of the Territory of Wisconsin.
It is generally agreed by writers upon international law, and the rule has been judicially applied in a great number of cases, that wherever any question may arise concerning the status of a person, it must be determined according to that law which has next previously rightfully operated on and fixed that status. And, further, that the laws of a country do not rightfully operate upon and fix the status of persons who are within its limits in itinere, or who are abiding there for definite temporary purposes, as for health, curiosity, or occasional business; that these laws, known to writers on public and private international law as personal statutes, operate only on the inhabitants of the country. Not that it is or can be denied that each independent nation may, if it thinks fit, apply them to all persons within their limits. But when this is done, not in conformity with the principles of international law, other States are not understood to be willing to recognise or allow effect to such applications of personal statutes.
It becomes necessary, therefore, to inquire whether the operation of the laws of the Territory of Wisconsin upon the status of the plaintiff was or was not such an operation as these principles of international law require other States to recognise and allow effect to.
And this renders it needful to attend to the particular facts and circumstances of this case.
*596 It appears that this case came on for trial before the Circuit Court and a jury, upon an issue, in substance, whether the plaintiff, together with his wife and children, were the slaves of the defendant.
The court instructed the jury that, "upon the facts in this case, the law is with the defendant." This withdrew from the jury the consideration and decision of every matter of fact. The evidence in the case consisted of written admissions, signed by the counsel of the parties. If the case had been submitted to the judgment of the court, upon an agreed statement of facts, entered of record, in place of a special verdict, it would have been necessary for the court below, and for this court, to pronounce its judgment solely on those facts, thus agreed, without inferring any other facts therefrom. By the rules of the common law applicable to such a case, and by force of the seventh article of the amendments of the Constitution, this court is precluded from finding any fact not agreed to by the parties on the record. No submission to the court on a statement of facts was made. It was a trial by jury, in which certain admissions, made by the parties, were the evidence. The jury were not only competent, but were bound to draw from that evidence every inference which, in their judgment, exercised according to the rules of law, it would warrant. The Circuit Court took from the jury the power to draw any inferences from the admissions made by the parties, and decided the case for the defendant. This course can be justified here, if at all, only by its appearing that upon the facts agreed, and all such inferences of fact favorable to the plaintiff's case, as the jury might have been warranted in drawing from those admissions, the law was with the defendant. Otherwise, the plaintiff would be deprived of the benefit of his trial by jury, by whom, for aught we can know, those inferences favorable to his case would have been drawn.
The material facts agreed, bearing on this part of the case, are, that Dr. Emerson, the plaintiff's master, resided about two years at the military post of Fort Snelling, being a surgeon in the army of the United States, his domicil of origin being unknown; and what, if anything, he had done, to preserve or change his domicil prior to his residence at Rock Island, being also unknown.
Now, it is true, that under some circumstances the residence of a military officer at a particular place, in the discharge of his official duties, does not amount to the acquisition of a technical domicil. But it cannot be affirmed, with correctness, that it never does. There being actual residence, and this being presumptive evidence of domicil, all the circumstances *597 of the case must be considered, before a legal conclusion can be reached, that his place of residence is not his domicil. If a military officer stationed at a particular post should entertain an expectation that his residence there would be indefinitely protracted, and in consequence should remove his family to the place where his duties were to be discharged, form a permanent domestic establishment there, exercise there the civil rights and discharge the civil duties of an inhabitant, while he did no act and manifested no intent to have a domicil elsewhere, I think no one would say that the mere fact that he was himself liable to be called away by the orders of the Government would prevent his acquisition of a technical domicil at the place of the residence of himself and his family. In other words, I do not think a military officer incapable of acquiring a domicil. (Bruce v. Bruce, 2 Bos. and Pul., 230; Munroe v. Douglass, 5 Mad. Ch. R., 232.) This being so, this case stands thus: there was evidence before the jury that Emerson resided about two years at Fort Snelling, in the Territory of Wisconsin. This may or may not have been with such intent as to make it his technical domicil. The presumption is that it was. It is so laid down by this court, in Ennis v. Smith, (14 How.,) and the authorities in support of the position are there referred to. His intent was a question of fact for the jury. (Fitchburg v. Winchendon, 4 Cush., 190.)
The case was taken from the jury. If they had power to find that the presumption of the necessary intent had not been rebutted, we cannot say, on this record, that Emerson had not his technical domicil at Fort Snelling. But, for reasons which I shall now proceed to give, I do not deem it necessary in this case to determine the question of the technical domicil of Dr. Emerson.
It must be admitted that the inquiry whether the law of a particular country has rightfully fixed the status of a person, so that in accordance with the principles of international law that status should be recognised in other jurisdictions, ordinarily depends on the question whether the person was domiciled in the country whose laws are asserted to have fixed his status. But, in the United States, questions of this kind may arise, where an attempt to decide solely with reference to technical domicil, tested by the rules which are applicable to changes of places of abode from one country to another, would not be consistent with sound principles. And, in my judgment, this is one of those cases.
The residence of the plaintiff, who was taken by his master, Dr. Emerson, as a slave, from Missouri to the State of Illinois, and thence to the Territory of Wisconsin, must be deemed to *598 have been for the time being, and until he asserted his own separate intention, the same as the residence of his master; and the inquiry, whether the personal statutes of the Territory were rightfully extended over the plaintiff, and ought, in accordance with the rules of international law, to be allowed to fix his status, must depend upon the circumstances under which Dr. Emerson went into that Territory, and remained there; and upon the further question, whether anything was there rightfully done by the plaintiff to cause those personal statutes to operate on him.
Dr. Emerson was an officer in the army of the United States. He went into the Territory to discharge his duty to the United States. The place was out of the jurisdiction of any particular State, and within the exclusive jurisdiction of the United States. It does not appear where the domicil of origin of Dr. Emerson was, nor whether or not he had lost it, and gained another domicil, nor of what particular State, if any, he was a citizen.
On what ground can it be denied that all valid laws of the United States, constitutionally enacted by Congress for the government of the Territory, rightfully extended over an officer of the United States and his servant who went into the Territory to remain there for an indefinite length of time, to take part in its civil or military affairs? They were not foreigners, coming from abroad. Dr. Emerson was a citizen of the country which had exclusive jurisdiction over the Territory; and not only a citizen, but he went there in a public capacity, in the service of the same sovereignty which made the laws. Whatever those laws might be, whether of the kind denominated personal statutes, or not, so far as they were intended by the legislative will, constitutionally expressed, to operate on him and his servant, and on the relations between them, they had a rightful operation, and no other State or country can refuse to allow that those laws might rightfully operate on the plaintiff and his servant, because such a refusal would be a denial that the United States could, by laws constitutionally enacted, govern their own servants, residing on their own Territory, over which the United States had the exclusive control, and in respect to which they are an independent sovereign power. Whether the laws now in question were constitutionally enacted, I repeat once more, is a separate question. But, assuming that they were, and that they operated directly on the status of the plaintiff, I consider that no other State or country could question the rightful power of the United States so to legislate, or, consistently with the settled rules of international law, could refuse to recognise the effects *599 of such legislation upon the status of their officers and servants, as valid everywhere.
This alone would, in my apprehension, be sufficient to decide this question.
But there are other facts stated on the record which should not be passed over. It is agreed that, in the year 1836, the plaintiff, while residing in the Territory, was married, with the consent of Dr. Emerson, to Harriet, named in the declaration as his wife, and that Eliza and Lizzie were the children of that marriage, the first named having been born on the Mississippi river, north of the line of Missouri, and the other having been born after their return to Missouri. And the inquiry is, whether, after the marriage of the plaintiff in the Territory, with the consent of Dr. Emerson, any other State or country can, consistently with the settled rules of international law, refuse to recognise and treat him as a free man, when suing for the liberty of himself, his wife, and the children of that marriage. It is in reference to his status, as viewed in other States and countries, that the contract of marriage and the birth of children becomes strictly material. At the same time, it is proper to observe that the female to whom he was married having been taken to the same military post of Fort Snelling as a slave, and Dr. Emerson claiming also to be her master at the time of her marriage, her status, and that of the children of the marriage, are also affected by the same considerations.
If the laws of Congress governing the Territory of Wisconsin were constitutional and valid laws, there can be no doubt these parties were capable of contracting a lawful marriage, attended with all the usual civil rights and obligations of that condition. In that Territory they were absolutely free persons, having full capacity to enter into the civil contract of marriage.
It is a principle of international law, settled beyond controversy in England and America, that a marriage, valid by the law of the place where it was contracted, and not in fraud of the law of any other place, is valid everywhere; and that no technical domicil at the place of the contract is necessary to make it so. (See Bishop on Mar. and Div., 125  129, where the cases are collected.)
If, in Missouri, the plaintiff were held to be a slave, the validity and operation of his contract of marriage must be denied. He can have no legal rights; of course, not those of a husband and father. And the same is true of his wife and children. The denial of his rights is the denial of theirs. So that, though lawfully married in the Territory, when they came out of it, into the State of Missouri, they were no longer *600 husband and wife; and a child of that lawful marriage, though born under the same dominion where its parents contracted a lawful marriage, is not the fruit of that marriage, nor the child of its father, but subject to the maxim, partus scquitur ventrem.
It must be borne in mind that in this case there is no ground for the inquiry, whether it be the will of the State of Missouri not to recognise the validity of the marriage of a fugitive slave, who escapes into a State or country where slavery is not allowed, and there contracts a marriage; or the validity of such a marriage, where the master, being a citizen of the State of Missouri, voluntarily goes with his slave, in itinere, into a State or country which does not permit slavery to exist, and the slave there contracts marriage without the consent of his master; for in this case, it is agreed, Dr. Emerson did consent; and no further question can arise concerning his rights, so far as their assertion is inconsistent with the validity of the marriage. Nor do I know of any ground for the assertion that this marriage was in fraud of any law of Missouri. It has been held by this court, that a bequest of property by a master to his slave, by necessary implication entitles the slave to his freedom; because, only as a freeman could he take and hold the bequest. (Legrand v. Darnall, 2 Pet. R., 664.) It has also been held, that when a master goes with his slave to reside for an indefinite period in a State where slavery is not tolerated, this operates as an act of manumission; because it is sufficiently expressive of the consent of the master that the slave should be free. (2 Marshall's Ken. R., 470; 14 Martin's Louis. R., 401.)
What, then, shall we say of the consent of the master, that the slave may contract a lawful marriage, attended with all the civil rights and duties which belong to that relation; that he may enter into a relation which none but a free man can assume  a relation which involves not only the rights and duties of the slave, but those of the other party to the contract, and of their descendants to the remotest generation? In my judgment, there can be no more effectual abandonment of the legal rights of a master over his slave, than by the consent of the master that the slave should enter into a contract of marriage, in a free State, attended by all the civil rights and obligations which belong to that condition.
And any claim by Dr. Emerson, or any one claiming under him, the effect of which is to deny the validity of this marriage, and the lawful paternity of the children born from it, wherever asserted, is, in my judgment, a claim inconsistent with good faith and sound reason, as well as with the rules of international law. And I go further: in my opinion, a law of the State *601 of Missouri, which should thus annul a marriage, lawfully contracted by these parties while resident in Wisconsin, not in fraud of any law of Missouri, or of any right of Dr. Emerson, who consented thereto, would be a law impairing the obligation of a contract, and within the prohibition of the Constitution of the United States. (See 4 Wheat., 629, 695, 696.)
To avoid misapprehension on this important and difficult subject, I will state, distinctly, the conclusions at which I have arrived. They are:
First. The rules of international law respecting the emancipation of slaves, by the rightful operation of the laws of another State or country upon the status of the slave, while resident in such foreign State or country, are part of the common law of Missouri, and have not been abrogated by any statute law of that State.
Second. The laws of the United States, constitutionally enacted, which operated directly on and changed the status of a slave coming into the Territory of Wisconsin with his master, who went thither to reside for an indefinite length of time, in the performance of his duties as an officer of the United States, had a rightful operation on the status of the slave, and it is in conformity with the rules of international law that this change of status should be recognised everywhere.
Third. The laws of the United States, in operation in the Territory of Wisconsin at the time of the plaintiff's residence there, did act directly on the status of the plaintiff, and change his status to that of a free man.
Fourth. The plaintiff and his wife were capable of contracting, and, with the consent of Dr. Emerson, did contract a marriage in that Territory, valid under its laws; and the validity of this marriage cannot be questioned in Missouri, save by showing that it was in fraud of the laws of that State, or of some right derived from them; which cannot be shown in this case, because the master consented to it.
Fifth. That the consent of the master that his slave, residing in a country which does not tolerate slavery, may enter into a lawful contract of marriage, attended with the civil rights and duties which belong to that condition, is an effectual act of emancipation. And the law does not enable Dr. Emerson, or any one claiming under him, to assert a title to the married persons as slaves, and thus destroy the obligation of the contract of marriage, and bastardize their issue, and reduce them to slavery.
But it is insisted that the Supreme Court of Missouri has settled this case by its decision in Scott v. Emerson, (15 Missouri Reports, 576;) and that this decision is in conformity *602 with the weight of authority elsewhere, and with sound principles. If the Supreme Court of Missouri had placed its decision on the ground that it appeared Dr. Emerson never became domiciled in the Territory, and so its laws could not rightfully operate on him and his slave; and the facts that he went there to reside indefinitely, as an officer of the United States, and that the plaintiff was lawfully married there, with Dr. Emerson's consent, were left out of view, the decision would find support in other cases, and I might not be prepared to deny its correctness. But the decision is not rested on this ground. The domicil of Dr. Emerson in that Territory is not questioned in that decision; and it is placed on a broad denial of the operation, in Missouri, of the law of any foreign State or country upon the status of a slave, going with his master from Missouri into such foreign State or country, even though they went thither to become, and actually became, permanent inhabitants of such foreign State or country, the laws whereof acted directly on the status of the slave, and changed his status to that of a freeman.
To the correctness of such a decision I cannot assent. In my judgment, the opinion of the majority of the court in that case is in conflict with its previous decisions, with a great weight of judicial authority in other slaveholding States, and with fundamental principles of private international law. Mr. Chief Justice Gamble, in his dissenting opinion in that case, said:
"I regard the question as conclusively settled by repeated adjudications of this court; and if I doubted or denied the propriety of those decisions, I would not feel myself any more at liberty to overturn them, than I would any other series of decisions by which the law upon any other question had been settled. There is with me nothing in the law of slavery which distinguishes it from the law on any other subject, or allows any more accommodation to the temporary excitements which have gathered around it. * * * * * * But in the midst of all such excitement, it is proper that the judicial mind, calm and self-balanced, should adhere to principles established when there was no feeling to disturb the view of the legal questions upon which the rights of parties depend."
"In this State, it has been recognised from the beginning of the Government as a correct position in law, that the master who takes his slave to reside in a State or Territory where slavery is prohibited, thereby emancipates his slave." (Winney v. Whitesides, 1 Mo., 473; Le Grange v. Chouteau, 2 Mo., 20; Milley v. Smith, Ib., 36; Ralph v. Duncan, 3 Mo., 194; Julia v. McKinney, Ib., 270; Nat v. Ruddle, Ib., 400; Rachel v. Walker, 4 Mo., 350; Wilson v. Melvin, 592.)
*603 Chief Justice Gamble has also examined the decisions of the courts of other States in which slavery is established, and finds them in accordance with these preceding decisions of the Supreme Court of Missouri to which he refers.
It would be a useless parade of learning for me to go over the ground which he has so fully and ably occupied.
But it is further insisted we are bound to follow this decision. I do not think so. In this case, it is to be determined what laws of the United States were in operation in the Territory of Wisconsin, and what was their effect on the status of the plaintiff. Could the plaintiff contract a lawful marriage there? Does any law of the State of Missouri impair the obligation of that contract of marriage, destroy his rights as a husband, bastardize the issue of the marriage, and reduce them to a state of slavery?
These questions, which arise exclusively under the Constitution and laws of the United States, this court, under the Constitution and laws of the United States, has the rightful authority finally to decide. And if we look beyond these questions, we come to the consideration whether the rules of international law, which are part of the laws of Missouri until displaced by some statute not alleged to exist, do or do not require the status of the plaintiff, as fixed by the laws of the Territory of Wisconsin, to be recognised in Missouri. Upon such a question, not depending on any statute or local usage, but on principles of universal jurisprudence, this court has repeatedly asserted it could not hold itself bound by the decisions of State courts, however great respect might be felt for their learning, ability, and impartiality. (See Swift v. Tyson, 16 Peters's R., 1; Carpenter v. The Providence Ins. Co., Ib., 495; Foxcroft v. Mallet, 4 How., 353; Rowan v. Runnels, 5 How., 134.)
Some reliance has been placed on the fact that the decision in the Supreme Court of Missouri was between these parties, and the suit there was abandoned to obtain another trial in the courts of the United States.
In Homer v. Brown, (16 How., 354,) this court made a decision upon the construction of a devise of lands, in direct opposition to the unanimous opinion of the Supreme Court of Massachusetts, between the same parties, respecting the same subject-matter  the claimant having become nonsuit in the State court, in order to bring his action in the Circuit Court of the United States. I did not sit in that case, having been of counsel for one of the parties while at the bar; but, on examining the report of the argument of the counsel for the plaintiff in error, I find they made the point, that this court ought to give effect to the construction put upon the will by the State *604 court, to the end that rights respecting lands may be governed by one law, and that the law of the place where the lands are situated; that they referred to the State decision of the case, reported in 3 Cushing, 390, and to many decisions of this court. But this court does not seem to have considered the point of sufficient importance to notice it in their opinions. In Millar v. Austin, (13 How., 218,) an action was brought by the endorsee of a written promise. The question was, whether it was negotiable under a statute of Ohio. The Supreme Court of that State having decided it was not negotiable, the plaintiff became nonsuit, and brought his action in the Circuit Court of the United States. The decision of the Supreme Court of the State, reported in 4 Ves., L.J., 527, was relied on. This court unanimously held the paper to be negotiable.
When the decisions of the highest court of a State are directly in conflict with each other, it has been repeatedly held, here, that the last decision is not necessarily to be taken as the rule. (State Bank v. Knoop, 16 How., 369; Pease v. Peck, 18 How., 599.)
To these considerations I desire to add, that it was not made known to the Supreme Court of Missouri, so far as appears, that the plaintiff was married in Wisconsin with the consent of Dr. Emerson, and it is not made known to us that Dr. Emerson was a citizen of Missouri, a fact to which that court seem to have attached much importance.
Sitting here to administer the law between these parties, I do not feel at liberty to surrender my own convictions of what the law requires, to the authority of the decision in 15 Missouri Reports.
I have thus far assumed, merely for the purpose of the argument, that the laws of the United States, respecting slavery in this Territory, were constitutionally enacted by Congress. It remains to inquire whether they are constitutional and binding laws.
In the argument of this part of the case at bar, it was justly considered by all the counsel to be necessary to ascertain the source of the power of Congress over the territory belonging to the United States. Until this is ascertained, it is not possible to determine the extent of that power. On the one side it was maintained that the Constitution contains no express grant of power to organize and govern what is now known to the laws of the United States as a Territory. That whatever power of this kind exists, is derived by implication from the capacity of the United States to hold and acquire territory out of the limits of any State, and the necessity for its having some government.
*605 On the other side, it was insisted that the Constitution has not failed to make an express provision for this end, and that it is found in the third section of the fourth article of the Constitution.
To determine which of these is the correct view, it is needful to advert to some facts respecting this subject, which existed when the Constitution was framed and adopted. It will be found that these facts not only shed much light on the question, whether the framers of the Constitution omitted to make a provision concerning the power of Congress to organize and govern Territories, but they will also aid in the construction of any provision which may have been made respecting this subject.
Under the Confederation, the unsettled territory within the limits of the United States had been a subject of deep interest. Some of the States insisted that these lands were within their chartered boundaries, and that they had succeeded to the title of the Crown to the soil. On the other hand, it was argued that the vacant lands had been acquired by the United States, by the war carried on by them under a common Government and for the common interest.
This dispute was further complicated by unsettled questions of boundary among several States. It not only delayed the accession of Maryland to the Confederation, but at one time seriously threatened its existence. (5 Jour. of Cong., 208, 442.) Under the pressure of these circumstances, Congress earnestly recommended to the several States a cession of their claims and rights to the United States. (5 Jour. of Cong., 442.) And before the Constitution was framed, it had been begun. That by New York had been made on the 1st day of March, 1781; that of Virginia on the 1st day of March, 1784; that of Massachusetts on the 19th day of April, 1785; that of Connecticut on the 14th day of September, 1786; that of South Carolina on the 8th day of August, 1787, while the Convention for framing the Constitution was in session.
It is very material to observe, in this connection, that each of these acts cedes, in terms, to the United States, as well the jurisdiction as the soil.
It is also equally important to note that, when the Constitution was framed and adopted, this plan of vesting in the United States, for the common good, the great tracts of ungranted lands claimed by the several States, in which so deep an interest was felt, was yet incomplete. It remained for North Carolina and Georgia to cede their extensive and valuable claims. These were made, by North Carolina on the 25th day of February, 1790, and by Georgia on the 24th day of April, *606 1802. The terms of these last-mentioned cessions will hereafter be noticed in another connection; but I observe here that each of them distinctly shows, upon its face, that they were not only in execution of the general plan proposed by the Congress of the Confederation, but of a formed purpose of each of these States, existing when the assent of their respective people was given to the Constitution of the United States.
It appears, then, that when the Federal Constitution was framed, and presented to the people of the several States for their consideration, the unsettled territory was viewed as justly applicable to the common benefit, so far as it then had or might attain thereafter a pecuniary value; and so far as it might become the seat of new States, to be admitted into the Union upon an equal footing with the original States. And also that the relations of the United States to that unsettled territory were of different kinds. The titles of the States of New York, Virginia, Massachusetts, Connecticut, and South Carolina, as well of soil as of jurisdiction, had been transferred to the United States. North Carolina and Georgia had not actually made transfers, but a confident expectation, founded on their appreciation of the justice of the general claim, and fully justified by the results, was entertained, that these cessions would be made. The ordinance of 1787 had made provision for the temporary government of so much of the territory actually ceded as lay northwest of the river Ohio.
But it must have been apparent, both to the framers of the Constitution and the people of the several States who were to act upon it, that the Government thus provided for could not continue, unless the Constitution should confer on the United States the necessary powers to continue it. That temporary Government, under the ordinance, was to consist of certain officers, to be appointed by and responsible to the Congress of the Confederation; their powers had been conferred and defined by the ordinance. So far as it provided for the temporary government of the Territory, it was an ordinary act of legislation, deriving its force from the legislative power of Congress, and depending for its vitality upon the continuance of that legislative power. But the officers to be appointed for the Northwestern Territory, after the adoption of the Constitution, must necessarily be officers of the United States, and not of the Congress of the Confederation; appointed and commissioned by the President, and exercising powers derived from the United States under the Constitution.
Such was the relation between the United States and the Northwestern Territory, which all reflecting men must have foreseen would exist, when the Government created by the *607 Constitution should supersede that of the Confederation. That if the new Government should be without power to govern this Territory, it could not appoint and commission officers, and send them into the Territory, to exercise there legislative, judicial, and executive power; and that this Territory, which was even then foreseen to be so important, both politically and financially, to all the existing States, must be left not only without the control of the General Government, in respect to its future political relations to the rest of the States, but absolutely without any Government, save what its inhabitants, acting in their primary capacity, might from time to time create for themselves.
But this Northwestern Territory was not the only territory, the soil and jurisdiction whereof were then understood to have been ceded to the United States. The cession by South Carolina, made in August, 1787, was of "all the territory included within the river Mississippi, and a line beginning at that part of the said river which is intersected by the southern boundary of North Carolina, and continuing along the said boundary line until it intersects the ridge or chain of mountains which divides the Eastern from the Western waters; then to be continued along the top of the said ridge of mountains, until it intersects a line to be drawn due west from the head of the southern branch of the Tugaloo river, to the said mountains; and thence to run a due west course to the river Mississippi."
It is true that by subsequent explorations it was ascertained that the source of the Tugaloo river, upon which the title of South Carolina depended, was so far to the northward, that the transfer conveyed only a narrow slip of land, about twelve miles wide, lying on the top of the ridge of mountains, and extending from the northern boundary of Georgia to the southern boundary of North Carolina. But this was a discovery made long after the cession, and there can be no doubt that the State of South Carolina, in making the cession, and the Congress in accepting it, viewed it as a transfer to the United States of the soil and jurisdiction of an extensive and important part of the unsettled territory ceded by the Crown of Great Britain by the treaty of peace, though its quantity or extent then remained to be ascertained.[*]
It must be remembered also, as has been already stated, that not only was there a confident expectation entertained by the *608 other States, that North Carolina and Georgia would complete the plan already so far executed by New York, Virginia, Massachusetts, Connecticut, and South Carolina, but that the opinion was in no small degree prevalent, that the just title to this "back country," as it was termed, had vested in the United States by the treaty of peace, and could not rightfully be claimed by any individual State.
There is another consideration applicable to this part of the subject, and entitled, in my judgment, to great weight.
The Congress of the Confederation had assumed the power not only to dispose of the lands ceded, but to institute Governments and make laws for their inhabitants. In other words, they had proceeded to act under the cession, which, as we have seen, was as well of the jurisdiction as of the soil. This ordinance was passed on the 13th of July, 1787. The Convention for framing the Constitution was then in session at Philadelphia. The proof is direct and decisive, that it was known to the Convention.[*] It is equally clear that it was admitted and understood not to be within the legitimate powers of the Confederation to pass this ordinance. (Jefferson's Works, vol. 9, pp. 251, 276; Federalist, Nos. 38, 43.)
The importance of conferring on the new Government regular powers commensurate with the objects to be attained, and thus avoiding the alternative of a failure to execute the trust assumed by the acceptance of the cessions made and expected, or its execution by usurpation, could scarcely fail to be perceived. That it was in fact perceived, is clearly shown by the Federalist, (No. 38,) where this very argument is made use of in commendation of the Constitution.
Keeping these facts in view, it may confidently be asserted that there is very strong reason to believe, before we examine the Constitution itself, that the necessity for a competent grant of power to hold, dispose of, and govern territory, ceded and expected to be ceded, could not have escaped the attention of those who framed or adopted the Constitution; and that if it did not escape their attention, it could not fail to be adequately provided for.
Any other conclusion would involve the assumption that a subject of the gravest national concern, respecting which the small States felt so much jealousy that it had been almost an insurmountable obstacle to the formation of the Confederation, and as to which all the States had deep pecuniary and political interests, and which had been so recently and constantly agitated, *609 was nevertheless overlooked; or that such a subject was not overlooked, but designedly left unprovided for, though it was manifestly a subject of common concern, which belonged to the care of the General Government, and adequate provision for which could not fail to be deemed necessary and proper.
The admission of new States, to be framed out of the ceded territory, early attracted the attention of the Convention. Among the resolutions introduced by Mr. Randolph, on the 29th of May, was one on this subject, (Res. No. 10, 5 Elliot, 128,) which, having been affirmed in Committee of the Whole, on the 5th of June, (5 Elliot, 156,) and reported to the Convention on the 13th of June, (5 Elliot, 190,) was referred to the Committee of Detail, to prepare the Constitution, on the 26th of July, (5 Elliot, 376.) This committee reported an article for the admission of new States "lawfully constituted or established." Nothing was said concerning the power of Congress to prepare or form such States. This omission struck Mr. Madison, who, on the 18th of August, (5 Elliot, 439,) moved for the insertion of power to dispose of the unappropriated lands of the United States, and to institute temporary Governments for new States arising therein.
On the 29th of August, (5 Elliot, 492,) the report of the committee was taken up, and after debate, which exhibited great diversity of views concerning the proper mode of providing for the subject, arising out of the supposed diversity of interests of the large and small States, and between those which had and those which had not unsettled territory, but no difference of opinion respecting the propriety and necessity of some adequate provision for the subject, Gouverneur Morris moved the clause as it stands in the Constitution. This met with general approbation, and was at once adopted. The whole section is as follows:
"New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the jurisdiction of any other State, nor any State be formed by the junction of two or more States, or parts of States, without the consent of the Legislatures of the States concerned, as well as of Congress.
"The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States or any particular State."
That Congress has some power to institute temporary Governments over the territory, I believe all agree; and, if it be admitted that the necessity of some power to govern the territory *610 of the United States could not and did not escape the attention of the Convention and the people, and that the necessity is so great, that, in the absence of any express grant, it is strong enough to raise an implication of the existence of that power, it would seem to follow that it is also strong enough to afford material aid in construing an express grant of power respecting that territory; and that they who maintain the existence of the power, without finding any words at all in which it is conveyed, should be willing to receive a reasonable interpretation of language of the Constitution, manifestly intended to relate to the territory, and to convey to Congress some authority concerning it.
It would seem, also, that when we find the subject-matter of the growth and formation and admission of new States, and the disposal of the territory for these ends, were under consideration, and that some provision therefor was expressly made, it is improbable that it would be, in its terms, a grossly inadequate provision; and that an indispensably necessary power to institute temporary Governments, and to legislate for the inhabitants of the territory, was passed silently by, and left to be deduced from the necessity of the case.
In the argument at the bar, great attention has been paid to the meaning of the word "territory."
Ordinarily, when the territory of a sovereign power is spoken of, it refers to that tract of country which is under the political jurisdiction of that sovereign power. Thus Chief Justice Marshall (in United States v. Bevans, 3 Wheat., 386) says: "What, then, is the extent of jurisdiction which a State possesses? We answer, without hesitation, the jurisdiction of a State is coextensive with its territory." Examples might easily be multiplied of this use of the word, but they are unnecessary, because it is familiar. But the word "territory" is not used in this broad and general sense in this clause of the Constitution.
At the time of the adoption of the Constitution, the United States held a great tract of country northwest of the Ohio; another tract, then of unknown extent, ceded by South Carolina; and a confident expectation was then entertained, and afterwards realized, that they then were or would become the owners of other great tracts, claimed by North Carolina and Georgia. These ceded tracts lay within the limits of the United States, and out of the limits of any particular State; and the cessions embraced the civil and political jurisdiction, and so much of the soil as had not previously been granted to individuals.
These words, "territory belonging to the United States," *611 were not used in the Constitution to describe an abstraction, but to identify and apply to these actual subjects matter then existing and belonging to the United States, and other similar subjects which might afterwards be acquired; and this being so, all the essential qualities and incidents attending such actual subjects are embraced within the words "territory belonging to the United States," as fully as if each of those essential qualities and incidents had been specifically described.
I say, the essential qualities and incidents. But in determining what were the essential qualities and incidents of the subject with which they were dealing, we must take into consideration not only all the particular facts which were immediately before them, but the great consideration, ever present to the minds of those who framed and adopted the Constitution, that they were making a frame of government for the people of the United States and their posterity, under which they hoped the United States might be, what they have now become, a great and powerful nation, possessing the power to make war and to conclude treaties, and thus to acquire territory. (See Cerré v. Pitot, 6 Cr., 336; Am. Ins. Co. v. Canter, 1 Pet., 542.) With these in view, I turn to examine the clause of the article now in question.
It is said this provision has no application to any territory save that then belonging to the United States. I have already shown that, when the Constitution was framed, a confident expectation was entertained, which was speedily realized, that North Carolina and Georgia would cede their claims to that great territory which lay west of those States. No doubt has been suggested that the first clause of this same article, which enabled Congress to admit new States, refers to and includes new States to be formed out of this territory, expected to be thereafter ceded by North Carolina and Georgia, as well as new States to be formed out of territory northwest of the Ohio, which then had been ceded by Virginia. It must have been seen, therefore, that the same necessity would exist for an authority to dispose of and make all needful regulations respecting this territory, when ceded, as existed for a like authority respecting territory which had been ceded.
No reason has been suggested why any reluctance should have been felt, by the framers of the Constitution, to apply this provision to all the territory which might belong to the United States, or why any distinction should have been made, founded on the accidental circumstance of the dates of the cessions; a circumstance in no way material as respects the necessity for rules and regulations, or the propriety of conferring *612 on the Congress power to make them. And if we look at the course of the debates in the Convention on this article, we shall find that the then unceded lands, so far from having been left out of view in adopting this article, constituted, in the minds of members, a subject of even paramount importance.
Again, in what an extraordinary position would the limitation of this clause to territory then belonging to the United States, place the territory which lay within the chartered limits of North Carolina and Georgia. The title to that territory was then claimed by those States, and by the United States; their respective claims are purposely left unsettled by the express words of this clause; and when cessions were made by those States, they were merely of their claims to this territory, the United States neither admitting nor denying the validity of those claims; so that it was impossible then, and has ever since remained impossible, to know whether this territory did or did not then belong to the United States; and, consequently, to know whether it was within or without the authority conferred by this clause, to dispose of and make rules and regulations respecting the territory of the United States. This attributes to the eminent men who acted on this subject a want of ability and forecast, or a want of attention to the known facts upon which they were acting, in which I cannot concur.
There is not, in my judgment, anything in the language, the history, or the subject-matter of this article, which restricts its operation to territory owned by the United States when the Constitution was adopted.
But it is also insisted that provisions of the Constitution respecting territory belonging to the United States do not apply to territory acquired by treaty from a foreign nation. This objection must rest upon the position that the Constitution did not authorize the Federal Government to acquire foreign territory, and consequently has made no provision for its government when acquired; or, that though the acquisition of foreign territory was contemplated by the Constitution, its provisions concerning the admission of new States, and the making of all needful rules and regulations respecting territory belonging to the United States, were not designed to be applicable to territory acquired from foreign nations.
It is undoubtedly true, that at the date of the treaty of 1803, between the United States and France, for the cession of Louisiana, it was made a question, whether the Constitution had conferred on the executive department of the Government of the United States power to acquire foreign territory by a treaty.
*613 There is evidence that very grave doubts were then entertained concerning the existence of this power. But that there was then a settled opinion in the executive and legislative branches of the Government, that this power did not exist, cannot be admitted, without at the same time imputing to those who negotiated and ratified the treaty, and passed the laws necessary to carry it into execution, a deliberate and known violation of their oaths to support the Constitution; and whatever doubts may then have existed, the question must now be taken to have been settled. Four distinct acquisitions of foreign territory have been made by as many different treaties, under as many different Administrations. Six States, formed on such territory, are now in the Union. Every branch of this Government, during a period of more than fifty years, has participated in these transactions. To question their validity now, is vain. As was said by Mr. Chief Justice Marshall, in the American Insurance Company v. Canter, (1 Peters, 542,) "the Constitution confers absolutely on the Government of the Union the powers of making war and of making treaties; consequently, that Government possesses the power of acquiring territory, either by conquest or treaty." (See Cerré v. Pitot, 6 Cr., 336.) And I add, it also possesses the power of governing it, when acquired, not by resorting to suppositious powers, nowhere found described in the Constitution, but expressly granted in the authority to make all needful rules and regulations respecting the territory of the United States.
There was to be established by the Constitution a frame of government, under which the people of the United States and their posterity were to continue indefinitely. To take one of its provisions, the language of which is broad enough to extend throughout the existence of the Government, and embrace all territory belonging to the United States throughout all time, and the purposes and objects of which apply to all territory of the United States, and narrow it down to territory belonging to the United States when the Constitution was framed, while at the same time it is admitted that the Constitution contemplated and authorized the acquisition, from time to time, of other and foreign territory, seems to me to be an interpretation as inconsistent with the nature and purposes of the instrument, as it is with its language, and I can have no hesitation in rejecting it.
I construe this clause, therefore, as if it had read, Congress shall have power to make all needful rules and regulations respecting those tracts of country, out of the limits of the several States, which the United States have acquired, or may hereafter acquire, by cessions, as well of the jurisdiction as of the *614 soil, so far as the soil may be the property of the party making the cession, at the time of making it.
It has been urged that the words "rules and regulations" are not appropriate terms in which to convey authority to make laws for the government of the territory.
But it must be remembered that this is a grant of power to the Congress  that it is therefore necessarily a grant of power to legislate  and, certainly, rules and regulations respecting a particular subject, made by the legislative power of a country, can be nothing but laws. Nor do the particular terms employed, in my judgment, tend in any degree to restrict this legislative power. Power granted to a Legislature to make all needful rules and regulations respecting the territory, is a power to pass all needful laws respecting it.
The word regulate, or regulation, is several times used in the Constitution. It is used in the fourth section of the first article to describe those laws of the States which prescribe the times, places, and manner, of choosing Senators and Representatives; in the second section of the fourth article, to designate the legislative action of a State on the subject of fugitives from service, having a very close relation to the matter of our present inquiry; in the second section of the third article, to empower Congress to fix the extent of the appellate jurisdiction of this court; and, finally, in the eighth section of the first article are the words, "Congress shall have power to regulate commerce."
It is unnecessary to describe the body of legislation which has been enacted under this grant of power; its variety and extent are well known. But it may be mentioned, in passing, that under this power to regulate commerce, Congress has enacted a great system of municipal laws, and extended it over the vessels and crews of the United States on the high seas and in foreign ports, and even over citizens of the United States resident in China; and has established judicatures, with power to inflict even capital punishment within that country.
If, then, this clause does contain a power to legislate respecting the territory, what are the limits of that power?
To this I answer, that, in common with all the other legislative powers of Congress, it finds limits in the express prohibitions on Congress not to do certain things; that, in the exercise of the legislative power, Congress cannot pass an ex post facto law or bill of attainder; and so in respect to each of the other prohibitions contained in the Constitution.
Besides this, the rules and regulations must be needful. But undoubtedly the question whether a particular rule or regulation be needful, must be finally determined by Congress itself. Whether a law be needful, is a legislative or political, *615 not a judicial, question. Whatever Congress deems needful is so, under the grant of power.
Nor am I aware that it has ever been questioned that laws providing for the temporary government of the settlers on the public lands are needful, not only to prepare them for admission to the Union as States, but even to enable the United States to dispose of the lands.
Without government and social order, there can be no property; for without law, its ownership, its use, and the power of disposing of it, cease to exist, in the sense in which those words are used and understood in all civilized States.
Since, then, this power was manifestly conferred to enable the United States to dispose of its public lands to settlers, and to admit them into the Union as States, when in the judgment of Congress they should be fitted therefor, since these were the needs provided for, since it is confessed that Government is indispensable to provide for those needs, and the power is, to make all needful rules and regulations respecting the territory, I cannot doubt that this is a power to govern the inhabitants of the territory, by such laws as Congress deems needful, until they obtain admission as States.
Whether they should be thus governed solely by laws enacted by Congress, or partly by laws enacted by legislative power conferred by Congress, is one of those questions which depend on the judgment of Congress  a question which of these is needful.
But it is insisted, that whatever other powers Congress may have respecting the territory of the United States, the subject of negro slavery forms an exception.
The Constitution declares that Congress shall have power to make "all needful rules and regulations" respecting the territory belonging to the United States.
The assertion is, though the Constitution says all, it does not mean all  though it says all, without qualification, it means all except such as allow or prohibit slavery. It cannot be doubted that it is incumbent on those who would thus introduce an exception not found in the language of the instrument, to exhibit some solid and satisfactory reason, drawn from the subject-matter or the purposes and objects of the clause, the context, or from other provisions of the Constitution, showing that the words employed in this clause are not to be understood according to their clear, plain, and natural signification.
The subject-matter is the territory of the United States out of the limits of every State, and consequently under the exclusive power of the people of the United States. Their *616 will respecting it, manifested in the Constitution, can be subject to no restriction. The purposes and objects of the clause were the enactment of laws concerning the disposal of the public lands, and the temporary government of the settlers thereon until new States should be formed. It will not be questioned that, when the Constitution of the United States was framed and adopted, the allowance and the prohibition of negro slavery were recognised subjects of municipal legislation; every State had in some measure acted thereon; and the only legislative act concerning the territory  the ordinance of 1787, which had then so recently been passed  contained a prohibition of slavery. The purpose and object of the clause being to enable Congress to provide a body of municipal law for the government of the settlers, the allowance or the prohibition of slavery comes within the known and recognised scope of that purpose and object.
There is nothing in the context which qualifies the grant of power. The regulations must be "respecting the territory." An enactment that slavery may or may not exist there, is a regulation respecting the territory. Regulations must be needful; but it is necessarily left to the legislative discretion to determine whether a law be needful. No other clause of the Constitution has been referred to at the bar, or has been seen by me, which imposes any restriction or makes any exception concerning the power of Congress to allow or prohibit slavery in the territory belonging to the United States.
A practical construction, nearly contemporaneous with the adoption of the Constitution, and continued by repeated instances through a long series of years, may always influence, and in doubtful cases should determine, the judicial mind, on a question of the interpretation of the Constitution. (Stuart v. Laird, 1 Cranch, 269; Martin v. Hunter, 1 Wheat, 304; Cohens v. Virginia, 6 Wheat., 264; Prigg v. Pennsylvania, 16 Pet., 621; Cooley v. Port Wardens, 12 How., 315.)
In this view, I proceed briefly to examine the practical construction placed on the clause now in question, so far as it respects the inclusion therein of power to permit or prohibit slavery in the Territories.
It has already been stated, that after the Government of the United States was organized under the Constitution, the temporary Government of the Territory northwest of the river Ohio could no longer exist, save under the powers conferred on Congress by the Constitution. Whatever legislative, judicial, or executive authority should be exercised therein could be derived only from the people of the United States under the Constitution. And, accordingly, an act was passed on the *617 7th day of August, 1789, (1 Stat. at Large, 50,) which recites: "Whereas, in order that the ordinance of the United States in Congress assembled, for the government of the territory northwest of the river Ohio, may continue to have full effect, it is required that certain provisions should be made, so as to adapt the same to the present Constitution of the United States." It then provides for the appointment by the President of all officers, who, by force of the ordinance, were to have been appointed by the Congress of the Confederation, and their commission in the manner required by the Constitution; and empowers the Secretary of the Territory to exercise the powers of the Governor in case of the death or necessary absence of the latter.
Here is an explicit declaration of the will of the first Congress, of which fourteen members, including Mr. Madison, had been members of the Convention which framed the Constitution, that the ordinance, one article of which prohibited slavery, "should continue to have full effect." Gen. Washington, who signed this bill, as President, was the President of that Convention.
It does not appear to me to be important, in this connection, that that clause in the ordinance which prohibited slavery was one of a series of articles of what is therein termed a compact. The Congress of the Confederation had no power to make such a compact, nor to act at all on the subject; and after what had been so recently said by Mr. Madison on this subject, in the thirty-eighth number of the Federalist, I cannot suppose that he, or any others who voted for this bill, attributed any intrinsic effect to what was denominated in the ordinance a compact between "the original States and the people and States in the new territory;" there being no new States then in existence in the territory, with whom a compact could be made, and the few scattered inhabitants, unorganized into a political body, not being capable of becoming a party to a treaty, even if the Congress of the Confederation had had power to make one touching the government of that territory.
I consider the passage of this law to have been an assertion by the first Congress of the power of the United States to prohibit slavery within this part of the territory of the United States; for it clearly shows that slavery was thereafter to be prohibited there, and it could be prohibited only by an exertion of the power of the United States, under the Constitution; no other power being capable of operating within that territory after the Constitution took effect.
On the 2d of April, 1790, (1 Stat. at Large, 106,) the first Congress passed an act accepting a deed of cession by North *618 Carolina of that territory afterwards erected into the State of Tennessee. The fourth express condition contained in this deed of cession, after providing that the inhabitants of the Territory shall be temporarily governed in the same manner as those beyond the Ohio, is followed by these words: "Provided, always, that no regulations made or to be made by Congress shall tend to emancipate slaves."
This provision shows that it was then understood Congress might make a regulation prohibiting slavery, and that Congress might also allow it to continue to exist in the Territory; and accordingly, when, a few days later, Congress passed the act of May 20th, 1790, (1 Stat. at Large, 123,) for the government of the Territory south of the river Ohio, it provided, "and the Government of the Territory south of the Ohio shall be similar to that now exercised in the Territory northwest of the Ohio, except so far as is otherwise provided in the conditions expressed in an act of Congress of the present session, entitled, `An act to accept a cession of the claims of the State of North Carolina to a certain district of western territory.'" Under the Government thus established, slavery existed until the Territory became the State of Tennessee.
On the 7th of April, 1798, (1 Stat. at Large, 649,) an act was passed to establish a Government in the Mississippi Territory in all respects like that exercised in the Territory northwest of the Ohio, "excepting and excluding the last article of the ordinance made for the government thereof by the late Congress, on the 13th day of July, 1787." When the limits of this Territory had been amicably settled with Georgia, and the latter ceded all its claim thereto, it was one stipulation in the compact of cession, that the ordinance of July 13th, 1787, "shall in all its parts extend to the Territory contained in the present act of cession, that article only excepted which forbids slavery." The Government of this Territory was subsequently established and organized under the act of May 10th, 1800; but so much of the ordinance as prohibited slavery was not put in operation there.
Without going minutely into the details of each case, I will now give reference to two classes of acts, in one of which Congress has extended the ordinance of 1787, including the article prohibiting slavery, over different Territories, and thus exerted its power to prohibit it; in the other, Congress has erected Governments over Territories acquired from France and Spain, in which slavery already existed, but refused to apply to them that part of the Government under the ordinance which excluded slavery.
Of the first class are the act of May 7th, 1800, (2 Stat. at *619 Large, 58,) for the government of the Indiana Territory; the act of January 11th, 1805, (2 Stat. at Large, 309,) for the government of Michigan Territory; the act of May 3d, 1809, (2 Stat. at Large, 514,) for the government of the Illinois Territory; the act of April 20th, 1836, (5 Stat. at Large, 10,) for the government of the Territory of Wisconsin; the act of June 12th, 1838, for the government of the Territory of Iowa; the act of August 14th, 1848, for the government of the Territory of Oregon. To these instances should be added the act of March 6th, 1820, (3 Stat. at Large, 548,) prohibiting slavery in the territory acquired from France, being northwest of Missouri, and north of thirty-six degrees thirty minutes north latitude.
Of the second class, in which Congress refused to interfere with slavery already existing under the municipal law of France or Spain, and established Governments by which slavery was recognised and allowed, are: the act of March 26th, 1804, (2 Stat. at Large, 283,) for the government of Louisiana; the act of March 2d, 1805, (2 Stat. at Large, 322,) for the government of the Territory of Orleans; the act of June 4th, 1812, (2 Stat. at Large, 743,) for the government of the Missouri Territory; the act of March 30th, 1822, (3 Stat. at Large, 654,) for the government of the Territory of Florida. Here are eight distinct instances, beginning with the first Congress, and coming down to the year 1848, in which Congress has excluded slavery from the territory of the United States; and six distinct instances in which Congress organized Governments of Territories by which slavery was recognised and continued, beginning also with the first Congress, and coming down to the year 1822. These acts were severally signed by seven Presidents of the United States, beginning with General Washington, and coming regularly down as far as Mr. John Quincy Adams, thus including all who were in public life when the Constitution was adopted.
If the practical construction of the Constitution contemporaneously with its going into effect, by men intimately acquainted with its history from their personal participation in framing and adopting it, and continued by them through a long series of acts of the gravest importance, be entitled to weight in the judicial mind on a question of construction, it would seem to be difficult to resist the force of the acts above adverted to.
It appears, however, from what has taken place at the bar, that notwithstanding the language of the Constitution, and the long line of legislative and executive precedents under it, three different and opposite views are taken of the power of Congress respecting slavery in the Territories.
*620 One is, that though Congress can make a regulation prohibiting slavery in a Territory, they cannot make a regulation allowing it; another is, that it can neither be established nor prohibited by Congress, but that the people of a Territory, when organized by Congress, can establish or prohibit slavery; while the third is, that the Constitution itself secures to every citizen who holds slaves, under the laws of any State, the indefeasible right to carry them into any Territory, and there hold them as property.
No particular clause of the Constitution has been referred to at the bar in support of either of these views. The first seems to be rested upon general considerations concerning the social and moral evils of slavery, its relations to republican Governments, its inconsistency with the Declaration of Independence and with natural right.
The second is drawn from considerations equally general, concerning the right of self-government, and the nature of the political institutions which have been established by the people of the United States.
While the third is said to rest upon the equal right of all citizens to go with their property upon the public domain, and the inequality of a regulation which would admit the property of some and exclude the property of other citizens; and, inasmuch as slaves are chiefly held by citizens of those particular. States where slavery is established, it is insisted that a regulation excluding slavery from a Territory operates, practically, to make an unjust discrimination between citizens of different States, in respect to their use and enjoyment of the territory of the United States.
With the weight of either of these considerations, when presented to Congress to influence its action, this court has no concern. One or the other may be justly entitled to guide or control the legislative judgment upon what is a needful regulation. The question here is, whether they are sufficient to authorize this court to insert into this clause of the Constitution an exception of the exclusion or allowance of slavery, not found therein, nor in any other part of that instrument. To engraft on any instrument a substantive exception not found in it, must be admitted to be a matter attended with great difficulty. And the difficulty increases with the importance of the instrument, and the magnitude and complexity of the interests involved in its construction. To allow this to be done with the Constitution, upon reasons purely political, renders its judicial interpretation impossible  because judicial tribunals, as such, cannot decide upon political considerations. Political reasons have not the requisite certainty to afford rules of juridical *621 interpretation. They are different in different men. They are different in the same men at different times. And when a strict interpretation of the Constitution, according to the fixed rules which govern the interpretation of laws, is abandoned, and the theoretical opinions of individuals are allowed to control its meaning, we have no longer a Constitution; we are under the government of individual men, who for the time being have power to declare what the Constitution is, according to their own views of what it ought to mean. When such a method of interpretation of the Constitution obtains, in place of a republican Government, with limited and defined powers, we have a Government which is merely an exponent of the will of Congress; or what, in my opinion, would not be preferable, an exponent of the individual political opinions of the members of this court.
If it can be shown, by anything in the Constitution itself, that when it confers on Congress the power to make all needful rules and regulations respecting the territory belonging to the United States, the exclusion or the allowance of slavery was excepted; or if anything in the history of this provision tends to show that such an exception was intended by those who framed and adopted the Constitution to be introduced into it, I hold it to be my duty carefully to consider, and to allow just weight to such considerations in interpreting the positive text of the Constitution. But where the Constitution has said all needful rules and regulations, I must find something more than theoretical reasoning to induce me to say it did not mean all.
There have been eminent instances in this court closely analogous to this one, in which such an attempt to introduce an exception, not found in the Constitution itself, has failed of success.
By the eighth section of the first article, Congress has the power of exclusive legislation in all cases whatsoever within this District.
In the case of Loughborough v. Blake, (5 Whea., 324,) the question arose, whether Congress has power to impose direct taxes on persons and property in this District. It was insisted, that though the grant of power was in its terms broad enough to include direct taxation, it must be limited by the principle, that taxation and representation are inseparable. It would not be easy to fix on any political truth, better established or more fully admitted in our country, than that taxation and representation must exist together. We went into the war of the Revolution to assert it, and it is incorporated as fundamental into all American Governments. But however true and important *622 this maxim may be, it is not necessarily of universal application. It was for the people of the United States, who ordained the Constitution, to decide whether it should or should not be permitted to operate within this District. Their decision was embodied in the words of the Constitution; and as that contained no such exception as would permit the maxim to operate in this District, this court, interpreting that language, held that the exception did not exist.
Again, the Constitution confers on Congress power to regulate commerce with foreign nations. Under this, Congress passed an act on the 22d of December, 1807, unlimited in duration, laying an embargo on all ships and vessels in the ports or within the limits and jurisdiction of the United States. No law of the United States ever pressed so severely upon particular States. Though the constitutionality of the law was contested with an earnestness and zeal proportioned to the ruinous effects which were felt from it, and though, as Mr. Chief Justice Marshall has said, (9 Wheat., 192,) "a want of acuteness in discovering objections to a measure to which they felt the most deep-rooted hostility will not be imputed to those who were arrayed in opposition to this," I am not aware that the fact that it prohibited the use of a particular species of property, belonging almost exclusively to citizens of a few States, and this indefinitely, was ever supposed to show that it was unconstitutional. Something much more stringent, as a ground of legal judgment, was relied on  that the power to regulate commerce did not include the power to annihilate commerce.
But the decision was, that under the power to regulate commerce, the power of Congress over the subject was restricted only by those exceptions and limitations contained in the Constitution; and as neither the clause in question, which was a general grant of power to regulate commerce, nor any other clause of the Constitution, imposed any restrictions as to the duration of an embargo, an unlimited prohibition of the use of the shipping of the country was within the power of Congress. On this subject, Mr. Justice Daniel, speaking for the court in the case of United States v. Marigold, (9 How., 560,) says: "Congress are, by the Constitution, vested with the power to regulate commerce with foreign nations; and however, at periods of high excitement, an application of the terms `to regulate commerce, such as would embrace absolute prohibition, may have been questioned, yet, since the passage of the embargo and non-intercourse laws, and the repeated judicial sanctions these statutes have received, it can scarcely at this day be open to doubt, that every subject falling legitimately *623 within the sphere of commercial regulation may be partially or wholly excluded, when either measure shall be demanded by the safety or the important interests of the entire nation. The power once conceded, it may operate on any and every subject of commerce to which the legislative discretion may apply it."
If power to regulate commerce extends to an indefinite prohibition of the use of all vessels belonging to citizens of the several States, and may operate, without exception, upon every subject of commerce to which the legislative discretion may apply it, upon what grounds can I say that power to make all needful rules and regulations respecting the territory of the United States is subject to an exception of the allowance or prohibition of slavery therein?
While the regulation is one "respecting the territory," while it is, in the judgment of Congress, "a needful regulation," and is thus completely within the words of the grant, while no other clause of the Constitution can be shown, which requires the insertion of an exception respecting slavery, and while the practical construction for a period of upwards of fifty years forbids such an exception, it would, in my opinion, violate every sound rule of interpretation to force that exception into the Constitution upon the strength of abstract political reasoning, which we are bound to believe the people of the United States thought insufficient to induce them to limit the power of Congress, because what they have said contains no such limitation.
Before I proceed further to notice some other grounds of supposed objection to this power of Congress, I desire to say, that if it were not for my anxiety to insist upon what I deem a correct exposition of the Constitution, if I looked only to the purposes of the argument, the source of the power of Congress asserted in the opinion of the majority of the court would answer those purposes equally well. For they admit that Congress has power to organize and govern the Territories until they arrive at a suitable condition for admission to the Union; they admit, also, that the kind of Government which shall thus exist should be regulated by the condition and wants of each Territory, and that it is necessarily committed to the discretion of Congress to enact such laws for that purpose as that discretion may dictate; and no limit to that discretion has been shown, or even suggested, save those positive prohibitions to legislate, which are found in the Constitution.
I confess myself unable to perceive any difference whatever between my own opinion of the general extent of the power of Congress and the opinion of the majority of the court, save *624 that I consider it derivable from the express language of the Constitution, while they hold it to be silently implied from the power to acquire territory. Looking at the power of Congress over the Territories as of the extent just described, what positive prohibition exists in the Constitution, which restrained Congress from enacting a law in 1820 to prohibit slavery north of thirty-six degrees thirty minutes north latitude?
The only one suggested is that clause in the fifth article of the amendments of the Constitution which declares that no person shall be deprived of his life, liberty, or property, without due process of law. I will now proceed to examine the question, whether this clause is entitled to the effect thus attributed to it. It is necessary, first, to have a clear view of the nature and incidents of that particular species of property which is now in question.
Slavery, being contrary to natural right, is created only by municipal law. This is not only plain in itself, and agreed by all writers on the subject, but is inferable from the Constitution, and has been explicitly declared by this court. The Constitution refers to slaves as "persons held to service in one State, under the laws thereof." Nothing can more clearly describe a status created by municipal law. In Prigg v. Pennsylvania, (10 Pet., 611,) this court said: "The state of slavery is deemed to be a mere municipal regulation, founded on and limited to the range of territorial laws." In Rankin v. Lydia, (2 Marsh., 12, 470,) the Supreme Court of Appeals of Kentucky said: "Slavery is sanctioned by the laws of this State, and the right to hold them under our municipal regulations is unquestionable. But we view this as a right existing by positive law of a municipal character, without foundation in the law of nature or the unwritten common law." I am not acquainted with any case or writer questioning the correctness of this doctrine. (See also 1 Burge, Col. and For. Laws, 738  741, where the authorities are collected.)
The status of slavery is not necessarily always attended with the same powers on the part of the master. The master is subject to the supreme power of the State, whose will controls his action towards his slave, and this control must be defined and regulated by the municipal law. In one State, as at one period of the Roman law, it may put the life of the slave into the hand of the master; others, as those of the United States, which tolerate slavery, may treat the slave as a person, when the master takes his life; while in others, the law may recognise a right of the slave to be protected from cruel treatment. In other words, the status of slavery embraces every condition, from that in which the slave is known to the law simply as a *625 chattel, with no civil rights, to that in which he is recognised as a person for all purposes, save the compulsory power of directing and receiving the fruits of his labor. Which of these conditions shall attend the status of slavery, must depend on the municipal law which creates and upholds it.
And not only must the status of slavery be created and measured by municipal law, but the rights, powers, and obligations, which grow out of that status, must be defined, protected, and enforced, by such laws. The liability of the master for the torts and crimes of his slave, and of third persons for assaulting or injuring or harboring or kidnapping him, the forms and modes of emancipation and sale, their subjection to the debts of the master, succession by death of the master, suits for freedom, the capacity of the slave to be party to a suit, or to be a witness, with such police regulations as have existed in all civilized States where slavery has been tolerated, are among the subjects upon which municipal legislation becomes necessary when slavery is introduced.
Is it conceivable that the Constitution has conferred the right on every citizen to become a resident on the territory of the United States with his slaves, and there to hold them as such, but has neither made nor provided for any municipal regulations which are essential to the existence of slavery?
Is it not more rational to conclude that they who framed and adopted the Constitution were aware that persons held to service under the laws of a State are property only to the extent and under the conditions fixed by those laws; that they must cease to be available as property, when their owners voluntarily place them permanently within another jurisdiction, where no municipal laws on the subject of slavery exist; and that, being aware of these principles, and having said nothing to interfere with or displace them, or to compel Congress to legislate in any particular manner on the subject, and having empowered Congress to make all needful rules and regulations respecting the territory of the United States, it was their intention to leave to the discretion of Congress what regulations, if any, should be made concerning slavery therein? Moreover, if the right exists, what are its limits, and what are its conditions? If citizens of the United States have the right to take their slaves to a Territory, and hold them there as slaves, without regard to the laws of the Territory, I suppose this right is not to be restricted to the citizens of slaveholding States. A citizen of a State which does not tolerate slavery can hardly be denied the power of doing the same thing. And what law of slavery does either take with him to the Territory? If it be said to be those laws respecting *626 slavery which existed in the particular State from which each slave last came, what an anomaly is this? Where else can we find, under the law of any civilized country, the power to introduce and permanently continue diverse systems of foreign municipal law, for holding persons in slavery? I say, not merely to introduce, but permanently to continue, these anomalies. For the offspring of the female must be governed by the foreign municipal laws to which the mother was subject; and when any slave is sold or passes by succession on the death of the owner, there must pass with him, by a species of subrogation, and as a kind of unknown jus in re, the foreign municipal laws which constituted, regulated, and preserved, the status of the slave before his exportation. Whatever theoretical importance may be now supposed to belong to the maintenance of such a right, I feel a perfect conviction that it would, if ever tried, prove to be as impracticable in fact, as it is, in my judgment, monstrous in theory.
I consider the assumption which lies at the basis of this theory to be unsound; not in its just sense, and when properly understood, but in the sense which has been attached to it. That assumption is, that the territory ceded by France was acquired for the equal benefit of all the citizens of the United States. I agree to the position. But it was acquired for their benefit in their collective, not their individual, capacities. It was acquired for their benefit, as an organized political society, subsisting as "the people of the United States," under the Constitution of the United States; to be administered justly and impartially, and as nearly as possible for the equal benefit of every individual citizen, according to the best judgment and discretion of the Congress; to whose power, as the Legislature of the nation which acquired it, the people of the United States have committed its administration. Whatever individual claims may be founded on local circumstances, or sectional differences of condition, cannot, in my opinion, be recognised in this court, without arrogating to the judicial branch of the Government powers not committed to it; and which, with all the unaffected respect I feel for it, when acting in its proper sphere, I do not think it fitted to wield.
Nor, in my judgment, will the position, that a prohibition to bring slaves into a Territory deprives any one of his property without due process of law, bear examination.
It must be remembered that this restriction on the legislative power is not peculiar to the Constitution of the United States; it was borrowed from Magna Charta; was brought to America by our ancestors, as part of their inherited liberties, and has existed in all the States, usually in the very words of *627 the great charter. It existed in every political community in America in 1787, when the ordinance prohibiting slavery north and west of the Ohio was passed.
And if a prohibition of slavery in a Territory in 1820 violated this principle of Magna Charta, the ordinance of 1787 also violated it; and what power had, I do not say the Congress of the Confederation alone, but the Legislature of Virginia, or the Legislature of any or all the States of the Confederacy, to consent to such a violation? The people of the States had conferred no such power. I think I may at least say, if the Congress did then violate Magna Charta by the ordinance, no one discovered that violation. Besides, if the prohibition upon all persons, citizens as well as others, to bring slaves into a Territory, and a declaration that if brought they shall be free, deprives citizens of their property without due process of law, what shall we say of the legislation of many of the slaveholding States which have enacted the same prohibition? As early as October, 1778, a law was passed in Virginia, that thereafter no slave should be imported into that Commonwealth by sea or by land, and that every slave who should be imported should become free. A citizen of Virginia purchased in Maryland a slave who belonged to another citizen of Virginia, and removed with the slave to Virginia. The slave sued for her freedom, and recovered it; as may be seen in Wilson v. Isabel, (5 Call's R., 425.) See also Hunter v. Hulsher, (1 Leigh, 172;) and a similar law has been recognised as valid in Maryland, in Stewart v. Oaks, (5 Har. and John., 107.) I am not aware that such laws, though they exist in many States, were ever supposed to be in conflict with the principle of Magna Charta incorporated into the State Constitutions. It was certainly understood by the Convention which framed the Constitution, and has been so understood ever since, that, under the power to regulate commerce, Congress could prohibit the importation of slaves; and the exercise of the power was restrained till 1808. A citizen of the United States owns slaves in Cuba, and brings them to the United States, where they are set free by the legislation of Congress. Does this legislation deprive him of his property without due process of law? If so, what becomes of the laws prohibiting the slave trade? If not, how can a similar regulation respecting a Territory violate the fifth amendment of the Constitution?
Some reliance was placed by the defendant's counsel upon the fact that the prohibition of slavery in this territory was in the words, "that slavery, &c., shall be and is hereby forever prohibited." But the insertion of the word forever can have no legal effect. Every enactment not expressly limited in its *628 duration continues in force until repealed or abrogated by some competent power, and the use of the word "forever" can give to the law no more durable operation. The argument is, that Congress cannot so legislate as to bind the future States formed out of the territory, and that in this instance it has attempted to do so. Of the political reasons which may have induced the Congress to use these words, and which caused them to expect that subsequent Legislatures would conform their action to the then general opinion of the country that it ought to be permanent, this court can take no cognizance.
However fit such considerations are to control the action of Congress, and however reluctant a statesman may be to disturb what has been settled, every law made by Congress may be repealed, and, saving private rights, and public rights gained by States, its repeal is subject to the absolute will of the same power which enacted it. If Congress had enacted that the crime of murder, committed in this Indian Territory, north of thirty-six degrees thirty minutes, by or on any white man, should forever be punishable with death, it would seem to me an insufficient objection to an indictment, found while it was a Territory, that at some future day States might exist there, and so the law was invalid, because, by its terms, it was to continue in force forever. Such an objection rests upon a misapprehension of the province and power of courts respecting the constitutionality of laws enacted by the Legislature.
If the Constitution prescribe one rule, and the law another and different rule, it is the duty of courts to declare that the Constitution, and not the law, governs the case before them for judgment. If the law include no case save those for which the Constitution has furnished a different rule, or no case which the Legislature has the power to govern, then the law can have no operation. If it includes cases which the Legislature has power to govern, and concerning which the Constitution does not prescribe a different rule, the law governs those cases, though it may, in its terms, attempt to include others, on which it cannot operate. In other words, this court cannot declare void an act of Congress which constitutionally embraces some cases, though other cases, within its terms, are beyond the control of Congress, or beyond the reach of that particular law. If, therefore, Congress had power to make a law excluding slavery from this territory while under the exclusive power of the United States, the use of the word "forever" does not invalidate the law, so long as Congress has the exclusive legislative power in the territory.
*629 But it is further insisted that the treaty of 1803, between the United States and France, by which this territory was acquired, has so restrained the constitutional powers of Congress, that it cannot, by law, prohibit the introduction of slavery into that part of this territory north and west of Missouri, and north of thirty-six degrees thirty minutes north latitude.
By a treaty with a foreign nation, the United States may rightfully stipulate that the Congress will or will not exercise its legislative power in some particular manner, on some particular subject. Such promises, when made, should be voluntarily kept, with the most scrupulous good faith. But that a treaty with a foreign nation can deprive the Congress of any part of the legislative power conferred by the people, so that it no longer can legislate as it was empowered by the Constitution to do, I more than doubt.
The powers of the Government do and must remain unimpaired. The responsibility of the Government to a foreign nation, for the exercise of those powers, is quite another matter. That responsibility is to be met, and justified to the foreign nation, according to the requirements of the rules of public law; but never upon the assumption that the United States had parted with or restricted any power of acting according to its own free will, governed solely by its own appreciation of its duty.
The second section of the fourth article is, "This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land." This has made treaties part of our municipal law; but it has not assigned to them any particular degree of authority, nor declared that laws so enacted shall be irrepealable. No supremacy is assigned to treaties over acts of Congress. That they are not perpetual, and must be in some way repealable, all will agree.
If the President and the Senate alone possess the power to repeal or modify a law found in a treaty, inasmuch as they can change or abrogate one treaty only by making another inconsistent with the first, the Government of the United States could not act at all, to that effect, without the consent of some foreign Government. I do not consider, I am not aware it has ever been considered, that the Constitution has placed our country in this helpless condition. The action of Congress in repealing the treaties with France by the act of July 7th, 1798, (1 Stat. at Large, 578,) was in conformity with these views. In the case of Taylor et al. v. Morton, (2 Curtis's Cir. Ct. R., *630 454,) I had occasion to consider this subject, and I adhere to the views there expressed.
If, therefore, it were admitted that the treaty between the United States and France did contain an express stipulation that the United States would not exclude slavery from so much of the ceded territory as is now in question, this court could not declare that an act of Congress excluding it was void by force of the treaty. Whether or no a case existed sufficient to justify a refusal to execute such a stipulation, would not be a judicial, but a political and legislative question, wholly beyond the authority of this court to try and determine. It would belong to diplomacy and legislation, and not to the administration of existing laws. Such a stipulation in a treaty, to legislate or not to legislate in a particular way, has been repeatedly held in this court to address itself to the political or the legislative power, by whose action thereon this court is bound. (Foster v. Nicolson, 2 Peters, 314; Garcia v. Lee, 12 Peters, 519.)
But, in my judgment, this treaty contains no stipulation in any manner affecting the action of the United States respecting the territory in question. Before examining the language of the treaty, it is material to bear in mind that the part of the ceded territory lying north of thirty-six degrees thirty minutes, and west and north of the present State of Missouri, was then a wilderness, uninhabited save by savages, whose possessory title had not then been extinguished.
It is impossible for me to conceive on what ground France could have advanced a claim, or could have desired to advance a claim, to restrain the United States from making any rules and regulations respecting this territory, which the United States might think fit to make; and still less can I conceive of any reason which would have induced the United States to yield to such a claim. It was to be expected that France would desire to make the change of sovereignty and jurisdiction as little burdensome as possible to the then inhabitants of Louisiana, and might well exhibit even an anxious solicitude to protect their property and persons, and secure to them and their posterity their religious and political rights; and the United States, as a just Government, might readily accede to all proper stipulations respecting those who were about to have their allegiance transferred. But what interest France could have in uninhabited territory, which, in the language of the treaty, was to be transferred "forever, and in full sovereignty," to the United States, or how the United States could consent to allow a foreign nation to interfere in its purely internal affairs, in which that foreign nation had no concern *631 whatever, is difficult for me to conjecture. In my judgment, this treaty contains nothing of the kind.
The third article is supposed to have a bearing on the question. It is as follows: "The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages, and immunities, of citizens of the United States; and in the mean time they shall be maintained and protected in the enjoyment of their liberty, property, and the religion they profess."
There are two views of this article, each of which, I think, decisively shows that it was not intended to restrain the Congress from excluding slavery from that part of the ceded territory then uninhabited. The first is, that, manifestly, its sole object was to protect individual rights of the then inhabitants of the territory. They are to be "maintained and protected in the free enjoyment of their liberty, property, and the religion they profess." But this article does not secure to them the right to go upon the public domain ceded by the treaty, either with or without their slaves. The right or power of doing this did not exist before or at the time the treaty was made. The French and Spanish Governments while they held the country, as well as the United States when they acquired it, always exercised the undoubted right of excluding inhabitants from the Indian country, and of determining when and on what conditions it should be opened to settlers. And a stipulation, that the then inhabitants of Louisiana should be protected in their property, can have no reference to their use of that property, where they had no right, under the treaty, to go with it, save at the will of the United States. If one who was an inhabitant of Louisiana at the time of the treaty had afterwards taken property then owned by him, consisting of fire-arms, ammunition, and spirits, and had gone into the Indian country north of thirty-six degrees thirty minutes, to sell them to the Indians, all must agree the third article of the treaty would not have protected him from indictment under the act of Congress of March 30, 1802, (2 Stat. at Large, 139,) adopted and extended to this territory by the act of March 26, 1804, (2 Stat. at Large, 283.)
Besides, whatever rights were secured were individual rights. If Congress should pass any law which violated such rights of any individual, and those rights were of such a character as not to be within the lawful control of Congress under the Constitution, that individual could complain, and the act of Congress, as to such rights of his, would be inoperative; but it *632 would be valid and operative as to all other persons, whose individual rights did not come under the protection of the treaty. And inasmuch as it does not appear that any inhabitant of Louisiana, whose rights were secured by treaty, had been injured, it would be wholly inadmissible for this court to assume, first, that one or more such cases may have existed; and, second, that if any did exist, the entire law was void  not only as to those cases, if any, in which it could not rightfully operate, but as to all others, wholly unconnected with the treaty, in which such law could rightfully operate.
But it is quite unnecessary, in my opinion, to pursue this inquiry further, because it clearly appears from the language of the article, and it has been decided by this court, that the stipulation was temporary, and ceased to have any effect when the then inhabitants of the Territory of Louisiana, in whose behalf the stipulation was made, were incorporated into the Union.
In the cases of New Orleans v. De Armas et al., (9 Peters, 223,) the question was, whether a title to property, which existed at the date of the treaty, continued to be protected by the treaty after the State of Louisiana was admitted to the Union. The third article of the treaty was relied on. Mr. Chief Justice Marshall said: "This article obviously contemplates two objects. One, that Louisiana shall be admitted into the Union as soon as possible, on an equal footing with the other States; and the other, that, till such admission, the inhabitants of the ceded territory shall be protected in the free enjoyment of their liberty, property, and religion. Had any one of these rights been violated while these stipulations continued in force, the individual supposing himself to be injured might have brought his case into this court, under the twenty-fifth section of the judicial act. But this stipulation ceased to operate when Louisiana became a member of the Union, and its inhabitants were "admitted to the enjoyment of all the rights, advantages, and immunities, of citizens of the United States."
The cases of Chouteau v. Marguerita, (12 Peters, 507,) and Permoli v. New Orleans, (3 How., 589,) are in conformity with this view of the treaty.
To convert this temporary stipulation of the treaty, in behalf of French subjects who then inhabited a small portion of Louisiana, into a permanent restriction upon the power of Congress to regulate territory then uninhabited, and to assert that it not only restrains Congress from affecting the rights of property of the then inhabitants, but enabled them and all other citizens of the United States to go into any part of the *633 ceded territory with their slaves, and hold them there, is a construction of this treaty so opposed to its natural meaning, and so far beyond its subject-matter and the evident design of the parties, that I cannot assent to it. In my opinion, this treaty has no bearing on the present question.
For these reasons, I am of opinion that so much of the several acts of Congress as prohibited slavery and involuntary servitude within that part of the Territory of Wisconsin lying north of thirty-six degree thirty minutes north latitude, and west of the river Mississippi, were constitutional and valid laws.
I have expressed my opinion, and the reasons therefor, at far greater length than I could have wished, upon the different questions on which I have found it necessary to pass, to arrive at a judgment on the case at bar. These questions are numerous, and the grave importance of some of them required me to exhibit fully the grounds of my opinion. I have touched no question which, in the view I have taken, it was not absolutely necessary for me to pass upon, to ascertain whether the judgment of the Circuit Court should stand or be reversed. I have avoided no question on which the validity of that judgment depends. To have done either more or less, would have been inconsistent with my views of my duty.
In my opinion, the judgment of the Circuit Court should be reversed, and the cause remanded for a new trial.
NOTES
[*] Vide Gibbons's Decline and Fall of the Roman Empire. London edition of 1825, vol. 3d, chap. 44, p. 183.
[*] Letter from James Madison to Robert Walsh, November 27th, 1819, on the subject of the Missouri Compromise.
[*] Mr. Varnum said: "The bill provided such a Government as had never been known in the United States." Mr. Eustis: "The Government laid down in this bill is certainly a new thing in the United States." Mr. Lucas: "It has been remarked, that this bill establishes elementary principles never previously introduced in the Government of any Territory of the United States. Granting the truth of this observation," &c., &c. Mr. Macon: "My first objection to the principle contained in this section is, that it establishes a species of government unknown to the United States." Mr. Boyle: "Were the President an angel instead of a man, I would not clothe him with this power." Mr. G.W. Campbell: "On examining the section, it will appear that it really establishes a complete despotism." Mr. Sloan: "Can anything be more repugnant to the principles of just government? Can anything be more despotic?"  Annals of Congress, 1803-'4.
[*] Mr. Jefferson wrote: "The Missouri question is the most portentous one that ever threatened our Union. In the gloomiest moments of the revolutionary war, I never had any apprehension equal to that I feel from this source."
[*] Note by Mr. Justice Curtis. This statement that some territory did actually pass by this cession, is taken from the opinion of the court, delivered by Mr. Justice Wayne, in the case of Howard v. Ingersoll, reported in 13 How., 405. It is an obscure matter, and, on some examination of it, I have been led to doubt whether any territory actually passed by this cession. But as the fact is not important to the argument, I have not thought it necessary further to investigate it.
[*] It was published in a newspaper at Philadelphia, in May, and a copy of it was sent by R.H. Lee to Gen. Washington, on the 15th of July. (See p. 261, Cor. of Am. Rev., vol. 4, and Writings of Washington, vol. 9, p. 174.)